David A. Riggi, Esq.
Bar No. 4727
7900 West Sahara Avenue, Suite 100
Las Vegas, Nevada 89117
Telephone:  (702) 463-7777
Facsimile:   (888) 306-7157
riggilaw@gmail.com
***Attorney for the Debtor in Possession***

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No. 25-10341-NMC |
| | ) |
| NUMALE CORPORATION, | ) Chapter 11 |
| | ) |
| Debtor in Possession | ) DATE: March 27, 2025 |
| | ) TIME:  9:30 a.m. |
| _____ | ) |

## OPPOSITION TO THE UNITED STATES TRUSTEE'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE UNDER 11 U.S.C. § 1104(a), OR, IN THE ALTERNATIVE, TO CONVERT OR DISMISS THIS CASE PURSUANT 11 U.S.C. § 1112(b), AND RESERVATION OF RIGHTS

The Debtor in Possession ("Debtor"), by and through its counsel, David A. Riggi, Esq., hereby opposes the "*United States Trustee's Motion to Appoint a Chapter 11 Trustee under 11 U.S.C. § 1104(a), or, in the Alternative, to Convert or Dismiss this Case Pursuant 11 U.S.C. § 1112(b), and Reservation Of Rights*" ("*Motion*") filed by the U.S. Trustee ("Trustee" or "US Trustee"). In support of this opposition, the Debtor relies on the following memorandum of points and authorities, as well as the documents on

1

file with the court, any declarations on file or to be filed and any oral testimony allowed as part of the hearing, any supplemental filings, and any arguments made at the hearing on the Motion.

DATED this 25th day of March, 2025.

/s/ David A. Riggi
David A. Riggi, Esq.
Bar No. 4727
7900 West Sahara Ave., Suite 100
Las Vegas, Nevada 89117
Telephone: (702) 463-7777
**Attorney for the Debtor in Possession**

## MEMORANDUM OF
## POINTS AND AUTHORITIES

## Introduction – this Pleading is Applicable to All Affiliated Cases

1.      NuMale affiliated companies (to be explained, further, below) have been an extraordinarily successful and profitable enterprise for over a decade, employing dozens of dedicated employees throughout the country This Chapter 11 proceeding is one of seven affiliated cases that have been commenced before this Court by separate filings on January 22, 2025.  As such, the cases have been pending for no more than slightly over 60 days.  Although of the Debtors have considered substantive consolidation of all seven cases, it is been decided that the grounds for substantive consolidation would not be strong. Joint administration, on the other hand, would be appropriate and there is a

pending motion before this court for such treatment of the cases. For purposes of this opposition, however, it is offered that filing substantially similar oppositions in all cases would aid and benefit the court and parties in interest toward understanding the status of these cases. Accordingly, this pleading will include exposition and arguments relating to all seven reorganizations.

### Appropriates Groupings of the Cases and Organization of NuMale Entities

2.     These seven cases can best be understood by grouping them into three types:

(a) NuMale Corporation and NuMale New Mexico SC - these two cases in which Michael Sanchez is a creditor, one of these (NuMale Corporation) also has creditor NewTek Financing as the seeming priming entity in terms of any cash collateral issues. Collectively, these can be referred to as the "Sanchez Cases";

(b) NuMale Colorado SC and NuMale Florida TB PLLC - these two cases in which the Debtors have ceased accepting new clients, have vacated its business premises, but are continuing to serve obligations toward present patients as these two cases, hopefully and eventually, soon wind down toward an orderly closing of operations, probably facilitated through a chapter 11 plans of liquidation. Collectively, these can be referenced as the "Liquidating Cases"; and

(c) Feliciano NuMale Nevada PLLC, NuMedical SC and NuMale Nebraska LLC - these three cases in which the Debtors are positioned toward soon drafting plans of reorganization which will focus primarily on the treatment of merchant cash advance

(MCA) creditors; although, as with NuMale Corporation, in NuMedical SC the creditor NewTek Financing seems to be the superior-timed party for cash collateral issues. Collectively, these are the "Regular Cases."

3.       It may also be helpful to understand the presence and purpose of other affiliated entities that are not in Chapter 11 proceedings.  Other than NuMale Corporation, which is the overall administrative entity for all NuMale companies, the other six chapter 11 reorganization are clinical operations at various sites around the country (Feliciano NuMale Nevada in Las Vegas; new medical in Milwaukee Wisconsin; Colorado in Denver, Colorado (although these premises have been vacated); Florida in Tampa Florida (these premises have also been vacated); Nebraska in Omaha, Nebraska; and New Mexico in Albuquerque New Mexico. For each of these six clinical locations, there has been a corresponding separate management company (generally, the way to distinguish a clinic entity from a management entity is that the clinic entity is named after the appropriate state, while the management company is named after the appropriate city – *e.g.*, the clinic NuMale New Mexico SC has as its management company, NuMale Albuquerque LLC). In summary, not only is there the overall management company of NuMale Corporation, but five of the clinics in bankruptcy has its own management company (the Las Vegas clinic of Feliciano NuMale Nevada is the exception, having the overall manager – Las Vegas based NuMale Corporation – as manager.  In addition to the set of entities in these six locations, there are NuMale operations, with corresponding

4

clinic and management companies, in: Green Bay, Wisconsin; Chicago, Illinois; and Charlotte, North Carolina (although this Charlotte location, like Denver and Tampa is closing).  An organizational table of the is attached as **Exhibit "A."**

### The Sanchez Cases – Involve Substantial and Powerful Interests that are Counter to the Interests of Creditors and a Fair Reorganization

4.      NuMale clinics have successfully treated thousands of patients in pursuit of a more robust lifestyle.  However, a patient in the Albuquerque New Mexico, clinic – Michael E. Sanchez ("Sanchez") – initiated a lawsuit against multiple NuMale related entities. That lawsuit has resulted in a jury verdict statement but, at this time, no judgment has been entered. Attached hereto as **Exhibit "B"** is the declaration of attorney Ricardo Echiverria, which sets forth a more detailed exposition of the legal status of the case, and particularly the actions of Beazley and/or Certain Underwriters at Lloyd's London (collectively "Beazley") in New Mexico.

5.      Of note, it is not so much the <u>actions</u> of Beazley that might be of immediate concern to this court but, rather, the <u>inaction</u> of Beazley –the meaning of the term "inaction," within the context of the Sanchez Cases, should include the fostering by Beazley of systemic inaction in the Sanchez Cases. Specifically, the NuMale affiliated entities completely endorse and approve the expedited initiatives by Sanchez to have a judgment entered in the New Mexico court. NuMale simply wants the process to move along so that a clear determination of the rights and obligations of all parties can be made. In contrast, Beazley is obstructing and delaying the entry of that judgment with any and

all arguments it can conjure and with the might of all of its substantial resources.   The reason for the Beazley tactics of delay is obvious – as any potential defendant in a civil action plans, create as many obstructions as possible to avoid or delay and, thereby, hold onto for as long as possible, the monies that might have to eventually be paid. In this specific instance, those monies could conceivably be distributed to creditors in the Sanchez cases.

6.      Another aspect of the Sanchez cases that distinguishes it from the others is that, possibly, a judgment may be entered against NuMale Corporation and NuMale New Mexico that would render the claim of Sanchez to be nondischargeable. If this were to occur than, effectively, there might be no desirable reorganization (although, arguably, feasible plans could still be proffered, but they would be burdened with the specter of a nondischargeable claimant potentially affecting operations).

7.      Clearly, the largest and first-in-time primary secured creditor in the NuMale Corporation Sanchez Case is NewTek Small Business Finance ("NewTek"), with a secured loan of about five million dollars that originated in 2023. NewTek is also the first-in-time primary secured creditor in the NuMedical affiliated bankruptcy case; and, arguably, may have similar positions in the others. In contrast, the several MCA creditors, with potential claims distributed among the seven affiliated bankruptcies, total collectively no more than two million dollars and were none were originated until the second half of 2024. A more thorough exposition of the MCA creditors is below. An

essential point regarding NewTek and the Sanchez Cases, as well as all affiliated bankruptcies is that NewTek, through its counsel, has consented to continued use of cash collateral.

