GARMAN TURNER GORDON LLP
GREGORY GARMAN, ESQ.
Nevada Bar No. 6654
Email: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
Email: tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
*Attorneys for Michael Carmel,*
*Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Lead Case No.: 25-10341-nmc<br>Chapter 11 |
| NUMALE CORPORATION, | |
|   AFFECTS THIS DEBTOR, ☐ | *Jointly administered with:* |
|   AFFECTS FELICIANO<br>  NUMALE NEVADA PLLC, ☐ | Feliciano NuMale Nevada PLLC,<br>Case No. 25-10342-nmc |
|   NUMEDICAL SC, ☐ | NuMedical SC<br>Case No. 25-10343-nmc |
|   NUMALE COLORADO SC, ☐ | NuMale Colorado SC,<br>Case No. 25-10344-nmc |
|   NUMALE FLORIDA TB PLLC, ☐ | NuMale Florida TB PLLC,<br>Case No. 25-10345-nmc |
|   NUMALE NEBRASKA LLC, ☐ | NuMale Nebraska LLC<br>Case No. 25-10346-nmc |
|   NUMALE NEW MEXICO SC, ☐ | NuMale New Mexico SC<br>Case No. 25-10347-nmc |
|   NUMALE ALL DEBTORS, ☒ | |
|     Debtors. | Hearing Date: September 2, 2025<br>Hearing Time: 9:30 a.m. |

## MOTION PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. §§ 363 AND 105 TO AUTHORIZE AND APPROVE GLOBAL SETTLEMENT AND ASSOCIATED RELEASES AND AUTHORIZE INSURANCE POLICIES BUYBACK

Michael Carmel, as the Chapter 11 trustee ("<u>Trustee</u>") of the bankruptcy Estates of NuMale

Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale

Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the

"Debtors"), hereby submits this motion (the "Motion") for entry of an order pursuant to Section 363 and Bankruptcy Rule[1] 9019 substantially in the form attached hereto as **Exhibit 1-A** (the "9019 Order"), approving the Global Settlement Agreement attached hereto as **Exhibit 1** (the "Global Settlement Agreement")[2] between and among the Trustee; verdict creditor Michael Sanchez ("Sanchez"); Certain Underwriters at Lloyd's, London, Syndicates 623 and 2623 (collectively, "Beazley"); the "NuMale Settling Defendants" (collectively, Justin Pulliam, Christopher Asandra, Debtor NuMale Corporation, and Debtor NuMale New Mexico SC, and non-Debtor NuMale Albuquerque LLC); and the "Affiliate Entities" (collectively, NMC Illinois, LLC, Nevada NuMale LLC, NuMale Albuquerque LLC, NuFemme Milwaukee, LLC, NuMale Green Bay, LLC, NuMale Wisconsin GB, SC, NuMale Omaha, LLC, NuMale Tampa, LLC, NuMale Charlotte, LLC, and NuMale Denver, LLC)).

This Motion is made and based upon the following memorandum of points and authorities; the declaration of Chapter 11 Trustee Michael W. Carmel ("Carmel Decl.") filed separately and concurrently herewith pursuant to Rule 9014(c) of the Local Rules; the pleadings, papers, and other records on file with the clerk of the above-captioned Court, with the Sanchez Lawsuit (defined below) pending in New Mexico and Beazley's Coverage Lawsuit (defined below) pending in the Ninth Judicial District Court of Curry County, New Mexico, judicial notice of which is hereby respectfully requested pursuant to FED. R. EVID. 201(b) and (c) and 1101(a) and (b)[3]; and any argument of counsel entertained by the Court at the hearing on the Motion.

---

[1] Unless otherwise stated, all references to "Section" herein shall be to Title 11 of the U.S. Code (the "Bankruptcy Code"); all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court for the District of Nevada.

[2] Unless otherwise defined herein, any undefined capitalized terms shall have the meaning(s) set forth in the Global Settlement Agreement and the Plan, in that sequence.

[3] The Trustee requests that pursuant to FED. R. EVID. 201(b), this Court take judicial notice of the filings and all materials appearing on the docket in the above-captioned matter filed in lead Case No. 25-10341-nmc before the Bankruptcy Court and in the Sanchez Lawsuit (defined below) commenced in New Mexico, pending in the Second Judicial District Court, County of Bernalillo, New Mexico, as Case No. D-202-CV-2020-06336, and in the Coverage Lawsuit (defined below) pending in the Ninth Judicial District Court of Curry County, New Mexico, as Case No. D-905-CV-202500157. *See United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980); *see also Bank of America, N.A., v. CD-04, Inc. (In re Owner Management Service, LLC Trustee Corps.)*, 530 B.R. 711, 717 (Bankr. C.D. Cal. 2015) ("The Court may consider the records in this case, the underlying bankruptcy case and public records.").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.
### JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1001(b)(1). This contested matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (E), (F), (H), (K), (L), (M), (N), and (O). Venue of the Debtors' Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This Motion is a "core proceeding" over which the Court has jurisdiction to render a decision.

The statutory bases for the relief sought herein arise from Sections 363, 1107, 1108 and 105 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9019.

Pursuant to Local Rule 9014.2, the Trustee and all parties to the Global Settlement Agreement consent to entry of final order(s) or judgment(s) on this Motion by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the United States Constitution.

### II.
### BACKGROUND

1. On January 22, 2025 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases"). *See, e.g.*, ECF No. 1.[4]

2. On April 1, 2025, this Court entered its *Interim Order Directing Joint Administration of Chapter 11 Cases. See* ECF No. 130.

#### TRUSTEE CARMEL'S APPOINTMENT AND INVESTIGATIONS

3. On April 2, 2025, this Court entered its Order on United States Trustee's Motion to Appoint Chapter 11 Trustee Under 11 U.S.C. § 1104(a), or in the Alternative, to Convert or Dismiss this Case Pursuant to 11 U.S.C. § 1112(b), and Reservation of Rights, thereby directing the appointment of a Chapter 11 trustee for the Debtors' Estates. *See* ECF No. 132.

---

[4] All references to "ECF No." are to the numbers assigned to the documents filed in the docket of the Debtors' lead jointly administered bankruptcy case, Case No. 25-10341-nmc, as they appear on the docket maintained by the Clerk of the Bankruptcy Court.

4.      On April 2, 2025, Tracy Hope Davis, then United States Trustee for Region 17 ("US Trustee"), appointed the Trustee as the Chapter 11 trustee for Debtors' Estates. *See* ECF No. 140.

5.      On April 7, 2025, the Court entered its *Order Approving Appointment of Chapter 11 Trustee* [ECF No. 155], thereby approving the Trustee's appointment. Later that same morning, the US Trustee filed its *Notice of Appointment of Chapter 11 Trustee* [ECF No. 156].

6.      Also on April 7, 2025, the Trustee filed his *Notice of Acceptance of Appointment of Chapter 11 Trustee* accepting his appointment as the Chapter 11 Trustee for the Debtors' Estates. *See* ECF No. 157.

7.      On April 28, 2025, the Court entered its Final Order Approving Motion for Order Directing Joint Administration of Debtors' Chapter 11 Cases Under Federal Rule of Bankruptcy Procedure 1015(b). *See, e.g.*, ECF No. 209.

8.      Immediately upon the Trustee's appointment he began investigating the assets and liabilities of the Debtors and their Estates. *See* Carmel Decl. ¶ 12.

9.      The Court established a "Bar Date" for claims to be filed by non-Governmental Units, which was June 30, 2025. Though, as to Beazley only, this "Bar Date" was initially extended by stipulation and further extended as set forth in the Global Settlement Agreement. *See, e.g.*, ECF Nos. 380, 381. The separate Bar Date for Governmental Units was July 21, 2025. *See* ECF No. 298.

10.     The Court's Claims Register reflects the largest claim of these Chapter 11 Cases is held by verdict creditor Michael E. Sanchez (Sanchez), whose claim represents approximately ninety-eight percent (98%) of all claims. *See* Carmel Decl. ¶ 14.

11.     The Trustee's investigation has also revealed a number of viable Chapter 5 claims against the principals and insiders of the Debtors, including other defendants to the Sanchez Lawsuit. *See* Carmel Decl. ¶ 15.

12.     In the event the Global Settlement Agreement is not approved, the Trustee is prepared to move forward with pursuing these Chapter 5 claims, and, as to Mr. Palubicki, the Trustee has already commenced suit against him (as more fully described herein *infra*). *See*

Carmel Decl. ¶ 16.

13. As to Messrs. Palubicki and Feliciano, the Palubicki/Feliciano Claims are being transferred and assigned to Beazley, including the Palubicki Adversary. *See* Carmel Decl. ¶ 17.

14. Additionally, on June 4, 2025, the Trustee issued Notice of Circumstances letters to the Debtors' carriers Arch Insurance[5] and Chubb[6] regarding facts, circumstances facts, and situations that could reasonably give rise to a claim, loss, matter, or wrongful act under their D&O and E&O policies. *See* **Exhibits 2 and 3** to Carmel Decl. (collectively, the "Carrier Notice Letters").

15. As outlined in these Carrier Notice Letters, the Trustee's investigation indicates several areas of concern respecting the Debtors' management and leadership, pre-dating his appointment. *See* Carmel Decl. ¶ 18.

**BACKGROUND**

16. In 2020, Sanchez commenced litigation in the Second Judicial District Court, County of Bernalillo, New Mexico. The litigation bears Case No. D-202-CV-2020-06336 (the "Sanchez Lawsuit"). *See* Carmel Decl. ¶ 19.

17. The Sanchez Lawsuit was filed against NuMale Corporation ("NuMale Corporation"); NuMale Albuquerque, LLC d/b/a NuMale Medical Center ("NuMale Albuquerque"); NuMale New Mexico SC Corp., d/b/a NuMale Medical Center ("NuMale New Mexico"); Christopher Asandra, M.D. ("Asandra"); Carlos Feliciano, M.D. ("Feliciano"); Brad Palubicki ("Palubicki"); Justin Pulliam ("Pulliam"); Steven G. Chapman, P.A.-C; and Mike Rivera. *See* Carmel Decl. ¶ 20.

18. The Sanchez Lawsuit was ultimately tried to a jury in approximately November 2024. *See* Carmel Decl. ¶ 21.

---

[5] Arch Insurance, a/k/a Arch Insurance Company, a/k/a Arch Specialty Insurance Company, Arch Insurance Company, and/or Arch Specialty Insurance Company ("Arch Insurance").

