GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail:  ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,*
*Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Lead Case No.: 25-10341-nmc<br>Chapter 11 |
| NUMALE CORPORATION, | |
| AFFECTS THIS DEBTOR, ☐ | *Jointly administered with:* |
| AFFECTS FELICIANO<br>NUMALE NEVADA PLLC, ☐ | Feliciano NuMale Nevada PLLC,<br>Case No. 25-10342-nmc |
| NUMEDICAL SC, ☐ | NuMedical SC<br>Case No. 25-10343-nmc |
| NUMALE COLORADO SC, ☐ | NuMale Colorado SC,<br>Case No. 25-10344-nmc |
| NUMALE FLORIDA TB PLLC, ☐ | NuMale Florida TB PLLC,<br>Case No. 25-10345-nmc |
| NUMALE NEBRASKA LLC, ☐ | NuMale Nebraska LLC<br>Case No. 25-10346-nmc |
| NUMALE NEW MEXICO SC, ☐ | NuMale New Mexico SC<br>Case No. 25-10347-nmc |
| NUMALE ALL DEBTORS, ☒ | |
| Debtors. | Hearing Date:  September 2, 2025<br>Hearing Time: 9:30 a.m. |

**DECLARATION OF MICHAEL CARMEL IN SUPPORT OF**
**MOTION PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. §§ 363 AND 105 TO**
**AUTHORIZE AND APPROVE GLOBAL SETTLEMENT AND ASSOCIATED**
**RELEASES AND AUTHORIZE INSURANCE POLICIES BUYBACK**

I, Michael Carmel, Esq., hereby declare as follows:

1.      I am over the age of 18 and mentally competent.  I have personal knowledge of the facts in this matter and if called upon to testify, could and would do so.

2.      I make this declaration in support of the *Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize and Approve Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* (the "Motion").[1]

3.      The Motion seeks Court approval of the Global Settlement Agreement and approval of the policy buyback that is a component of the Global Settlement Agreement including a good faith finding under  11 U.S.C. § 363(m) as to Beazley's Policy Buyback of the NuMale-Beazley Policies.  A copy of the Global Settlement Agreement is attached to the Motion as **Exhibit 1**.

4.      I am the duly appointed Chapter 11 trustee ("Trustee") over the bankruptcy Estates of Debtors NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors").

5.      On January 22, 2025 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned  bankruptcy cases (collectively, the "Chapter 11 Cases").  *See, e.g.*, ECF No. 1.

6.      On April 1, 2025, this Court entered its *Interim Order Directing Joint Administration of Chapter 11 Cases*.  *See* ECF No. 130.

7.      On April 2, 2025, this Court entered its *Order on United States Trustee's Motion to Appoint Chapter 11 Trustee Under 11 U.S.C. § 1104(a), or in the Alternative, to Convert or Dismiss this Case Pursuant to 11 U.S.C. § 1112(b), and Reservation of Rights*, thereby directing the appointment of a Chapter 11 trustee for the Debtors' Estates.  *See* ECF No. 132.

8.      On April 2, 2025, Tracy Hope Davis, then United States Trustee for Region 17 ("US Trustee"), appointed me as the Chapter 11 trustee for Debtors' Estates.  *See* ECF No. 140.

---

[1] Unless otherwise expressly stated herein, all undefined, capitalized terms shall have the meaning ascribed to them in the Settlement Agreement and Motion, in that sequence.

9.     On April 7, 2025, the Court entered its *Order Approving Appointment of Chapter 11 Trustee* [ECF No. 155], thereby approving my appointment. Later that same morning, the US Trustee filed its *Notice of Appointment of Chapter 11 Trustee* [ECF No. 156].

10.     Also on April 7, 2025, I filed my *Notice of Acceptance of Appointment of Chapter 11 Trustee* accepting my appointment as the Chapter 11 Trustee for the Debtors' Estates. *See* ECF No. 157.

11.     On April 28, 2025, the Court entered its *Final Order Approving Motion for Order Directing Joint Administration of Debtors' Chapter 11 Cases Under Federal Rule of Bankruptcy Procedure 1015(b)*. *See, e.g.*, ECF No. 209.

12.     Immediately upon my appointment I began investigating the assets and liabilities of the Debtors and their Estates.

13.     The Court established a "Bar Date" for claims to be filed by non-Governmental Units, which was June 30, 2025. Though, as to Beazley only, this "Bar Date" was initially extended by stipulation and further extended as set forth in the Global Settlement Agreement. *See, e.g.*, ECF Nos. 380, 381. The separate Bar Date for Governmental Units was July 21, 2025. *See* ECF No. 298.

14.     The Court's Claims Register reflects the largest claim of these Chapter 11 Cases is held by verdict creditor Michael E. Sanchez ("Sanchez"), whose claim represents approximately ninety-eight percent (98%) of all claims.

15.     My investigation has also revealed a number of viable Chapter 5 claims against the principals and insiders of the Debtors, including other defendants to the Sanchez Lawsuit.

16.     In the event the Global Settlement Agreement is not approved, I am prepared to move forward with pursuing these Chapter 5 claims, and, as to Mr. Palubicki, I have already commenced suit against him (as more fully described herein *infra*).

17.     As to Messrs. Palubicki and Feliciano, the Palubicki/Feliciano Claims are being transferred and assigned to Beazley, including the Palubicki Adversary.

18.     Additionally, on June 4, 2025, I issued Notice of Circumstances letters to the

Debtors' carriers Arch Insurance[2] and Chubb[3] regarding facts, circumstances facts, and situations that could reasonably give rise to a claim, loss, matter, or wrongful act under their D&O and E&O policies. *See* **Exhibits "2" and "3"** hereto (collectively, "Carrier Notice Letters"). As outlined in these Carrier Notice Letters, my investigation indicates several areas of concern respecting the Debtors' management and leadership, pre-dating my appointment.