8.    Despite settlement discussions with a particular MCA creditor, LCF Funding (discussions being with Senior Recovery Porfolio Manager Michael Silva, who also, specifically consented to cash collateral use), that creditor filed a proof of claim in the NuMale New Mexico case.  An objection to that claim will be filed. Of import to this claim, as well as all other MCA claim is that they are almost universally have the law of New York as the governing law. Importantly, unlike Nevada, New York has usury laws which have been held to be applicable MCAs. Attached for the Court's convenience as **Exhibit "C"** is an unpublished, yet very instructive, recent Ninth Circuit Bankruptcy Appellate Panel decision regarding MCAs.

### The Liquidating Cases – are Not Taking New Patients but Must Continue to Operate

9.    The reorganizations of the Liquidating Cases of NuMale Colorado and Numale Florida are, perhaps, the simplest.  The two major creditors in each case, other than potentially Newtek, are MCAs Fox Funding and DLP.  Settlements have been agreed upon with both Fox Funding (through its attorney Shanna Kaminski) and DLP (through its attorney Jacob Weinstein) in both cases. Rule 9011 motions and the final settlement documents are being drafted.

10.    NuMale Colorado vacated the Denver premises this month, allowing the landlord to issue appropriate notices for any third party, such as NewTek, property that it may be holding as security. Undersigned counsel contacted NewTek regarding this and is determining whether retrieval of the personal property collateral is worth the effort and expense of retrieving.

11.    The importance of ongoing operations in the Liquidating Cases must be emphasized. There are existing obligations to patients which, if not fulfilled, would result in potential monetary damages against NuMale Colorado and NuMale Florida. Further, if the existing patients of these entities for not provided the appropriate services, then there is always the potential of complaints against these entities with the appropriate state licensing Board which, as a consequence, could result in affecting the license of Dr. Feliciano and, thereby, affecting his licensing privileges in other locations as well.

## The Regular Cases – They are in a Posture to have Settlements Proposed and Soon have Plans Files

12.    The reorganizations of the Regular Cases of Feliciano NuMale Nevada (Las Vegas location), NuMedical (Milwaukee location) and NuMale Nebraska (Omaha location) have somewhat byzantine potential MCA claims. In other words, any particular MCA claim may have secured obligations from multiple NuMale entities.

13.    Fortunately, over the two months of these NuMale affiliated bankruptcy cases, the groundwork has been laid and, finally and recently, the appropriate debtors

have reached agreements with Fox Funding, Vox and DLP. As with Fox Funding and DLP in the Regular Cases, Rule 9011 motions and the final settlement documents are being drafted. Shortly after approval of settlements, these Regular Cases may be ripe for the filing of disclosure statements and plans with a focus on the allocation of settlement payments.

**The Implications by the US Trustee that the Debtors are Delaying the Reorganizations are Without any Basis – the Debtors have Great Incentives to Move the Case Forward and the Debtors gave Already Made Substantial Progress**

14.     As set forth in the accompanying declaration of Brian Palubicki, attached hereto as **Exhibit "D,"** the NuMale affiliated companies have many incentives to expedite the progress of the reorganizations. These incentives include, but are not limited to: (1) seeking the release of about $75,000 of monies of the NuMale clinics being held by a third party as the result of three MCAs presenting ostensibly appropriate notices to the third party; (2) wanting to re-commence the payment of wages to insiders; and (3) emerging from what could be the marketplace stigma of being a company "in" bankruptcy.

15.     The Debtors have prepared and filed lengthy and detailed monthly operating reports, have prepared and filed a very long Form 426 for Numale Corporation,  and have prepared financial statements and prepared and submitted large number of documents to the US Trustee. Debtors have expended significant time and effort to meet their

administrative tasks. The first monthly operating report was for only a nine day period at the end of January and, admittedly, there was some confusion as to whether that nine day time period could be reported with the month of February. In any event, January and February have both been filed and the Debtors are now current.

16.    Amendments to the schedules and statements have been. or soon will be, accomplished.  Unfortunately, there was a time period of several days during which ECF was not allowing counsel to submit documents. Since then, and through abundance of caution, Debtors are re-reviewing toward the goal of accuracy and completeness. Other document requirements, administrative or otherwise, will continue to be updated as necessary, as is the common practice in bankruptcy reorganizations.  Concerning the inclusion of Sanchez in documents, it should be noted that both Sanchez and the US Trustee were aware of the reorganizations at, or soon after, the case commencements.

17.    Finally, the exposition of the progress of the cases, as set forth in this document, is evidence, or at least an offer of evidence, of the efforts and encouraging progress that the Debtors have made.  Should the Court want strict evidence of the

//   //   //   //

//   //   //   //

//   //   //   //

assertions made in this document or in the accompanying declarations, then, the Debtors

request an evidentiary hearing.

WHEREFORE, the Debtor respectfully requests that this Court:
        (i)     deny the Motion and/or;
        (ii)    allow a patient care ombudsman to review the operations and report to the Court regarding the need for a trustee; and/or
        (iii)   schedule an evidentiary hearing and/or
        (iv)   grant such other relief the Court deems just and proper.

DATED this 25th day of March, 2025.

*/s/ David A. Riggi*
David A. Riggi, Esq.
***Attorney for the Debtor in Possession***

# EXHIBIT "A"

| Entity Name | Clinic Services or Management Company Entity | Date Opened/Closed | Owners Name | Ownership % | Personal Resident State | Entity Register State | |
|---|---|---|---|---|---|---|---|
| NuMale Corporation | Management Company | | Dr. Carlos Feliciano<br>Brad Palubicki<br>Justin Pulliam | 36.37%<br>36.37%<br>27.27% | NV<br>NV<br>NV | NV | LAS VEGAS LOCATION |
| Nevada NuMale, LLC | Management Company for Las Vegas | Apr-14 | NuMale Corporation | 100.00% | | NV | |
| Feliciano NuMale Nevada, PLLC f/n/a Alsandra NuMale Nevada, PLLC | Clinic Services | Apr-14 | Dr. Carlos Feliciano | 100.00% | | NV | |
| NuMale Medical Center, LLC | Management Company for NuMale Milwaukee | Mar-13 | Dr. Carlos Feliciano<br>Brad Palubicki | 50.00%<br>50.00% | WI<br>NV | WI | MILWAUKEE LOCATION |
| NuFemme Milwaukee, LLC | Management Company for NuFemme Milwaukee | Aug-15 | NuMale Corporation<br>NuMale Medical Center, LLC | 90.00%<br>10.00% | <br>WI | NV<br>WI | |
| NuMedical, S.C. | Clinic Services for NuFemme Rejuvenation Clinic and NuMale Medical Center, LLC | May-13 | Dr. Carlos Feliciano | 100.00% | WI | WI | |
| NuMale Green Bay, LLC | Management Company for Green Bay | Oct-14 | NuMale Corporation<br>Dr. Adam Aicher | 25.00%<br>75.00% | <br>WI | WI | GREEN BAY LOCATION |
| NuMale Wisconsin GB, SC | Clinic Services | Oct-14 | Dr. Adam Aicher<br>Dr. Carlos Feliciano | 75.00%<br>25.00% | WI<br>NV | WI | |
| Numale Nebraska, LLC Entity has two d/b/a's NuMale Medical Center NuFemme Rejuvenation Clinic | Clinic Services Nebraska | Jul-14 | Dr. Carlos Feliciano | 100.00% | | WI | OMAHA LOCATION |
| NuMale Omaha, LLC | Management Company for Omaha NuMale and NuFemme | Jul-14 | NuMale Corporation<br>Revive for Life Men's Wellness Center, LLC Owned by Charles V Sederstrom, III | 51.00%<br>49.00% | | WI<br>NE | |
| NuMale New Mexico, SC | Clinic Services for Albuquerque | Aug-14 | Dr. Carlos Feliciano | 100.00% | | WI | ALBUQUERQUE LOCATION |
| NuMale Albuquerque, LLC | Management Company for Albuquerque | Aug-14 | NuMale Corporation<br>Brad, Justin, Carlos | 99.00%<br>1.00% | | NV | |
| NuMale Chicago, LLC | Clinic Services for Chicago | Mar-14 | Dr. Carlos Feliciano<br>Brad Palubicki | 99.99%<br>0.10% | WI<br>NV | IL | CHICAGO LOCATION |