[6] Federal Insurance Company a/k/a Chubb a/k/a Chubb Forefront a/k/a Chubb the Forefront Portfolio for Healthcare Organizations a/k/a the Company a/k/a The ForeFront Portfolio a/k/a Forefront ("Chubb").

19. On or about November 25, 2024, the jury rendered its verdict. A copy of the Special Verdict Form was filed with the New Mexico Court on or about November 26, 2024. *See* **Exhibit 1** to Carmel Decl. (the "Jury Verdict").

20. The Jury Verdict assessed compensatory damages in the amount of $37,005,149.00 against all of the defendants, with the exception of (1) Steven Chapman; and (2) Mike Rivera, both of whom had been dismissed. The Jury Verdict defendants (collectively, the "NuMale Defendants") are (Debtor) NuMale Corporation, (Debtor) NuMale New Mexico, NuMale Albuquerque, Asandra, Feliciano, Palubicki, and Pulliam. *See id.* at p. 4.

21. NuMale Albuquerque is 99% owned by NuMale Corporation. *See* Carmel Decl. ¶ 24.

22. Additionally, the Trustee's position is that the Jury Verdict assessed punitive damages only against Defendant NuMale Corporation in the amount of $375,000,000. *See* Carmel Decl. ¶ 25.

23. However, Sanchez contends all NuMale Defendants are jointly and severally liable as co-conspirators for the entire verdict arising from fraud, unfair and unconscionable trade practices, and negligence as a matter of New Mexico law. *See* Carmel Decl. ¶ 26.

24. Sanchez's contention is disputed by Beazley. In filings with this Court, Beazley has contended the punitive damages were assessed solely against NuMale Corporation—a contrary position to Sanchez and an aligned position with the Trustee's analysis on this issue. *See, e.g.*, ECF No. 179 at ¶ 4. The Global Settlement Agreement resolves this dispute. *See* Carmel Decl. ¶ 27.

25. The Jury Verdict Form is also appended to a proof of claim filed by Sanchez in this Court. *See* NuMale Corporation Claim No. 7-1; *see also* NuMale New Mexico Claim No. 3-1 (collectively, the "Sanchez Claim").

26. On or about March 26, 2025, Sanchez filed the Sanchez Claim with this Court, asserting damages in excess of $579,442,390.01. The Sanchez Claim includes the amount awarded by the jury, *plus* pre-judgment interest in accordance with New Mexico law. *See* NuMale Corporation Claim No. 7-1; *see also* NuMale New Mexico Claim No. 3-1. The Sanchez Claim

represents approximately 98% of claims filed in these Chapter 11 cases.

27.    After the Jury Verdict was rendered, a number of post-trial motions were filed in the New Mexico Court, which remain pending.  *See* Carmel Decl. ¶ 30.

28.    The Global Settlement Agreement resolves the Sanchez Lawsuit prior to adjudication of these or any other post-trial motions and prior to judgment being entered by the New Mexico Court.  *See* Carmel Decl. ¶ 31.

29.    Certain Underwriters at Lloyd's, London Syndicates 2623/623 (collectively, Beazley) subscribing to a $1 million Miscellaneous Medical Professional Liability Claims Made and Reported Insurance (Policy No. W14CC4190601) and its accompanying $5 million Excess Insurance Policy (Policy No. W1561E190601), issued policies (collectively, the "NuMale-Beazley Policies").  *See* **Exhibits 4 and 5** to Carmel Decl. (the NuMale-Beazley Policies).

30.    The Sanchez Lawsuit had been tendered to Beazley in accordance with the terms of the NuMale-Beazley Policies, and during the pendency of the Sanchez Lawsuit including at trial the NuMale Defendants were all represented by the law firm Quintairos, Prieto, Wood & Boyer, P.A. ("Quintairos Firm").  *See* Carmel Decl. ¶ 33.

**BEAZLEY AND THE NUMALE-BEAZLEY POLICIES**

31.    Various insurance policies had previously been issued by Beazley in its capacity as Certain Underwriters at Lloyd's, London, Syndicates 623 and 2623 (the NuMale-Beazley Policies).  *See* Carmel Decl. ¶ 34.

32.    The policy period for the NuMale-Beazley Policies is January 23, 2019, to January 23, 2020.  *See* **Exhibits 4 and 5** to Carmel Decl. (the NuMale-Beazley Policies).

33.    The NuMale-Beazley Policies are claims made and reported policies, meaning they provide coverage that is triggered when a claim is made against the insured and reported during the policy period, even if the incident or injury giving rise to the claim occurred prior to the inception of the policy period.  *See id.*

34.    On or about March 14, 2025, Beazley commenced a lawsuit in a different New Mexico court to determine Beazley's obligations, if any, with respect to the NuMale-Beazley Policies and the claims for coverage in connection with the Sanchez Lawsuit (the "Coverage

Lawsuit"). *See* Carmel Decl. ¶ 37.

35.    The Coverage Lawsuit bears Case No. D-905-CV-2025-00157.  It is currently pending in the 9th Judicial District, County of Curry, New Mexico. *See* Carmel Decl. ¶ 38.

36.    The NuMale-Beazley Policies and their proceeds (the "Policy Proceeds") are property of the Estates. *See* Carmel Decl. ¶ 39.

37.    Any asserted rights under the NuMale-Beazley Policies, and all claims against Beazley that could be brought pursuant to, in connection with, as a consequence or result of, or under the NuMale-Beazley Policies including but not limited to a bad faith claim on the NuMale-Beazley Policies, are property of the Estates. *See* Carmel Decl. ¶ 40.

38.    The non-Debtor NuMale Defendants—Palubicki, Pulliam, Feliciano, Asandra, and NuMale Alburquerque—contend they have independent bad faith claims against Beazley.  The Trustee disagrees, particularly in light of the Global Settlement Agreement's terms. *See* Carmel Decl. ¶ 41.

**SANCHEZ LAWSUIT**

39.    The Debtors NuMale Corporation and NuMale New Mexico and non-Debtor NuMale Albuquerque LLC are NuMale Defendants and parties to the Sanchez Lawsuit initiated in 2020, which was initiated for ordinary and medical negligence, battery, unfair and unconscionable trade practices, fraud, and civil conspiracy. *See* Carmel Decl. ¶ 42.

40.    The Trustee's position is that the Sanchez Lawsuit involves events covered by the NuMale-Beazley Policies, which transpired in connection with Sanchez seeking treatment at the Debtors' New Mexico clinic. *See* Carmel Decl. ¶ 43.

41.    Nonetheless, Beazley contests the scope of coverage afforded by the NuMale-Beazley Policies to the events and circumstances that are subject of the Sanchez Lawsuit. *See* Carmel Decl. ¶ 44.

42.    In the course of his investigations, the Trustee learned the Sanchez Lawsuit had been tendered to Beazley in accordance with the terms of the NuMale-Beazley Policies, and that during the pendency of the Sanchez Lawsuit including at trial the NuMale Defendants were all

represented by the Quintairos Firm.  *See* Carmel Decl. ¶ 45.

43.     Sanchez has also filed a number of post-verdict motions in the Sanchez Lawsuit that await adjudication by the New Mexico State Court.  These and any other post-verdict motions must be adjudicated prior to entry of judgment on the Jury Verdict.  *See* Carmel Decl. ¶ 46.  *See also* ECF Nos. 98 and 100.

44.     There is a pending dispute with Beazley regarding its obligations under the NuMale-Beazley Policies and an asserted bad faith insurance claim.  *See* Carmel Decl. ¶ 47.

45.     Notwithstanding this dispute, Beazley agreed to pay special legal counsel's fees for the post-verdict motion practice and the eventual appeal anticipated in the Sanchez Lawsuit, in accordance with the terms of the NuMale-Beazley Policies.  *See* Carmel Decl. ¶ 48.

46.     To date, no judgment has been entered in the Sanchez Lawsuit, and the hearings on the post-verdict motions following the Jury Verdict have not been re-set.  *See* Carmel Decl. ¶ 49.

47.     The other NuMale Defendants contend they have bad faith claims, notwithstanding that no judgment has been entered.  The Trustee disagrees with their contentions.  *See* Carmel Decl. ¶ 50.

## OTHER NEW MEXICO LITIGATION: THE COVERAGE LAWSUIT

48.     Post-petition, but prior to the Trustee's appointment, Beazley commenced the Coverage Lawsuit in the Ninth Judicial District Court of Curry County, New Mexico, against the other NuMale Defendants—Palubicki, Pulliam, Feliciano, Asandra, and NuMale Albuquerque (altogether, the non-Debtor NuMale Defendants).  *See* Carmel Decl. ¶ 51.

49.     As part of the settlement, the Coverage Lawsuit shall be dismissed with respect to Asandra, Pulliam, and NuMale Albuquerque, LLC.  *See* Carmel Decl. ¶ 52.

50.     The Coverage Lawsuit seeks declaratory relief regarding the NuMale-Beazley Policies—namely, declaratory relief and rescission of the NuMale-Beazley Policies, declaratory relief that Beazley has no duty to indemnify due to policy exclusions, declaratory relief that Beazley has no duty to indemnify due to breach of a "cooperation provision," and declaratory relief that  Beazley did not act in bad faith with regard to the Sanchez Lawsuit.  *See* Carmel Decl. ¶ 52.

51. Sanchez, Debtor NuMale Corporation, and Debtor NuMale New Mexico were not named as parties to the Coverage Lawsuit. *See* Carmel Decl. ¶ 53.

52. The Coverage Lawsuit is pending. *See* Carmel Decl. ¶ 54.

53. In the event the Global Settlement Agreement is not approved, the Trustee is prepared to move forward with an adversary proceeding seeking declaratory relief that the NuMale-Beazley Policies and the Policy Proceeds are property of the estate. *See* Carmel Decl. ¶ 55.

54. The Trustee has already commenced an Adversary Proceeding against Palubicki, Adv. Proc. No. 25-01155 (the "Palubicki Adversary"). The Palubicki Adversary was filed on or about July 4, 2025. It seeks, *inter alia*, declaratory relief the NuMale-Beazley Policies and Policy Proceeds are property of the Estates. *See* Palubicki Adversary Complaint, Adv. Case No. 25-01155 ECF No. 1. *See also* Adv. Case No. 25-01155 ECF No. 4 (amended complaint). *See* Carmel Decl. ¶ 56.