**BACKGROUND**

19. In 2020, Sanchez commenced litigation in the Second Judicial District Court, County of Bernalillo, New Mexico. The litigation bears Case No. D-202-CV-2020-06336 **(**the "Sanchez Lawsuit").

20. The Sanchez Lawsuit was filed against NuMale Corporation ("NuMale Corporation"); NuMale Albuquerque, LLC d/b/a NuMale Medical Center ("NuMale Albuquerque"); NuMale New Mexico SC Corp., d/b/a NuMale Medical Center ("NuMale New Mexico"); Christopher Asandra, M.D. ("Asandra"); Carlos Feliciano, M.D. ("Feliciano"); Brad Palubicki ("Palubicki"); Justin Pulliam ("Pulliam"); Steven G. Chapman, P.A.-C; and Mike Rivera.

21. The Sanchez Lawsuit was ultimately tried to a jury in approximately November 2024.

22. On or about November 25, 2024, the jury rendered its verdict. A copy of the Special Verdict Form was filed with the New Mexico Court on or about November 26, 2024. It is attached hereto as **Exhibit "1"** (the "Jury Verdict").

23. The Jury Verdict assessed compensatory damages in the amount of $37,005,149.00 against all of the defendants, with the exception of (1) Steven Chapman; and (2) Mike Rivera, both of whom I understand had been dismissed. The Jury Verdict defendants (collectively, the "NuMale Defendants") are (Debtor) NuMale Corporation, (Debtor) NuMale New Mexico,

---

[2] Arch Insurance, a/k/a Arch Insurance Company, a/k/a Arch Specialty Insurance Company, Arch Insurance Company, and/or Arch Specialty Insurance Company ("Arch Insurance").

[3] Federal Insurance Company a/k/a Chubb a/k/a Chubb Forefront a/k/a Chubb the Forefront Portfolio for Healthcare Organizations a/k/a the Company a/k/a The ForeFront Portfolio a/k/a Forefront ("Chubb").

NuMale Albuquerque, Asandra, Feliciano, Palubicki, and Pulliam. *See id.* at p. 4.

24.     NuMale Albuquerque is 99% owned by NuMale Corporation.

25.     Additionally, it is my position the Jury Verdict assessed punitive damages only against Defendant NuMale Corporation in the amount of $375,000,000. *See id.* at p. 4.

26.     I am aware Sanchez contends all NuMale Defendants are jointly and severally liable as co-conspirators for the entire verdict arising from fraud, unfair and unconscionable trade practices, and negligence as a matter of New Mexico law.

27.     I understand Sanchez's contention is disputed by Beazley.  In filings with this Court, Beazley has contended the punitive damages were assessed solely against NuMale Corporation—a contrary position to Sanchez and an aligned position with my own analysis on this issue. *See, e.g.*, ECF No. 179 at ¶ 4.  The Global Settlement Agreement resolves this dispute.

28.     The Jury Verdict Form is also appended to a proof of claim filed by Sanchez in this Court.  *See* NuMale Corporation Claim No. 7-1; *see also* NuMale New Mexico Claim No. 3-1 (collectively, the "Sanchez Claim").

29.     On or about March 26, 2025, Sanchez filed the Sanchez Claim with this Court, asserting damages in excess of $579,442,390.01.  The Sanchez Claim includes the amount awarded by the jury, *plus* pre-judgment interest in accordance with New Mexico law.  *See* NuMale Corporation Claim No. 7-1; *see also* NuMale New Mexico Claim No. 3-1.  The Sanchez Claim represents approximately 98% of claims filed in these Chapter 11 cases.

30.     After the Jury Verdict was rendered, a number of post-trial motions were filed in the New Mexico Court, which to my understanding remain pending.

31.     The Global Settlement Agreement resolves the Sanchez Lawsuit, prior to adjudication of these or any other post-trial motions and prior to judgment being entered by the New Mexico Court.

32.     Certain Underwriters at Lloyd's, London Syndicates 2623/623 (collectively, "Beazley") subscribing to a $1 million Miscellaneous Medical Professional Liability Claims Made and Reported Insurance (Policy No. W14CC4190601) and its accompanying $5 million Excess Insurance Policy (Policy No. W1561E190601), issued policies (collectively, the "NuMale-Beazley

Policies"). *See* **Exhibits "4" and "5"** hereto.

33. In the course of my investigations, I learned the Sanchez Lawsuit had been tendered to Beazley in accordance with the terms of the NuMale-Beazley Policies, and during the pendency of the Sanchez Lawsuit including at trial the NuMale Defendants were all represented by the law firm Quintairos, Prieto, Wood & Boyer, P.A. ("Quintairos Firm").

**BEAZLEY AND THE NUMALE-BEAZLEY POLICIES**

34. Various insurance policies had previously been issued by Beazley in its capacity as Certain Underwriters at Lloyd's, London, Syndicates 623 and 2623 (the NuMale-Beazley Policies).

35. The policy period for the NuMale-Beazley Policies is January 23, 2019, to January 23, 2020. *See* **Exhibits "4" and "5"** hereto.

36. The NuMale-Beazley Policies are claims made and reported policies, meaning they provide coverage that is triggered when a claim is made against the insured and reported during the policy period, even if the incident or injury giving rise to the claim occurred prior to the inception of the policy period. *See id.*

37. I am aware that, on or about March 14, 2025, Beazley commenced a lawsuit in a different New Mexico court to determine Beazley's obligations, if any, with respect to the NuMale-Beazley Policies and the claims for coverage in connection with the Sanchez Lawsuit (the "Coverage Lawsuit").

38. The Coverage Lawsuit bears Case No. D-905-CV-2025-00157. It is currently pending in the 9th Judicial District, County of Curry, New Mexico.

39. The NuMale-Beazley Policies and their proceeds (the "Policy Proceeds") are property of these Estates.

40. Any asserted rights under the NuMale-Beazley Policies, and all claims against Beazley that could be brought pursuant to, in connection with, as a consequence or result of, or under the NuMale-Beazley Policies including but not limited to a bad faith claim on the NuMale-Beazley Policies, are property of the Estates.