| Entity | Description | Date | Owner | Percentage | State | State | Location |
|---|---|---|---|---|---|---|---|
| NMC Illinois, LLC | Management Company for Chicago | | NuMale Corporation | 99.00% | NV | WI | |
| | | | Dr. Carlos Feliciano | 0.53% | WI | | |
| | | | Brad Palubicki | 0.27% | NV | | |
| | | | Justin Pulliam | 0.20% | NV | | |
| NuMale Tampa, LLC | Management Company for Tampa | Feb-15 | NuMale Corporation | 51.00% | | NV | TAMPA LOCATION |
| | | | JayMale Investments, LLC | 49.00% | | FL | |
| NuMale Florida TB, PLLC | Clinic Services for Tampa Location | Feb-15 | Carlos Feliciano MD | 100.00% | NV | FL | |
| NuMale Charlotte, LLC | Management Company - for Charlotte | Feb-15 | NuMale Corporation | 51.00% | NV | NV | CHARLOTTE LOCATION |
| | | | CNS Advisors LLC | 49.00% | NY | NY | |
| | | | CNS is owned by | | | | |
| | | | Dr. Sunil Verma | | | NY | |
| | | | Ms. Chau Banks | | | NY | |
| NuMale North Carolina, PLLC | Clinic Services for Charlotte Location | Feb-15 | Dr. Carlos Feliciano | 100.00% | WI | NC | |
| NuMale Colorado, SC | Clinic Services for Denver Location | Nov-14 | Dr. Carlos Feliciano | 100.00% | WI | CO | |
| NuMale Denver, LLC | Management Company for Denver | Nov-14 | NuMale Corporation | 76.00% | NV | NV | DENVER LOCATION |
| | | | American IRA, LLC FBO John Cortez IRA | 10.35% | CA | | |
| | | | Nuvestment LLC | 13.65% | CA | | |
| | | | Nuvestmnet LLC members | | | | |
| | | | Dave Ngo | | oh | | |
| | | | John Cortez | | CA | | |
| | | | Tony Ngo | | ny | | |
| | | | Hai Ngo | | oh | | |

# EXHIBIT "B"

David A. Riggi, Esq. NV Bar. No. 4727
7900 W. Sahara Avenue Suite 100
Las Vegas, NV 89117
Ph:   1-702-463-7777
Fax:  1-888-306-7157
E-mail:RiggiLaw@gmail.com
*Attorney for Debtor in Possession*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

NUMALE CORPORATION,
    Debtor in Possession

Case No.:  25-10341-NMC

Chapter 11

Hearing Date:  March 27, 2025

Hearing Time: 9:30 a.m.

## DECLARATION OF RICARDO ECHEVERRIA IN SUPPORT OF THE OPPOSITION TO THE UNITED STATES TRUSTEE'S, MOTION TO APPOINT A CHAPTER 11 TRUSTEE UNDER 11 U.S.C. § 1104(a), OR, IN THE ALTERNATIVE, TO CONVERT OR DISMISS THIS CASE PURSUANT 11 U.S.C. § 1112(b), AND RESERVATION OF RIGHTS

I, Ricardo Echeverria, declare as follows:

1. I am a partner in the law firm Shernoff Bidart Echeverria LLP, duly licensed to practice before all the courts in the State of California. I have personal knowledge of the facts set forth in this declaration and, if called upon as a witness, I could and would competently testify to each of them.

2. I have been retained by: a) NuMale Corporation (subject to bankruptcy court approval), b) NuMale Albuquerque, LLC,  c) NuMale New Mexico, SC dba NuMale Medical Center (subject to bankruptcy court approval) d) Carlos Feliciano, M.D., and e) Brad Palubicki,  (collectively "Clients") to represent them with respect to their rights against their insurance company, Beazley plc and/or Certain

1

Underwriters at Lloyd's, London, including Syndicates 2623/623 (collectively "Beazley").

3. The Clients were defendants, along with others, in a case brought in the State of New Mexico, County of Bernalillo, Second Judicial District Court filed by Michael E. Sanchez, Case No. D-202-CV-2020-06636 for care and treatment of Mr. Sanchez (the "Underlying Action"). During the relevant time of the allegations in the Underlying Action, my Clients were insured by Beazley under two liability insurance policies, a primary policy with limits of $1 Million and an excess policy with limits of $5 Million. While Beazley had several opportunities to settle the Underlying Action within the available policy limits, the matter did not settle and instead proceeded to trial, wherein a jury verdict in the amount of $412,005,149 was rendered in favor of Mr. Sanchez against the defendants in that action, including my Clients. Post-trial motions, which have not yet occurred in the Underlying Action, will determine the amount of the final judgment.

4. Although none of my Clients have been formally served, on March 14, 2025, Beazley filed a Civil Complaint for Declaratory Judgment in the State of New Mexico, County of Curry, Ninth Judicial District against three of my clients, as well as some other individuals whom I do not represent, Case No. D-905-2025-00157 ("Declaratory Relief Action"). Specifically, Beazley sued the following three defendants who are my Clients: a) NuMale Albuquerque LLC (improperly listed by Beazley as d/b/a NuMale Medical Center), b) Carlos Feliciano, M.D. and c) Brad Palubicki. Beazley also sued Christopher Assandra, M.D., and Justin Pulliam, neither of whom my firm represents.

5. In the Declaratory Relief Action, Beazley has alleged that there is no coverage afforded to the defendants in that action under the Beazley policies for the verdict in the Underlying Action. Beazley is also now seeking to rescind the policies

it issued.

6. My firm and I have also retained New Mexico insurance bad faith counsel, Davis Kelin Law Firm, LLC with whom we will be working to file a response to the Declaratory Relief Action.

7. In addition to responding to the Declaratory Relief Action, my firm and co-counsel anticipate filing affirmative claims against Beazley for breaches of common law duties, contractual obligations, and violations of statutes related to Beazley's insurance policy. With these affirmative claims, we will be seeking damages for our Clients which will include indemnity for the entirety of the eventual judgment in the Underlying Action against them, consequential economic damages they sustained as a result of Beazley's conduct, emotional distress, punitive damages, and any other available remedies.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on March 25 , 2025, in Claremont, California.

.

Ricardo Echeverria

EXHIBIT "C"

2024 WL 4328581

Only the Westlaw citation is currently available.

**NOT FOR PUBLICATION**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

# IN RE: ENPARK LANDSCAPE, LLC, Debtor.

# Enpark Landscape, LLC, Appellant,

# v.

# AKF, Inc. dba FundKite, Appellee.

BAP No. NV-23-1182-PLCBk. No. 23-11145-abl

Filed September 27, 2024

Appeal from the United States Bankruptcy Court for the District of Nevada, August B. Landis, Chief Bankruptcy Judge, Presiding

## Attorneys and Law Firms

Carlos R. Hernandez-Vivoni, United States Department of Justice, United States Trustee, Region 17, Las Vegas, NV, for U.S. Trustee.

Matthew C. Zirzow, Larson and Zirzow, LLC, Las Vegas, NV, for Debtor.