55. The Palubicki Adversary also seeks damages for negligence and other claims and is being transferred and assigned to Beazley. *See* Carmel Decl. ¶ 57.

**THE GLOBAL SETTLEMENT AGREEMENT**[7]

56. On or about August 1, 2025, the Trustee, the NuMale Settling Defendants (being NuMale Corporation, NuMale New Mexico, Pulliam, Asandra, and NuMale Albuquerque), certain affiliate entities controlled by the Debtors, Sanchez, and Beazley agreed to the *Global Settlement Agreement (Containing Mutual Releases and Policy Buyback)* (the "Global Settlement Agreement"). *See* Carmel Decl. ¶ 58.

57. A copy of the Global Settlement Agreement, with all exhibits thereto, is attached hereto as **Exhibit 1**.

58. The Motion seeks Court approval of the Global Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 363, 105, 1107, and

---

[7] The summary set forth herein of the Global Settlement Agreement and its terms is for descriptive and summary purposes only; should there be any ambiguity between the description set forth herein and the Global Settlement Agreement or any term sheet thereof, in all respects the executed Global Settlement Agreement controls.

1108.  *See* Carmel Decl. ¶ 59.

59.    Under the Global Settlement Agreement, (i) the Beazley payment to the Estates of the one-time lump sum Purchase and Settlement Amount of $108,500,000 is in connection with a buyback and termination of the NuMale-Beazley Policies; (ii) there are milestones and Plan support by the Parties to the Global Settlement Agreement, including voting in favor of the Plan; (iii) initially, there is a stay of the Sanchez Lawsuit and Coverage Lawsuit pending this Court's approval of the Global Settlement Agreement, and, ultimately, a dismissal with prejudice of both lawsuits as to all Parties to the Global Settlement Agreement (form dismissals are exhibits to the Global Settlement Agreement); (iv) there are mutual releases including for the Parties to the Global Settlement Agreement along with a prohibition on litigating any claims released under the Global Settlement Agreement; and (v) the Estates (a) retain all Chapter 5 claims except the Palubicki/Feliciano Claims, which are transferred and assigned to Beazley; (b) retain certain claims under the Debtors' D&O and E&O (non-Beazley) policies; (c) retain claims against a variety of additional parties such as the Howard and Howard Claim, the Hassoun Claim, the N2 Litigation Claim, and parties who violated the automatic stay; (d) transfer and assign to Beazley the claims asserted in the Palubicki Adversary and any adversary proceeding claims initiated against Carlos Feliciano by the Trustee on behalf of the Estates (referred to as the Palubicki/Feliciano Claims, in the Global Settlement Agreement); (e) retain any other adversary proceedings the Trustee commences before Plan confirmation; and (f) retain the malpractice claims against the Quintairos Firm held by the Estates, all of which will be administered pursuant to the Plan.  *See* Carmel Decl. ¶ 60.

60.    More specifically, the Global Settlement Agreement provides in pertinent part:

▪ **Payment of $108,500,000 to the Estates:**

> Within ten (10) days of the Settlement Order becoming a Final Order, Beazley shall pay, or shall cause to be paid, the full Purchase and Settlement Amount to the Estates.  The Agreed Plan shall provide that its Effective Date (as defined therein) shall not occur until the full Purchase and Settlement Amount has been paid to the Estates and received by the Trustee.

> *See* Global Settlement Agreement § IV.A.

- **Compromise of the Sanchez Claim:**

     The Trustee and Sanchez hereby agree and stipulate as follows:

          The Allowed Sanchez Claim "Allowed Sanchez Claim" consists of an allowed unsecured claim amount of $410,000,000 pursuant to the terms of this Agreement. The Parties agree that Sanchez shall receive an Initial Distribution from the Trustee of no more and no less than the sum of $96,500,000 payable by the Trustee to Sanchez immediately upon receipt of the Beazley payment and the order approving this Agreement becoming a Final Order. For the avoidance of doubt, the remainder of the Allowed Sanchez Claim shall be entitled to recovery as set forth in Class 9 of the Agreed Plan.

     *See* Global Settlement Agreement § IV.B.1.

- **Buyback and Termination of the Policies and Rights Thereunder:**

     In consideration of the promises contained in this Agreement, upon the Effective Date: (i) the limits of liability of the NuMale-Beazley Policies shall be fully extinguished and exhausted for all claims; (ii) any purported rights, duties, responsibilities and obligations of the Beazley Parties alleged to have been created or that may be created by the NuMale-Beazley Policies (to the extent they are not void ab initio) are hereby deemed extinguished, terminated, canceled, and otherwise fully satisfied; and (iii) any and all rights under the NuMale-Beazley Policies (to the extent they are not void ab initio) shall be and are extinguished, terminated and voided, subject to the terms and conditions of this Agreement. The NuMale-Beazley Policies are to be thereafter treated as null and void (to the extent they are not void ab initio), and no person or entity shall have the right thereafter to present or tender any claim under the NuMale-Beazley Policies.

     Upon the Effective Date, and without the need of the execution or delivery of any further documentation or the taking of any other action by any Party, the NuMale Parties shall be deemed to have sold, transferred and conveyed all of their right, title and interest in the NuMale-Beazley Policies to Beazley pursuant to Section 363 of the Bankruptcy Code (the "Sale"), free and clear of all liens, claims, encumbrances, interests and other rights of any nature, whether at law or in equity, of any person ("Liens").

     Beazley shall be reimbursed by the Liquidation Trust (as defined in the Agreed Plan) up to an aggregate cap of $5 million (the "Beazley Reimbursement Claim") for (i) all of Beazley's reasonable and documented costs and expenses, if any, incurred in connection with

the Liquidation Trust's pursuit of Litigation Claims (as defined in the Agreed Plan) and (ii) all of Beazley's losses and reasonable and documented costs and expenses, if any, incurred in connection with claims or causes of action asserted by Palubicki, Carlos Feliciano or any of their respective related persons against Beazley.

The Settlement Order shall provide that (a) the Sale and the Assignment (defined below) is approved and authorized, (b) the Sale and the Assignment each represent a sound exercise of the Trustee's business judgment, will yield a fair and reasonable price for the assets being sold, is in the best interests of the Debtors' Estates, and otherwise complies with Section 363 of the Bankruptcy Code, and (c) the Sale and Assignment each constitute a purchase by Beazley in good faith pursuant to Section 363(m) of the Bankruptcy Code, rendering the provisions of Section 363(m) applicable and affording Beazley all protections thereunder.

*See* Global Settlement Agreement § IX.

- **Milestones and Plan Support:**

  Upon execution of this Agreement, the parties shall have the following obligations under the terms of this Agreement:

  On or before August 1, 2025, the Trustee shall file the *Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize and Approve Global Settlement and Associated Releases And Authorize Insurance Policies Buyback; for approval of the Settlement Agreement* (the "Settlement Motion") reasonably satisfactory to the other Parties, seeking entry of the proposed order attached hereto as **Exhibit A** (the "Settlement Order").

  On or prior to August 1, 2025, the Trustee shall file a proposed Chapter 11 plan and disclosure statement, in the lead case of the jointly administered Chapter 11 Cases, consistent in all respects with this Agreement, the Settlement Order, and the Plan attached hereto as **Exhibit B** (the "Agreed Plan").

  On or before August 15, 2025, the Trustee shall file the confirmation order for the Plan (the "Confirmation Order"), which Confirmation Order shall be consistent in all respects with this Agreement, the Settlement Order and the Agreed Plan and acceptable to all Parties to this Agreement.

  The Trustee shall seek a hearing on the Settlement Motion the week of September 1, 2025 and a confirmation hearing on the Agreed Plan the week of September 15, 2025, or as

soon as reasonably practicable in the ordinary course, subject to the availability of the Bankruptcy Court.

Sanchez and each of the NuMale Settling Defendants shall vote in favor of the Plan and shall not object to, or cause or encourage any person to object to, confirmation of the Agreed Plan or approval of the Settlement Motion; *provided* that the Individual Settling Defendants may exercise the rights granted to them in the Agreed Plan, including seeking approval of administrative, priority, and unsecured claims consistent with the Agreed Plan (but shall still be subject to support obligations in this Section II if such claim is not allowed).

The Trustee, Debtors, and the NuMale Settling Defendants (solely excluding Christopher Asandra, who represents and warrants that he does not have power over the Debtors or the Affiliate Entities) shall: (i) within three business days of execution of this Agreement, remove (or cause to be removed) Palubicki from any role as director, officer, manager, employee, agent, authorized person, or any other fiduciary or administrative role, with respect to all Debtors and Affiliate Entities; (ii) within three business days of execution of this Agreement, cause any Affiliate Entities which have not already executed this Agreement to join this Agreement; and (iii) cause (x) the Affiliate Entities and (y) the holders of intercompany claims, in each of the Chapter 11 Cases, to vote in favor of the Agreed Plan. The Trustee shall also use his commercially reasonable best efforts to cause NuMale Chicago, LLC, NuMale Medical Center, LLC, and NuMale North Carolina, PLLC to execute this Agreement.

The Settlement Order, the Agreed Plan, or the Confirmation Order shall not be modified without the prior written consent of each Party.

*See* Global Settlement Agreement § II.

- **Settlement with Individual Settling Defendants**

Through this Agreement and as described in the Agreed Plan, the NuMale Settling Defendants are providing the "New Value Contribution," which is the contribution to the Debtors and the Estates of each and every claim they could conceivably assert against Beazley, which claims were settled and released by this Agreement; (ii) contribution to the Estates of each and every claim they could conceivably assert under any Liability Insurance Policies held by any of the Debtors (solely excluding the claims each

released against Beazley and Sanchez in this Agreement); (iii) the agreement regarding the prosecution of the Quintairos Non-Debtor Claims as set forth in Section 5.12 of the Agreed Plan; (iv) the voluntary subordination of the NuMale Albuquerque Claim asserted in the amount of $1,080,292.91; and (v) the voluntary cancellation and release of the Intercompany Claims exceeding $3,000,000 (as set forth in Section 4.11 of the Agreed Plan).