41. The non-Debtor NuMale Defendants—Palubicki, Pulliam, Feliciano, Asandra, and

NuMale Alburquerque—contend they have independent bad faith claims against Beazley. I disagree, particularly in light of the Global Settlement Agreement's terms.

**SANCHEZ LAWSUIT**

42.     The Debtors NuMale Corporation and NuMale New Mexico and non-Debtor NuMale Albuquerque LLC are NuMale Defendants and parties to the Sanchez Lawsuit initiated in 2020, which I understand was initiated for ordinary and medical negligence, battery, unfair and unconscionable trade practices, fraud, and civil conspiracy.

43.     I believe the Sanchez Lawsuit involves events covered by the NuMale-Beazley Policies, which transpired in connection with Sanchez seeking treatment at the Debtors' New Mexico clinic.

44.     Nonetheless, I am aware that Beazley contests the scope of coverage afforded by the NuMale-Beazley Policies to the events and circumstances that are subject of the Sanchez Lawsuit.

45.     In the course of my investigations, I learned the Sanchez Lawsuit had been tendered to Beazley in accordance with the terms of the NuMale-Beazley Policies, and that during the pendency of the Sanchez Lawsuit including at trial the NuMale Defendants were all represented by the Quintairos Firm.

46.     Sanchez has also filed a number of post-verdict motions in the Sanchez Lawsuit that await adjudication by the New Mexico State Court. I understand that these and any other post-verdict motions must be adjudicated prior to entry of judgment on the Jury Verdict.

47.     There is a pending dispute with Beazley regarding its obligations under the NuMale-Beazley Policies and an asserted bad faith insurance claim.

48.     Notwithstanding this dispute, Beazley agreed to pay special legal counsel's fees for the post-verdict motion practice and the eventual appeal anticipated in the Sanchez Lawsuit, in accordance with the terms of the NuMale-Beazley Policies.

49.     To date, no judgment has been entered in the Sanchez Lawsuit, and the hearings on the post-verdict motions following the Jury Verdict have, to my knowledge, not been re-set.

50.     The other NuMale Defendants contend they have bad faith claims, notwithstanding

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

1  that no judgment has been entered.  I disagree with their contentions.

2  **OTHER NEW MEXICO LITIGATION: THE COVERAGE LAWSUIT**

3  51.    Post-petition, but prior to my appointment, Beazley commenced the Coverage

4  Lawsuit in the Ninth Judicial District Court of Curry County, New Mexico, against the other

5  NuMale Defendants—Palubicki, Pulliam, Feliciano, Asandra, and NuMale Albuquerque

6  (altogether, the non-Debtor NuMale Defendants).

7  52.    As part of the settlement, the Coverage Lawsuit shall be dismissed with respect to

8  Asandra, Pulliam, and NuMale Albuquerque, LLC.  I understand the Coverage Lawsuit seeks

9  declaratory relief regarding the NuMale-Beazley Policies—namely, declaratory relief and

10  rescission of the NuMale-Beazley Policies, declaratory relief that Beazley has no duty to

11  indemnify due to policy exclusions, declaratory relief that Beazley has no duty to indemnify due

12  to breach of a "cooperation provision," and declaratory relief that  Beazley did not act in bad faith

13  with regard to the Sanchez Lawsuit.

14  53.    I understand that Sanchez, Debtor NuMale Corporation, and Debtor NuMale New

15  Mexico were not named as parties to the Coverage Lawsuit.

16  54.    I also understand the Coverage Lawsuit is pending.

17  55.    In the event the Global Settlement Agreement is not approved, I am prepared to

18  move forward with an adversary proceeding seeking declaratory relief that the NuMale-Beazley

19  Policies and the Policy Proceeds are property of the estate.

20  56.    I have already commenced an Adversary Proceeding against Palubicki, Adv. Proc.

21  No. 25-01155 (the "Palubicki Adversary").  The Palubicki Adversary was filed on or about July

22  4, 2025.  It seeks, *inter alia*, declaratory relief the NuMale-Beazley Policies and Policy Proceeds

23  are property of the Estates.  *See* Palubicki Adversary Complaint, Adv. Case No. 25-01155 ECF

24  No. 1. *See also* Adv. Case No. 25-01155 ECF No. 4 (amended complaint).

25  57.    The Palubicki Adversary also seeks damages for negligence and other claims and

26  is being transferred and assigned to Beazley.

27  . . .

28   . . .

**THE GLOBAL SETTLEMENT AGREEMENT[4]**

58.    On or about August 1, 2025, I, the NuMale Settling Defendants (being NuMale Corporation, NuMale New Mexico, Pulliam, Asandra, and NuMale Albuquerque), certain affiliate entities controlled by the Debtors, Sanchez, and Beazley agreed to the *Global Settlement Agreement (Containing Mutual Releases and Policy Buyback)* (the "Global Settlement Agreement").  A copy of the Global Settlement Agreement, with all exhibits thereto, is attached to the Motion as **Exhibit 1**.

59.    I seek Court approval of the Global Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. §§ 363, 105, 1107, and 1108.