Before: PEARSON1, LAFFERTY, and CORBIT, Bankruptcy Judges.

MEMORANDUM*

INTRODUCTION

*1 Debtor Enpark Landscape, LLC ("Enpark") appeals the bankruptcy court's order allowing the secured claim filed by creditor AKF, Inc., dba FundKite.

FundKite timely filed a proof of claim in Enpark's chapter 112 bankruptcy case and supported its claim with two documents: (i) a Revenue Purchase Agreement executed by FundKite as the purported purchaser of some of Enpark's accounts; and (ii) a Settlement Agreement entered into by the parties shortly before Enpark's bankruptcy filing that purported to resolve disputes between them arising from Enpark's default under the Revenue Purchase Agreement.

Enpark objected to FundKite's claim, focusing primarily on whether the Revenue Purchase Agreement was enforceable. Specifically, Enpark argued that, rather than an agreement to purchase some of Enpark's accounts receivable, the Revenue Purchase Agreement was, under applicable non-bankruptcy law, actually a disguised loan, and a criminally usurious one at that. In making this argument, Enpark highlighted the plethora of cases in New York and elsewhere that have concluded that agreements like the Revenue Purchase Agreement are, in fact, loans, and subject to attack under the state's usury laws.

The bankruptcy court overruled the objection based upon the longstanding and generally applicable doctrine that courts should honor settlement agreements, and accord them finality. Although the court indicated that its cursory examination of the Revenue Purchase Agreement gave it concerns about the enforceability of the agreement, the court ultimately decided that it was required to focus solely on the Settlement Agreement and honor the parties' putative intent to resolve their disputes per that agreement.

In so ruling, the bankruptcy court made two critical determinations that the Panel believes were erroneous. First, although the FundKite claim as filed was supported by the Revenue Purchase Agreement as well as the Settlement Agreement, the bankruptcy court at least nominally chose to rely solely on the Settlement Agreement and determined that the Settlement Agreement provided sufficient factual support for the filed claim. We believe that this determination was in error. In this instance, the Settlement Agreement simply did not provide enough information about FundKite's right to payment to permit the bankruptcy court to allow FundKite's secured claim relying on the Settlement Agreement alone. Second, if an objection is made to a claim, the Bankruptcy Code requires the court to determine whether the claim is "unenforceable … against the debtor … under any … applicable law." § 502(b)(1). In relying solely on the Settlement Agreement, the bankruptcy court declined to address issues raised by Enpark regarding the enforceability of FundKite's claim. Although Enpark's objection did not cite relevant applicable **non-bankruptcy law** – New York law – regarding the enforceability of the **Settlement Agreement**, in light of our decision to remand this matter to the bankruptcy court based on the court's erroneous determination that the Settlement Agreement itself provided sufficient support for the claim, we

believe that the court must also consider and address arguments regarding the enforceability of FundKite's claim.

*2 Therefore, we VACATE the bankruptcy court's ruling and REMAND this matter for further proceedings consistent with this decision.

FACTS<u>3</u>

In December 2022, Enpark entered into a Revenue Purchase Agreement with FundKite, in which FundKite purchased $344,448 of Enpark's future receipts for $249,600. To satisfy its obligation to FundKite, Enpark was required to pay 13% of its receipts to FundKite each week until it had paid FundKite the $344,448 plus any outstanding fees. FundKite also took a security interest in Enpark's accounts to secure Enpark's obligations.

Enpark concedes that it defaulted on the Revenue Purchase Agreement. FundKite then sought enforcement in arbitration and also sought the aid of a New York state court to restrain Enpark's use of its receivables pending arbitration.

Before the hearing on the order to show cause in the state court action, Enpark and FundKite entered into the Settlement Agreement, with an effective date of March 6, 2023. A stipulation of settlement was filed with, but not approved by, the New York state court. The Settlement Agreement required Enpark to make certain payments to FundKite, in an amount and on a schedule modified from the Revenue Purchase Agreement.

After complying with the initial obligations of the Settlement Agreement, Enpark soon thereafter defaulted. Enpark filed its chapter 11 bankruptcy case on March 27, 2023.

FundKite filed a proof of secured claim. FundKite's proof of claim was properly executed, and included Official Form 410, a copy of a UCC-1 financing statement that listed Enpark as debtor, a copy of the Settlement Agreement, and a copy of the Revenue Purchase Agreement. Enpark objected to the proof of claim.

The bankruptcy court, relying upon the written records in the case, and considering the arguments of counsel, orally ruled to allow FundKite's claim. The bankruptcy court held that FundKite's proof of claim complied with the requirements of the Bankruptcy Code and Rules, and that the claim was prima facie valid. The bankruptcy court also acknowledged that if the underlying Revenue Purchase Agreement were the basis of the claim, Enpark's objection contained "probative force equal to that of the allegations of the proof of claim."

However, the bankruptcy court held that the proof of claim was based on the Settlement Agreement. The bankruptcy court opined that settlement agreements are favored by the law and concluded that it would not look behind the terms of the Settlement Agreement. The bankruptcy court, in its oral ruling, said that "[t]he Court is looking at the settlement agreement as the basis for the proof of claim and whether or not the settlement agreement can provide support under New York law for the proof of claim itself, and I find that it can." In so concluding, the bankruptcy court necessarily found that the Settlement Agreement contained sufficient information and support to demonstrate that FundKite had an allowable secured claim before considering whether, for other reasons, the claim would be enforceable under applicable law.

\*3 Enpark asserts that the bankruptcy judge made an alternative ruling that the underlying Revenue Purchase Agreement was enforceable, and criticizes the bankruptcy court for failing to provide any analysis. FundKite insists that the bankruptcy court made no such alternative ruling and relied solely on the Settlement Agreement. While not entirely clear, the bankruptcy court stated that it was relying on the Settlement Agreement alone in reaching its decision, and the court did not appear to refer to any provisions of the Revenue Purchase Agreement in overruling the objection. Accordingly, the bankruptcy court did not appear to decide whether the underlying Revenue Purchase Agreement was actually a loan, and if it were a loan, if it were criminally usurious, and if so, what impact that would have on the enforceability of the Settlement Agreement.

On November 1, 2023, the bankruptcy court entered its written Order Overruling Objection to Claim. Later that day, Enpark appealed.

## JURISDICTION

The bankruptcy court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and Rule 1001(b)(1) of the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court, District of Nevada.4 This matter is a core proceeding under 🚩 28 U.S.C. § 157(b)(2)(B). We have jurisdiction over the bankruptcy court's determination under 28 U.S.C. § 158(a)(1).

## ISSUES

Did the bankruptcy court err in relying exclusively on the Settlement Agreement to overrule Enpark's objection to FundKite's claim, including determining the Settlement Agreement alone adequately supported FundKite's proof of claim?

Did the bankruptcy court err in failing to analyze the enforceability of FundKite's claim under applicable nonbankruptcy law?

STANDARD OF REVIEW

In the context of a claim objection, we review the bankruptcy court's legal conclusions de novo and its findings of fact for clear error. *Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). The bankruptcy court's ruling purely on the sufficiency of the proof of claim, including its finding that the Settlement Agreement contained sufficient information to support the proof of claim, is reviewed for clear error.

The bankruptcy court's legal conclusions – such as its holding that it could not consider any documents other than the Settlement Agreement and its interpretation of New York law regarding the enforceability of settlement agreements – are questions of law that we review de novo. *See Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1064 (9th Cir. 2002) (applying state law); *MPEG LA, LLC v. Samsung Elecs. Co.*, 166 A.D.3d 13, 17, 86 N.Y.S.3d 4, 8 (App. Div. 2018) (similar rule in New York). When we conduct a de novo review, "we look at the matter anew, the same as if it had not been heard before, and as if no decision previously had been rendered, giving no deference to the bankruptcy court's determinations." *Charlie Y., Inc. v. Carey (In re Carey)*, 446 B.R. 384, 389 (9th Cir. BAP 2011).