As more fully described in the Agreed Plan, in consideration of their respective New Value Contribution, the NuMale Settling Defendants shall receive the treatment described in the Agreed Plan, which includes:

for Christopher Asandra, the full releases provided in this Agreement and an Allowed General Unsecured Claim in the amount of $417,705.75; and

for Justin Pulliam, (i) the full releases provided in this Agreement; (ii) the Pulliam Administrative Claim described in Section 1.1.109 of the Agreed Plan for his unpaid post-petition wages and expense reimbursement, the Pulliam Priority Claim described in Section 1.1.111 of the Agreed Plan for his unpaid pre-petition wages, and the Pulliam Unsecured Claim, which will be Allowed in an amount ultimately determined by stipulation between the Trustee and Justin Pulliam and/or Final Order of the Bankruptcy Court; (iii) the Debtors' 2019 Ford F150; and (iv) the 363 Stalking Horse Bid described in Section 1.1.7 of the Agreed Plan for the 363 Sale of the Debtors' 363 Assets (as defined in Section 1.1.4 of the Agreed Plan).

*See* Global Settlement Agreement § V.

- **The Sanchez Lawsuit and the Coverage Lawsuit:**

Upon execution of this Agreement by all Parties, the Parties to the Sanchez Lawsuit and Coverage Lawsuit (including the NuMale Settling Defendants) shall file joint motions seeking entry of the proposed orders attached hereto as **Exhibits C and D**, staying each respective case until the earlier of (i) the Effective Date; or (ii) the termination of this Agreement in accordance with its terms, including termination of the Settlement Agreement because the Bankruptcy Court declines to enter the Settlement Order.

During the pendency of the Consensual Stay, no Party shall assert or cause or encourage any other person to assert any claim or cause of action against any other Party that the Parties agree to release under Sections VII and VIII of this Agreement.

*See* Global Settlement Agreement § VI.

▪ **Releases:**

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, the NuMale Settling Defendants, the Debtors and the Affiliate Entities, on their own behalf, and on behalf of their past, present, and future agents, representatives, directors, officers, trustees, employees, agents, advisors, attorneys, accountants, shareholders, partners, predecessors, successors (including any trust formed in the Agreed Plan or any other Chapter 11 plan for the Debtors), heirs, executors, administrators, principals, assigns, insurers, and reinsurers (including the NuMale Insureds), each in their respective capacities as such (collectively, the "NuMale Parties") hereby release and forever discharge the Certain Underwriters at Lloyd's, London Syndicates 623 and 2623, Beazley USA Services, Inc., and Beazley Furlonge Limited, their direct and indirect affiliates, parents, subsidiaries, owners, members and shareholders, and their respective past, present, and future agents, representatives, directors, officers, trustees, employees, attorneys, accountants, shareholders, partners, predecessors, successors, heirs, executors, administrators, principals, assigns, insurers, and reinsurers (collectively, the "Beazley Parties") from any and all actual or potential actions, causes of action, notices, claims, suits, damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the NuMale Parties had, have, or may have in the future against the Beazley Parties which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly to the NuMale-Beazley Policies or Incident, including but not limited to the Sanchez Lawsuit and the Coverage Lawsuit.

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, the Beazley Parties hereby release and forever discharge the NuMale Parties from any and all actual or potential actions, causes of action, notices, claims, suits, damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the Beazley Parties had, have, or may have in the future against the NuMale Parties (except for Palubicki, Feliciano, NuMale Chicago LLC, NuMale Medical Center LLC, and NuMale North Carolina, PLLC) which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly to the Incident, including but not limited to the Sanchez Lawsuit and the Coverage Lawsuit.

1
2
3
4
5
6
7
8
9
10
11

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, Sanchez, on his own behalf, and on behalf of his past, present, and future agents, representatives, directors, officers, trustees, employees, attorneys, accountants, shareholders, partners, predecessors, successors, heirs, executors, administrators, principals, assigns, insurers, and reinsurers (collectively, the "Sanchez Parties") hereby releases and forever discharges the NuMale Parties, the NuMale Defendants, and the NuMale Insureds from any and all actual or potential actions, causes of action, notices, claims, suits, damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the Sanchez Parties had, have, or may have in the future against the NuMale Parties, the NuMale Defendants, and the NuMale Insureds which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly to the Incident, including but not limited to the Sanchez Lawsuit and the Coverage Lawsuit.

12
13
14
15
16
17
18
19

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, the NuMale Settling Defendants and the Affiliated Entities hereby release and forever discharge the Sanchez Parties from any and all actual or potential actions, causes of action, notices, claims, suits, damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the NuMale Settling Defendants and the Affiliated Entities had, have, or may have in the future against the Sanchez Parties which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly to the Incident, including but not limited to the Sanchez Lawsuit and the Coverage Lawsuit.

20
21
22
23
24
25
26
27

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, the Sanchez Parties hereby release and forever discharge the Beazley Parties from any and all actual or potential actions, causes of action, notices, claims, suits, damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the Sanchez Parties had, have, or may have in the future against the Beazley Parties (including by assignment) which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly to the Incident, including but not limited to the Sanchez Lawsuit and the Coverage Lawsuit.

28

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, the Beazley Parties hereby release and forever discharge the Sanchez Parties from any and all actual or potential actions, causes of action, notices, claims, suits, damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the Beazley Parties had, have, or may have in the future against the Sanchez Parties which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly to the Incident, including but not limited to the Sanchez Lawsuit and the Coverage Lawsuit.

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, the Debtors and the Affiliated Entities, on their own behalf, and on behalf of their direct and indirect affiliates, parents, subsidiaries, owners, members and shareholders, and their respective past, present, and future agents, representatives, directors, officers, trustees, employees, agents, advisors, attorneys, accountants, shareholders, partners, predecessors, successors (including any trust formed in the Plan or any other Chapter 11 plan for the Debtors), heirs, executors, administrators, principals, assigns, insurers, and reinsurers, each in their respective capacities as such (collectively, the "Debtor Parties") hereby release and forever discharge the Individual Settling Defendants and their direct and indirect affiliates, parents, subsidiaries, owners, members and shareholders, and their respective past, present, and future agents, representatives, directors, officers, trustees, employees, agents, advisors, attorneys, accountants, shareholders, partners, predecessors, successors, heirs, executors, administrators, principals, assigns, insurers, and reinsurers, each in their respective capacities as such (collectively, the "Individual Settling Defendant Parties") from any and all actual or potential actions, causes of action, notices, claims, suits, damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the Debtor Parties had, have, or may have in the future against the Individual Settling Defendant Parties which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly their involvement in any capacity with the Debtor Parties.

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by the Debtors, the Individual Settling Defendant Parties, hereby release and forever discharge the Debtor Parties from any and all actual or potential actions, causes of action, notices, claims, suits,

damages, judgments, costs, and demands whatsoever in law or in equity, known or unknown, now existing or hereafter arising, whether contractual, extra-contractual, in tort or otherwise, which the Individual Settling Defendant Parties had, have, or may have in the future against the Debtor Parties which were raised in, could have been raised in, arise out of, connect with, or relate directly or indirectly their involvement in any capacity with the Individual Settling Defendant Parties.

For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement:

> All claims against Brad Palubicki, Carlos Feliciano, NuMale Chicago LLC, NuMale Medical Center LLC, and NuMale North Carolina, PLLC are not being released by Beazley herein and are expressly preserved by, and for the benefit of, Beazley, including, without limitation all rights and claims that have been or could be asserted in the pending Coverage Lawsuit.

> The Palubicki/Feliciano Claims are not being released by the Estates, any Debtor, or Beazley, and are explicitly being retained by the various Estates and assigned to Beazley on the Effective Date in accordance Section X of this Agreement; and

> All claims against Quintairos, Prieto, Wood & Boyer, P.A. are not being released and are expressly preserved.

*See* Global Settlement Agreement § VII.

- ▪ **Assignment of the Palubicki/Feliciano Claims:**

> In consideration of the promises contained in this Agreement, upon the Effective Date, the Estates shall transfer and assign all Palubicki/Feliciano Claims to Beazley, free and clear of all Liens (the "<u>Assignment</u>").

> The Estates and any successor thereto, including the Liquidation Trust formed under the Agreed Plan, shall fully cooperate with, and assist Beazley in, prosecuting the Palubicki/Feliciano Claims, including in connection with providing documents and testimony necessary for (i) the successful prosecution of such claims and (ii) disclosing or reporting information to the United States Department of Justice, the United States Drug Enforcement Administration, the Internal Revenue Service, the Centers for Medicare & Medicaid Services and any other applicable state or federal licensing, regulatory or criminal governmental authorities, including in connection with the Palubicki Whistleblower Claims.

Upon the Effective Date, and without the need of the execution or delivery of any further documents or the taking of any other action by any Party, the Trustee, on behalf of the Estates, the Debtors and any successors thereto (including the Liquidation Trust formed under the Agreed Plan) hereby waives the Debtors' attorney-client privilege with respect to any documents, testimony, or other information or materials relating to the Palubicki/Feliciano Claims. For the avoidance of doubt, the Trustee shall not waive and shall retain his attorney-client privilege and all other privileges with respect to the lawyers the Trustee has retained in the Chapter 11 Cases, including Garman Turner Gordon LLP.

Within five (5) Business Days of the Effective Date, the Trustee, on behalf of the Estates and the Debtors, shall use best efforts to transfer to Beazley all documents and other information or materials relating to the Palubicki/Feliciano Claims, including, for the avoidance of doubt, the Palubicki Whistleblower Claims, and the Settlement Order shall direct the Estates and the Debtors to comply with the foregoing.  For the avoidance of doubt, the Trustee shall fully cooperate with all requests for information and documents requested by Beazley.

*See* Global Settlement Agreement § X.

*See* **Exhibit 1** (Global Settlement Agreement).

**T**RUSTEE'S **A**NALYSIS OF THE **G**LOBAL **S**ETTLEMENT **A**GREEMENT

61.    The Global Settlement Agreement for which the Trustee seeks Court approval is the result of significant efforts by the Trustee and his counsel Garman Turner Gordon LLP ("GTG"), and all of the parties to the Global Settlement Agreement and their counsel, to resolve litigation which commenced almost five (5) years ago (the Sanchez Lawsuit).  These efforts commenced within one (1) week of the Trustee's appointment and have been ongoing on a daily basis for nearly four (4) months.  The Sanchez Lawsuit is the result of treatment Sanchez allegedly received in 2017.  *See* Carmel Decl. ¶ 61.