60.    Under the Global Settlement Agreement, (i) the Beazley payment to the Estates of the one-time lump sum Purchase and Settlement Amount of $108,500,000 is in connection with a buyback and termination of the NuMale-Beazley Policies; (ii) there are milestones and Plan support by the Parties to the Global Settlement Agreement, including voting in favor of the Plan; (iii) initially, there is a stay of the Sanchez Lawsuit and Coverage Lawsuit pending this Court's approval of the Global Settlement Agreement, and, ultimately, a dismissal with prejudice of both lawsuits as to all Parties to the Global Settlement Agreement (form dismissals are exhibits to the Global Settlement Agreement); (iv) there are mutual releases including for the Parties to the Global Settlement Agreement along with a prohibition on litigating any claims released under the Global Settlement Agreement; and (v) the Estates (a) retain all Chapter 5 claims except the Palubicki/Feliciano Claims, which are transferred and assigned to Beazley; (b) retain certain claims under the Debtors' D&O and E&O (non-Beazley) policies; (c) retain claims against a variety of additional parties such as the Howard and Howard Claim, the Hassoun Claim, the N2 Litigation Claim, and parties who violated the automatic stay; (d) transfer and assign to Beazley the claims asserted in the Palubicki Adversary and any adversary proceeding initiated against Carlos Feliciano by the Trustee on behalf of the Estates (referred to as the Palubicki/Feliciano

---

[4] The summary set forth herein of the Global Settlement Agreement and its terms is for descriptive and summary purposes only; should there be any ambiguity between the description set forth herein and the Global Settlement Agreement, in all respects the executed Global Settlement Agreement controls.

Claims, in the Global Settlement Agreement); (e) retain any other adversary proceedings I commence before Plan confirmation, and (f) retain the malpractice claims against the Quintairos Firm held by the Estates, all of which will be administered pursuant to the Plan.

**TRUSTEE'S ANALYSIS OF THE GLOBAL SETTLEMENT AGREEMENT**

61.     The Global Settlement Agreement for which I seek Court approval is the result of significant efforts by myself and my counsel Garman Turner Gordon LLP ("GTG"), and all of the parties to the Global Settlement Agreement and their counsel, to resolve litigation which commenced almost five (5) years ago (the Sanchez Lawsuit). These efforts commenced within one (1) week of my appointment and have been ongoing on a daily basis for nearly four (4) months. The Sanchez Lawsuit is the result of treatment Sanchez allegedly received in 2017.

62.     The Global Settlement Agreement also resolves the Coverage Lawsuit as to the Estates and the NuMale Settling Defendants (NuMale Corporation, NuMale New Mexico, Pulliam, Asandra, and NuMale Albuquerque LLC[5]), as well as a variety of potential claims for "bad faith" denial of insurance coverage. Those potential claims are asserted against Beazley.

63.     The Global Settlement Agreement also fully resolves treatment of the Sanchez Claim. As noted herein, Sanchez is compromising his claim from $579,442,390.01 to $410,000,000.00, a reduction of approximately twenty-nine percent (29%). Thus, through negotiations, I have reduced the Estates' liability on the Sanchez Claim by almost $170,000,000.00.

64.     The United States Trustee appointed me to be the Chapter 11 Trustee in these Chapter 11 Cases. My appointment was approved by this Court on April 7, 2025.

65.     I have been licensed to practice law since October 1982 and started my own solo practice in January 1986. I have represented Chapter 7 trustees and Chapter 11 trustees in hundreds of cases throughout my career.

66.     The Office of the United States Trustee for the District of Arizona (Region 14) ("AZUST") has appointed me a Chapter 11 Trustee in several cases over the past thirty-five (35)

---

[5] Collectively, the "NuMale Settling Defendants".

years.  The AZUST selected me to be on the Panel of SubChapter V Trustees in February 2020.  I have also been a Post-Confirmation Trustee.

67.    I have been appointed a Chapter 11 trustee in the District of Nevada in two (2) prior matters.  The first was *In re Thomas Hantges*, Case No. 07-13163.  The appointment was made in the summer of 2007.  This case was part of the USA Commercial Mortgage Company cases pending before Judge Riegle.  More recently, in March 2023, I was appointed a Chapter 11 trustee in the jointly administered cases of *In re Silver State Broadcasting, LLC*, et al., jointly administered under lead case No. 21-14978-abl; these cases were before Judge Landis.

68.    I have successfully prosecuted dozens of motions to approve settlements pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

69.    The Global Settlement Agreement is fair, reasonable, made within my sound business judgment, and clearly in the best interests of the creditors and the Debtors' Estates.  First, the Global Settlement Agreement brings **$108,500,000** (one hundred eight million, five hundred thousand dollars) into these Estates for distribution to creditors.  Second, the Global Settlement Agreement is part of a global settlement and resolution that includes a path to Plan confirmation and resolution of these Chapter 11 Cases.  Third, the Global Settlement Agreement brings an end to years of litigation in New Mexico involving Sanchez (the Sanchez Lawsuit, which is ongoing) and, as to the NuMale Settling Defendants, Beazley's coverage pursuant to the NuMale-Beazley Policies (the Coverage Lawsuit).  Fourth, the releases in the Global Settlement Agreement bring real and meaningful finality to all parties to the Sanchez Lawsuit and to the parties who are settling the Coverage Lawsuit, while preserving other claims for the Estates and the benefit of creditors (such as the Chapter 5 claims not otherwise transferred and assigned, the Estates' malpractice claim against the Quintairos Firm, the N2 Litigation Claim, the Hassoun Claim, and certain D&O and E&O claims).

70.    Furthermore, the Global Settlement Agreement represents a sound exercise of my business judgment, will yield a fair and reasonable price for the assets being sold, and is in the best interests of the Estates and the creditors.

**ANALYSIS**

71.     I have prepared a declaratory relief action against Beazley and believe I will succeed in obtaining a determination that the NuMale-Beazley Policies and the Policy Proceeds are property of these Estates.  Furthermore, I believe that any asserted rights under the NuMale-Beazley Policies, and all claims against Beazley that could be brought pursuant to, in connection with, as a consequence or result of, or under the NuMale-Beazley Policies including but not limited to any bad faith claim(s) on the NuMale-Beazley Policies, are also property of the Estates.  Others dispute this, so, the parties have disparate views of my probability of success on these issues.  The Global Settlement Agreement resolves these disputes, obviating the need for me to file the anticipated lawsuit against Beazley.