DISCUSSION

A proof of claim is deemed allowed unless a party in interest objects to the claim. § 502(a). When an objection to claim is filed, the objecting party must "produce evidence and show facts tending to defeat the claim by probative force equal to that of the allegations" of the proof of claim. *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991) (citation omitted). If the objecting party produces such facts, the burden of proof shifts to the claimant to "prove the validity of the claim by a preponderance of the evidence." *Lundell*, 223 F.3d at 1039 (citation omitted). The claimant has the ultimate burden of persuasion. *Id.*

The court must then determine the amount of the claim and (with exceptions not relevant here) "allow such claim in such amount, except to the extent that... such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." § 502(b)(1). Any dispute over a claim in bankruptcy

based on contract law is governed by relevant state law unless the Bankruptcy Code specifically states otherwise. *Merced Prod. Credit Assoc. v. Sparkman (In re Sparkman)*, 703 F.2d 1097, 1099 (9th Cir. 1983).5

**\*4** Enpark objected to FundKite's claim, primarily challenging the enforceability of the Revenue Purchase Agreement under New York law. Notwithstanding this objection, the bankruptcy court made two findings it believed militated against disallowance of FundKite's claim.

First, the court found that FundKite's claim was based entirely on the Settlement Agreement, and that the Settlement Agreement sufficiently established FundKite's right to payment. As set forth below, we disagree and we question the effectiveness of the Settlement Agreement in light of its language concerning the effect of filing for bankruptcy.

Second, the bankruptcy court concluded that it would not adjudicate Enpark's arguments regarding the validity of the Revenue Purchase Agreement because settlement agreements are generally favored and enforceable under New York state law. The bankruptcy court interpreted this law as prohibiting any evaluation of the underlying facts leading to entry of the Settlement Agreement.

While we acknowledge the importance of honoring settlement agreements as a matter of sound judicial policy, we do not believe that any such policy prohibits looking behind such agreements to determine the true nature of a debt in the claims allowance process. Absent a bankruptcy-based restriction on looking behind settlement agreements in claims allowance, which we believe case law does not support, we believe that on remand the parties may raise, and the bankruptcy court may consider, arguments based on applicable non-bankruptcy law regarding the appropriate tests for when a court should look beyond a settlement agreement to determine the enforceability of the underlying transaction.

## A. The bankruptcy court's finding that the Settlement Agreement alone established FundKite's secured claim was clear error.

In its ruling, the bankruptcy court agreed with FundKite that the proof of claim was based solely on the Settlement Agreement. However, the Settlement Agreement, standing alone, could not have supported FundKite's claim.

First, and most conspicuously, although FundKite asserted that its claim was secured, and the bankruptcy court agreed and allowed the claim as secured,

nothing in the Settlement Agreement so much as referred to a basis for the assertion of a secured claim, let alone contained or referred to evidence of a grant of security in favor of FundKite, or the perfection of any such interest. The only grant of a security interest from Enpark to FundKite in the record is in the Revenue Purchase Agreement. In fact, FundKite itself attached the Revenue Purchase Agreement to the official claim form, presumably for the purpose of establishing that its claim was secured.

Moreover, it is questionable whether the Settlement Agreement even governs this claim. The Settlement Agreement provides the following:

9. Bankruptcy action. In the event that a petition for bankruptcy relief, whether voluntary or involuntary, is filed by or relating to any Defendant [Enpark] prior to the expiration of ninety-one (91) days after Plaintiff [FundKite] receives the final Settlement Payment, **this Agreement shall be of no effect as to such Defendant filing Bankruptcy**, and Plaintiff shall be entitled to assert a claim in such bankruptcy proceeding....

(Emphasis added).

**\*5** Read most plainly, paragraph 9 of the Settlement Agreement indicates that the Settlement Agreement will not be enforceable between FundKite and Enpark if Enpark files bankruptcy. We note that the relevant language does **not** provide that "at the option of the creditor" (here, FundKite) the Settlement Agreement may be unenforceable should Enpark file for bankruptcy. Nor does it provide that should Enpark file for bankruptcy, FundKite is not bound by any financial accommodations made in the Settlement Agreement pertaining to the amount of the debt or timing of payment. Rather, it appears the parties may have bargained for a more absolute result, i.e., for the outcome that the Revenue Purchase Agreement, **not the Settlement Agreement**, would be the controlling agreement if Enpark filed bankruptcy.

At oral argument, the Panel inquired of counsel for the parties whether the issue of the applicability or effect of paragraph 9 of the Settlement Agreement had been argued to the bankruptcy court; counsel indicated that it had not. And it appears from the bankruptcy court's oral ruling that the court neither mentioned nor evaluated the effect of this provision.[6] On remand, the bankruptcy court should consider these issues.

As provided in greater detail in section B, the bankruptcy court concluded that the mere existence of the Settlement Agreement meant that the court was prohibited from assessing other documents submitted in support of FundKite's claim. However, while the court may ultimately decide that the Settlement Agreement remains binding and enforceable, nothing prevented the bankruptcy court from looking behind the Settlement Agreement to decide the nature of FundKite's claim. In light of the above, the bankruptcy court's finding that the Settlement Agreement formed the sole basis of FundKite's claim was clear error.[7]

**B. The Settlement Agreement did not present a bar to the bankruptcy court analyzing the enforceability of the Settlement Agreement and the Revenue Purchase Agreement under New York law.**

As discussed above, we believe that the bankruptcy court erred in finding that the Settlement Agreement alone formed the basis of FundKite's claim. However, the bankruptcy court also did not fully consider applicable New York law regarding the enforceability of the Settlement Agreement.

**\*6** As a preliminary matter, we acknowledge that Enpark's legal theories regarding invalidation of the Settlement Agreement left much to be desired. Although Enpark referenced New York law to advance its theories regarding invalidation of the **Revenue Purchase Agreement**, Enpark relied exclusively on federal law in support of its arguments regarding the validity of the **Settlement Agreement**. We agree with the bankruptcy court that Enpark mistakenly relied on *Archer v. Warner* in support of its position that the Settlement Agreement is not enforceable. 538 U.S. 314 (2003).[8] *Archer* provided that the existence of a prepetition settlement agreement may not shield from the bankruptcy court's inquiry the nature of a prepetition debt, i.e., whether a debt should be excepted from discharge under § 523(a), a holding not relevant to this case.

Nevertheless, *Archer* does stand for the proposition that bankruptcy courts may look beyond a settlement agreement to determine the nature of a claim; more simply, *Archer* provides that there is no overall bankruptcy law prohibition on looking past a settlement agreement in performing a central purpose of the bankruptcy laws, including the allowance of claims. *Id.* at 323.

As expressly declared by the language of § 502(b)(1), in the claims allowance process, the enforceability of a claim must be assessed under "any ... applicable law"—here, New York law. Enpark expressly and vigorously challenged the validity

and enforceability of both the Revenue Purchase Agreement and the Settlement Agreement by asserting that the Revenue Purchase Agreement was a disguised loan with a criminally usurious interest rate and, therefore, void. This challenge to FundKite's claim presented a serious issue regarding the enforceability of the Revenue Purchase Agreement under New York law. Enpark's misplaced reference to federal law notwithstanding, a review of New York law pursuant to § 502(b)(1) would have revealed state law support for Enpark's theory. Under *Archer* and § 502(b)(1), nothing prohibited the bankruptcy court from considering such authorities.

To be sure, the bankruptcy court did reference New York law for the basic proposition that settlement agreements are favored by New York courts and are not lightly cast aside. *See Stein v. Stein*, 12 N.Y.S.3d 284, 286 (NY App. Ct. 2015).9 However, this general policy does not translate to a *per se* rule that settlement agreements are **never** invalidated under New York law, nor does it necessarily prevent the bankruptcy court from considering all of the documents and information in support of FundKite's claim prior to adjudicating the enforceability of that claim.