62.    The Global Settlement Agreement also resolves the Coverage Lawsuit as to the Estates and the NuMale Settling Defendants (NuMale Corporation, NuMale New Mexico, Pulliam, Asandra, and NuMale Albuquerque LLC), as well as a variety of potential claims for "bad faith" denial of insurance coverage.  Those potential claims are asserted against Beazley.  *See* Carmel Decl. ¶ 62.

63.    The Global Settlement Agreement also fully resolves treatment of the Sanchez Claim.  Sanchez is compromising his claim from $579,442,390.01 to $410,000,000.00, a reduction of approximately twenty-nine percent (29%).  Thus, through negotiations, the Trustee has reduced the Estates' liability on the Sanchez Claim by almost $170,000,000.00.  *See* Carmel Decl. ¶ 63.

64.    The Global Settlement Agreement is fair, reasonable, made within the Trustee's sound business judgment, and clearly in the best interests of the creditors and the Debtors' Estates.  First, the Global Settlement Agreement brings **$108,500,000** (one hundred eight million, five hundred thousand dollars) into these Estates for distribution to creditors.  Second, the Global Settlement Agreement is part of a global settlement and resolution that includes a path to Plan confirmation and resolution of these Chapter 11 Cases.  Third, the Global Settlement Agreement brings an end to years of litigation in New Mexico involving Sanchez (the Sanchez Lawsuit, which is ongoing) and, as to the NuMale Settling Defendants, Beazley's coverage pursuant to the NuMale-Beazley Policies (the Coverage Lawsuit).  Fourth, the releases in the Global Settlement Agreement bring real and meaningful finality to all parties to the Sanchez Lawsuit and to the parties who are settling the Coverage Lawsuit, while preserving other claims for the Estates and the benefit of creditors (such as the Chapter 5 claims not otherwise transferred and assigned, the Estates' malpractice claim against the Quintairos Firm, the N2 Litigation Claim, the Hassoun Claim, and certain D&O and E&O claims).  *See* Carmel Decl. ¶ 69.

65.    Furthermore, the Global Settlement Agreement represents a sound exercise of the Trustee's business judgment, will yield a fair and reasonable price for the assets being sold, and is in the best interests of the Estates and the creditors.  *See* Carmel Decl. ¶ 70.

66.    With the assistance of his counsel GTG, the Trustee analyzed the myriad of claims which were being asserted by all of the parties.  These parties included Beazley, Sanchez, the Debtors who were NuMale Defendants in the Sanchez Lawsuit (NuMale Corporation and NuMale New Mexico), as well as the individuals Palubicki, Feliciano, Pulliam, and Asandra, and the entity NuMale Albuquerque.  *See* Carmel Decl. ¶ 92.

67.    When the Trustee was appointed, the non-Debtor NuMale Defendants reported their belief there were significant claims which could be asserted against Beazley.  Indeed, the

Trustee quickly learned many of the non-Debtor NuMale Defendants had apparently retained their own counsel to pursue those claims on a contingent fee basis.  *See* Carmel Decl. ¶ 93.

68.     Separately, Beazley had already filed the Coverage Lawsuit, which asserted claims that, *inter alia*, Beazley should not be obligated to make any payment(s) resulting from the Jury Verdict.  *See* Carmel Decl. ¶ 94.

69.     For his part, Sanchez was seeking an assignment of the bankruptcy Estates' bad faith claims for him to pursue against Beazley.  *See* Carmel Decl. ¶ 95.

70.     Although certain post-trial motions had been filed in the Sanchez Lawsuit, the automatic stay precluded those motions from going forward, at least with respect to the Debtors that were NuMale Defendants, absent stay relief.  *See* Carmel Decl. ¶ 96.

71.     The Trustee was also aware of the Estates' obligation to mitigate the damages and seek to reduce the Jury Verdict as much as possible.  This would require appeals in the New Mexico State Court system, as well as prosecution of all post-trial motions, including motions which had not yet been filed on behalf of the NuMale Defendants, as well as defending the post-verdict motions filed by Sanchez.  Additionally, as previously noted, the Trustee negotiated a compromise with Sanchez of approximately $170,000,000.00 of the Sanchez Claim.  This amount is exclusive of additional interest which would have otherwise accrued since the date of the Jury Verdict.  *See* Carmel Decl. ¶ 97.[8]

72.     The Trustee also became aware of the difficulty generally involved in overturning the Jury Verdict.  *See* Carmel Decl. ¶ 98.

73.     For the past approximately ten (10) weeks the Trustee and his counsel GTG have repeatedly attempted to reach an agreement with Palubicki and Feliciano—all to no avail.  The Trustee and his counsel have been in constant communication with them through their representatives (including their counsel) on an almost daily basis.  The Trustee believes Mr. Palubicki and Dr. Feliciano have held the Estates hostage for unreasonable payments at the

---

[8] Additionally, the Trustee understands the discretionary pre-judgment interest rate for tort actions in New Mexico is ten percent (10%), and the post-judgment interest rate for tort actions in New Mexico is fifteen percent (15%).  *See* Carmel Decl. ¶ 97 at n.10.

expense of the general creditor body, which would violate the absolute priority rule.  *See* Carmel Decl. ¶ 99.

74.    The Global Settlement Agreement provides, *inter alia*, an allocation of the $96,500,000.00 payment to Sanchez, which, among other things, states the Jury Verdict's $37,005,149.00 compensatory award is fully satisfied.  *See* Carmel Decl. ¶ 100.

75.    It is the Trustee's intent on behalf of the bankruptcy Estates, and as the party who is making the payment of $96,500,000 to Sanchez, that this payment constitutes compensation for the following alleged damages (a) thirty-seven million, five thousand, one hundred forty-nine dollars and zero cents ($37,005,149.00) in full and complete satisfaction of the compensatory damages awarded in the Special Verdict Form in the Sanchez Lawsuit issued in favor of Sanchez for damages on account of alleged personal physical injuries or physical sickness pursuant to Internal Revenue Code § 104(a)(2) (26 U.S.C. § 104 (a)(2)); (b) fourteen million fifty-one thousand, eight hundred thirty-three dollars and zero cents ($14,051,833.00) for punitive damages; and (c) forty-five million, four hundred forty-three thousand, eighteen dollars and zero cents ($45,443,018.00) for Sanchez's claim for associated legal fees and expenses for the Sanchez Lawsuit.  *See* Carmel Decl. ¶ 101.

76.    The Initial Distribution payment of $96,500,000 to Sanchez is consideration for the releases in the Global Settlement Agreement and dismissal of the Sanchez Lawsuit.  Sanchez will still be owed approximately $313,500,000 on the compromised Sanchez Claim of $410,000,000, after receipt of the $96,500,000 Initial Distribution payment, and will be the largest beneficiary (approximately 98%) of the proposed Liquidation Trust.  *See* Carmel Decl. ¶ 102.

77.    More specifically, the $96,500,000 Initial Distribution the Trustee will pay Sanchez to partially satisfy the Allowed Sanchez Claim is consideration offered in exchange for Sanchez's agreement to dismiss the Sanchez Lawsuit and enter into the releases set forth in the Global Settlement Agreement.  *See* Carmel Decl. ¶ 103.

78.    The Trustee does not believe collection against Beazley and any ultimate award would be difficult.  However, the risks and length of time associated with ultimately succeeding in prosecuting a bad faith claim against Beazley, as well as successfully defending against

Beazley's Coverage Lawsuit, weighed heavily in his assessment of the amounts which could ultimately be recovered.  *See* Carmel Decl. ¶ 104.

79.     The various pending lawsuits, as well as those which were about to be filed, were extremely complex.  Moreover, the Trustee estimates the costly appeals of the Jury Verdict alone would take no less than two to three years to resolve.  This does not include the time in litigating all of the bad faith claims, which has not yet commenced.  It is reasonable to assume the bad faith litigation, absent a settlement, would separately take no less than three (3) years, and perhaps much longer, to resolve, or go to trial, which bad faith litigation is attendant with risk for the Estates. *See* Carmel Decl. ¶ 105.

80.     Additionally, under the Global Settlement Agreement, the proposed Plan payment to Newtek is part of the negotiations to obtain Mr. Pulliam's release of claim(s) against Beazley. A separate motion seeking approval of the settlement with Newtek pursuant to Bankruptcy Rule 9019 will be filed.  *See* Carmel Decl. ¶ 106.

81.     Weighing all of the matters the Trustee considered, the Global Settlement Agreement for which the Trustee seeks Court approval is in the best interest of the creditors of these Estates.  *See* Carmel Decl. ¶ 107.

82.     Mr. Sanchez will be receiving $96,500,000 from the Initial Distribution.  This represents approximately Sixteen and One-Half Percent (16.5%) of his original claim and approximately twenty-three and one-half percent (23.5%) of his compromised claim.  *See* Carmel Decl. ¶ 108.

83.     The secured claims to be paid from the Initial Distribution aggregate approximately $1,000,000.  After holdbacks, payment of anticipated allowed administrative expenses, and priority claims, the Trustee has calculated the general unsecured creditors' return from the Initial Distribution to be approximately 26%.  This figure is before taking into account any reductions or compromises as a result of the claims objection process.  *See* Carmel Decl. ¶ 109.

84.     If the Court approves the Global Settlement Agreement, litigation which commenced in 2020 and the Coverage Lawsuit which commenced in March 2025 will be fully resolved, and there will be no future litigation for the Estates involving Sanchez, Beazley, and the

1    incident(s) subject of the Sanchez Lawsuit.  *See* Carmel Decl. ¶ 110.

## III.
## LEGAL ARGUMENT

A.    **Applicable Standard Under Bankruptcy Rule 9019.**

Compromise and settlement agreements have long been an integral part of the bankruptcy process.  *See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (*citing Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106 (1939)).  A bankruptcy court may approve a compromise if it makes an informed, independent judgment that the compromise is fair and equitable.  *See id.*

To determine whether a proposed settlement is fair and equitable, a bankruptcy court is directed to consider the following factors (the "A&C Properties Factors"): "(1) the probability of success in litigation of the dispute, (2) the difficulties to be encountered, if any, in the collection of an award, (3) the complexity, expense, inconvenience and delay of litigation, and (4) the interest of creditors in the case, giving deference to any reasonable views expressed."  *In re Endoscopy Ctr. of S. Nevada, LLC*, 451 B.R. 527, 535-36 (Bankr. D. Nev. 2011) (*citing In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986)).