72.     For their part, certain non-Debtor NuMale Defendants—Palubicki, Feliciano, Pulliam, Asandra—strenuously disagree with me and have expressed a belief that *they* have bad faith claims against Beazley.  The non-Debtor NuMale Defendants contend they have these bad faith claims notwithstanding that no judgment has been entered in the Sanchez Lawsuit—analysis I strenuously dispute.  This belief held by these non-Debtor NuMale Defendants, and the commensurate "potential" to realize lucrative litigation proceeds, rendered negotiations difficult because the parties were entrenched in their respective positions—me included, given my analysis that the bad faith claims against Beazley are property of these Estates.  As to Pulliam and Asandra, these disputes are resolved through the Global Settlement Agreement.

73.     Meanwhile, Sanchez contends that all NuMale Defendants are jointly and severally liable for the entire verdict arising from fraud, unfair and unconscionable trade practices, and negligence as a matter of New Mexico law.[6]  However Beazley disagrees, contending that only NuMale Corporation is responsible for $375,000,000 in punitive damages awarded by the Jury Verdict, and all NuMale Defendants are liable for only the $37,005,149 compensatory damages portion.[7]  This dispute is only one of the components that must be resolved in the Sanchez Lawsuit in order for the Jury Verdict to be liquidated to a judgment.  This and other issues are expected to

---

[6] *See, e.g.*, Claim No. 7-1 Part 2 p. 7 of 75 at Question 11.

[7] *See, e.g.*, ECF No. 179 at ¶ 4.

be hotly contested and vigorously litigated.

74.    Further complicating matters, the parties to the Sanchez Lawsuit (Sanchez, on the one hand, the NuMale Defendants on the other) each believe they will prevail in the post-verdict motions which are pending and anticipated in that case.  The outcome of these post-verdict motions will determine, for example, the application of prejudgment interest to the verdict amount, among other issues of critical importance that affect the liquidation of the Sanchez Claim.  And, after that, the parties to the Sanchez Lawsuit anticipate appealing the judgment.

75.    I anticipate difficulties in collecting from Beazley.  While I am confident that Beazley has sufficient assets to satisfy the eventual judgment anticipated in the Sanchez Lawsuit, and any commensurate award entered against Beazley in the anticipated bad faith action against Beazley, the difficulty in collection comes from the heavy litigation I foresee as necessary to get to each of those endpoints (a final judgment in the Sanchez Lawsuit, a final judgment in the bad faith litigation).  For these reasons, I believe the Global Settlement Agreement avoids the extended costly litigation requisite to ultimately collect funds from Beazley and bring money into the Estates expeditiously, and do this much sooner than would otherwise be possible.

76.    Furthermore, the Estates coming into significant funds—on a much shorter timetable than would otherwise exist were the Estates to continue litigating the Sanchez Lawsuit and separately litigate a bad faith lawsuit against Beazley—means that a confirmable Plan can be proposed within the first few months of my appointment.  In *settling with* Beazley, I am resolving the issues associated with litigation delay causing a difficulty in collecting from Beazley, thus ensuring the Estates reap the benefits of these funds much more quickly.

77.    My anticipated declaratory relief action against Beazley and the scope of coverage of the NuMale-Beazley Policies will be litigated heavily, and, therefore, will be expensive for the Estates and take significant time to resolve.  This is made more complex by the Coverage Lawsuit, which Beazley initiated against the non-Debtor NuMale Defendants concerning coverage under the NuMale-Beazley Policies, which policies are property of these Estates.  Litigating these issues with Beazley will require extensive briefing, and, considering I and Beazley have opposing views on these issues, the litigation is unlikely to settle and therefore highly likely to be expensive,

inconvenient, and lengthy, even though I believe I would ultimately prevail.

78.     Litigating the Estates' bad faith claims against Beazley in connection with the Sanchez Lawsuit will be very hard fought, not only against Beazley on these claims, but also will require coordination with the other NuMale Defendants who believe they too hold bad faith claims related to the Sanchez Lawsuit.  By settling with the NuMale Settling Defendants, I am bringing them "on side", and their bad faith claims are resolved through the Global Settlement Agreement along with the Estates'.  Any litigation of the bad faith by Beazley in connection with its handling of the claims(s) pertinent to the Sanchez Lawsuit will be very fact intensive and involve circumstances dating back more than five years.  Discovery will, as a result, be lengthy and likely contentious.  Moreover, the legal issues relating to Beazley's bad faith are not simple.  This litigation will be complex, involve multiple parties with diametrically opposing views, will require experts, and potentially a jury trial—all of which will be expensive, protracted, and preclude any recovery for creditors for many years, and take significant time to resolve.  As such, the Global Settlement Agreement resolving the Estates' bad faith claims, and those of the NuMale Settling Defendants, as a component of a global resolution, is not only meaningful, but it avoids the complexity, delay, inconvenience, and expense of litigating these claims.

79.     I submit that, as to the Non-Settling Defendants Palubicki and Feliciano (collectively, the "Non-Settling Defendants"), who are not parties to the Global Settlement Agreement, the bad faith claims they allege they hold are rendered valueless and/or void by the Global Settlement Agreement; and, in any event, Palubicki and Feliciano are subject to additional, separate litigation claims held by the Estates that are transferred and assigned to Beazley.

80.     Third, the post-verdict motion practice and anticipated appeal in the Sanchez Lawsuit could take years.  The Estates will not be paying the fees and costs incurred by defense counsel (Beazley is paying those directly),[8] so, the expense of litigation (while anticipated to be significant) is not an expense of the Estates.  However, the legal issues are complex, and the parties do not have alignment on the issues raised in Sanchez's post-verdict motions.  Furthermore, at

---

[8] *See, e.g.*, ECF Nos. 269-271, 322, 328-329, 335; *see also* ECF Nos. 272-274, 330-331, 336.

present, the NuMale Defendants have yet to file all their post-verdict motions. These must be filed and fully briefed before the New Mexico Court can adjudicate all post-trial motions and ultimately enter a judgment. The delays associated with the remaining phases of this litigation are extensive. First, it is now eight months after the jury verdict, and Sanchez's post-verdict motions have not been adjudicated, and the NuMale Defendants' post-verdict motions have not yet been fully briefed or argued. Second, after the New Mexico Court enters judgment, the parties plan to appeal the judgment after certain post-judgment motion practice. The length of time of any appeal is uncertain, but even a conservative estimate amounts to a multi-year delay, and there may be multiple appeals.[9] Therefore, the delay, inconvenience, and complexity associated with reaching a final resolution of the Sanchez Lawsuit are significant.