Because Enpark argued that the Revenue Purchase Agreement is void as criminally usurious, on remand, nothing prohibits the bankruptcy court from assessing Enpark's arguments using this state law framework. The record before the Panel indicates that Enpark's arguments raised at least three issues the bankruptcy court could have considered under applicable New York law: (i) whether the Revenue Purchase Agreement was a disguised loan; (ii) if the Revenue Purchase Agreement was a disguised loan, whether it contained a criminally usurious interest rate which rendered the entire agreement void;10 and (iii) whether Enpark's arguments regarding the Revenue Purchase Agreement provided a basis for invalidation of the Settlement Agreement under **New York law**.

**\*7** It is not this Panel's function to take any position regarding these questions, other than to conclude that the bankruptcy court's determination that it was restricted from considering them was erroneous. On remand, these issues are ripe for adjudication.

The concurrence believes that this decision does not go far enough in analyzing the question of the proper treatment of the Settlement Agreement on remand, and that the Panel may be faulted for having disposed of an issue that might be

deemed to have been harmless error by the trial court. Respectfully, we take a different view.

First, we question the applicability of the harmless error doctrine to our disposition of this matter. The harmless error doctrine describes a means by which a reviewing court determines **not** to disturb a ruling by the trial court based on the immateriality of the trial court's putative error. And our decision **not** to invoke that doctrine here is hardly a matter for which this Panel may appropriately be critiqued, especially where the Panel has also determined that the trial court made a clearly erroneous finding of fact that compels remand in any event.

More fundamentally, with respect to the legal issue on which the concurrence is concerned, we do not believe that the trial court's erroneous determination that it was **prohibited even from considering** whether there was a basis in applicable non-bankruptcy law to question the enforceability of FundKite's claim, a determination that runs directly contra the express directive of § 502(b)(1), could ever be "harmless." Assessing the availability and applicability of legal arguments concerning the enforceability of the Settlement Agreement presents a different question, and one that has not yet even been addressed.

For this reason, we do not agree that the decision leaves a necessary aspect of this issue unresolved. In our view, the issue of whether the trial court may look past the Settlement Agreement is "gating," in the sense that, as the trial court determined, there is a well-acknowledged doctrine that when parties settle a dispute, a court should normally give effect to their arrangement, and accord that arrangement the finality to which the parties agreed. *See Stein*, *supra*, 130 A.D.3d at 605. And that gating issue should be raised, argued, and disposed of by the trial court consistent with the dictates of § 502(b)(1) and applicable non-bankruptcy law.

Thus, while we acknowledge that the cases referenced in the concurrence provide one potential basis for the bankruptcy court to examine the enforceability of the Settlement Agreement, any such determination is for the trial court to decide after the parties have had an opportunity to raise the issue, cite relevant authority, and fully argue the matter to that court. It is not for this court to decide that issue prior to the presentation of arguments to the trial court, to define the parameters of such presentation, or to indicate which cases would be most relevant to the trial court's determinations.

We acknowledge, and applaud, the statement at the conclusion of the concurrence that it does not purport to decide the issue of whether the trial court **should** look past the Settlement Agreement. But we are concerned that that statement is difficult to square with the approach adopted in the concurrence. The concurrence expends several pages citing and providing detailed analysis of the holdings and import of numerous cases under New York law on one side of this subject; it would be difficult for a reader not to conclude that the concurrence is essentially opining not only on the proper scope of the inquiry, but also necessarily, on the "right" answer to the underlying question, and dictating that answer to the trial court. For the reasons previously stated, we believe that that exercise is inconsistent with the proper role of this appellate Panel, and is an activity in which this court should not engage.

## CONCLUSION

**\*8** For the reasons set forth above, we VACATE the bankruptcy court's ruling and REMAND this matter for further proceedings consistent with this decision.

Concurrence by Judge Pearson

PEARSON, Bankruptcy Judge, concurring:

I generally concur with the disposition of this matter and the preceding opinion. I write separately because I believe the analysis needs to go further.

The majority asserts that it is sufficient to vacate based on our decision regarding a "gating" issue, without any examination of whether that "gating" issue could potentially make a difference to the outcome of the case. Based on the harmless error doctrine, I do not agree. If there are no non-frivolous arguments that would make Enpark's position tenable, Enpark would not be harmed by the trial court's failure to consider its arguments. This court does not act on errors unless those errors impact the rights of the parties. *Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 355 (9th Cir. BAP 2012) ("Generally speaking, we ignore harmless error"); *Litton Loan Servicing, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 704 (9th Cir. BAP 2006) (refusing to reverse "for reasons that do not affect the substantial rights of parties") (citing, *inter alia*, 28 U.S.C. § 2111). Before vacating the bankruptcy court's decision, we must determine whether the bankruptcy court's decision to consider only the Settlement Agreement and general law favoring settlement agreements, and not Enpark's argument that that the Revenue Purchase Agreement is criminally usurious,[11] may have impacted Enpark's rights.

**\*9** Under New York law, the enforceability of a settlement agreement can be impacted by the nature of the underlying agreement. In *Denburg v. Parker Chapin Flattau & Klimpl*, 624 N.E.2d 995 (1993), the New York Court of Appeals (New York's highest court) considered whether a settlement agreement was unenforceable when the initial agreement underlying the dispute was itself unenforceable as against public policy. *Denburg* involved a dispute between a law firm and one of its former partners. The firm's partnership agreement provided that a withdrawing partner would receive certain payments, but only if he did not work for the firm's clients over the next two years after withdrawing. The Court of Appeals held that this anticompetitive term of the partnership agreement violated New York public policy and was unenforceable. *Id.* at 1000. This did not end the Court of Appeals' inquiry, however, because the firm and the former partner had also entered into a settlement agreement. The Court of Appeals also had to decide whether the settlement agreement—which arose from the dispute over the contract terms that violated public policy—was enforceable.

In making that decision, the Court of Appeals first noted the strong public policy favoring enforcement of settlement agreements. But that public policy was not dispositive. The Court of Appeals acknowledged the former partner's argument that, if a settlement agreement of a dispute over an illegal contract was enforceable, the parties could by private agreement waive the illegality and evade the prohibitions against the original contract. *Id.* at 1001. The Court of Appeals then stated the rule in New York as follows: "While some bargains are so offensive to society that courts will not entertain the action—essentially leaving the parties where they are (*see, e.g., McConnell v Commonwealth Pictures Corp.*, 7 NY2d 465, 467 [involving commercial bribery]; *Flegenheimer v Brogan*, 284 NY 268, 272-273 [involving fraud])—in other cases an illegal agreement is not so repugnant and may be enforced (*see, Lloyd Capital Corp. v Pat Henchar, Inc.*, 80 NY2d 124, 127-128 [involving a federal regulatory violation that did not make a contract unenforceable under federal law]). It is all a matter of degree." *Id*.

The Court of Appeals noted that the provision in the law firm's partnership agreement was not per se illegal, but its enforceability was dependent upon facts and circumstances, and thus unlike situations involving commercial bribery or fraud. Therefore, the Court of Appeals concluded that the settlement agreement

resolving the dispute over the anticompetitive terms of the partnership agreement could be enforced.

In addition to the rule in *Denburg*, there is a long history of cases where New York courts have refused to enforce settlement agreements that either include terms that are void in violation of New York law, or that perpetuate the enforcement of an underlying illegal contract. In *Drucker v. Mauro*, 30 A.D.3d 37(App. Div. 2006), a landlord and a tenant entered into a lease that incorporated a settlement over disputed items. The settlement terms in the lease were not consistent with New York's Rent Stabilization Law. Lease provisions violating that law are void, not merely voidable. The court refused to enforce the settlement.