In seeking approval of a compromise, the trustee has the burden of persuasion.  *See id*. at 536 (citation omitted).  However, the trustee is not necessarily required to satisfy each of the A&C Properties Factors if the A&C Properties Factors favor approval of the settlement as a whole.  *In re Pacific Gas and Elec. Co.*, 304 B.R. 395, 416-17 (Bankr. N.D. Cal. 2004).  A bankruptcy court may approve a settlement pursuant to Bankruptcy Rule 9019 where, based on its own judgment, the Court determines that the settlement is "fair and equitable when comparing the claims being compromised against the likely rewards of litigation."  *In re Endoscopy Center*, 451 B.R. at 535 (*citing TMT Trailer*, 390 U.S. at 425).

Thus, the settlement does not have to be the best the trustee could have possibly obtained, but must only fall "within the reasonable range of litigation possibilities."  *In re Adelphia Comm'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (citation omitted).  The court is not required to

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

conduct a mini-trial of the underlying claims or rule upon disputed facts and questions of law, which would defeat the purpose of settlement and frustrate negotiations, but need only canvass the issues. *See Suter v. Goedert*, 396 B.R. 535, 548 (D. Nev. 2008) (*citing*, *inter alia*, *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997)); *In re Western Funding Inc.*, 550 B.R. 841, 852 (B.A.P. 9th Cir. 2016), *aff'd,* 705 F. App'x 600 (9th Cir. 2017); *In re Sanders*, 2023 WL 5098577, *6 (B.A.P. 9th Cir. Aug. 9, 2023) (citation omitted).

**B.**      **The Global Settlement Agreement Is Fair and Reasonable and Should be Approved.**

The Global Settlement Agreement reached with the Trustee, nine-figure verdict creditor Sanchez, malpractice insurer Beazley, the NuMale Settling Defendants,[9] and the Affiliate Entities,[10] is fair, reasonable, made within the Trustee's business judgment, and clearly in the best interest of the creditors and the Debtors' Estates. First, the Global Settlement Agreement brings **$108,500,000** (one hundred eight million, five hundred thousand dollars) into these Estates for distribution to creditors. Second, the Global Settlement Agreement is part of a global settlement and resolution that includes a path to Plan confirmation and resolution of these Chapter 11 Cases. Third, the Global Settlement Agreement brings an end to years of litigation in New Mexico involving Sanchez (the Sanchez Lawsuit, which is ongoing) and, as to the NuMale Settlement Defendants, Beazley's coverage pursuant to the NuMale-Beazley Policies (the Coverage Lawsuit). Fourth, the comprehensive releases in the Global Settlement Agreement bring real and meaningful finality to all parties to the Sanchez Lawsuit and to the Parties who are settling the Coverage Lawsuit, while preserving other claims for the Estates and the benefit of creditors (such as the Chapter 5 claims not otherwise transferred and assigned, the Estates' malpractice claim against the Quintairos Firm, the N2 Litigation Claim, the Hassoun Claim, and certain claims under the Debtors' D&O and E&O (non-Beazley) policies. *See* Carmel Decl. ¶ 111.

Furthermore, the Global Settlement Agreement represents a sound exercise of the Trustee's

---

[9] Collectively, NuMale Corporation, NuMale New Mexico, Asandra, Pulliam, and NuMale Albuquerque.

[10] Collectively, NMC Illinois, LLC, Nevada NuMale LLC, NuMale Albuquerque LLC, NuFemme Milwaukee, LLC, NuMale Green Bay, LLC, NuMale Wisconsin GB, SC, NuMale Omaha, LLC, NuMale Tampa, LLC, NuMale Charlotte, LLC, and NuMale Denver, LLC.

business judgment, will yield a fair and reasonable price for the assets being sold, and is in the best interests of the Estates.  *See* Carmel Decl. ¶ 112.

### a.    The probability of success in litigation.

The Parties to the Global Settlement Agreement have diametrically opposing views as to the probability of success in the many disputes that are resolved through the Global Settlement Agreement: (i) the Trustee's anticipated declaratory relief action concerning the NuMale-Beazley Policies, (ii) the Coverage Lawsuit and the disputes regarding the scope of coverage provided by the NuMale-Beazley Policies, (iii) the Sanchez Lawsuit including the amount of any judgment ultimately to be entered by the New Mexico Court, (iv) the appropriate amount of the liquidated Sanchez Claim in these Chapter 11 Cases), (v) the bad faith claims against Beazley, and (vi) the ability to successfully reorganize these Debtors in the absence of the Global Settlement Agreement.

The Trustee has prepared a declaratory relief action against Beazley and believes he will succeed in obtaining a determination that the NuMale-Beazley Policies and the Policy Proceeds are property of these Estates.  Furthermore, the Trustee believes that any asserted rights under the NuMale-Beazley Policies, and all claims against Beazley that could be brought pursuant to, in connection with, as a consequence or result of, or under the NuMale-Beazley Policies including but not limited to any bad faith claim(s) on the NuMale-Beazley Policies, are also property of the Estates.  Others dispute this, so, the parties have disparate views on the Trustee's probability of success on these issues.  The Global Settlement Agreement resolves these disputes, obviating the need for the Trustee to file his anticipated lawsuit against Beazley.  *See* Carmel Decl. ¶ 71.

For their part, certain non-Debtor NuMale Defendants—Palubicki, Feliciano, Pulliam, Asandra—strenuously disagree with the Trustee and have expressed a belief that *they* have bad faith claims against Beazley.  The non-Debtor NuMale Defendants contend they have these bad faith claims notwithstanding that no judgment has been entered in the Sanchez Lawsuit—analysis the Trustee strenuously disputes.  This belief held by these non-Debtor NuMale Defendants, and the commensurate "potential" to realize lucrative litigation proceeds, rendered negotiations difficult because the parties were entrenched in their respective positions—the Trustee included,

given his analysis that the bad faith claims against Beazley are property of these Estates.  As to Pulliam and Asandra, these disputes are resolved through the Global Settlement Agreement.  *See* Carmel Decl. ¶ 72.

Meanwhile, Sanchez contends that all NuMale Defendants are jointly and severally liable for the entire verdict arising from fraud, unfair and unconscionable trade practices, and negligence as a matter of New Mexico law.[11]  However Beazley disagrees, contending that only NuMale Corporation is responsible for $375,000,000 in punitive damages awarded by the Jury Verdict, and all NuMale Defendants are liable for only the $37,005,149 compensatory damages portion.[12]  This dispute is only one of the components that must be resolved in the Sanchez Lawsuit in order for the Jury Verdict to be liquidated to a judgment.  This and other issues are expected to be hotly contested and vigorously litigated.  *See* Carmel Decl. ¶ 73.

Further complicating matters, the parties to the Sanchez Lawsuit (Sanchez, on the one hand, the NuMale Defendants on the other) each believe they will prevail in the post-verdict motions which are pending and anticipated in that case.  The outcome of these post-verdict motions will determine, for example, the application of prejudgment interest to the verdict amount, among other issues of critical importance that affect the liquidation of the Sanchez Claim.  And, after that, the parties to the Sanchez Lawsuit anticipate appealing the judgment.  *See* Carmel Decl. ¶ 74.

Taking all these considerations into account, the probability of success factor weighs strongly in favor of approving the Global Settlement Agreement.

**b.    The difficulties to be encountered, if any, in the collection of an award.**

This factor favors approval of the Global Settlement Agreement.  As a preliminary matter, this is not a situation in which the Trustee would be recovering any funds from Sanchez, so as to Sanchez this factor is neutral.  However, the Trustee anticipates difficulties in collecting from Beazley.  While the Trustee is confident that Beazley has sufficient assets to satisfy the eventual judgment anticipated in the Sanchez Lawsuit, and any commensurate award entered against

---

[11] *See, e.g.*, Claim No. 7-1 Part 2 p. 7 of 75 at Question 11.

[12] *See, e.g.*, ECF No. 179 at ¶ 4.

Beazley in the Trustee's bad faith action against Beazley, the difficulty in collection comes from the heavy litigation the Trustee foresees as necessary to get to each of those endpoints (a final judgment in the Sanchez Lawsuit, a final judgment in the bad faith litigation). For these reasons, the Trustee believes the Global Settlement Agreement avoids the extended costly litigation requisite to ultimately collect funds from Beazley and bring money into the Estates expeditiously, and do this much sooner than would otherwise be possible. *See* Carmel Decl. ¶ 75.

Furthermore, the Estates coming into significant funds—on a much shorter timetable than would otherwise exist were the Estates to continue litigating the Sanchez Lawsuit and separately litigate a bad faith lawsuit against Beazley—means that a confirmable Plan can be proposed within the first few months of the Trustee's appointment. In *settling with* Beazley, the Trustee is resolving the issues associated with litigation delay causing a difficulty in collecting from Beazley, thus ensuring the Estates reap the benefits of these funds much more quickly. *See* Carmel Decl. ¶ 76.

Based on these considerations this factor strongly weighs in favor of approving the Global Settlement Agreement.

        **c.**        **The complexity, expense, inconvenience, and delay of litigation.**

This factor strongly favors approval of the Global Settlement Agreement because the complexity, expense, inconvenience, and delay associated with litigating the issues resolved through the Global Settlement Agreement is significant.

First, the Trustee's anticipated declaratory relief action against Beazley and the scope of coverage of the NuMale-Beazley Policies will be litigated heavily, and, therefore, will be expensive for the Estates and take significant time to resolve. This is made more complex by the Coverage Lawsuit, which Beazley initiated against the non-Debtor NuMale Defendants concerning coverage under the NuMale-Beazley Policies, which policies are property of these Estates. Litigating these issues with Beazley will require extensive briefing, and, considering the Trustee and Beazley have opposing views on these issues, the litigation is unlikely to settle and therefore highly likely to be expensive, inconvenient, and lengthy, even though the Trustee believes he would prevail. *See* Carmel Decl. ¶ 77.

Second, litigating the Estates' bad faith claims against Beazley in connection with the

Sanchez Lawsuit will be very hard fought, not only against Beazley on these claims, but also will require coordination with the other NuMale Defendants who believe they too hold bad faith claims related to the Sanchez Lawsuit. By settling with the NuMale Settling Defendants, the Trustee brings them "on side", and their bad faith claims are resolved through the Global Settlement Agreement along with the Estates'. Any litigation of the bad faith by Beazley in connection with its handling of the claims(s) pertinent to the Sanchez Lawsuit will be very fact intensive and involve circumstances dating back more than five years. Discovery will, as a result, be lengthy and likely contentious. Moreover, the legal issues relating to Beazley's bad faith are not simple. This litigation will be complex, involve multiple parties with diametrically opposing views, will require experts, and potentially a jury trial—all of which will be expensive, protracted, and preclude any recovery for creditors for many years. As such, the Global Settlement Agreement resolving the Estates' bad faith claims, and those of the NuMale Settling Defendants, as a component of a global resolution, is not only meaningful, but it avoids the complexity, delay, inconvenience, and expense of litigating these claims. *See* Carmel Decl. ¶ 78.