81. The Global Settlement Agreement brings a more expeditious and effective resolution to these Chapter 11 Cases by paving the path for me to proceed with a confirmable Plan of reorganization largely funded by the Beazley Purchase and Settlement Amount. Although settlement negotiations were initiated by my counsel GTG and me, and have been extensive and ongoing for the duration of my appointment, and the resolution embodied in the Global Settlement Agreement was by no means achieved easily or readily, the funds remitted by Beazley pursuant to the Global Settlement Agreement (the Purchase and Settlement Amount of $108,500,000.00) materially improve in all respects the delay, inconvenience, complexity, and expense associated with confirming a plan of reorganization in these Chapter 11 Cases.

82. My investigations have revealed: (i) from April 2020 through February 2021 the Debtors, collectively, received over $1.098 million in paycheck protection loans that were ultimately forgiven; (ii) as the Debtors' financial strife escalated in 2023 (*i.e.*, as then-senior debt became due), in approximately December 2023 NuMale Corporation and others took out a $5 million Small Business Association-backed loan from Newtek Bank, National Association ("Newtek"), and, of the $5 million in proceeds received under this loan facility, approximately

---

[9] And, until the appeals are exhausted in the Sanchez Lawsuit, the Sanchez Claim in these Chapter 11 Cases is unliquidated.

$2,410,964.73 went to "working capital" for NuMale Corporation, which then transferred approximately $407,280 to various NuMale entities and used approximately $1,312,653.90 to fund losses; (iii) in the last four months of 2024 alone the Debtors appear to have taken out over $1.1 million in Merchant Cash Advance loans; and (iv) the Debtors also financed operations through factoring-type arrangements as well.

83.    Based on my investigations, it appears the Debtors have required some form of outside funding to stay afloat for approximately five years—making it difficult and complex, if not impossible, to prosecute a confirmable plan in these Chapter 11 Cases that is funded from operations alone.  Because the Global Settlement Agreement brings immediate and significant money into the Estates in the form of the Purchase and Settlement Amount, the Global Settlement Agreement avoids the complexity, expense, delay, and inconvenience of litigating and prosecuting a plan of reorganization premised on other means of recovery (which appear scant, based on the information I have uncovered in the course of my investigations to date).

84.    There can be no question that producing nine figures in value for these Estates; achieving (first the stay and ultimately) the dismissal of both the Sanchez Lawsuit and the Coverage Lawsuit as to the Estates and the Parties to the Global Settlement Agreement; resolving the disputes associated with the NuMale Settling Defendants' (including the Estates') bad faith claims connected to Beazley, the NuMale-Beazley Policies, and the Sanchez Lawsuit, as to all Parties to the Global Settlement Agreement; and providing for milestones and Plan support in the form of Plan treatment and acceptance, is in the best interests of the Estates and their creditors.

85.    By entering into the Global Settlement Agreement I am making it possible for a distribution to be made to creditors of all the Estates **this year**.  Given the Debtors' operational issues, history of prepetition lending, and the state of business operations at the time of my appointment, I am not optimistic that these Estates will generate any meaningful recovery to creditors in the absence of approval of this Global Settlement Agreement—which brings in a nine-figure sum to these Estates within the first approximately six (6) months of my appointment.  This is substantially more money than the Debtors' operations could ever provide.  Undoubtedly, approval of the Global Settlement Agreement is in the best interests of creditors and the Estates.

86.     Additionally, under the Global Settlement Agreement no Party thereto may pursue or cause another party to pursue claims that are released under the Global Settlement Agreement. The Global Settlement Agreement also has carve-outs for the Chapter 5 claims (other than the Palubicki/Feliciano Claims, which are transferred and assigned to Beazley), certain D&O and E&O claims such as those identified in the Carrier Notice Letters, and the malpractice claim against the Quintairos Firm, among others, so, the value of these and of all Litigation Claims under the Plan are preserved for the benefit of creditors (as beneficiaries of the Liquidation Trust).  Thus, while the claims resolved through the Global Settlement Agreement are fully and finally resolved (and the Global Settlement Agreement contains a prohibition on litigating any claims released thereunder), certain select valuable litigation claims *are* preserved, notwithstanding these releases.

87.     Particularly impactful to the administration of these Chapter 11 Cases, however, is that the Global Settlement Agreement provides for milestones and support for the Plan. Commensurate with the Global Settlement Agreement, the Parties agreed to Plan terms that provide for a confirmable exit strategy for these Chapter 11 Cases, in which the Sanchez Claim is liquidated, administrative (to the extent not otherwise deferred or voluntarily reduced) and priority creditors are paid in full, secured creditors (to the extent they hold valid, perfected liens) are paid in full, and general unsecured creditors receive a distribution from the Purchase and Settlement Amount and become beneficiaries of the Liquidation Trust.  In addition, the Plan provides for the Liquidation Trust that will, post-confirmation, liquidate the remaining assets of the Estates and provide a further distribution to beneficiaries.

88.     Approval of the Motion ***is not*** approval of the Plan, and confirmation of the Plan is not a condition of Beazley's funding the Purchase and Settlement Amount to the Estates, which in turn will fund the Initial Distribution to Sanchez.  However, the Global Settlement Agreement's approval is a foundational cornerstone to my prosecution of a confirmable Plan prepared commensurate with the Global Settlement Agreement.

89.     Based on the foregoing analyses, I submit that the compromise in the form of the Global Settlement Agreement is fair and reasonable, and I request that it be approved.