In *Baksi v. Wallman*, 271 A.D. 422(App. Div. 1946), *aff'd*, 74 N.E.2d 172 (1947), a professional boxer entered into a management agreement with two of his managers. The management agreement was illegal and unenforceable because it violated New York's boxing laws. The two managers had stipulated to a settlement between themselves. The New York courts held that the stipulation of settlement could not be enforced without enforcing the illegal underlying contract, and that therefore, the settlement also was unenforceable. *Id*. at 426.

There is also a line of authority in New York that any new agreement that is made for the purpose of carrying out any of the unexecuted provisions of a previously illegal contract is tainted by the same illegality and void. *Boyd v. Boyd*, 130 A.D. 161 (App. Div. 1909); *Coffey v. Burke*, 132 A.D. 128 (App. Div. 1909); *Gray v. Hook*, 4 N.Y. 449, 459-60 (1851) ("When the contract grows immediately out of and is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it; and if the contract be in *part only* connected with the illegal transaction, and grows immediately out of it, though it be in fact a new contract, it is equally tainted by the illegality of the transaction from which it sprung.") (emphasis in original).

**\*10** If Enpark is correct that the Revenue Purchase Agreement is criminally usurious, then, depending on how this New York law is applied to the context of a criminally usurious agreement, it is possible that the Settlement Agreement may also be unenforceable under New York law.

Enpark's substantial rights were impacted when the bankruptcy court did not consider Enpark's arguments that Revenue Purchase Agreement was criminally usurious. We must vacate so the bankruptcy court can consider those arguments.

To be clear, a determination that Enpark's rights were affected because the bankruptcy court did not consider its arguments is not the same thing as a determination that Enpark's arguments are correct. The discussion of the case law above is not intended to dictate a "right" answer, but instead to show that there is a non-frivolous basis why Enpark's arguments about the allegedly-criminally usurious nature of the Revenue Purchase Agreement could matter to evaluation of the Settlement Agreement and the outcome of this case. This court need not decide, and is not deciding, whether the Revenue Purchase Agreement is criminally usurious or whether the Settlement Agreement is enforceable under New York law. On remand, Enpark is entitled to make its arguments, and FundKite is entitled to refute those arguments. We leave the ultimate merits for the bankruptcy court to determine.

## All Citations

Slip Copy, 2024 WL 4328581

### Footnotes

1
Hon. Teresa H. Pearson, United States Bankruptcy Judge for the District of Oregon, sitting by designation.

*
This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

2
Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

3
We have taken judicial notice of the bankruptcy court docket and various documents filed through the electronic docketing system. *See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).*

4
Nevada's Local Rule 1001(b)(1) automatically refers all bankruptcy cases in the District of Nevada to the bankruptcy court.

5

The Rules require claimants filing a proof of claim to, among other things, provide a copy of the writing on which the claim is based as well as evidence of perfection of any security interest the claimant asserts. Rule 3001(c)(1), (d). A proof of claim filed in accordance with the Rules constitutes prima facie evidence of the validity and amount of the claim. Rule 3001(f). Here, the bankruptcy court correctly held, and the parties do not dispute, that FundKite initially satisfied Rule 3001 by furnishing documentation adequate to serve as prima facie evidence of the validity and amount of the claim, i.e., the Revenue Purchase Agreement and the Settlement Agreement.

6

If the Settlement Agreement were an executory contract, this type of provision would be an unenforceable ipso facto clause under 11 U.S.C. § 365(e)(1). However, settlement agreements are not always executory contracts. *See Svenhard's Swedish Bakery v. U.S. Bakery (In re Svenhard's Swedish Bakery), 653 B.R. 471, 477 (9th Cir. BAP 2023)*. The effect of paragraph 9 is a matter the bankruptcy court should consider on remand.

7

The Panel further notes that the Settlement Agreement also contained fairly broad mutual releases of claims that FundKite asserts resolve any claim against it pertaining to the Revenue Purchase Agreement. The bankruptcy court referred to these releases at the conclusion of its oral ruling as further support for the proposition that the Settlement Agreement, and the Settlement Agreement alone, governed the parties' legal relations, and fully supported FundKite's claim. However, the Panel also notes the broad and unqualified language of paragraph 9 of the Settlement Agreement, which, read plainly, indicates that if a debtor party filed bankruptcy, the Settlement Agreement would not be effective and the parties would essentially go back to square one. This outcome would presumably not include the option for either party to retain the benefit of the releases—but the parties can argue that point on remand.

Further, as referred to in section B of this Memorandum Decision, should the bankruptcy court on remand determine that, in light of the nature of the underlying transaction that gave rise to the Settlement Agreement, that agreement would not be enforceable under New York law, there would be no reason to enforce a release contained in such an unenforceable agreement.

8

The parties also cite and discuss cases holding that agreements waiving the benefits and protections of the Bankruptcy Code are void. *Continental Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 671 F.3d 1011 (9th Cir. 2012); Bank of China v. Huang (In re Huang), 275 F.3d 1173 (9th Cir. 2002); Hayhoe v. Cole (In re Cole), 226 B.R. 647 (9th Cir. BAP 1998); In re Pease, 195 B.R. 431 (Bankr. D. Neb. 1996)*. The bankruptcy court correctly held these cases were irrelevant.

9

There is no dispute in this case that the Settlement Agreement meets the basic legal requirements in New York for a settlement to be an effective contract: it is in writing, signed by both parties, and includes material terms and a manifestation of mutual intent. N.Y. Civil Practice

Laws and Rules, § 2104 (McKinney 2024); *Forcelli v. Gelco Corp.*, 972 N.Y.S. 2d 570, 573 (App. Div. 2013).

10

Enpark provided ample law regarding these first two questions in its briefing before the bankruptcy court, including a decision involving a very similar contract that FundKite had with another borrower. *AKF, INC. d/b/a FundKite v. Western Foot & Ankle Center*, 632 F.Supp.3d 66 (E.D.N.Y. 2022).

11

Enpark argued that contracts to purchase future receivables are loans subject to usury laws and unenforceable, citing *Funding Metrics, LLC v. NRO Edgartown, LLC*, 2019 WL 4376780, 2019 N.Y. Slip. Op. 32651 (N.Y. Sup. Ct. Aug. 28, 2019); *GMI Grp., Inc. v. Unique Funding Sols., LLC*, 606 B.R. 467, 489 (Bankr. N.D. Ga. 2019) (applying New York law); *QFC, LLC v. Iron Centurian, LLC*, 2017 WL 2989222, 2017 N.Y. Slip. Op. 31438 (N.Y. Sup. Ct. July 5, 2017), *rev'd*, 179 A.D.3d 1110 (2020); *Merch. Funding Servs., LLC v. Volunteer Pharmacy, Inc.*, 55 Misc. 3d 316 (N.Y. Sup. Ct. 2016), *rev'd*, 179 A.D.3d 1051 (2020); *Pearl Capital Rivis Ventures, LLC v. RDN Constr., Inc.*, 54 Misc. 3d 470, (N.Y. Sup. Ct. 2016); *see also* *Funding Metrics, LLC v. D&V Hosp., Inc.*, 62 Misc. 3d 966 (N.Y. Sup. Ct. 2019), *rev'd*, 197 A.D.3d 1150 (2021). Enpark set forth the elements of criminal usury under New York law, and explained why, under the facts of this case, Enpark believed the Revenue Purchase Agreement was criminally usurious. Enpark also pointed out that, under New York law, criminally usurious loans are void and unenforceable, citing *AKF, Inc. v. Western Foot & Ankle Center*, 632 F.Supp.3d 66, 83 (E.D.N.Y. 2022), *vacated* (June 14, 2024). The New York Court of Appeals has ruled that a criminally usurious contract is void ab initio and unenforceable. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 614-21 (2021). FundKite disputes that the Revenue Purchase Agreement is criminally usurious, asserting it is not a loan and that Enpark released all its defenses.