The Trustee submits that, as to the Non-Settling Defendants Palubicki and Feliciano (collectively, the "Non-Settling Defendants"), who are not parties to the Global Settlement Agreement, the bad faith claims they allege they hold are rendered valueless and/or void by the Global Settlement Agreement; and, in any event, Palubicki and Feliciano are subject to additional, separate litigation claims held by the Estates that are transferred and assigned to Beazley. *See* Carmel Decl. ¶ 79.

Third, the post-verdict motion practice and anticipated appeal in the Sanchez Lawsuit could take years. The Estates will not be paying the fees and costs incurred by defense counsel (Beazley is paying those directly),[13] so, the expense of litigation (while anticipated to be significant) is not an expense of the Estates. However, the legal issues are complex, and the parties do not have alignment on the issues raised in Sanchez's post-verdict motions. Furthermore, at present, the NuMale Defendants have yet to file all their post-verdict motions. These must be filed and fully

---

[13] *See, e.g.*, ECF Nos. 269-271, 322, 328-329, 335; *see also* ECF Nos. 272-274, 330-331, 336.

briefed before the New Mexico Court can adjudicate all post-trial motions and ultimately enter a judgment. The delays associated with the remaining phases of this litigation are extensive. First, it is now eight months after the jury verdict, and Sanchez's post-verdict motions have not been adjudicated, and the NuMale Defendants' post-verdict motions have not yet been fully briefed or argued. Second, after the New Mexico Court enters judgment, the parties plan to appeal the judgment after certain post-judgment motion practice. The length of time of any appeal is uncertain, but even a conservative estimate amounts to a multi-year delay and there may be multiple appeals.[14] Therefore, the delay, inconvenience, and complexity associated with reaching a final resolution of the Sanchez Lawsuit are significant. *See* Carmel Decl. ¶ 80.

Last, the Global Settlement Agreement brings a more expeditious and effective resolution to these Chapter 11 Cases by paving the path for the Trustee to proceed with a confirmable Plan of reorganization largely funded by the Beazley Purchase and Settlement Amount. Although settlement negotiations were initiated by the Trustee and his counsel GTG, and have been extensive and ongoing for the duration of the Trustee's appointment, and the resolution embodied in the Global Settlement Agreement was by no means achieved easily or readily, the funds remitted by Beazley pursuant to the Global Settlement Agreement (the Purchase and Settlement Amount of $108,500,000.00) materially improve in all respects the delay, inconvenience, complexity, and expense associated with confirming a plan of reorganization in these Chapter 11 Cases. *See* Carmel Decl. ¶ 81.

Based on the Trustee's investigations, it appears the Debtors have required some form of outside funding to stay afloat for approximately five years[15]—making it difficult and complex, if

---

[14] And, until the appeals are exhausted in the Sanchez Lawsuit, the Sanchez Claim in these Chapter 11 Cases is unliquidated.

[15] The Trustee's investigations have revealed: (i) from April 2020 through February 2021 the Debtors, collectively, received over $1.098 million in paycheck protection loans that were ultimately forgiven; (ii) as the Debtors' financial strife escalated in 2023 (*i.e.*, as then-senior debt became due), in approximately December 2023 NuMale Corporation and others took out a $5 million Small Business Association-backed loan from Newtek Bank, National Association, ("Newtek") and, of the $5 million in proceeds received under this loan facility, approximately $2,410,964.73 went to "working capital" for NuMale Corporation, which then transferred approximately $407,280 to various NuMale entities and used approximately $1,312,653.90 to fund losses; (iii) in the last four months of 2024 alone the Debtors appear to have taken out over $1.1 million in Merchant Cash Advance loans; and (iv) the Debtors also financed operations through factoring-type arrangements as well. *See* Carmel Decl. ¶ 82.

1    not impossible, to prosecute a confirmable plan in these Chapter 11 Cases that is funded from

2    operations alone.  Because the Global Settlement Agreement brings immediate and significant

3    money into the Estates in the form of the Purchase and Settlement Amount, the Global Settlement

4    Agreement avoids the complexity, expense, delay, and inconvenience of litigating and prosecuting

5    a plan of reorganization premised on other means of recovery (which appear scant, based on the

6    information the Trustee has uncovered in the course of his investigations to date).  *See* Carmel

7    Decl. ¶ 83.

8            All of these considerations taken together mean that the complexity, expense,

9    inconvenience, and delay associated with litigating these several complex issues are saved through

10    approving the Global Settlement Agreement.  As such, this factor strongly favors approval of the

11    Global Settlement Agreement.

12                    **d.        The interests of creditors, giving deference to any reasonable views.**

13            There can be no question that producing nine figures in value for these Estates; achieving

14    (first the stay and ultimately) the dismissal of both the Sanchez Lawsuit and the Coverage Lawsuit

15    as to the Estates and the Parties to the Global Settlement Agreement; resolving the disputes

16    associated with the NuMale Settling Defendants' (including the Estates') bad faith claims

17    connected to Beazley, the NuMale-Beazley Policies, and the Sanchez Lawsuit, as to all Parties to

18    the Global Settlement Agreement; and providing for milestones and Plan support in the form of

19    Plan treatment and acceptance, is in the best interests of the Estates and their creditors.  *See* Carmel

20    Decl. ¶ 84.

21            By entering into the Global Settlement Agreement the Trustee is making it possible for a

22    distribution to be made to creditors of all the Estates **this year**.  Given the Debtors' operational

23    issues, history of prepetition lending, and the state of business operations at the time of the

24    Trustee's appointment, the Trustee is not optimistic that these Estates will generate any meaningful

25    recovery to creditors in the absence of approval of this Global Settlement Agreement—which

26    brings in a nine-figure sum to these Estates within the first approximately six (6) months of his

27    appointment.  This is substantially more money than the Debtors' operations could ever provide.

28    Undoubtedly, approval of the Global Settlement Agreement is in the best interests of creditors and

1    the Estates. *See* Carmel Decl. ¶ 85.

2         Additionally, under the Global Settlement Agreement no Party thereto may pursue or cause

3    another party to pursue claims that are released under the Global Settlement Agreement. The

4    Global Settlement Agreement also has carve-outs for the Chapter 5 claims (other than the

5    Palubicki/Feliciano Claims, which are transferred and assigned to Beazley), certain D&O and

6    E&O claims such as those identified in the Carrier Notice Letters, and the malpractice claim

7    against the Quintairos Firm, among others, so, the value of these and of all Litigation Claims under

8    the Plan are preserved for the benefit of creditors (as beneficiaries of the Liquidation Trust). Thus,

9    while the claims resolved through the Global Settlement Agreement are fully and finally resolved

10   (and the Global Settlement Agreement contains a prohibition on litigating any claims released

11   thereunder), certain select valuable litigation claims *are* preserved, notwithstanding these releases.

12   *See* Carmel Decl. ¶ 86.

13        Particularly impactful to the administration of these Chapter 11 Cases, however, is that the

14   Global Settlement Agreement provides for milestones and support for the Trustee's Plan.

15   Commensurate with the Global Settlement Agreement, the Parties agreed to Plan terms that

16   provide for a confirmable exit strategy for these Chapter 11 Cases, in which the Sanchez Claim is

17   liquidated, administrative (to the extent not otherwise deferred or voluntarily reduced) and priority

18   creditors are paid in full, secured creditors (to the extent they hold valid, perfected liens) are paid

19   in full, and general unsecured creditors receive a distribution from the Purchase and Settlement

20   Amount and become beneficiaries of the Liquidation Trust. In addition, the Plan provides for the

21   Liquidation Trust that will, post-confirmation, liquidate the remaining assets of the Estates and

22   provide a further distribution to beneficiaries. *See* Carmel Decl. ¶ 86.

23        Undoubtedly, this factor weighs in favor of approval of the Global Settlement Agreement.

24        Approval of this Motion **is not** approval of the Plan, and confirmation of the Plan is not a

25   condition of Beazley's funding the Purchase and Settlement Amount to the Estates, which in turn

26   will fund the Initial Distribution to Sanchez. However, the Global Settlement Agreement's

27   approval is a foundational cornerstone to the Trustee prosecuting the confirmable Plan he prepared

28   commensurate with the Global Settlement Agreement. *See* Carmel Decl. ¶ 88. Based on the

1    foregoing analyses, the Trustee submits that the compromise in the form of the Global Settlement

2    Agreement is fair and reasonable, and he requests that it be approved.  *See* Carmel Decl. ¶ 89.

3    **C.**    **The Court Should Approve Under Section 363 the NuMale-Beazley Policies Buyback.**

4            Commensurate with approval of the Global Settlement Agreement, the Trustee also seeks

5    Court authority under 11 U.S.C. § 363 to effectuate the buyback of the NuMale-Beazley Policies,

6    as contemplated by the Global Settlement Agreement.

7            Section 363(b)(1) of the Bankruptcy Code provides in pertinent part, "[t]he trustee, after

8    notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property

9    of the estate . . . ."  11 U.S.C. § 363(b)(1).  "This plain text is generalized and sweeping; so long

10   as the bankruptcy court approves a proposed transaction under defined standards discussed below,

11   nearly any 'use,' 'sale,' or 'lease' of property is permitted."  *In re Claar Cellars LLC*, 2020 WL

12   1238924, *3 (Bankr. E.D. Wash. 2020).  However, Section 363(b)(1) is not without limits.  As

13   described by the Court:

14               Section 363(b)(1) is, of course, not limitless.  Its neighboring subsections
                impose restrictions in certain specified contexts. Other sections similarly
15               cabin or complicate its utility.  Applicable nonbankruptcy law also confines
                what might otherwise be permitted based solely on section 363(b)(1)'s text.
16               These assorted statutory provisions throttle the force of section 363(b)(1),
                but what remains is an exceptionally powerful engine. This is undoubtedly
17               by design insofar as section 363(b)(1) lies at the heart of a series of broad
                administrative powers sweeping widely to protect and maximize the
18               bankruptcy estate for stakeholders.  And more notably, the provision
                codifies principles of long lineage in United States bankruptcy law—if an
19               estate is to be maximized, then its representative must enjoy a flexible and
                broad mandate to use or sell the estate's assets to realize or create value.
20

21   *In re Claar Cellars*, 2020 WL 1238924 at *3 (footnotes and citations omitted).