**A & C PROPERTIES FACTORS**

90.    I am well versed in the requisite standards to approve a settlement agreement set forth by the Ninth Circuit in *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986) (the "A&C Properties Factors"). Those factors are:

- The probability of success in the litigation;
- The difficulties of collection;
- The complexities of litigation and the expense, inconvenience, and delay caused by such litigation; and
- The interest of the creditors with reasonable deference to their reasonable views.

91.    I address each of the A&C Properties Factors below.

92.    With respect to the *first* factor, the probability of success in the litigation: with the assistance of my counsel GTG, I analyzed the myriad of claims which were being asserted by all of the parties. These parties included Beazley, Sanchez, the Debtors who were NuMale Defendants in the Sanchez Lawsuit (NuMale Corporation and NuMale New Mexico), as well as the individuals Palubicki, Feliciano, Pulliam, and Asandra, and the entity NuMale Albuquerque.

93.    When I was appointed Trustee, the non-Debtor NuMale Defendants reported to me their belief there were significant claims which could be asserted against Beazley. Indeed, I quickly learned many of the non-Debtor NuMale Defendants had apparently retained their own counsel to pursue those claims on a contingent fee basis.

94.    Separately, Beazley had already filed the Coverage Lawsuit, which asserted claims that, *inter alia*, Beazley should not be obligated to make any payment(s) resulting from the Jury Verdict.

95.    For his part, Sanchez was seeking an assignment of the bankruptcy Estates' bad faith claims for him to pursue against Beazley.

96.    Although certain post-trial motions had been filed in the Sanchez Lawsuit, the automatic stay precluded those motions from going forward, at least with respect to the Debtors that were NuMale Defendants, absent stay relief.

97.    I was also aware of the Estates' obligation to mitigate the damages and seek to

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

reduce the Jury Verdict as much as possible.  This would require appeals in the New Mexico State Court system, as well as prosecution of all post-trial motions, including motions which had not yet been filed on behalf of the NuMale Defendants, as well as defending the post-verdict motions filed by Sanchez.  Additionally, as previously noted, I negotiated a compromise with Sanchez of approximately $170,000,000.00 of the Sanchez Claim.  This amount is exclusive of additional interest which would have otherwise accrued since the date of the Jury Verdict.[10]

98.    I also became aware of the difficulty generally involved in overturning the Jury Verdict.

99.    For the past approximately ten (10) weeks my counsel and I have repeatedly attempted to reach an agreement with Palubicki and Feliciano—all to no avail.  We have been in constant communication with them through their representatives (including their counsel)[11] on an almost daily basis.  It is my belief Mr. Palubicki and Dr. Feliciano have held the Estates hostage for unreasonable payments at the expense of the general creditor body, which would violate the absolute priority rule.

100.    The Global Settlement Agreement provides, *inter alia*, an allocation of the $96,500,000.00 payment to Sanchez, which, among other things, states the Jury Verdict's $37,005,149.00 compensatory award is fully satisfied.

101.    It is my intent on behalf of the bankruptcy Estates, and as the party who is making the payment of $96,500,000 to Sanchez, that this payment constitutes compensation for the following alleged damages (a) thirty-seven million, five thousand, one hundred forty-nine dollars and zero cents ($37,005,149.00) in full and complete satisfaction of the compensatory damages awarded in the Special Verdict Form in the Sanchez Lawsuit issued in favor of Sanchez for

---

[10] I understand the discretionary pre-judgment interest rate for tort actions in New Mexico is ten percent (10%), and the post-judgment interest rate for tort actions in New Mexico is fifteen percent (15%).

[11] On or about June 24, 2025, Mr. Gubner appeared in Court at a telephonic hearing in these Chapter 11 Cases on behalf of both Mr. Palubicki and Dr. Feliciano, a hearing which I also attended.  I heard Mr. Gubner report on June 24, 2025, to the Court at that hearing that Mr. Palubicki was on the "one yard line" on the Global Settlement Agreement.  However, Mr. Palubicki did not come across it into the end zone.  I understand that Mr. Gubner subsequently withdrew either just before or during the July Fourth holiday weekend.  My counsel was then contacted by a new attorney, Robert Schumacher, who was going to represent these individuals, but I am advised that Mr. Schumacher also withdrew.

damages on account of alleged personal physical injuries or physical sickness pursuant to Internal Revenue Code § 104(a)(2) (26 U.S.C. § 104 (a)(2)); (b) fourteen million fifty-one thousand, eight hundred thirty-three dollars and zero cents ($14,051,833.00) for punitive damages; and (c) forty-five million, four hundred forty-three thousand, eighteen dollars and zero cents ($45,443,018.00) for Sanchez's claim for associated legal fees and expenses for the Sanchez Lawsuit.

102.    The Initial Distribution payment of $96,500,000 to Sanchez is consideration for the releases in the Settlement Agreement and dismissal of the Sanchez Lawsuit.  Sanchez will still be owed approximately $313,500,000 on the compromised Sanchez Claim of $410,000,000, after receipt of the $96,500,000 Initial Distribution payment, and will be the largest beneficiary (approximately 98%) of the proposed Liquidation Trust.

103.    More specifically, the $96,500,000 Initial Distribution I will pay Sanchez to partially satisfy the Allowed Sanchez Claim is consideration offered in exchange for Sanchez's agreement to dismiss the Sanchez Lawsuit and enter into the releases set forth in the Global Settlement Agreement.

104.    With respect to the *second* A&C Properties Factor and the difficulties of collection, I do not believe collection against Beazley and any ultimate award would be difficult.  However, the risks and length of time associated with ultimately succeeding in prosecuting a bad faith claim against Beazley, as well as successfully defending against Beazley's Coverage Lawsuit, weighed heavily in my assessment of the amounts which could ultimately be recovered.