**End of Document**

EXHIBIT "D"

David A. Riggi, Esq. NV Bar. No. 4727
7900 W. Sahara Avenue Suite 100
Las Vegas, NV 89117
Ph:    1-702-463-7777
Fax:   1-888-306-7157
E-mail:RiggiLaw@gmail.com
***Attorney for Debtor in Possession***

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No.:  25-10341-NMC |
| | ) Chapter 11 |
| NUMALE CORPORATION, | ) |
|     Debtor in Possession | ) |
| _____ | ) |

**DECLARATION OF BRAD PALUBICKI**
**IN SUPPORT OF THE OPPOSITION TO UNITED STATES TRUSTEE'S**
**MOTION TO APPOINT A CHAPTER 11 TRUSTEE UNDER 11 U.S.C. §**
**1104(a), OR, IN THE ALTERNATIVE, TO CONVERT OR DISMISS THIS**
**CASE PURSUANT § 1112(b), AND RESERVATION OF RIGHTS**

I, Brad Palubicki, declare, under penalty of perjury, the following:

1.    I am the President of the Debtor ("Company"), as well as the six other affiliated entities that have also commenced Chapter 11 cases before this court. I have knowledge and am competent to testify concerning the facts set forth in this declaration.

2.    The NuMale companies have been extremely successful and profitable enterprises for over a decade, employing dozens of dedicated individuals in several states.  Nevertheless, even after the many satisfied and returning patients that the NuMale companies have had, there was a particular patient in our New Mexico clinic that had an unfortunate experience.  Specifically, a state court action in New Mexico by a patient named Sanchez resulted in an unfavorable verdict in November

1

2024 against NuMale Corporation and NuMale New Mexico. Importantly, no judgment has been entered and, it has been our goal, that a settlement occur and no judgment ever be entered. In any event, in anticipation of fallout from the New Mexico case, the NuMale companies decided to look into alternative financial options as contingencies. Buttressing our cash flow with what I was introduced to as merchant cash advances (MCAs). I realized though, at the beginning of January 2025 that the MCAs were not the financial benefit that was promised or that we had hoped and, in fact, they were automatically drawing hundreds of thousands of dollars from our coffers every month. We sought the services of a debt consolidation company to address the MCAs; however, even after they negotiated reductions, the resulting payments were still too large for the company to sustain, making the solution ultimately unworkable.

3.    Meanwhile, we were waiting for a favorable settlement of the New Mexico case before a judgment would be entered. We also realized that if a settlement could not be reached then bankruptcy reorganizations would have to be commenced not only for the specific defendants in the New Mexico action, NuMale Corporation and NuMale New Mexico, but probably through an abundance of caution and also because of the growing MCA issues, other related affiliated NuMale entities. So under our planned timeline – no bankruptcy filings before the end of pre-judgment settlement negotiations – the bankruptcy filings would not have commenced until around March 15, 2025 (the date that was stipulated by the Sanchez and our insurance carrier as the end of settlement discussions, whether a settlement was arrived at or not). Our plan of action was to retain bankruptcy counsel no later than mid-February if it appeared that the settlement negotiations would not be fruitful, with the hope that our retention of counsel and preparation for bankruptcy would be a prudent precaution (giving us a month to prepare for chapter 11) while, eventually, would prove to be unnecessary.

4.      Unfortunately, the timetable for a mid-March filing, if necessary at all, was accelerated to mid-January as a result of an unexpected administrative freezing of bank accounts by several of the MCAs (We believe then that these administrative freezing's were improper and that belief has only been reinforced over the last several months).  I was hoping that through the filing of bankruptcy's that the administrative freezes would automatically be released. So we retained counsel only a week before the eventual Chapter 11 filings; as such, the preparation time was very short and, moreover, there was a three-day weekend in the middle of that time. So, admittedly, in an effort to have an immediate release of funds, which unfortunately did not occur, our filings were hurried and incomplete.

5.      Once the bankruptcy was filed on January 22, we had every reason to prosecute the Chapter 11 as quickly as possible for many reasons, including: (1) the sooner we could address the frozen bank accounts, perhaps through agreement with the MCAs that froze our accounts, or even the third party that was holding the frozen accounts, the better part cash flow would immediately become;  (2) upon advice of counsel, insiders would not request the court for wages until we had filed monthly operating reports that indicated we would be able to support those wages; and (3) we wanted any marketplace stigma of bankruptcy to be in the past. Regarding the frozen accounts, third party Elevon is still holding onto over $75,000 from various NuMale accounts.

6.      During this initial few weeks of the cases, our attention included not only the paperwork for filing and for the United States Trustee, but was also diverted toward several pressing matters, not least of which was the need to obtain insurance which Beazley surprisingly, and to our chagrin, had refused to renew. It is customary in the insurance industry, from my experience, for there to be a 30 day notice of impending termination of service – Beazley only gave us a few days.  As a result, because I was the sole person with the knowledge and information to

submit applications to insurance carriers, I had to devote most my time for eight days toward obtaining insurance.  Those eight days should have been devoted to directly addressing bankruptcy paperwork. However, Beazley's action made that impossible.

7.      In addition to the challenges already described, my attention has been diverted by multiple landlord disputes at virtually every NuMale location. These disputes have required individual attention and direct negotiations to maintain our ability to operate, preserve jobs, and continue serving patients. Each location has presented unique challenges that I have had to address personally to avoid disruption to our operations and reorganization efforts.

8.      During the initial weeks following our Chapter 11 filing, I personally gathered, organized, and produced over 100 documents for the United States Trustee and created detailed financial statements. This extensive document production required significant time and resources, especially given that many of these documents contained complex financial information that only I, as President of the company, had the expertise to compile and explain accurately.

9.      Beyond the New Mexico case, I have been actively managing several concurrent legal proceedings across multiple states. Each of these matters requires my personal attention and knowledge of NuMale's operations to ensure our interests are properly represented. These legal matters have placed extraordinary demands on my time that would otherwise have been available for administrative bankruptcy matters.

10.      Contrary to any suggestion that the New Mexico matter represents an intractable problem, I can affirm that NuMale's attorneys and the plaintiff's attorneys in the New Mexico case have established a constructive working relationship. Each side recognizes mutual interests that could lead to resolution: NuMale desires that the judgment not be filed to avoid further damage to our

reputation, while the plaintiff would like certain rights of NuMale assigned to them to enhance their bad faith suit against our malpractice insurance carrier.

11.     Our insurance carrier's conduct has been detrimental to NuMale's interests. Their refusal to settle the New Mexico case, thereby forcing the plaintiff to potentially file the verdict, causes more harm to NuMale than good. I have been actively working to mitigate this damage and find a resolution that protects the company's interests despite the carrier's actions.

12.     I have devoted substantial time to addressing other complicated issues. which require specialized knowledge of NuMale's business relationships and corporate structure that a trustee would lack, potentially jeopardizing our reorganization efforts if management were to change at this critical juncture.

13.     My settlement efforts with Sanchez extend beyond merely resolving the case and include preventing the potential revocation of Carlos' professional license, which would significantly impact our reorganization prospects and ability to serve patients in certain markets.

14.     The untimely administrative shortcomings asserted by the US Trustee have been the focus of prompt correction with my staff and our counsel.  Any untimeliness was not intentional. NuMale wants the process to be as quick as possible so that, for instance, frozen funds can be recaptured, insider wages can re-commence and we can emerge from the bankruptcties.

15.     NuMale is currently implementing a comprehensive reorganization strategy that includes restructuring our operations, renegotiating key contracts, and developing a sustainable business model going forward. Appointing a trustee at this juncture would disrupt these efforts and potentially destroy value that could otherwise benefit creditors. The institutional knowledge and industry relationships

I possess are critical to the successful implementation of this strategy and cannot be quickly or easily transferred to a trustee.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated this 23rd day of March, 2025.

/s/  Brad Palubicki
Brad Palubicki