22           "Because the requirements of § 363(b) protect the creditors' interest in the estate's assets,

23   '[t]he usual effect of a sale or lease of property of the estate, conducted outside of the ordinary

24   course of business but without adherence to the notice and hearing requirements of § 363(b)(1), is

25   that any sale held is rendered null and void.'"  *In re Koneta*, 357 B.R. 540, 543-44 (Bankr. D. Ariz.

26   2006) (collecting cases).  To approve the use of assets outside the ordinary course of business

27   pursuant to Section 363(b), a court must find that a "good business reason" exists for the use of

28

assets.  *See, e.g.*, *Official Comm. of Unsecured Creditors v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 27-28 (S.D.N.Y. 2005) (quoting *In re Lionel Corp.*, 722 F. 2d 1063, 1071 (2d Cir. 1983)).

Bankruptcy courts routinely defer to the trustee's business judgment on business decisions. *See Group of Inst'l Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  *See also In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985) (noting that authority to operate the business "necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters." (citation omitted)); *see also In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (concurring with the premise "that business judgments should be left to the board room . . ."). *See also In re Curlew Valley Assoc.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (declining to second-guess a trustee's business judgment when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code.") (footnotes omitted).  In general, a bankruptcy court should defer to a trustee's business judgment unless such decision is arbitrary and capricious.  *See id.*, 14 B.R. at 511-13.

The business judgment rule is satisfied where "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).  "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted), *rev'd on other grounds*, 801 F.2d 60 (2d Cir. 1986).

The Global Settlement Agreement, and the buyback of the NuMale-Beazley Policies free and clear of any liens or interests pursuant thereto (the "Policy Buyback"), are a reasonable exercise of the Trustee's business judgment.  Several good business reasons support this.  First, the Trustee is not aware of any liens encumbering the assets proposed to be sold (the NuMale-Beazley Policies). Second, the Policy Buyback (which is a sale of the NuMale-Beazley Policies,

to Beazley) is in the best interests of the Debtors' creditors because it brings finality to all of the Estates' litigation involving the NuMale-Beazley Policies and is a sale of the NuMale-Beazley Policies that brings $108,500,000 into the Estates.  *See* Carmel Decl. ¶ 111.

More specifically, the Global Settlement Agreement at Section IX provides in part:

> In consideration of the promises contained in this Agreement, upon the Effective Date: (i) the limits of liability of the NuMale-Beazley Policies shall be fully extinguished and exhausted for all claims; (ii) any purported rights, duties, responsibilities and obligations of the Beazley Parties alleged to have been created or that may be created by the NuMale-Beazley Policies (to the extent they are not void ab initio) are hereby deemed extinguished, terminated, canceled, and otherwise fully satisfied; and (iii) any and all rights under the NuMale-Beazley Policies (to the extent they are not void ab initio) shall be and are extinguished, terminated and voided, subject to the terms and conditions of this Agreement.  The NuMale-Beazley Policies are to be thereafter treated as null and void (to the extent they are not void ab initio), and no person or entity shall have the right thereafter to present or tender any claim under the NuMale-Beazley Policies.

> Upon the Effective Date, and without the need of the execution or delivery of any further documentation or the taking of any other action by any Party, the NuMale Parties shall be deemed to have sold, transferred and conveyed all of their right, title and interest in the NuMale-Beazley Policies to Beazley pursuant to Section 363 of the Bankruptcy Code (the "Sale"), free and clear of all liens, claims, encumbrances, interests and other rights of any nature, whether at law or in equity, of any person ("Liens").

*See* Global Settlement Agreement at Section IX.A. and B.

Under such circumstances, approval of the Policy Buyback is a reasonable exercise of the Trustee's business judgment.  The sale of the NuMale-Beazley Policies represents a sound exercise of the Trustee's business judgment, will yield a fair and reasonable price for the NuMale-Beazley Policies being sold, is in the best interests of the Debtors' Estates, otherwise complies with Section 363 of the Bankruptcy Code, is a consensual sale of the NuMale-Beazley Policies pursuant to the Global Settlement Agreement, and constitutes a purchase by Beazley in good faith pursuant to Section 363(m) of the Bankruptcy Code.  Based on the foregoing, it is Trustee Carmel's business

judgment that a sale of the NuMale-Beazley Policies is in the best interests of the Estates and creditors.  *See* Carmel Decl. ¶ 112.

Last, the Policy Buyback generates significant revenue for these Estates and eliminates future anticipated litigation costs for the Estates which are not insignificant.  Additionally, the Policy Buyback brings an end to the significant litigation regarding Mr. Sanchez's treatment at the Debtors' New Mexico clinic nearly eight years ago—and brings significant money into the Estates which can be used to pay creditors.  Thus, the Trustee's sale of the NuMale-Beazley Policies (the Policy Buyback) is an appropriate and reasonable exercise of his business judgment, and should be approved. *See* Carmel Decl. ¶ 113.

For these reasons, the Policy Buyback of the NuMale-Beazley Policies, as set forth in the Global Settlement Agreement, should be authorized under Section 363(b) of the Bankruptcy Code.

1. **Beazley Is Entitled to a Good Faith Finding.**

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

As set forth more fully in the Carmel Decl., the Trustee submits that the sale of the NuMale-Beazley Policies to Beazley (the Policy Buyback of the Global Settlement Agreement) is the product of arm's-length, good faith negotiations that have taken place over the course of the months since the Trustee's appointment.  *See* Carmel Decl. ¶ 114.  Accordingly, the Trustee requests that the Court make a finding at the Sale Hearing and in the Sale Order that the Policy Buyback is in good faith, and, as such, Beazley is entitled to the full protections of Section 363(m), thereby protecting Beazley's purchased interest in Policy Buyback should the Policy Buyback ever be successfully challenged on appeal.

a. **Notice of the Motion Is Sufficient.**

Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property that is not in the ordinary course of business must be given: (A) under Rule 2002(a)(2),

(c)(1), (i), and (k); and (B) in accordance with § 363(b)(2), if applicable." *See* Bankruptcy Rule 6004(a). Bankruptcy Rule 2002(a)(2) requires at least twenty-one days' notice by mail to the debtor, the trustee, all creditors, and indenture trustees of a proposal to use, sale, or lease property of the estate other than in the ordinary course of business (unless the court for cause shown shortens the time or orders another method of giving notice). Bankruptcy Rule 2002(a)(2).[16] Additionally, Bankruptcy Rule 2002(c)(1) requires notice of the time and place of a sale or use of property and begins with:

> Subject to Rule 6004, the notice of a proposed use, sale, or lease of property under (a)(2) must include: (A) a general description of the property; (B) the time and place of any public sale; (C) the terms and conditions of any private sale; (D) the time to file objections; and (E) for a proposed sale or lease of personally identifiable information under § 363(b)(1), a statement whether the sale is consistent with any policy that prohibits transferring the information.

*See* Bankruptcy Rule 2002(c)(1).

Here, notice of the Motion and the relief requested therein, the Global Settlement Agreement, and the sale of the NuMale-Beazley Policies, and Policy Buyback contemplated thereby, conform with these requirements and are appropriate under the circumstances. And, the Motion is filed in the ordinary course and will be heard on the Court's regular law and motion calendar in a timeframe conforming to these Rules. As such, the Trustee submits that notice of the Motion and relief requested therein is appropriate, and no further, additional, or supplemental notice is required.

### b. **Waiver of Fourteen-Day Stay Is Warranted.**

Bankruptcy Rule 6004(h) provides in pertinent part that "Unless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14

---

[16] Additionally, Bankruptcy Rule 2002(c)(1) requires notice of the time and place of a sale or use of property and begins with:

> Subject to Rule 6004, the notice of a proposed use, sale, or lease of property under (a)(2) must include: (A) a general description of the property; (B) the time and place of any public sale; (C) the terms and conditions of any private sale; (D) the time to file objections; and (E) for a proposed sale or lease of personally identifiable information under § 363(b)(1), a statement whether the sale is consistent with any policy that prohibits transferring the information.

days after the order is entered." *See* Bankruptcy Rule 6004(h). *See also* Bankruptcy Rule 6006(d) ("Unless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) if stayed for 14 days after the order is entered.").

Here, the Motion will be heard on September 2, 2025, in advance of Plan confirmation. Plan confirmation is anticipated to take place September 24, 2025. Because the Purchase and Settlement Amount largely funds the Plan, and because the approval of the Global Settlement Agreement is a cornerstone of the Plan, the 9019 Order should be effective immediately and should not be stayed, in order to afford all parties the opportunity to effectuate the Global Settlement Agreement's term's in the days leading up to Plan Confirmation. Therefore, relief from the fourteen-day stay otherwise applicable under Bankruptcy Rules 6004(h) and 6006(d) to the 9019 Order is appropriate. The Trustee therefore requests that this Court find cause exists to waive the fourteen-day stay otherwise applicable under Bankruptcy Rules 6004(h) and 6006(d) and provide in the 9019 Order granting this Motion that such order is effective immediately.

## IV.
## CONCLUSION

The settlement memorialized in the Global Settlement Agreement attached as **Exhibit 1** hereto is in the best interest of the Estates and the Debtors' creditors and is fair and equitable under the standard set forth in *A&C Properties*. Accordingly, the Trustee respectfully requests that the Court enter the proposed 9019 Order attached hereto as **Exhibit 1-A** approving of the Global Settlement Agreement and for a waiver of the 14-day stay under Bankruptcy Rule 6004(h) on the entry of the order approving this Motion, and that the Court grant other and further relief as is just and proper.

Dated this 1st day of August 2025.

GARMAN TURNER GORDON LLP

By: */s/ Talitha Gray Kozlowski*
    GREGORY E. GARMAN, ESQ.
    TALITHA GRAY KOZLOWSKI, ESQ.
    MARY LANGSNER, Ph.D.
    7251 Amigo Street, Suite 210
    Las Vegas, Nevada 89119
    *Attorneys for Michael Carmel, Chapter 11*
    *Trustee*