105.    With respect to the *third* A&C Properties Factor, I incorporate all of the statements I have made herein.  The various pending lawsuits, as well as those which were about to be filed, were extremely complex.  Moreover, I estimate the costly appeals of the Jury Verdict alone would take no less than two to three years to resolve.  This does not include the time in litigating all of the bad faith claims, which has not yet commenced.  It is reasonable to assume the bad faith litigation, absent a settlement, would separately take no less than three (3) years, and perhaps much longer, to resolve, or go to trial, which bad faith litigation is attendant with risk for the Estates.

106.    Additionally, under the Global Settlement Agreement, the proposed Plan payment to Newtek is part of the negotiations to obtain Mr. Pulliam's release of claim(s) against Beazley.

A separate motion seeking approval of the settlement with Newtek pursuant to Bankruptcy Rule 9019 will be filed.

107.    With respect to the *fourth* A&C Properties Factor and weighing all of the matters I have considered, the Global Settlement Agreement for which I seek Court approval is in the best interest of the creditors of these Estates.

108.    Mr. Sanchez will be receiving $96,500,000 from the Initial Distribution.   This represents approximately Sixteen and One-Half Percent (16.5%) of his original claim and approximately twenty-three and one-half percent (23.5%) of his compromised claim.

109.    The secured claims to be paid from the Initial Distribution aggregate approximately $1,000,000.    After holdbacks, payment of anticipated allowed administrative expenses, and priority claims, I have calculated the general unsecured creditors' return from the Initial Distribution to be approximately 26%.    This figure is before taking into account any reductions or compromises as a result of the claims objection process.

110.    If the Court approves this Global Settlement Agreement, litigation which commenced in 2020 and the Coverage Lawsuit which commenced in March 2025 will be fully resolved, and there will be no future litigation for the Estates involving Sanchez, Beazley, and the incident(s) subject of the Sanchez Lawsuit.

**NuMale-Beazley Policies Buyback**

111.    The Global Settlement Agreement, and the buyback of the NuMale-Beazley Policies (the "Policy Buyback") free and clear of any liens or interests pursuant thereto, are a reasonable exercise of my business judgment.  Several good business reasons support this.  First, I am not aware of any liens encumbering the assets proposed to be sold (the NuMale-Beazley Policies). Second, the Policy Buyback (which is a sale of the NuMale-Beazley Policies, to Beazley) is in the best interests of the Debtors' creditors because it brings finality to all of the Estates' litigation involving the NuMale-Beazley Policies and is a sale of the NuMale-Beazley Policies that brings $108,500,000 into the Estates.

112.     Under such circumstances, approval of the Policy Buyback is a reasonable exercise of my business judgment.  The sale of the NuMale-Beazley Policies represents a sound

exercise of my business judgment, will yield a fair and reasonable price for the NuMale-Beazley Policies being sold, is in the best interests of the Debtors' Estates, otherwise complies with Section 363 of the Bankruptcy Code, is a consensual sale of the NuMale-Beazley Policies pursuant to the Global Settlement Agreement, and constitutes a purchase by Beazley in good faith pursuant to Section 363(m) of the Bankruptcy Code. Based on the foregoing, it is my business judgment that a sale of the NuMale-Beazley Policies is in the best interests of the Estates and creditors.

113.    Last, the Policy Buyback generates significant revenue for these Estates and eliminates future anticipated litigation costs for the Estates which are not insignificant. Additionally, the Policy Buyback brings an end to the significant litigation regarding Mr. Sanchez's treatment at the Debtors' New Mexico clinic nearly eight years ago—and brings significant money into the Estates which can be used to pay creditors. Thus, the sale of the NuMale-Beazley Policies (the Policy Buyback) is an appropriate and reasonable exercise of my business judgment, and should be approved.

114.    Additionally, I submit that the sale of the NuMale-Beazley Policies to Beazley (the Policy Buyback) is the product of arm's-length, good faith negotiations that have taken place over the course of the months since my appointment.

### CONCLUSION

115.    Rule 9019, Federal Rules of Bankruptcy Procedure is entitled **"Compromise or Settlement; Arbitration"**. The Global Settlement Agreement, as I have explained herein, is extremely complex. The Global Settlement Agreement is the very essence of the meaning of the word "compromise." Every party to the Global Settlement Agreement (and, there are more than fifteen) compromised their otherwise hotly contested claims. It is unfortunate that Mr. Palubicki and Dr. Feliciano have chosen to not be Parties to the Global Settlement Agreement. Every conceivable effort was made to include them. Their refusal in no way diminishes my firm belief that the Global Settlement Agreement is an excellent outcome for all creditors and the bankruptcy Estates, and should be approved.

116.    The Global Settlement Agreement achieves a very fair and equitable result for all creditors and interested parties. It contemplates additional potential recoveries for creditors

1    beyond the Initial Distribution through the mechanism of the Liquidation Trust.

2        117.    The unfortunate circumstances which caused Mr. Sanchez to assert claims against

3    a number of parties started in 2017—approximately eight (8) years ago.  It is time to put the

4    litigation comprising the Sanchez Lawsuit and the Coverage Lawsuit (and the associated costs and

5    risks)—past, present, and future—to an end.  The Estates retain and preserve a variety of other

6    claims transferred to the Liquidation Trust, including but not limited to the claims against the

7    Quintairos Firm.

8        118.    Creditors are being appropriately compensated via the funds brought into the

9    Estates through the Global Settlement Agreement, and, as noted, under the Plan contemplated by

10    the Global Settlement Agreement, creditors will share in net recoveries obtained in present and

11    future litigation as beneficiaries of the Liquidation Trust.

12        119.    For the reasons set forth herein, I believe each of the A&C Properties Factors are

13    fully and completely satisfied, and I request the Court approve the Global Settlement Agreement

14    in its entirety.

15        I declare under penalty of perjury of the laws of the United States that these facts are true

16    to the best of my knowledge and belief.

17        DATED this 1st day of August 2025.

18

19        MICHAEL CARMEL, ESQ.
         *Chapter 11 Trustee*

20

21

22

23

24

25

26

27

28

German Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000