GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail:  ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*Attorneys for Michael Carmel,
Chapter 11 Trustee*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Lead Case No.: 25-10341-nmc |
| NUMALE CORPORATION, | Chapter 11 |
| ☐ AFFECTS THIS DEBTOR, | *Jointly administered with:* |
| ☐ AFFECTS FELICIANO NUMALE NEVADA PLLC, | Feliciano NuMale Nevada PLLC, Case No. 25-10342-nmc |
| ☐ NUMEDICAL SC, | NuMedical SC Case No. 25-10343-nmc |
| ☐ NUMALE COLORADO SC, | NuMale Colorado SC, Case No. 25-10344-nmc |
| ☐ NUMALE FLORIDA TB PLLC, | NuMale Florida TB PLLC, Case No. 25-10345-nmc |
| ☐ NUMALE NEBRASKA LLC, | NuMale Nebraska LLC Case No. 25-10346-nmc |
| ☐ NUMALE NEW MEXICO SC, | NuMale New Mexico SC Case No. 25-10347-nmc |
| ☒ NUMALE ALL DEBTORS, | |
| Debtors. | <u>Confirmation Hearing</u> Date:    September 24, 2025 Time:  9:30 a.m. |

## DISCLOSURE STATEMENT TO ACCOMPANY
## <u>JOINT PLAN OF REORGANIZATION</u>

1

**TABLE OF CONTENTS**

I. INTRODUCTION TO THE PLAN OF REORGANIZATION ................................................. 1

II. IMPORTANT INFORMATION anD DISCLAIMER REGARDING THIS DISCLOSURE STATEMENT ................................................................................................................. 5

III. DISCUSSION OF THE PAYMENTS TO BE MADE UNDER THE PLAN ...................... 12

    A.  Treatment of Administrative Claims. .........................................................13

    B.  Treatment of Priority Tax Claims. .............................................................16

    C.  Class 1 – Newtek Secured Claim. ..............................................................17

    D.  Class 2 – Kalamata Claim. ........................................................................17

    E.  Class 3 – EBF Holdings Claim. .................................................................18

    F.  Class 4 – Fox Funding Claim. ...................................................................19

    G.  Class 5 – Top Tier Claim. ..........................................................................19

    H.  Class 6 – LCF Group Claim. .....................................................................20

    I.  Class 7 – Ford Motor Claim. .....................................................................21

    J.  Class 8 – Priority Unsecured Claims. ........................................................21

    K.  Class 9 – Sanchez Claim. ..........................................................................22

    L.  Class 10 – General Unsecured Claims. ......................................................22

    M.  Class 11 – Intercompany Claims. ..............................................................23

    N.  Class 12 – Subordinated Claims. ...............................................................23

    O.  Class 13 – Equity Interests. .......................................................................26

IV. SUMMARY OF VOTING PROCESS ............................................................................. 26

    A.  Who May Vote to Accept or Reject the Plan. ...........................................26

    B.  Summary of Voting Requirements. ...........................................................26

V. INFORMATION ABOUT DEBTORS' BUSINESSES AND THE CHAPTER 11 CASES.. 27

    A.  Overview of the Debtors' Assets and Historical Operations. .....................27

        1.  Clinics and Corporate Structure ......................................................... 29

        2.  Business Operations. .......................................................................... 30

B. The Sanchez Lawsuit, Beazley, and the Insurance Policies. ......................35

   1. The Sanchez Lawsuit. .................................................... 35

   2. Beazley and the Beazley Policies. ................................... 36

   3. Litigation Claims Against the Quintairos Firm. .................. 37

   4. Coverage Lawsuit. ...................................................... 39

C. The Commencement of the Chapter 11 Cases and Proceedings in the Chapter 11 Cases Prior to the Trustee's Appointment. ...............................................39

D. The Trustee's Appointment and Subsequent Proceedings in the Chapter 11 Case. ...................................................................................40

   1. The Global Settlement Agreement. ................................ 41

   2. The 363 Sale. .......................................................... 43

VI. DESCRIPTION OF THE NON-PAYMENT TERMS OF THE PLAN ............................... 45

A. Means of Implementation of the Plan. .............................................45

B. Executory Contracts and Leases. ...................................................59

   1. Executory Contracts. .................................................. 59

   2. Approval of Assumption or Rejection. ............................. 59

   3. Cure of Defaults. ...................................................... 60

   4. Objection to Cure Amounts. ......................................... 60

   5. Confirmation Order. ................................................... 61

   6. Post-Petition Date Contracts and Leases. ......................... 61

   7. Bar Date. ............................................................... 61

C. Conditions to Confirmation and Effectiveness of the Plan. ......................62

D. Discharge, Injunction, and Exculpation. ..........................................62

VII. RISK FACTORS ............................................................................ 67

   1. Projected Recoveries Are Estimates Only and Subject to Change. .................. 67

   2. No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections. .......................................................... 67

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

ii

      3.   The Trustee or Another Party in Interest May Object to Your Claim or Classification...................................................................................... 68

      4.   Parties in Interest May Object to the Trustee's Classification of Claims. ............ 68

      5.   The Conditions Precedent to the Effective Date May Not Occur......................... 68

      6.   The Trustee May Not Satisfy the Vote Requirement...................................... 68

      7.   The Trustee May Not Secure Confirmation of the Plan. ..................................... 69

      8.   Nonconsensual Confirmation of the Plan May Be Necessary. ........................... 70

      9.   The Chapter 11 Cases May be Converted to Chapter 7. ..................................... 70

VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................................... 71

IX. CONFIRMATION OF THE PLAN .......................................................................... 77

   A.  Confirmation of the Plan..................................................................................77

   B.  Objections to Confirmation of the Plan. ..........................................................77

      1.   Best interest of Creditors and liquidation analysis. .......................................... 77

      2.   Feasibility........................................................................................................... 80

      3.   Accepting impaired class. .................................................................................. 80

      4.   Acceptance of Plan. ........................................................................................... 81

      5.   Confirmation over a dissenting Class ("Cram Down"). ..................................... 81

      6.   Allowed Claims. ................................................................................................ 81

      7.   Impaired Claims and Equity Interests................................................................ 82

      8.   Voting procedures. ............................................................................................. 82

X. ALTERNATIVES TO THE PLAN .......................................................................... 83

   A.  Alternative Plans of Reorganization. ................................................................84

   B.  Liquidation Under Chapter 7. ..........................................................................84

XI. RECOMMENDATION AND CONCLUSION ................................................................ 85

APPENDIX....................................................................................................... 87

Garman Turner Gordon
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

# I.
## INTRODUCTION TO THE PLAN OF REORGANIZATION

On January 22, 2025 (the "Petition Date"), NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors") each filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code,[1] in the United States Bankruptcy Court for the District of Nevada, Las Vegas (the "Bankruptcy Court"), thereby commencing the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases").

The Chapter 11 Cases are jointly administered under the lead bankruptcy case of *In re NuMale Corporation*, Case No. 25-10341-nmc.   On April 7, 2025, the Bankruptcy Court appointed Michael W. Carmel, Esq. (the "Trustee") as the Chapter 11 Trustee in all of the Chapter 11 Cases.

The Plan is the culmination of a Global Settlement Agreement, the approval of which has been sought pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.   The Global Settlement Agreement is attached as Exhibit 1 to the Plan.   Since the Trustee's appointment on April 7, 2025, the Trustee and his professionals have undertaken extensive efforts to carve a path forward in these Chapter 11 Cases to confirm a plan that provides for a meaningful distribution to creditors.   As a direct result of the Trustee's and his professionals' diligent efforts and extensive negotiations with the parties to the Global Settlement Agreement, $108.5 million is being paid to the estates pursuant to a Global Settlement Agreement, which funds will be used to satisfy the allowed claims of the Debtors' creditors.

**Under the Plan:**

**\* all allowed secured claims will be paid in full,**

**\* all allowed priority claims will be paid in full,**

**\*all allowed administrative claims (to the extent not voluntarily reduced or deferred) will be paid in full,**

---

[1] Unless otherwise indicated herein, all references to "Chapter" or "Section" refer to Title 11 of the United States Code (the "Bankruptcy Code").

**\* the Allowed Sanchez Claim will receive an <u>initial distribution</u> of 23.5% of his compromised claim on the Plan's Effective Date, <u>plus</u> subsequent distributions from the Liquidation Trust established by the Plan,**

**\* allowed general unsecured claims will receive an estimated <u>initial distribution</u> of approximately 26% of their claims on the Plan's Effective Date, <u>plus</u> subsequent distributions from the Liquidation Trust established by the Plan, and**

**\* subordinated claims will receive a distribution if all unsecured claims are paid in full.**

As a general overview, the Plan provides that allowed claims will be paid on the later of (i) the Effective Date, or (ii) upon allowance of the claim. Allowed secured claims will be paid in full, as will allowed priority claims. For classes of claims that are not paid in full on the Effective Date of the Plan, they will become the beneficiaries of a Liquidation Trust formed to prosecute litigation claims for be benefit of these creditors. Four classes of creditors that hold allowed claims will become the beneficiaries of the Liquidation Trust: (i) deferred administrative expenses of the estates; (ii) holders of general unsecured claims; (iii) Mr. Sanchez, the holder of the allowed $410 million claim; and (iv) the subordinated claims, who will only receive a distribution from the Liquidation Trust after all other claims are paid in full. Administrative expenses of the Liquidation Trust, as well as the Beazley Expense Reimbursement (discussed more fully below) will also be paid from the Liquidation Trust. Additionally, under the Plan intercompany claims and the equity interests in the Debtors are cancelled, released, and extinguished.

The Global Settlement Agreement is a great result, achieved through the hard work and persistent efforts of the parties to the Global Settlement Agreement. In the absence of the Global Settlement Agreement there would not be funds in these Chapter 11 Cases available to make any meaningful distribution to creditors, as the Debtors' operations are insufficient to do so.

As discussed more fully herein, the Plan is made consistent with the terms of the Global Settlement Agreement and Global Settlement Order and generally provides for:

(i) the reorganization of the Debtors *with the Trustee retaining sole control and*

*authority over the Reorganized Debtors* and their assets after the Effective Date to enable liquidation of their assets and distributions to creditors in accordance with the Plan;

(ii) the sale of the Debtors/Reorganized Debtors' non-litigation assets pursuant to a sale and auction process under Section 363 of the Bankruptcy Code, through which Justin Pulliam or his assignee will be the stalking horse bidder;

(iii) the distribution of the proceeds of the $108.5 million settlement payment to holders of allowed claims in accordance with the terms of the Plan; and

(iv) the creation of the Liquidation Trust through which the Liquidation Trustee will pursue, litigate, waive, settle, compromise, and liquidate the Litigation Claims and the other Liquidation Trust Assets to maximize additional recoveries by the Liquidation Trust Beneficiaries.

*For the avoidance of doubt, as reflected in the Liquidation Analyses attached hereto as Exhibit 2, if the Plan is not approved and the Chapter 11 Cases are converted to Chapter 7, there will be virtually no distribution to unsecured creditors and only a nominal distribution to secured creditors.  Accordingly, all creditors in voting classes are encouraged to review the Plan and the Disclosure Statement in detail and vote to accept the Plan.*

Based on the interrelationship of Debtors' operations and creditor pool, the Plan also serves as a motion by the Trustee seeking entry, pursuant to Section 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of the Debtors' Estates only for purposes of classifying and treating all Claims and Equity Interests under the Plan, including for voting, confirmation, and Distribution purposes.  Such substantive consolidation will not (i) alter the state of organization of any Debtor for purposes of determining applicable law of any of the Litigation Claims; (ii) alter or impair the legal and equitable rights of the Liquidation Trustee to enforce any of the Litigation Claims; (iii) otherwise impair, release, discharge, extinguish or affect any of the rights or issues raised as a part thereof (including any defenses to any such Litigation Claims); or (iv) alter or impair the Reorganized Debtor Assets.

The Trustee has prepared this Disclosure Statement (the "Disclosure Statement") in connection with the solicitation of votes on the *Joint Plan of Reorganization* (the "Plan") to treat the Claims of Creditors of the Debtors and the Persons holding Equity Interests in the Debtors.[2] The various exhibits to this Disclosure Statement included in the Appendix are incorporated into and are a part of this Disclosure Statement. The Plan is included as **Exhibit 1** in the Appendix. The information provided in this Disclosure Statement is based on the best information available to the Trustee. After having reviewed the Disclosure Statement and the Plan, any interested party desiring further information may contact:

Garman Turner Gordon LLP
Attn: Talitha Gray Kozlowski, Esq.
7251 Amigo Street, Suite 210
Las Vegas, NV 89119
(725) 777-3000 Telephone
Email:  tgray@gtg.legal

Interested parties may also obtain further information from the Bankruptcy Court at its PACER website:  http://www.nvb.uscourts.gov.

**ONLY HOLDERS OF THE SANCHEZ CLAIM (CLASS 9), GENERAL UNSECURED CLAIMS (CLASS 10), INTERCOMPAY CLAIMS (CLASS 11), AND SUBORDINATED CLAIMS (CLASS 12) ARE ENTITLED TO VOTE ON THE PLAN AND ARE BEING SOLICITED UNDER THIS DISCLOSURE STATEMENT.**

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING PACIFIC TIME ON SEPTEMBER 10, 2025**

**(UNLESS THE TRUSTEE EXTENDS THE VOTING DEADLINE).**

---

[2] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

## II.
## IMPORTANT INFORMATION AND DISCLAIMER REGARDING
## THIS DISCLOSURE STATEMENT

The objective of a Chapter 11 case is the confirmation (*i.e.*, approval by the Bankruptcy Court) of a plan of reorganization for a debtor. A plan describes in detail (and in language appropriate for a legal contract) the means for satisfying the claims against, and equity interests in, a debtor. After a plan has been filed, the holders of such claims and equity interests that are Impaired (as defined in Section 1124) are permitted to vote to accept or reject the plan. Before a plan proponent can solicit acceptances of a plan, Section 1125 requires the plan proponent to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable those parties entitled to vote on the plan to make an informed judgment about the plan and whether they should accept or reject the plan.

The purpose of this Disclosure Statement is to provide sufficient information about the Debtors and the Plan to enable Creditors to make an informed decision in exercising their rights to vote to accept or reject the Plan. This Disclosure Statement will be used to solicit acceptances of the Plan. The Bankruptcy Court has already issued an order approving this Disclosure Statement on a conditional basis finding that this Disclosure Statement provides adequate information in accordance with Section 1125; however the Court will ultimately analyze, on a final basis, whether this Disclosure Statement provides adequate information in accordance with Section 1125 and is anticipated to issue a final order with this finding. Approval by the Bankruptcy Court is not an opinion or ruling on the merits of this Disclosure Statement, and it does not mean that the Plan itself has been or will be approved by the Bankruptcy Court.

After the appropriate Holders of Claims have voted on whether to accept or reject the Plan, there will be a hearing on the Plan to determine whether it should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including but not limited to Section 1129. The Bankruptcy Court will also receive and consider a Ballot Summary that will present a tally of the votes of Classes accepting or rejecting the Plan that are cast by those entitled to vote. Once

confirmed, the Plan will be treated essentially as a contract binding on all Creditors, Holders of Equity Interests, and other parties-in-interest in the Chapter 11 Cases.

The Plan is attached as Exhibit 1. For the convenience of Creditors and Holders of Equity Interests, the Plan is summarized in this Disclosure Statement. In the event of any inconsistency between this Disclosure Statement and the Plan, the Plan controls.

THE TRUSTEE IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF REORGANIZATION*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF FEDERAL SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE TRUSTEE CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES; LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS; VARIATION FROM PROJECTED FINANCIAL DATA; AND AVAILABILITY AND TERMS OF CAPITAL.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY ENTITY'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE PROJECTED BY OR ON BEHALF OF THE TRUSTEE, AND THE TRUSTEE UNDERTAKES NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE PLAN RECOVERY ANALYSIS, PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE TRUSTEE URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:

(A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

GARMAN TURNER GORDON IS GENERAL BANKRUPTCY COUNSEL TO THE TRUSTEE. THE TRUSTEE AND HIS COUNSEL HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  THE TRUSTEE'S COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE OR THAT MAY BE FILED LATER WITH A PLAN SUPPLEMENT.

ALTHOUGH THE TRUSTEE BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.

IN PREPARING THIS DISCLOSURE STATEMENT, THE TRUSTEE RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. ALTHOUGH THE TRUSTEE HAS USED HIS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ANY FUTURE FINANCIAL RESULTS. THE TRUSTEE EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, OR AS HAVING ANY ADVERSE ESTOPPEL EFFECT. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000

1    OR ACTIONS.

2          NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR

3    LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR

4    IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  **EXCEPT AS PROVIDED**

5    **UNDER THE PLAN, THE REORGANIZED DEBTORS, THE LIQUIDATION**

6    **TRUSTEE, OR THE LIQUIDATION TRUST, AS APPLICABLE, MAY SEEK TO**

7    **INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND**

8    **MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE**

9    **OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT**

10    **IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS ON THE TERMS**

11    **SPECIFIED IN THE PLAN.**

12          THE TRUSTEE IS GENERALLY MAKING THE STATEMENTS AND PROVIDING

13    THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS

14    OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY

15    NOTED.  ALTHOUGH THE TRUSTEE MAY SUBSEQUENTLY UPDATE THE

16    INFORMATION IN THIS DISCLOSURE STATEMENT, THE TRUSTEE HAS NO

17    AFFIRMATIVE DUTY TO DO SO.   HOLDERS OF CLAIMS REVIEWING THIS

18    DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR

19    REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE

20    DISCLOSURE STATEMENT WAS SENT.   INFORMATION CONTAINED HEREIN IS

21    SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE TRUSTEE

22    RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED

23    DISCLOSURE STATEMENT FROM TIME TO TIME.

24          AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER

25    ACTIONS OR POTENTIAL ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT

26    CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,

27    STIPULATION OR WAIVER, OR AS HAVING ANY ADVERSE ESTOPPEL EFFECT, BUT

28    RATHER AS THE TRUSTEE'S STATEMENT OF THE STATUS OF THE RESPECTIVE

1   MATTER.  FURTHER, AS SET FORTH IN DETAIL IN THE PLAN (INCLUDING AS SET

2   FORTH IN THE PLAN'S DEFINITION OF "LITIGATION CLAIMS"), EXCEPT AS

3   OTHERWISE PROVIDED IN THE PLAN AND GLOBAL SETTLEMET AGREEMENT, ALL

4   LITIGATON CLAIMS ARE EXPRESSLY RESERVED AND PRESERVED UNDER THE

5   PLAN.

6          HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN

7   MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN

8   ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO

9   ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER

10  AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING

11  CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY

12  ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS

13  HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN

14  ARTICLE VII HEREIN, "RISK FACTORS."

15         HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER THIRD PARTIES

16  SHOULD BE AWARE THAT THE PLAN CONTAINS INJUNCTIONS, EXCULPATIONS,

17  RELEASES, AND LIMITATIONS OF LIABILITY THAT MAY MATERIALLY AFFECT

18  THEIR RIGHTS.

19         IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE

20  EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST AND HOLDERS OF

21  EQUITY INTERESTS IN (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT

22  SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE

23  PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY

24  THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

25  . . .

26  . . .

27  . . .

28  . . .

# III.
## DISCUSSION OF THE PAYMENTS TO BE MADE UNDER THE PLAN

The following is a general overview of the treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the provisions of the Plan itself.   The Plan's treatment of each Class of Claims is summarized in the following table:

| Class | Description | Treatment | Estimated Asserted Claim Amounts |
|---|---|---|---|
| Class 1 | Newtek Secured Claim | Unimpaired; No solicitation required. | $1,000,000.00 |
| Class 2 | Kalamata Claim | Unimpaired. No solicitation required. | $    86,628.42 (amount is disputed) |
| Class 3 | EBF Holdings Claim | Unimpaired. No solicitation required. | $    32,317.50 (amount is disputed) |
| Class 4 | Fox Funding Claim | Unimpaired. No solicitation required. | $    78,225.00 (amount is disputed) |
| Class 5 | Top Tier Claim | Unimpaired. No solicitation required. | $    263,942.88 (amount is disputed) |
| Class 6 | LCF Group Claim | Unimpaired. No solicitation required. | $    505,443.56 (amount is disputed) |
| Class 7 | Ford Motor Claim | Unimpaired. No solicitation required. | $    21,593.98 |
| Class 8 | Priority Unsecured Claims | Unimpaired. No solicitation required. | $    15,150.00 |
| Class 9 | Sanchez Claim | Impaired. Solicitation required. | Allowed in the amount of $410,000,000.00 |
| Class 10 | General Unsecured Claims | Impaired. Solicitation required. | $8,907,336.79 (amounts are disputed) |
| Class 11 | Intercompany Claims | Impaired. Solicitation required. | $3,771,462.03 (amounts are disputed) |
| Class 12 | Subordinated Claims | Impaired. Solicitation required. | $4,694,795.10 (amounts are disputed) |
| Class 13 | Equity Interests | Impaired; deemed rejected. No solicitation required. | N/A |

Consistent with the substantive consolidation of the Debtors for Plan purposes, as set forth more fully in Section 5.5 of the Plan, the Plan groups the Debtors together for purposes of classifying and treating all Claims and Equity Interests under the Plan, including for voting, confirmation, and Distribution purposes, for describing treatment under the Plan, confirmation of

the Plan, and making Plan Distributions with respect to Allowed Claims against and Equity Interests in the Debtors. Accordingly, pursuant to the Plan, the Assets of the Debtors and their Estates, and the Allowed Claims against and Equity Interests in the Debtors, will be treated as if the Debtors and their Estates are substantively consolidated on the Effective Date. Notwithstanding this, such grouping shall not (i) alter the state of organization of any Debtor for purposes of determining applicable law of any of the Litigation Claims; (ii) alter or impair the legal and equitable rights of the Liquidation Trustee to enforce any of the Litigation Claims; (iii) otherwise impair, release, discharge, extinguish or affect any of the or issues raised as a part thereof (including any defenses to any such Litigation Claims); or (iv) alter or impair the Reorganized Debtor Assets. Nor shall the substantive consolidation of the Debtors for Plan purposes affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets, except as otherwise set forth in the Plan. Furthermore, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities after the Effective Date. However, notwithstanding the foregoing substantive consolidation for Plan purposes, fees payable, pursuant to 28 U.S.C. § 1930, shall be due and payable by each individual Debtor.

## A.  **Treatment of Administrative Claims.**

Administrative Claims are as defined in Section 1.1.10 of the Plan: A Claim for any cost or expense of administration of the Chapter 11 Cases allowed under Sections 503(b) or 507(b) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including, but not limited to: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates; (ii) all Taxes arising between the Petition Date and the Effective Date, including those Taxes for which returns are not yet due; and (iii) all Professional Fees[3] approved by the Bankruptcy Court pursuant to interim and final allowances. To the extent

---

[3] "Professional Fees" means the Administrative Claims for compensation and reimbursement submitted pursuant to Sections 328, 330, 331, or 503(b) of the Bankruptcy Code of Persons: (i) employed pursuant to an order of the Bankruptcy Court under Sections 327, 328, or 1102 of the Bankruptcy Code; or (ii) for whom compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Sections 363(b) or 503(b) of the Bankruptcy

that a Claim is allowed pursuant to Sections 365(d)(3) and (d)(5) of the Bankruptcy Code, such Claim shall also be deemed an "Administrative Claim".

Pursuant to Section 1123(a)(1), Allowed Administrative Claims are not designated as a Class. The Holders of such unclassified Claims shall be paid in full under the Plan consistent with the requirements of Section 1129(a)(9)(A) and are not entitled to vote on the Plan. The amount of Administrative Claims as of the filing of this Disclosure Statement is estimated to be $7.5-$9.5 million. This includes the following estimated fees and costs: (i) the Court-appointed Patient Care Ombudsman's ("PCO") administrative claim, estimated at the amount of $100,000; (ii) Garman Turner Gordon LLP ("GTG"), the Trustee's counsel, has estimated its reduced hourly and contingency fee under the order employing GTG exceeds $11,250,000.[4] However, GTG is presently willing to materially discount its fee subject to its final fee application being approved, the Global Settlement Agreement being approved, and the Plan being expeditiously confirmed. GTG is willing to waive its reduced hourly fee, discount its contingency fee by 20%, and defer between 45% and 50% of its contingency fee to be paid through recoveries from the Liquidation Trust to ensure the Plan is confirmable; (iii) estate special litigation counsel fees, estimated at $50,000; (iv) the Trustee's statutory fee under Section 326, estimated at $3,278,250[5]; (v) pre-petition and post-petition administrative claims of landlords, estimated at $125,000 (Prospect Rainbow, LLC estimated at $76,488.36, and other landlords estimated at $19,158.69, plus additional amounts to cover any presently unknown shortfalls); (vi) the Pulliam Administrative Claim capped at $300,000; (vii) potential post-petition wage claims asserted by Carlos Feliciano and Brad Palubicki to the extent not disallowed in connection with the pending adversaries filed by the Trustee; (viii) the $150,000 holdback for the Liquidation Trust; (ix)

———————————————— (continued)
Code or by other Final Order. *See also* Plan Section 1.1.106.

[4] GTG was employed on a hybrid reduced hourly and reduced contingency fee basis. At present, and subject in all respects to the Plan being expeditiously confirmed and going effective, GTG has indicated its willingness to voluntarily waive the reduced hourly fees incurred, and to voluntarily reduce the contingency compensation as will be set forth in its fee application submitted prior to the Confirmation Hearing. Any voluntary waiver is conditioned in all respects to the Plan being confirmed and going effective expeditiously.

[5] Likewise, the Trustee anticipates deferring $278,250.00 of his statutory fee (the total statutory commission amounting to $3,278,250.00), to be paid from the Liquidation Trust proceeds under the Plan in accordance with the waterfall applicable to payouts from the Liquidation Trust.

asserted Professional Fees incurred by David Riggi as counsel for the Debtors prior to the Trustee's appointment, which are not expected to exceed $100,000; and (x) other administrative expense claims resulting from Debtors' post-petition operations and/or other professionals who performed services for the Estates. If authorized by the Bankruptcy Court, it is also possible that certain of the foregoing Administrative Claims may be paid in advance of Plan confirmation. For the avoidance of doubt, the foregoing solely identifies anticipated Administrative Claims that may be sought. All potential Administrative Claims identified in this Disclosure Statement remain subject to approval by the Bankruptcy Court. While not an Administrative Expense Claim, the Trustee also anticipates that the United States Trustee quarterly fees will be approximately $260,000 for the quarter in which the Effective Date occurs.

It is possible that other Professional Fees may be asserted by and awarded to former estate professionals or that other Administrative Claims may be asserted and awarded, which could materially increase the amount of Allowed Administrative Claims.

Under the Plan, to the extent an Allowed Administrative Claim has not been paid prior to the Effective Date in accordance with an order of the Bankruptcy Court, each Allowed Administrative Claim shall be paid upon the latest of: (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable, (iii) the first (1st) Business Day that is fourteen (14) days after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the Holder of such Claim and the Trustee, the Reorganized Debtor, or Liquidation Trustee, as applicable, and the Holder of the Administrative Claim shall agree upon.

All requests for allowance and payment of Administrative Claims against the Debtors and all final applications for allowance and disbursement of Professional Fees must be filed by the Administrative Claims Bar Date or the Holders thereof shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, and/or the Liquidation Trust. *The Administrative Claim Bar Date is defined as "[t]he first (1st) Business Day occurring on or after the fifteenth (15th) day after the Effective Date."*

All Professional Fees applications must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order, and all other orders governing payment of Professional Fees. Unless otherwise ordered by the Bankruptcy Court, from and after the Effective Date, no professional shall be required to file fee applications with the Bankruptcy Court and the Reorganized Debtors or Liquidation Trustee, as applicable, may pay all professionals in the ordinary course for fees and expenses incurred after the Effective Date.

The failure to file a request for payment of an Administrative Claim on or before the Administrative Claim Bar Date shall result in such Administrative Claim being forever disallowed, barred, and expunged in its entirety without further notice to any party, or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt, this includes any trade accounts payable, operating expenses, deposit reimbursements, accrued expenses, and other liabilities of the Debtors arising in the ordinary course of business after the Petition Date.

**B.      Treatment of Priority Tax Claims.**

As set forth more specifically in Section 1.1.104 of the Plan, Priority Tax Claims include "any and all governmental unit Claims accorded priority in right of payment under Section 507(a)(8) of the Bankruptcy Code." This includes certain tax obligations. Currently, the Trustee estimates Priority Claims of Governmental Units in the amount of $9,000, although the Bar Date for Governmental Units filing a proof of Claim does not pass until July 21, 2025.

Each Allowed Priority Tax Claim, if any, shall be paid in full in Cash by the Trustee or Reorganized Debtors, as applicable, on the latest of: (i) the Effective Date or as soon thereafter as is practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable, (iii) the first (1st) Business Day that is fourteen (14) days after such Priority Tax Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the Holder of such Priority Tax Claim and the Trustee, Reorganized Debtors, or Liquidation Trustee, as applicable, shall agree. Until the Allowed Priority Tax Claim is paid in full, the unpaid balance shall accrue statutory interest from the Effective Date fixed at the applicable federal or state statutory rate in effect with respect to such Priority Tax Claim on the Petition Date.

**C.**    **Class 1 – Newtek Secured Claim.**

Class 1 consists of the Newtek Secured Claim, which is the Secured Claim portion of the Claim asserted by Newtek Bank N.A. aka Newtek Small Business Finance, LLC against NuMale Corp, among others, in proof of claim number 24, filed in bankruptcy case number 25-10341-nmc, which asserted Claim is in the amount of $5,033,301.46.  The Trustee has entered into a settlement of the Newtek Claim (the "Newtek Settlement"), which is the settlement by and between the Trustee, Debtors, Justin Pulliam, and Irma L. Pulliam, whereby the Newtek Claim shall be an Allowed Secured Claim against the Debtors in the amount of $1,000,000; the balance of the Allowed Newtek Claim is a General Unsecured Claim; Justin Pulliam and Irma L. Pulliam shall be released from all liability and liens in connection with the Newtek Claim; and Newtek Bank N.A. shall retain all rights to pursue recovery of the balance of the Newtek Claim from all obligors and guarantors that are not party to the Newtek Settlement.  The Newtek Settlement is memorialized in the Settlement and Release Agreement, which shall be approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019.

The Allowed Claim in Class 1 of the Plan shall be treated as follows: In accordance with the terms of the Newtek Settlement, in full and final satisfaction of the Debtors, Justin Pulliam, and Irma Pulliam's obligations with respect to the Newtek Secured Claim, Newtek shall be paid $1,000,000 in Cash by the Reorganized Debtors upon the Effective Date or as soon thereafter as practicable.

The Creditor in Class 1 is Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and not entitled to vote on the Plan.

**D.**    **Class 2 – Kalamata Claim.**

Class 2 consists of the Kalamata Claim, which is the Claim asserted by Kalamata Capital Group, LLC against each of the Debtors, among others, in proof of claim number 9 filed in bankruptcy case number 25-10341-nmc, which asserted Claim is in the amount of $86,628.41.

The Allowed Claim in Class 2 shall be treated as follows: The Trustee disputes the validity of the Kalamata Claim and will be seeking disallowance of the Kalamata Claim.  Should the Bankruptcy Court determine that any portion of the Kalamata Claim is an Allowed Secured

Claim, then the Allowed Secured Claim portion of the Kalamata Claim shall be paid in full in Cash by the Reorganized Debtors upon the latest of: (i) such date as may be fixed by the Bankruptcy Court; (ii) the first (1st) Business Day following the fourteenth (14th) day after such Secured Claim is Allowed; and (iii) such date as agreed upon by the Holder of such Secured Claim and the Trustee, and after the Effective Date, by the Reorganized Debtors.  Should the Bankruptcy Court determine that any portion of the Kalamata Claim is an Allowed Unsecured Claim, such Allowed Unsecured Claim portion of the Kalamata Claim shall be treated as an Allowed General Unsecured Claim in Class 10.

The Creditor in Class 2 is Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and not entitled to vote on the Plan.

**E.      Class 3 – EBF Holdings Claim.**

Class 3 consists of the EBF Holdings Claim, which is the Claim asserted by EBF Holdings, LLC d/b/a/ Everest Business Funding against NuMale Florida, among others, in duplicate proof of claim numbers 18 and 19, which are duplicate claims filed in bankruptcy case number 25-10341-nmc, which asserted Claim is in the amount of $32,317.50.

The Allowed Claim in Class 3 shall be treated as follows: The Trustee disputes the validity of the EBF Holdings Claim and will be seeking disallowance of the EBF Holdings Claim.  Should the Bankruptcy Court determine that any portion of the EBF Holdings Claim is an Allowed Secured Claim, then the Allowed Secured Claim portion of the EBF Holdings Claim shall be paid in full in Cash by the Reorganized Debtors upon the latest of: (i) such date as may be fixed by the Bankruptcy Court; (ii) the first (1st) Business Day following the fourteenth (14th) day after such Secured Claim is Allowed; and (iii) such date as agreed upon by the Holder of such Secured Claim and the Trustee, and after the Effective Date, by the Reorganized Debtors. Should the Bankruptcy Court determine that any portion of the EBF Holdings Claim is an Allowed Unsecured Claim, such Allowed Unsecured Claim portion of the EBF Holdings Claim shall be treated as an Allowed General Unsecured Claim in Class 10.

The Creditor in Class 3 is Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and not entitled to vote on the Plan.

**F.    Class 4 – Fox Funding Claim.**

Class 4 consists of the Fox Funding Claim, which is the Claim asserted by Fox Funding Group, LLC against NuMale Corp, NuMedical SC, NuMale Colorado, NuMale Florida, NuMale Nebraska, and NuMale New Mexico, among others, in duplicate proof of claim number 20 filed in bankruptcy case number 25-10341-nmc and proof of claim number 1 filed in bankruptcy case number 25-10346, which asserted Claim is in the amount of $78,225.00.

The Allowed Claim in Class 4 shall be treated as follows: The Trustee disputes the validity of the Fox Funding Claim and will be seeking disallowance of the Fox Funding Claim. Should the Bankruptcy Court determine that any portion of the Fox Funding Claim is an Allowed Secured Claim, then the Allowed Secured Claim portion of the Fox Funding Claim shall be paid in full in Cash by the Reorganized Debtors upon the latest of: (i) such date as may be fixed by the Bankruptcy Court; (ii) the first (1st) Business Day following the fourteenth (14th) day after such Secured Claim is Allowed; and (iii) such date as agreed upon by the Holder of such Secured Claim and the Trustee, and after the Effective Date, by the Reorganized Debtors. Should the Bankruptcy Court determine that any portion of the Fox Funding Claim is an Allowed Unsecured Claim, such Allowed Unsecured Claim portion of the Fox Funding Claim shall be treated as an Allowed General Unsecured Claim in Class 10.

The Creditor in Class 4 is Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and not entitled to vote on the Plan.

**G.    Class 5 – Top Tier Claim.**

Class 5 consists of the Top Tier Claim, which is the Claim asserted by Proventure d/b/a Top Tier Capital against Feliciano NuMale, NuMale New Mexico SC, and NuMale Nebraska, among others, in duplicate proof of claim number 21 filed in bankruptcy case number 25-10341-nmc and proof of claim numbers 1 and 2 filed in bankruptcy case number 25-10342, which asserted Claim is in the amount of $263,942.88.

The Allowed Claim in Class 5 shall be treated as follows: The Trustee disputes the validity of the Top Tier Claim and will be seeking disallowance of the Top Tier Claim. Should the Bankruptcy Court determine that any portion of the Top Tier Claim is an Allowed Secured

1    Claim, then the Allowed Secured Claim portion of the Fox Funding Claim shall be paid in full in

2    Cash by the Reorganized Debtors upon the latest of: (i) such date as may be fixed by the

3    Bankruptcy Court; (ii) the first (1st) Business Day following the fourteenth (14th) day after such

4    Secured Claim is Allowed; and (iii) such date as agreed upon by the Holder of such Secured

5    Claim and the Trustee, and after the Effective Date, by the Reorganized Debtors.  Should the

6    Bankruptcy Court determine that any portion of the Top Tier Claim is an Allowed Unsecured

7    Claim, such Allowed Unsecured Claim portion of the Top Tier Claim shall be treated as an

8    Allowed General Unsecured Claim in Class 10.

9         The Creditor in Class 5 is Unimpaired under the Plan, deemed to have accepted the Plan

10   pursuant to Section 1126(f) of the Bankruptcy Code, and not entitled to vote on the Plan.

11   **H.** **Class 6 – LCF Group Claim.**

12        Class 6 consists of the LCF Group Claim, which is the Claim asserted by The LCF

13   Group, Inc. against NuMale New Mexico, Feliciano NuMale, NuMale Corp, NuMale Florida,

14   among others, in duplicate proof of claim number 22 filed in bankruptcy case number 25-10341-

15   nmc,  and proof of claim number 1 filed in bankruptcy case number 25-10347-nmc, which

16   asserted Claim is in the amount of $113,378.47; proof of claim number 3 filed in bankruptcy

17   case number 25-10342, which asserted Claim is in the amount of $149,466.02; and late filed

18   claim number 42 in bankruptcy case number 25-10341-nmc, which is in the amount of

19   $242,599.07 and is based on an asserted guarantor obligation.

20        The Allowed Claim in Class 6 shall be treated as follows: The Trustee disputes the

21   validity of the LCF Group Claim and will be seeking disallowance of the LCF Group Claim.

22   Should the Bankruptcy Court determine that any portion of the LCF Group Claim is an Allowed

23   Secured Claim, then the Allowed Secured Claim portion of the LCF Group Claim shall be paid

24   in full in Cash by the Reorganized Debtors upon the latest of: (i) such date as may be fixed by

25   the Bankruptcy Court; (ii) the first (1st) Business Day following the fourteenth (14th) day after

26   such Secured Claim is Allowed; and (iii) such date as agreed upon by the Holder of such Secured

27   Claim and the Trustee, and after the Effective Date, by the Reorganized Debtors.  Should the

28   Bankruptcy Court determine that any portion of the LCF Group Claim is an Allowed Unsecured

Claim, such Allowed Unsecured Claim portion of the LCF Group Claim shall be treated as an Allowed General Unsecured Claim in Class 10.

The Creditor in Class 6 is Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and not entitled to vote on the Plan.

**I.**       **Class 7 – Ford Motor Claim.**

Class 7 consists of the Allowed Ford Motor Claim, which is the Secured Claim asserted by Ford Motor Credit Company, LLC against NuMale Corp in proof of claim number 1 filed in bankruptcy case number 25-10341-nmc, which asserted Claim is in the amount of $21,593.98.

The Allowed Claim in Class 7 shall be treated as follows: The Allowed Ford Motor Claim shall, in full and final satisfaction of such claim, be paid in full in Cash by the Reorganized Debtors upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first (1st) Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Trustee, and after the Effective Date, by the Reorganized Debtors.

The Creditor in Class 7 is Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and not entitled to vote on the Plan.

**J.**       **Class 8 – Priority Unsecured Claims.**

Class 8 consists of the Allowed Priority Unsecured Claims, which are any and all Claims accorded priority in right of payment under Section 507(a) of the Bankruptcy Code, except under Section 507(a)(2) and Section 507(a)(3). On the Effective Date, the unpaid pre-petition wage claim of Justin Pulliam shall be Allowed up to the statutory cap of $15,150.00.

The Allowed Claims in Class 8 shall be treated as follows: Each Allowed Priority Unsecured Claim, shall, in full and final satisfaction of such Claim, be paid in full in Cash by the Reorganized Debtors upon the latest of: (i) the Effective Date or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first (1st) Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Trustee, and after the Effective Date, by the

Reorganized Debtors.

Creditors in Class 8 are Unimpaired under the Plan, deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan.

**K.**     **Class 9 – Sanchez Claim.**

Class 9 consists of the compromised Sanchez Claim, which is unsecured Claim held by Sanchez as asserted in proof of claim number 7 filed in bankruptcy case number 25-10341-nmc and proof of claim number 3 filed in bankruptcy case number 25-10347-nmc, in the asserted amount of $579,442,390.01 as of the Petition Date, which compromised Claim is Allowed in the amount of $410,000,000 pursuant to the terms of the Global Settlement Agreement.

The Allowed Claim in Class 9 shall be treated as follows: The Sanchez Claim is Allowed in the compromised amount of $410,000,000.   In full and final satisfaction of such Claim, the Allowed Sanchez Claim shall be treated as follows:

        (i)        In accordance with the terms of the Global Settlement Agreement, unless paid by the Trustee prior to the Effective Date, pursuant to the terms of the Global Settlement Agreement, within two days on the Effective Date, Sanchez shall be paid in Cash its Pro Rata share of the Initial Distribution; provided, however, that Sanchez shall receive no more and no less than the sum of $96,500,000 from the Initial Distribution not subject to assessment of bankruptcy fees or costs, and payment shall be made as set forth in the Global Settlement Agreement; and

        (ii)      The remaining balance of the Allowed Sanchez Claim after the Initial Distribution is $313,500,000.  Sanchez shall receive his Pro Rata share of the Liquidation Trust Interests and is entitled to all Distributions in the order of priority set forth in the Liquidation Trust Agreement.

Class 9 is Impaired under the Plan.  The Holder of the Class 9 Claim is entitled to vote on the Plan.

**L.**     **Class 10 – General Unsecured Claims.**

Class 10 consists of the Allowed General Unsecured Claims, which include any Claim that is not secured by a Lien or other charge against or interest in property in which the Estates have an interest and is not (i) an Administrative Claim, (ii) a Priority Tax Claim, or (iii) a Priority Unsecured Claim; (iv) the Sanchez Claim; (v) an Intercompany Claim; or (vi) a Subordinated Claim.  General Unsecured Claims shall include all Claims arising under Section

502(g) of the Bankruptcy Code, and for the avoidance of doubt, the Asandra Claim and the Pulliam Claim.

In full and final satisfaction of such Claims, each Allowed Claim in Class 10 shall be treated as follows:

> (i)    Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each Holder of a General Unsecured Claim shall be paid in Cash its Pro Rata share of the Initial Distribution after upon the latest of: (i) the sixtieth (60th) day after the Effective Date, or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court; (iii) the first (1st) Business Day following the fourteenth (14th) day after such Claim is Allowed; and (iv) such date as agreed upon by the Holder of such Claim and the Trustee, and after the Effective Date, by the Reorganized Debtors; and

> (ii)   Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Liquidation Trust Interests and is entitled to all Distributions in the order of priority set forth in the Liquidation Trust Agreement.

Class 10 is Impaired under the Plan.  The Holders of the Class 10 Allowed General Unsecured Claims are Impaired and entitled to vote on the Plan.

**M.    Class 11 – Intercompany Claims.**

Class 11 consists of the Intercompany Claims, which are Claims held by one the Debtors against one or more of the other Debtors.

In full and final satisfaction of such Claims, the Allowed Claims in Class 11 shall be treated as follows:  All Intercompany Claims shall be cancelled, released, and extinguished as of the Effective Date, and no Distribution shall be made on account of any such Claim.

Class 11 is Impaired under the Plan.  The Holders of the Class 11 Allowed Intercompany Claims are entitled to vote on the Plan.

**N.    Class 12 – Subordinated Claims.**

Class 12 consists of the Subordinated Claims, which are defined in the Plan as "[u]nless determined by Final Order to be entitled to treatment in Class 10, the following Claims that are voluntarily equitably subordinated pursuant to the terms of the Global Settlement Agreement and/or equitably subordinated pursuant to section 510(c) of the Bankruptcy Code: (i) the NuMale

Albuquerque Claim, and (ii) all General Unsecured Claims asserted by Brad Palubicki; Carlos Feliciano; NMC Illinois, LLC; Nevada NuMale, LLC; NuMale Chicago LLC, and every other Insider and Affiliate of any of the Debtors, solely excluding the Asandra Claim and the Pulliam Claims. For the avoidance of doubt, the Trustee has sought the disallowance and equitable subordination of the Claims asserted by Brad Palubicki and Carlos Feliciano in a pending Adversary Proceeding, thereby rendering them Disputed Claims that will only qualify as Subordinated Claims should the Disputed Claims be Allowed by Final Order of the Bankruptcy Court."

Subordination of claims is typically applied in bankruptcy cases where the asserted creditor—often an insider of the debtors, such as an officer, director, or significant shareholder—has acted unfairly or wrongly, causing harm to other creditors or gaining an unfair advantage. To apply equitable subordination treatment to claims, a court must typically find: (i) there is inequitable conduct, such as that the asserted creditor (who may be an insider) engaged in misconduct such as fraud, misrepresentation, or breaches of fiduciary duty, that injured the other creditors or provided the claimant with an unfair advantage; and (ii) there is harm to other creditors or an unfair advantage, such as the misconduct must have resulted in actual injury to other creditors or a clear unfair benefit for the claimant; and (iii) applying equitable subordination treatment must not be inconsistent with the provisions of the Bankruptcy Code.

Here, the Plan equitably subordinates all General Unsecured Claims asserted by Brad Palubicki, Carlos Feliciano, NMC Illinois, LLC, Nevada NuMale, LLC, NuMale Chicago LLC, and every other Insider and Affiliate of any of the Debtors, solely excluding the Asandra Claim and the Pulliam Claim.

In determining to equitably subordinate the Subordinated Claims under the Plan, the Trustee evaluated the inequitable conduct discovered in the course of his investigations, indicating that the creditors holding Subordinated Claims (and, to the extent such creditor is an entity, the principals of that entity), engaged in breaches of fiduciary duty, mismanagement, and potentially even misrepresentations, that harmed the creditors of these Debtors. For example, the Carrier Notice Letters issued by the Trustee during his tenure set forth in detail the Trustee's

concerns regarding the breaches of duties including breaches of fiduciary duties by the Debtors' principals including Mr. Palubicki, and Dr. Feliciano.  Copies of the Carrier Notice letters are included with the Carmel Declaration in support of the Settlement Motion, on file with the Court.

Additionally, through the Palubicki Adversary, the Trustee is specifically suing Mr. Palubicki for, *inter alia*, the harm and damages caused to the Debtors by Mr. Palubicki in the course of his leadership and management and tenure as an officer and principal of the Debtors including as their President.  The harms alleged in the Palubicki Adversary include damages approximating five hundred million dollars.  As described herein, the Trustee is also evaluating whether to expand the claims alleged in the Palubicki Adversary, and whether to add additional parties or commence suit against other insiders who have caused harm to the Debtors.  All of the foregoing, and other information uncovered in the course of the Trustee's investigation, indicate the first factor warranting equitable subordination is present in these Chapter 11 Cases.

Without question, the second factor warranting equitable subordination is also present because the breaches of fiduciary duty, the mismanagement, and the potential misrepresentations undoubtedly harmed these Debtors and the Debtors' creditors.  The misconduct by these claimants (including their principals) resulted in over $579 million in claims being asserted by these Debtors, and obligating the Debtors to a variety of loan agreements including with MCAs that the Debtors did not have a hope to repay, as the Debtors' operations could not sustain ongoing obligations, let alone new obligations to which management obligated them.  This harmed creditors, who extended debt to these Debtors and/or have judgments against the Debtors, and remain unpaid.

Last, the equitable subordination treatment set forth in the Plan is not inconsistent with the provisions of the Bankruptcy Code.  For these reasons, the equitable subordination of the Subordinated Claims is warranted and consistent with the terms of the Global Settlement Agreement.

Under the Plan, in full and final satisfaction of such Claim, each Holder of an Allowed Subordinated Claim in Class 12 shall receive its Pro Rata share of the Liquidation Trust Interests and is entitled to all Distributions in the order of priority set forth in the Liquidation Trust

Agreement.

Class 12 is Impaired under the Plan.  The Holders of the Class 12 Allowed Subordinated Claims are entitled to vote on the Plan.

**O.    Class 13 – Equity Interests.**

Class 13 consists of the Equity Interests in the Debtors as of the Record Date.

The Allowed Equity Interests in Class 13 shall be treated as follows:  On the Effective Date, all Allowed Equity Interests shall be deemed cancelled and extinguished without further act or action under any applicable agreement, law, regulation, order, or rule.  No Distribution shall be made on account of any Equity Interest.

Class 13 is Impaired under the Plan and deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code, and is not entitled to vote on the Plan.

**IV.**
**SUMMARY OF VOTING PROCESS**

**A.    Who May Vote to Accept or Reject the Plan.**

Generally, holders of allowed claims or equity interests that are "Impaired" under a plan are permitted to vote on the plan.  A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor.  An equity interest represents an ownership stake in a debtor, such as a share.  In order to vote, a creditor must first have an allowed claim.

The solicitation of votes on the Plan will be sought only from those Holders of Allowed Claims whose Claims are Impaired under the Plan.  As explained more fully below, to be entitled to vote, a Claim must be both "Allowed" and "Impaired."

**B.    Summary of Voting Requirements.**

In order for the Plan to be confirmed, the Plan must be accepted by at least one non-insider, Impaired Class of Claims; this excludes the votes of insiders.  A class of claims is deemed to have accepted a plan when allowed votes representing at least two-thirds (2/3) in amount and a majority in number of the claims of the class actually voting cast votes in favor of a plan.  A class of equity interests has accepted a plan when votes representing at least two-thirds (2/3) in amount of the outstanding equity interests of the class actually voting cast votes in favor

1    of a plan.

2        The Trustee is soliciting votes from Holders of Allowed Claims in the following Classes:

| Class | Description |
|-------|-------------|
| Class 9 | Sanchez Claim |
| Class 10 | General Unsecured Claims |
| Class 11 | Intercompany Claims |
| Class 12 | Subordinated Claims |

**A VOTE FOR ACCEPTANCE OF THE PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT. THE TRUSTEE BELIEVES THAT THE TREATMENT OF CREDITORS UNDER THE PLAN IS THE BEST ALTERNATIVE FOR CREDITORS, AND THUS THE TRUSTEE RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN DO VOTE IN FAVOR OF THE PLAN.**

**V.**
**INFORMATION ABOUT DEBTORS' BUSINESSES AND THE CHAPTER 11 CASES**

**A.    Overview of the Debtors' Assets and Historical Operations.**

        The Debtors operate affiliated clinics offering a variety of elective medical or cosmetic treatments, including elective men's health (and in some instances women's health) services related to, *inter alia*, hormone replacement, sexual performance, and cosmetic hair treatments. The Debtor began to be formed in or about 2014 by Carlos Feliciano and Brad Palubicki.

        The Debtors are:

- NuMale Corporation (Case No. 25-10341-nmc), a Nevada Corporation, whose equity interests are held by Brad Palubicki, Justin Pulliam,[6] and Dr. Carlos Feliciano; management company.

_____

[6] In connection with the Global Settlement Agreement, the Trustee has agreed that Mr. Pulliam's unpaid post-petition wages and documented and verified unreimbursed expenses constitute allowed Administrative Claims. Additionally, the Trustee has agreed that Mr. Pulliam's pre-petition wage claims are valid and constitute Priority Claims for wages in the statutory amount of $15,150.00 (apiece) pursuant to 11 U.S.C. § 507(a)(4)(A).

- Feliciano NuMale Nevada PLLC (Case No. 25-10342-nmc), a Nevada professional limited liability company whose sole equity interest holder is Dr. Feliciano; operates clinic in Las Vegas, Nevada.

- NuMedical SC (Case No. 25-10343-nmc), a Wisconsin service corporation whose sole equity interest holder is Dr. Feliciano; operates clinic in Milwaukee, Wisconsin.

- NuMale Colorado SC (Case No. 25-10344-nmc), a Colorado corporation whose sole equity interest holder is Dr. Feliciano; formerly operated clinic in Greenwood Village (near Denver), Colorado.

- NuMale Florida TB PLLC (Case No. 25-10345-nmc), a Florida limited liability company whose sole equity interest holder is Dr. Feliciano; formerly operated clinic in Tampa, Florida.

- NuMale Nebraska LLC (No. 25-10346-nmc), a Wisconsin limited liability company whose sole equity interest holder is Dr. Feliciano; operates clinic in Omaha, Nebraska.

- NuMale New Mexico SC (Case No. 25-10347-nmc), a Wisconsin service corporation whose sole equity interest holder is Mr. Feliciano; operates clinic in Albuquerque, New Mexico.

Prepetition, Messrs. Palubicki, Pulliam, and Feliciano operated the Debtors. The Debtors' primary assets are the operations at their respective clinic locations, including intellectual property (IP), customer lists, large scale equipment, furniture, office equipment, computers, saleable medicines, and laboratory facilities and testing equipment. Based on the values assigned by Mr. Palubicki in Debtors' Schedules, these assets have relatively nominal value in a liquidation.

Since at least as far back as 2020, and due in part to the facts and circumstances outlined herein, the Debtors' businesses have relied on and/or required outside funding through loans and/or the factoring of their receivables to meet their operating obligations, as well as a number of intercompany loans. To state it differently, without loans and receivable factoring, the

1    Debtors were unable to pay their operating expenses pre-petition.

2           Based on the Trustee's investigation, outside funding has been the only financial

3    mechanism that kept the Debtors' businesses afloat for at least the several years before the

4    Petition Date.  For example, in his investigations the Trustee noted that in approximately

5    December 2023 alone, over $2.4 million in the proceeds of a Small Business Association-backed

6    loan ("Newtek Loan", *see infra*) went to working capital for NuMale Corporation and over $1.3

7    million funded then-cash flow deficiencies.  Additionally, post-petition, certain patient financing

8    has been accomplished through a third-party vendor contracting with a nondebtor.  The Debtors'

9    daily sales and collections summary for the second quarter of 2025, on both a cash basis and an

10   accrual basis, is attached hereto as **Exhibit 3**.

11          The Debtors' operating shortfalls lead to significant arrearages at their Las Vegas clinic,

12   with the landlord, Prospect Rainbow, seeking eviction.  The inability to fund rent persisted post-

13   petition, resulting in Prospect Rainbow seeking stay relief to resume eviction as discussed more

14   fully below.  The Debtors were also forced to close two clinics, one in Greenwood Village,

15   Colorado, and one in Tampa, Florida.

16          **1.     Clinics and Corporate Structure**

17          Historically, NuMale Corporation served principally as the lead management company

18   for the other six Debtors, who operated clinics located throughout the United States.  Equity in

19   NuMale Corporation is roughly divided as 36.37% held by President Brad Palubicki, 36.37%

20   held by Secretary/Vice President Dr. Feliciano, and 27.27% held by Vice President Justin

21   Pulliam.  Equity in the other six Debtors is held 100% by Dr. Feliciano.

22          Originally, Debtors and their non-debtor affiliates operated at least nine clinic locations

23   through a structure in which each clinic location had its own separate clinic *entity* as well as its

24   own separate local management *entity*, and each clinic entity also had a separate ownership

25   structure from not only its related local management entity but also that differed from NuMale

26   Corporation's ownership structure.  Of the clinic entities, only six were brought into bankruptcy;

27   none of the local management entities were brought into bankruptcy.  As such, the Debtors are:

28          ▪   NuMale Corporation—lead management company, does not operate any clinics.

- Feliciano NuMale Nevada PLLC—operates the clinic located in Las Vegas, Nevada.
- NuMedical SC—operates the clinic located in Milwaukee, Wisconsin.
- NuMale Colorado SC—operated the clinic located in Greenwood Village, Colorado. This clinic is *currently closed*.[7]
- NuMale Florida TB PLLC—operated the clinic located in Tampa, Florida. This clinic is *currently closed*.[8]
- NuMale Nebraska LLC—operates the clinic located in Omaha, Nebraska.
- NuMale New Mexico SC—operates the clinic located in Albuquerque, New Mexico.

## 2.    **Business Operations.**

As a result of the mismanagement of the Debtors' businesses under the direction of the principals and insiders, the Debtors incurred millions of dollars of obligations to vendors, lenders, and others with little means of satisfying those claims. In their Schedules of assets and liabilities in the Bankruptcy Cases, the Debtors listed total prepetition claims arising from the operation of their businesses of approximately $8.6 million (exclusive of insider debt), and other claims have been asserted by creditors who filed proofs of claim with the Bankruptcy Court since the Petition Date. Additionally, the Debtors incurred insider, often intercompany debt, which as of the Petition Date, exceeded $5,225,548.18 (of which $3,771,462.03 was intercompany debt owed to Debtors and $1,454,086.15 was intercompany debt owed to non-Debtor affiliates). Additionally, years of mounting losses, in some instances lack of oversight of certain medical employees, and business divorce disputes with joint venture partners preceded Debtors' descent into bankruptcy, as did the Sanchez Lawsuit resulting in a jury verdict of $412,005,149, plus interest and fees, bringing the claim total to $579,442,390.01 as of the Petition Date, which is discussed more fully below.

. . .

---

[7] This clinic closed prior to the Trustee's appointment. Currently, patient care related to this clinic is handled as follows: Patients are being provided with medication(s) on an as needed basis. No procedures are being performed. No office visits are being provided. Akin to telemedicine services, when patients need medications they call in, and (with oversight) those medications are prescribed. Nothing more is being provided, as the clinic is truly closed.

[8] *Id.*

### a.    <u>Leases</u>

Debtors (or their non-debtor affiliates that are tenants under leases guaranteed by a Debtor) failed to pay rent in full at multiple locations prepetition and postpetition.  Before the Trustee was appointed, the Las Vegas landlord Prospect Rainbow, LLC ("<u>Prospect Rainbow</u>") sought termination of the automatic stay to evict the Debtors from the Las Vegas clinic premises. The Trustee ultimately negotiated a conditional order with Prospect Rainbow that allowed the Debtors to remain in the premises so long as rent was paid going forward—and, since the Trustee's appointment, it has been.

Notwithstanding this, a Cure of Defaults is required for any existing lease to which a Debtor is a party, in order that an Unexpired Lease(s) be assigned pursuant to the Plan.  Allowed Cure payments are set forth on <u>Schedule 6.3</u> of the Plan.

### b.    <u>Non-bankruptcy Litigation</u>

The Debtors' entry into bankruptcy was preceded by a number of lawsuits, as well as a jury verdict in the Sanchez Lawsuit pending in New Mexico State Court totaling $412,005,149, of which $37,005,149 is compensatory damages and $375,000,000 in punitive damages, plus interest and fees, bringing the claim total to $579,442,390.01 as of the Petition Date (the "<u>Jury Verdict</u>") (*see infra*); the Jury Verdict has not yet been reduced to judgment.

The Trustee's investigation has also revealed that, over time, the Debtors' prepetition leadership made a series of decisions that forced the Debtors into litigation over various business divorce disputes with prospective or existing partners, one of which was the business divorce involving Dr. Christopher Asandra, which ultimately gave rise to a judgment forming the basis of Dr. Asandra's claim of $417,705.75 asserted against NuMale Corporation (the Asandra Claim).

The Debtors' leadership also chose to pursue, on NuMale Corporation's behalf, a malpractice lawsuit against Debtors' former counsel Howard & Howard Attorneys PLLC and two attorneys at that firm, after losing the litigation against Dr. Asandra, presently pending in the Eighth Judicial District Court as Case No. A-25-910072-C.  Prior to the Trustee's appointment, the estate was represented in this litigation by local Nevada counsel who was not employed by

the Bankruptcy Court and withdrew from the case.  After the Trustee was appointed, the Trustee obtained a stay of this malpractice litigation, which the defendants are seeking to dismiss.  The Howard and Howard Claim is a Litigation Claim under the Plan preserved for the beneficiaries of the Liquidation Trust.

A separate business divorce dispute ended favorably for NuMale Corporation, who currently holds a judgment against Dr. Basel Hassoun.  During the Trustee's tenure, the Trustee hired counsel to liquidate the Hassoun Judgment and obtain any remaining payments due thereon.  The Hassoun Claim is a Litigation Claim under the Plan preserved for the beneficiaries of the Liquidation Trust.  Presently, the Debtors believe approximately $251,518 remains outstanding and still due, although Dr. Hassoun has taken the position that only approximately $70,000 is still due.

The Trustee's investigation also revealed that, in or about April 2023, NuMale Corporation and an affiliate (NuMale Medical Center) appear to have entered into an agreement with The N2 Company ("N2") for digital advertising services that ultimately obligated NuMale Corporation and its nondebtor affiliate NuMale Medical Center for alleged digital advertising costs that went unpaid.  N2's dispute is the subject of litigation pending before the United States District Court for the Eastern District of North Carolina as Case No. 7:24-cv-00927-D-RN ("EDNC Litigation"), and its complaint in the EDNC Litigation seeks $686,593.14 in damages; however N2's proof of claim filed against NuMale Corporation seeks substantially more than that, $920,617.94.  The Trustee is evaluating the estate's rights and remedies against N2, including the counterclaim filed by NuMale Corporation against N2 prior to the Trustee's appointment.  The N2 Litigation Claim is a Litigation Claim under the Plan preserved for the beneficiaries of the Liquidation Trust.

Related to all of the foregoing, the Trustee's investigation also revealed that the Debtors habitually did not pay a number of their outside professionals such as counsel.  Therefore proofs of claim have been filed by several counsel who represented one or more of the Debtors in nonbankruptcy litigation or other matters.

. . .

### c.     Trustee's Adversary Against Mr. Palubicki.

On July 4, 2025, the Trustee initiated Adversary Proceeding No. 25-01155-nmc against Mr. Palubicki (the "Palubicki Adversary"). Presently, the Palubicki Adversary seeks declaratory relief that the Beazley insurance policies and their proceeds are property of the Estates; the avoidance and recovery of preferential and fraudulent transfers totaling at least $176,922.90; damages for breach of fiduciary duty, negligence, and unjust enrichment; an accounting; and the disallowance of the proofs of claim Mr. Palubicki has filed on his own behalf or scheduled in these Chapter 11 Cases. In the Palubicki Adversary, the Trustee also reserved rights to seek the recovery from Mr. Palubicki of all fraudulent and avoidable transfers avoidable under Chapter 5 of the Bankruptcy Code, including those discovered at a later date. The Palubicki Adversary is included within the Palubicki and Feliciano Claims[9] transferred to Beazley pursuant to the Global Settlement Agreement. The Trustee has expressly reserved his rights to amend the complaint and expand the counts against Mr. Palubicki.

### d.     Additional Adversaries.

The Trustee is presently evaluating additional claims against Dr. Feliciano and certain non-debtor affiliates of the Debtors, which the Trustee expects to be initiated prior to the Confirmation Hearing and all of which are preserved Litigation Claims for the beneficiaries of the Liquidation Trust. These claims are part of the Palubicki and Feliciano Claims that are transferred to Beazley as part of the Global Settlement Agreement.

### e.     Newtek Bank Small Business Association Loan.

As the Debtors' financial strife escalated in 2023 (*i.e.*, as then-senior debt became due), in December 2023 the Debtors took out a $5 million Small Business Association-backed loan from Newtek Bank, National Association ("Newtek") to pay off senior debt (the "Newtek Loan"). Borrowers on the Newtek Loan are identified as NuMale Corporation (a Debtor in these

---

[9] The Palubicki and Feliciano Claims are defined as "[a]ll Claims, Causes of Action or rights held by the Debtors or their Estates or their respective direct and indirect subsidiaries, whether arising prior to or after the Petition Date, against Brad Palubicki, Eva Gabriela Farmer de la Torre, Carlos Feliciano, any entities they respectively own or control and any of their respective subsequent transferees, including the claims and causes of action asserted in the adversary proceeding number 25-01155-nmc and the Palubicki Whistleblower Claims (as defined in the Global Settlement Agreement)."

Chapter 11 Cases) and non-debtors NMC Illinois, LLC; NuMale Albuquerque, LLC; NMC Denver, LLC; and NuMale Medical Center, LLC; guarantors on the SBA Loan are identified as non-debtors NuMale Denver, LLC; NuMale Omaha, LLC; NuMale Charlotte, LLC; NuMale Tampa, LLC; NuFemme Milwaukee, LLC; Mr. Palubicki; Mr. Pulliam; Ms. Irma Pulliam; and Dr. Feliciano.  On or about December 22, 2023, Newtek recorded a UCC Financing Statement with the Nevada Secretary of State.

From the $5 million in proceeds received under the SBA Loan, approximately $2,410,964.73 went to "working capital" for NuMale Corporation.  Of this "working capital" for NuMale Corporation, approximately $300,000 went to a "Florida Investor – Payback"; NuMale Corporation then lent approximately $36,705 to a "Charlotte" entity and lent approximately $30,575 to a Tampa entity; made a "NuMale Medical Center Loan Repayment" of approximately $245,000 and a "NuMale Albuquerque Loan Repayment" of approximately $95,000; and paid approximately $175,000 to MBI.  An approximately $1,312,653.90 then funded the Debtors' calendar year losses.

Newtek has filed Claim No. 24 against NuMale Corporation, in the amount of $5,033,301.46.  As discussed herein, the Trustee has settled the treatment of this Claim against Debtors.

### f.    Other Financing, MCAs

The Trustee's investigation also revealed that, in the last several months of 2024, the Debtors and other non-debtor affiliates entered into a series of either factoring-type agreements for the Debtors' receivables, or loan transactions such as Merchant Cash Advance ("MCA") agreements premised on Debtors' receivables.  As a result, a number of MCA creditors have asserted secured proofs of claim against the Debtors, which the Trustee disputes.  Classes 2, 3, 4, 5, and 6 under the Plan address the treatment of Claims filed by various MCA entities should any of these Claims ultimately be Allowed.

### g.    D&O and E&O Claims (not released in the Settlement)

On June 4, 2025, the Trustee issued Notice of Circumstances letters to the Debtors' carriers Arch Insurance, a/k/a Arch Insurance Company, a/k/a Arch Specialty Insurance

Company, Arch Insurance Company, and/or Arch Specialty Insurance Company and Federal Insurance Company a/k/a Chubb a/k/a Chubb Forefront a/k/a Chubb the Forefront Portfolio for Healthcare Organizations a/k/a the Company a/k/a The ForeFront Portfolio a/k/a Forefront regarding facts, circumstances facts, and situations that could reasonably give rise to a claim, loss, matter, or wrongful act under their D&O and E&O policies (collectively, the "Carrier Notice Letters"). The Carrier Notice Letters preserved, for the benefit of the Estates any and all claims, losses, matters, or wrongful acts under the Chubb and Arch D&O and E&O policies. All claims, rights, and recoveries available with respect to these and other Liability Insurance Policies (excluding the Beazley Policies) are Distributable Assets under the Plan and preserved for the beneficiaries of the Liquidation Trust.

**B.    The Sanchez Lawsuit, Beazley, and the Insurance Policies.**

Immediately upon his appointment, the Trustee began investigating the assets and liabilities of the Debtors and their Estates. The largest claim in these Chapter 11 Cases is held by verdict creditor Michael E. Sanchez ("Sanchez").

**1.    The Sanchez Lawsuit.**

In 2020, Sanchez commenced litigation in the Second Judicial District Court, County of Bernalillo, New Mexico, bearing Case No. D-202-CV-2020-06336 (the "Sanchez Lawsuit"). The Sanchez Lawsuit was filed against NuMale Corp, NuMale Albuquerque, LLC d/b/a NuMale Medical Center ("NuMale Albuquerque"); NuMale New Mexico; Christopher Asandra; Carlos Feliciano; Brad Palubicki; Justin Pulliam; and two other defendants (Steven G. Chapman, P.A.-C, and Mike Rivera) ultimately dismissed from the lawsuit. The Sanchez Lawsuit concerned ordinary and medical negligence, battery, unfair and unconscionable trade practices, fraud, and civil conspiracy.

The Sanchez Lawsuit was ultimately tried to a jury in November 2024. On or about November 25, 2024, the jury rendered its verdict totaling $412,005,149, of which $37,005,149 is compensatory damages and $375,000,000 is punitive damages, and a Special Verdict Form was filed with the New Mexico Court on or about November 26, 2024 (the Jury Verdict), plus interest and fees, bringing the claim total to $579,442,390.01 as of the Petition Date. The Jury

Verdict defendants are Debtor NuMale Corporation, Debtor NuMale New Mexico, and nondebtors NuMale Albuquerque, Dr. Asandra, Dr. Feliciano, Mr. Palubicki, and Mr. Pulliam (all seven together collectively, the "NuMale Defendants").   Sanchez, on the one hand, contended that all NuMale Defendants are jointly and severally liable as co-conspirators for the entire verdict arising from fraud, unfair and unconscionable trade practices, and negligence as a matter of New Mexico law.  However, the Trustee (and Beazley) on the other hand, contended that punitive damages were assessed only against NuMale Corporation.  This dispute is resolved through the Global Settlement Agreement[10] described herein.

Sanchez has filed a number of post-verdict motions in the Sanchez Lawsuit that await adjudication by the New Mexico State Court.  These and any other post-verdict motions must be adjudicated prior to the New Mexico Court entering judgment on the jury verdict.  To date, no judgment has been entered in the Sanchez Lawsuit.  However, under the Global Settlement Agreement that the Trustee obtained in these Chapter 11 Cases, the Sanchez Lawsuit is resolved on a final basis.  First, the Sanchez Lawsuit is stayed pending confirmation of the Plan and then ultimately is dismissed, thereby bringing nearly five years of litigation in New Mexico State Court system to a close.  Additionally, the Global Settlement Agreement compromises the Sanchez Claim, reducing the claim from $579,442,390.01 to $410,000,000, with a guaranteed payment on or before the Effective Date of $96,500,000.  This material reduction of nearly 30% enables the Trustee to also tender a material distribution to Holders of Allowed General Unsecured Claims on the Effective Date.

### 2.    Beazley and the Beazley Policies.

Certain Underwriters at Lloyd's, London Syndicates 2623/623 (collectively, Beazley) subscribing to a $1 million Miscellaneous Medical Professional Liability Claims Made and Reported Insurance (Policy No. W14CC4190601) and its accompanying $5 million Excess Insurance Policy (Policy No. W1561E190601), issued these (collectively, the "Beazley

---

[10] The summary set forth herein of the Global Settlement Agreement and its terms is for descriptive and summary purposes only; should there be any ambiguity between this Disclosure Statement or the Global Settlement Agreement or any term sheet thereof, in all respects the Global Settlement Agreement controls.  The Global Settlement Agreement is attached as Exhibit 1 to the Plan.

Policies"). The policy period for the Beazley Policies is January 23, 2019, to January 23, 2020. The Beazley Policies are claims made and reported policies, meaning they provide coverage that is triggered when a claim is made against the insured and reported during the policy period, even if the incident or injury giving rise to the claim occurred prior to the inception of the policy period. The Beazley Policies and their proceeds are property of these Estates. Any asserted rights under the Beazley Policies, and all claims against Beazley that could be brought pursuant to, in connection with, as a consequence or result of, or under the Beazley Policies are property of the Estates.

### 3.    Litigation Claims Against the Quintairos Firm.

The Sanchez Lawsuit involves events covered by the Beazley Policies that transpired in connection with Sanchez seeking treatment at the Debtors' New Mexico clinic. The Sanchez Lawsuit was tendered to Beazley in accordance with the terms of the Beazley Policies. During the pendency of the Sanchez Lawsuit including at trial the NuMale Defendants were all represented by the law firm Quintairos, Prieto, Wood & Boyer, P.A. Justin Pulliam, Christopher Asandra, NuMale Corp, NuMale Albuquerque LLC, and NuMale New Mexico SC (collectively, the "NuMale Settling Defendants") contend they hold legal malpractice claims against the Quintairos Firm, related to or arising out of a number of issues regarding the Quintairos Firm's representation of the NuMale Defendants during the Sanchez Lawsuit. Because ultimately the Jury Verdict was entered against the NuMale Defendants for the amount of $37,005,149 is compensatory damages and $375,000,000 in punitive damages, plus interest and fees, bringing the claim total to $579,442,390.01 as of the Petition Date, the legal malpractice claims against the Quintairos Firm have potential litigation value, and will be pursued by the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries.

In exchange for the benefits and releases provided in the Global Settlement Agreement, the Liquidation Trust and the NuMale Settling Defendants shall jointly prosecute their respective Quintairos Claims and Quintairos Non-Debtor Claims, which claims shall be jointly prosecuted under the sole direction and control of the Liquidation Trustee. In exchange for the benefits and releases received under the Global Settlement Agreement, the NuMale Settling Defendants agree

that the Liquidation Trustee shall have sole authority to retain counsel, determine litigation strategy, engage in settlement negotiations, approve a settlement, and/or make other decisions with respect to such joint litigation of the Quintairos Claims and Quintairos Non-Debtor Claims, though the Liquidation Trustee agrees to consult with, and keep informed, the NuMale Settling Defendants regarding ongoing negotiations, strategy, and any resolution or settlement.

The NuMale Settling Defendants shall fully cooperate with, and assist the Liquidation Trustee in, prosecuting the Quintairos Claims and Quintairos Non-Debtor Claims, including in connection with providing documents and testimony necessary for the successful prosecution of such claims.

To the extent that the Quintairos Claims and Quintairos Non-Debtor Claims produce a monetary recovery, and to the extent they cannot otherwise agree, the Liquidation Trustee and the NuMale Settling Defendants shall participate in a mediation to determine how such recovery shall be allocated between the Quintairos Claims and Quintairos Non-Debtor Claims after payment of retained counsel and experts' fees and costs. Within ten (10) days' written notice from the Liquidation Trustee that there is a monetary recovery on account of the Quintairos Claims and Quintairos Non-Debtor Claims, the Liquidation Trustee and the NuMale Settling Defendants shall jointly select a mediator to determine the allocation of such recovery amongst themselves. If an agreement cannot be reached with respect to the identification of the mediator, one of the following mediators will be selected by the Liquidation Trustee: Bruce Markell or Miles Ruthberg. The mediation will occur within thirty (30) days of the selection of the mediator unless otherwise agreed in writing by the Liquidation Trustee and each of the NuMale Settling Defendants. If the Liquidation Trustee and each of the NuMale Settling Defendants cannot agree on an allocation of the proceeds from the recovery of the Quintairos Claims and Quintairos Non-Debtor Claims at the mediation and the mediator determines, in the mediator's sole discretion, that the parties have reached an impasse, the mediator shall present a mediator's proposal for the proper allocation of the recovery from the Quintairos Claims and Quintairos Non-Debtor Claims between the Liquidation Trust and each of the NuMale Settling Defendants, which mediator's proposal shall be immediately binding on the Liquidation Trust and each of the

NuMale Settling Defendants without any further order, act, or approval and without any right of appeal.  Any resolution shall be noticed to the full matrix in the Chapter 11 Cases.

       **4.**     **Coverage Lawsuit.**

Beazley contests the scope of coverage afforded by the Beazley Policies to the events and circumstances that are subject of the Sanchez Lawsuit, and there is a pending dispute with Beazley regarding its obligations under the Beazley Policies and an asserted bad faith insurance claim.[11]  Notwithstanding this insurance coverage dispute, Beazley agreed to pay the Estates' special legal counsel's fees for the post-verdict motion practice and the eventual appeal anticipated in the Sanchez Lawsuit, in accordance with the terms of the Beazley Policies.

Post-petition, but prior to the Trustee's appointment, Beazley had commenced Case No. D-905-CV-202500157 in the Ninth Judicial District Court of Curry County, New Mexico, against the other NuMale Defendants (Mr. Palubicki, Mr. Pulliam, Dr. Feliciano, Mr. Asandra, and NuMale Albuquerque (altogether, the "Nondebtor NuMale Defendants") (the "Coverage Lawsuit"). The Coverage Lawsuit seeks declaratory relief regarding the Beazley Policies—namely, declaratory relief and rescission of the Beazley Policies, declaratory relief that Beazley has no duty to indemnify due to policy exclusions, declaratory relief that Beazley has no duty to indemnify due to breach of a "cooperation provision," and declaratory relief that Beazley did not act in bad faith with regard to the Sanchez Lawsuit.  Sanchez, Debtor NuMale Corp, and Debtor NuMale New Mexico were not named as parties to the Coverage Lawsuit.  The Coverage Lawsuit is pending and is resolved with respect to the Debtors and the NuMale Settling Defendants through the Global Settlement Agreement described herein.

**C.**     **The Commencement of the Chapter 11 Cases and Proceedings in the Chapter 11 Cases Prior to the Trustee's Appointment.**

During the nearly eleven weeks preceding the Trustee's appointment in the Chapter 11 Cases, the Debtors (then under the control of Messrs. Palubicki, Pulliam, and Feliciano): (i)

---

[11] There was also a separate dispute with the other NuMale Defendants—Palubicki, Pulliam, Asandra, and NuMale Alburquerque—whom all had asserted that they too have valuable independent bad faith claims against Beazley; however this dispute was also resolved with respect to Pulliam, Asandra, and NuMale Albuquerque through the Global Settlement Agreement described herein.

1    failed to employ special litigation counsel to represent the Estates in a variety of pending

2    nonbankruptcy litigation; (ii) sought but did not successfully obtain approval for the employment

3    of the Riggi Law Firm as their general bankruptcy counsel until July 2025; (iii) amended their

4    Schedules and Statements multiple times due to numerous errors, omissions, and deficiencies;

5    (iv) faced compliance issues on a variety of matters identified by the US Trustee and, also, a

6    number of continuances of the Section 341 meetings of creditors; (v) pursued joint

7    administration of the Debtors' Chapter 11 Cases but did not prosecute turnover motions, cash

8    collateral motions, or other typical "first day" Chapter 11 motions; (vi) failed to remain current

9    on post-petition rent obligations at all of their locations.

10    **D.    The Trustee's Appointment and Subsequent Proceedings in the Chapter 11 Case.**

11    The Trustee was appointed on April 7, 2025. Since the time of his appointment, the

12    Trustee has taken a number of steps to move the Chapter 11 Cases forward and generate a

13    meaningful recovery for creditors. Aside from the Global Settlement Agreement previewed

14    above and discussed in more detail below, these steps included, without limitation: (i)

15    investigating the Debtor's operations and financial affairs; (ii) investigating the Debtor's prior

16    management, issuing carrier demand letters to preserve D&O and E&O claims under existing

17    policies and preparing a detailed adversary complaint (held in abeyance pending approval of the

18    Global Settlement Agreement); (iii) sending demand for turnover of insurance proceeds related

19    to a post-petition theft at the Colorado Clinic belatedly disclosed by the Debtors' leadership; (iv)

20    successfully prosecuting a motion to extend and establish a claims bar date for all non-

21    governmental creditors in these Chapter 11 Cases; (v) meeting the Court's requirements

22    established by the *Interim Order Directing Joint Administration of Chapter 11 Cases* [ECF No.

23    130] and maintaining an updated creditor matrix as the Debtors-out-of-possession and their

24    leadership belatedly disclosed contract counterparties for weeks into the Trustee's appointment;

25    (vi) noticed all parties-in-interest of these Chapter 11 Cases and the established Bar Date of June

26    30, 2025; (vii) obtained a conditional order on Prospect Rainbow, LLC's stay relief motion that

27    allowed the Estates to continue to operate at this location postpetition so long as rent was timely

28    paid (and, it has been paid in full every month since the Trustee's appointment); (viii) renewed

the Debtors' insurance policies and obtained Court approval for financing of a policy premium; (ix) issued subpoenas to investigate holders of alleged security interests; (x) sought relief against creditors violating the automatic stay and, as to Kalamata Capital Group, LLC, consensually resolved the matter by obtaining a vacated judgment without need for motion practice before this Court, and, as to Top Tier Capital and Ace Recovery Group, LLC, prosecuting a motion to enforce automatic stay and for sanctions; (xi) investigated means of continued financing of Debtors' operations; (xii) successfully employed special counsel to assist with post-verdict motion practice and appeals in the Sanchez Lawsuit; (xiii) sought the employment of special counsel in Oklahoma to collect on an asset of the estate (the Hassoun Judgment); (xiv) pursued retention of special counsel in North Carolina to defend NuMale Corp in the EDNC Litigation instigated by a creditor of the Estates; (xv) obtained turnover of client files from the estate's former counsel in Nevada and North Carolina, without resorting to motion practice; (xvi) investigated other assets of the Estates including targets of potential additional turnover demands; (xvii) cooperated with the Court-appointed PCO to ensure continued patient care; (xviii) as set forth more fully herein, heavily negotiated the Global Settlement Agreement with Sanchez and Beazley and the non-debtor NuMale Settling Defendants to bring multiple complex, heavily litigated, and hotly contested issues to a final resolution; (xix) commenced the Palubicki Adversary and prepared for filing other adversaries against Dr. Feliciano; and (xx) prepared the Plan of reorganization that provides a meaningful distribution to creditors of these Estates and prosecuted the Plan within the first quarter of the Trustee's appointment.  The confirmation of the Plan will end years of costly litigation in which two of the Debtors and all the Debtors' principals have been embroiled for years.

        **1.**        **The Global Settlement Agreement.**[12]

On August 1, 2025, the Trustee filed a motion to approve a Global Settlement Agreement through which a global settlement reached with the Chapter 11 Cases' largest creditor (Sanchez),

---

[12] The summary set forth herein of the Global Settlement Agreement and its terms is for descriptive and summary purposes only; should there be any ambiguity between this Disclosure Statement or the Global Settlement Agreement or any term sheet thereof, in all respects the Global Settlement Agreement controls.  The Global Settlement Agreement is attached as Exhibit 1 to the Plan.

the Debtors' previous malpractice carrier (Beazley), NuMale Corp, NuMale New Mexico SC, Justin Pulliam, and Christopher Asandra, regarding a resolution reached on numerous competing and complex issues impacting the administration of these Chapter 11 Cases (the "Settlement Motion").  This Settlement Motion will come before the Bankruptcy Court for approval on September 2, 2025, at 9:30 a.m.  Upon entry of the Bankruptcy Court's order approving this Settlement Motion and its Global Settlement Agreement, the Beazley Settlement Payment, the sum of one hundred ten million dollars ($108,500,000) will be paid into these Estates.

The Global Settlement Agreement provides for the following:

- The payment by Beazley to the Bankruptcy Estate in the amount of One Hundred Ten Million Dollars ($108,500,000) (the Beazley Settlement Payment), which partially funds the Plan.

- Mutual releases to be executed by all parties to the Global Settlement Agreement, as well as a prohibition on litigating any claims released under the Global Settlement Agreement.

- Compromise of the Sanchez Claim in an allowed amount of Four Hundred Ten Million Dollars ($410,000,000).

- Creation of the Liquidation Trust, which will pursue, litigate, waive, settle, compromise, and liquidate the Litigation Claims and the other Liquidation Trust Assets to maximize additional recoveries by the Holders of Allowed Claims.

- Transfers the Palubicki and Feliciano Claims to Beazley.

- Resolution of the Sanchez Lawsuit, including the dispute regarding which of the NuMale Defendants are liable for the punitive damages portion of the Jury Verdict. First, the Sanchez Lawsuit is stayed pending confirmation of the Plan and then ultimately is dismissed before a judgment is actually entered on the Jury Verdict, thereby bringing nearly five years of litigation in New Mexico State Court system to a close.

- Resolution of the Coverage Lawsuit with respect to Debtors and the NuMale Settling Defendants.

- Brings to a close portended litigation respecting the bad faith claims that any NuMale Defendants could assert in connection with Beazley and the Sanchez Lawsuit, as these are all contributed the Global Settlement Agreement and/or resolved through the terms of the Global Settlement Agreement.

- Preserves for the estates all other Litigation Claims not expressly released in the Global Settlement Agreement.

- Resolves any dispute with Dr. Asandra regarding the Asandra Claim.

- Provides for the New Value Contribution, which is the NuMale Settling Defendants': (i) contribution to the Debtors and the Estates of each and every claim they could conceivably assert against Beazley, which claims were settled and released by the Global Settlement Agreement and Global Settlement Order; (ii) contribution to the Estates of each and every claim they could conceivably assert under any Liability Insurance Policies held by any of the Debtors (solely excluding the claims each released against Beazley and Sanchez in the Global Settlement Agreement); (iii) the agreement regarding the prosecution of the Quintairos Non-Debtor Claims as set forth in Section 5.12 of the Plan; (iv) the voluntary subordination of the NuMale Albuquerque Claim; and (v) the voluntary cancellation and release of the Intercompany Claims.

A copy of the Global Settlement Agreement is attached to the Plan as Exhibit 1.

## 2.    The 363 Sale.

Prior to the Confirmation Hearing on the Plan, the Trustee will have filed a motion seeking approval to sell all of Debtors' assets solely excluding the Distributable Assets,[13] the Debtors' 2019 Ford F150, the proceeds from the 363 Sale, and the Equity Interests in each of the Debtors (the "363 Assets") in accordance with Section 363(b) of the Bankruptcy Code, among other provisions (the "363 Motion").  The 363 Motion will seek approval of Justin Pulliam or his

---

[13] The term "Distributable Assets" mean the following assets distributable by the Trustee, Reorganized Debtors, or Liquidation Trustee, as applicable, to Allowed Claims in accordance with the Plan: (i) all Litigation Claims; (ii) all claims, rights, and recoveries available with respect to the Liability Insurance Policies; (iii) the Beazley Settlement Payment; (iv) the New Value Contribution; and (v) the proceeds from the 363 Sale.

assignee as the stalking horse bidder with the following stalking horse bid: "In accordance with the terms of the Global Settlement Agreement and in exchange for the 363 Stalking Horse's New Value Contribution: (i) the 363 Stalking Horse shall have an Allowed Secured Claim in the amount of $300,000.00, which the 363 Stalking Horse is credit bidding at the 363 Sale; provided, however, in no event shall this Allowed Secured Claim be entitled to any Distribution in the Chapter 11 Cases or under the Plan beyond the right to credit bid; (ii) the 363 Stalking Horse may, at his election, credit bid the Allowed Pulliam Administrative Claim and/or the Allowed Pulliam Priority Claim; and (iii) the 363 Stalking Horse may, at his election, credit bid the Allowed Pulliam Unsecured Claim, which each dollar of the Allowed Pulliam Unsecured Claim credit bid shall be equal to $0.25 Cash"[14] (the "Stalking Horse Bid").

The 363 Motion will also seek approval of the following bid procedures (the "363 Bid Procedures"): (i) approval of the 363 Stalking Horse and the 363 Stalking Horse Bid; (ii) designation of the 363 Stalking Horse as a qualified bidder; (iii) for any other bidder to qualify as a qualified bidder, the bidder must provide prior to the auction, among other things, (a) a bid of no less than $25,000 more than the Stalking Horse Bid in immediately available funds; (b) proof satisfactory to the Trustee of immediately available funds for the full amount of the bid; (c) a deposit of twenty percent (20%) of the bid; (d) the identity and corporate authority to submit the bid; and (e) an executed asset purchase agreement and redline against the asset purchase agreement executed by the 363 Stalking Horse; (iv) in the event there is more than one qualified bidder, the Trustee shall conduct an auction; (v) if the 363 Stalking Horse Bid is the only timely qualified bid, there will be no auction and the 363 Stalking Horse Bid will be identified as the prevailing bidder at the final sale hearing. The Trustee shall also seek approval to reimburse the documented reasonable, actual, out-of-pocket costs and expenses paid or incurred by the Stalking

---

[14] The term "Pulliam Administrative Claim" means Administrative Claim of Justin Pulliam arising from post-petition wages and unreimbursed expenses incurred in the ordinary course of the Debtors' operations post-petition, which expenses shall be established through receipts and other documentation acceptable to the Trustee in his sole reasonable discretion, which amount shall not exceed $300,000.00. The wages and expense reimbursement approved by the Trustee shall be an Allowed Administrative Claim. The term "Pulliam Priority Claim" means the Claim asserted by Justin Pulliam for unpaid, pre-petition wages, which Claim shall be Allowed in the statutory amount of $15,150.00.

Horse Bidder directly, incident to, under, or in connection with the negotiation, execution, and performance as the Stalking Horse Bidder and the transactions contemplated thereunder (including travel expenses and reasonable fees and disbursements of counsel, accountants and financial advisors) in an amount not to exceed $30,000.  The Trustee will endeavor to close the 363 Sale as expeditiously as possible.  However, to the extent it is not closed prior to the Plan's Effective Date, the Plan expressly provides authority for the 363 Assets to vest in the Reorganized Debtors and for the Reorganized Debtors (under the sole control and authority of the Trustee) to effectuate and close the 363 Sale in accordance with the terms of the 363 Motion and 363 Bid Procedures.

## VI.
## DESCRIPTION OF THE NON-PAYMENT TERMS OF THE PLAN

**A.     Means of Implementation of the Plan.**

**1.     Overview.**  This Plan is made consistent with the terms of the Global Settlement Agreement and Global Settlement Order and provides for: (i) the reorganization of the Debtors pursuant to the terms of the Plan, with the Trustee having sole control and authority over the Reorganized Debtors on and after the Effective Date; (ii) effectuation of the 363 Sale to the extent not closed prior to the Effective Date; (iii) payment of Effective Date payments by the Reorganized Debtors and the funding of the Disputed Claim Reserve; and (iv) the creation of the Liquidation Trust and a mechanism for the Liquidation Trustee to pursue, litigate, waive, settle, compromise, and liquidate the Litigation Claims and the other Liquidation Trust Assets to maximize additional recoveries by the Holders of Allowed Claims.

**2.     General Settlement of Claims.**  Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is in

the best interests of the Debtors, the Estates, and the Holders of Claims and Equity Interests, and is fair, equitable, and reasonable.

**3.** **Substantive Consolidation for Plan Purposes.** The Plan serves as a motion by the Trustee seeking entry, pursuant to section 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of the Debtors' Estates only for purposes of classifying and treating all Claims and Equity Interests under the Plan, including for voting, confirmation, and Distribution purposes. Such substantive consolidation will not (i) alter the state of organization of any Debtor for purposes of determining applicable law of any of the Litigation Claim; (ii) alter or impair the legal and equitable rights of any party in interest including the Liquidation Trustee to enforce any of the Litigation Claims; (iii) otherwise impair, release, discharge, extinguish or affect any of the substantive rights of the parties in interest (including any defenses to any such Litigation Claims); or (iv) alter or impair the 363 Assets.

If substantive consolidation for plan purposes is ordered, then on and after the Effective Date, all Distributable Assets and liabilities of the Debtors shall be treated as though they were merged into a single estate for purposes of treatment of and Distributions on Allowed Claims. All duplicative Claims (identical in both amount and subject matter) filed against more than one of the Debtors shall automatically be expunged so that only one Claim survives against the consolidated Debtors. All guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and/or several liability of any Debtor with respect to any other Debtor, shall be treated as one single collective obligation of the Debtors. Any alleged defaults under any applicable agreement with one or more of the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

Notwithstanding the foregoing substantive consolidation for plan purposes, fees payable, pursuant to 28 U.S.C. § 1930, shall be due and payable by each individual Debtor.

**4.** **Beazley Settlement Payment on the Effective Date.** Within ten (10) days of the Global Settlement Agreement becoming a Final Order, the proceeds from the Beazley Settlement Payment shall be transferred to Michael W. Carmel, in his capacity as the Trustee, the

Liquidation Trustee, and/or as the sole manager, officer, and director of the Reorganized Debtors, to enable Reorganized Debtors to make the Effective Date payments, to fund the Disputed Claim Reserve, and to fund the Liquidation Trust Reserve. For the avoidance of doubt, the Beazley Settlement Payment proceeds shall be held in a bank account under the sole control of Michael W. Carmel, in his capacity as Trustee, the Liquidation Trustee, and/or as the sole manager, officer, and director of the Reorganized Debtors, as applicable. Neither the Debtors nor the current or former shareholders, members, managers, officers, directors, employees, or agents of the Debtors shall have access to, rights to, or control over, the Beazley Settlement Payment.

5.      **Corporate Action.** On the Effective Date, the matters under the Plan involving or requiring corporate action of the Debtors, including but not limited to actions requiring a vote or other approval of the board of directors, managers, members, partners, or other equity holders of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the managers, members, directors, or officers of the Debtors.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) any existing manager, director, and officer of the Reorganized Debtors will be deemed to have resigned on the Effective Date without any further corporate action; (ii) the Trustee shall be deemed the sole manager, director, officer, and representative of the Reorganized Debtors to exercise the rights, power, and authority of the Reorganized Debtors under applicable provisions of the Plan and bankruptcy and non-bankruptcy law; and (iii) all matters provided under the Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Confirmation Order shall act as an order modifying the Debtors' operating agreements or articles of incorporation, as applicable, such that the provisions of the Plan can be effectuated.

On and after the Effective Date, the Trustee may, in the name of the Reorganized Debtors, take all steps to effectuate the 363 Sale in accordance with the 363 Bid Procedures and

the 363 Sale Order.  On and after the Effective Date, the Trustee may take all additional actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions imposed by the Global Settlement Agreement, the Global Settlement Order, the Plan, and/or the Confirmation Order.

6.  **Distributions.**  Except as provided herein, all Distributions shall be made by the Liquidation Trustee or the Reorganized Debtors in accordance with the terms of the Plan.  The Liquidation Trustee or the Reorganized Debtors shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.

The Liquidation Trustee and the Reorganized Debtors shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform their duties under the Plan; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Liquidation Trustee and the Reorganized Debtors by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Liquidation Trustee and/or the Reorganized Debtors to be necessary and proper to implement the provisions hereof.

7.  **Effective Date Distributions.**  On the Effective Date, the Reorganized Debtors shall make the Distributions payable on the Effective Date and under the Plan from the Beazley Settlement Payment proceeds.  On the Effective Date, the Reorganized Debtors shall also establish the Disputed Claim Reserve.  Unless otherwise ordered by the Bankruptcy Court, within ten (10) days of a Disputed Claim becoming an Allowed Claim, the Reorganized Debtors shall Distribute to the Holder of such Allowed Claim from the Disputed Claim Reserve, the portion of their Allowed Claim that would have been paid on the Effective Date had the Claim not been Disputed.  The Reorganized Debtors shall maintain the Disputed Claim Reserve until all Disputed Claims have been resolved by Final Order, at which point, the Reorganized Debtors shall tender any remaining funds in the Disputed Claim Reserve to the Liquidation Trust and close the Disputed Claim Reserve.

8.  **Liquidation Trust.**  Prior to the Effective Date, the Trustee shall execute the Liquidation Trust Agreement.  The Liquidation Trust Agreement shall be in the form included in

the Plan Supplement and acceptable to the Trustee, Beazley, and Sanchez, in their respective sole discretion.

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purpose of maximizing the value of the Liquidation Trust Assets, which shall initially consist of the Distributable Assets, and effectuating Distributions to Creditors consistent with the Plan.  The Liquidation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Liquidation Trust.

**All Litigation Claims are expressly preserved for, and shall vest in, the Liquidation Trust.  The preserved Litigation Claims include all of the Litigation Claims identified on Scheduled 1.1.82 of the Plan.**

On the Effective Date, the Liquidation Trust Assets shall vest automatically in the Liquidation Trust.  The transfer of the Liquidation Trust Assets to the Liquidation Trust shall be made for the benefit and on behalf of the Liquidation Trust Beneficiaries.  The assets comprising the Liquidation Trust Assets will be treated for tax purposes as being transferred by the Debtors to the Liquidation Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Liquidation Trust Beneficiaries to the Liquidation Trust in exchange for the Liquidation Trust Interests in the Liquidation Trust.  The Liquidation Trust Beneficiaries shall be treated as the grantors and owners of the Liquidation Trust.  Upon the transfer of the Liquidation Trust Assets, the Liquidation Trust shall succeed to all of the Debtors' rights, title, and interest in the Liquidation Trust Assets, and the Debtors and Estates will have no further interest in or with respect to the Liquidation Trust Assets.

Except as otherwise provided in the Plan, on and after the Effective Date, all Liquidation Trust Assets will vest in the Liquidation Trust free and clear of all Claims, Liens, charges, other encumbrances, and Equity Interests.  All parties shall execute any documents or other instruments as necessary to cause title to the applicable Liquidation Trust Assets to be transferred

to the Liquidation Trust.  The Liquidation Trust Assets will be held in trust for the benefit of all Liquidation Trust Beneficiaries pursuant to the terms of the Plan and the Liquidation Trust Agreement.

The Confirmation Order shall constitute a determination that the transfers of the Liquidation Trust Assets to the Liquidation Trust are legal and valid and consistent with applicable law, including Colorado, Florida, Nevada, and Wisconsin state law.

Without limiting the foregoing, the Liquidation Trustee may pay all reasonable Liquidation Trust Expenses in the ordinary course of business without further notice to Creditors or Holders of Equity Interests or approval of the Bankruptcy Court.

In pursuing any Litigation Claim, the Liquidation Trustee shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Litigation Claim may be brought under section 546 of the Bankruptcy Code.  The Liquidation Trust Agreement will require consistent valuation of the Liquidation Trust Assets by the Liquidation Trustee and the Liquidation Trust Beneficiaries for all U.S. federal and other income tax and reporting purposes.  The Liquidation Trust will not be permitted to receive or retain Cash in excess of a reasonable amount to meet claims and contingent liabilities or to maintain the value of the Liquidation Trust Assets.

In connection with the prosecution of the Litigation Claims, any attorney-client privilege, work-product privilege, joint interest privilege, or other privilege or immunity attaching to any prepetition and/or pre-Effective Date documents or communications relating to the Litigation Claims shall be transferred to and shall vest in the Liquidation Trust.  The Liquidation Trust's receipt of such privileges or immunities associated with the Litigation Claims shall not operate as a waiver of those privileges or immunities possessed or retained by the Debtors, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege or immunity. The Liquidation Trust shall also be vested with the Estates' rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004.  The Liquidation Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtors other than expressly provided for by the Plan

and the Liquidation Trust Agreement.

Except as otherwise ordered by the Bankruptcy Court, the Liquidation Trust Expenses on or after then Effective Date shall be paid in the ordinary course of business in accordance with the Liquidation Trust Agreement, without further order of the Bankruptcy Court and without notice to any other party.

The Liquidation Trust shall file annual reports regarding the liquidation or other administration of property comprising the Liquidation Trust Assets, the Distributions made by it, and other matters required to be included in such report in accordance with the Liquidation Trust Agreement. In addition, the Liquidation Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Article 1.671-4(a).

The Liquidation Trust Interests are not intended to constitute "securities." To the extent the Liquidation Trust Interests are deemed to be "securities," the issuance of such interests shall be exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act or other applicable law. If the Liquidation Trustee determines, with the advice of counsel, that the Liquidation Trust is required to comply with registration or reporting requirements under the Securities Act, the Exchange Act, or other applicable law, then the Liquidation Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and to file reports with the Securities and Exchange Commission to the extent required by applicable law.

The existence of the Liquidation Trust and the authority of the Liquidation Trustee will commence as of the Effective Date and will remain and continue in full force and effect until the date on which: (i) all material Liquidation Trust Assets are liquidated and/or monetized in accordance with the Plan; provided, however, for the avoidance of doubt, that the Liquidation Trustee shall not be required to pursue any Litigation Claims or take any other action that the Liquidation Trustee determines, in his sole discretion, is not likely to yield sufficient additional proceeds to justify further pursuit or action; (ii) the funds in the Liquidation Trust have been distributed in accordance with the Plan; and (iii) the order closing the Chapter 11 Cases is a Final

Order.

To the extent that the terms of the Plan with respect to the Liquidation Trust are inconsistent with the terms set forth in the Liquidation Trust Agreement, then the terms of the Liquidation Trust Agreement shall govern.

This Plan shall be interpreted so as to afford, for the benefit of all Holders of Allowed Claims, the greatest opportunity for maximum recovery by the Liquidation Trustee of the Liquidation Trust Assets and proceeds thereof, including the Litigation Claims and proceeds thereof, and the rights in and proceeds of any Liability Insurance Policies. The proceeds of Litigation Claims are material to the implementation of the Plan and the recoveries to Creditors.

**9.** **Liquidation Trustee Compensation.** The Liquidation Trustee shall be compensated consistent with the calculation and provisions of section 326 of the Bankruptcy Code.

**10.** **Liquidation Trustee as Representative of the Debtors' Estates.** On the Effective Date, the Liquidation Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidation Trust Agreement, including the right to (i) effect all actions and execute all agreements, instruments, and other documents necessary to implement the provisions of the Liquidation Trust Agreement; (ii) administer the Liquidation Trust Assets, including prosecuting, settling, abandoning, or compromising any Litigation Claims; and (iii) employ and compensate professionals and other agents consistent with the provisions of the Plan.

For the avoidance of doubt, upon the occurrence of the Effective Date, the Liquidation Trustee shall automatically be granted, have, and be vested with exclusive standing and authority to: (i) bring and prosecute any Litigation Claim in a court of competent jurisdiction; and (ii) negotiate, settle, waive, or otherwise resolve any Litigation Claims. For the further avoidance of doubt, upon the Effective Date, the Liquidation Trustee shall automatically be: (i) deemed a representative of the Debtors and the Estates with respect to all applicable Litigation Claims and any related Liability Insurance Policies; and (ii) granted and have the right to control any and all privileges and protections on behalf of the Debtors and the Estates with respect to all applicable

Litigation Claims. Nothing in the Plan shall require the Liquidation Trustee to prosecute or pursue any Litigation Claim.

**11.** **Powers of the Liquidation Trustee.** The Liquidation Trustee shall be a representative of the Debtors' Estates and shall, subject to the terms of the Liquidation Trust Agreement, have the power to make all decisions with respect to the Liquidation Trust Assets, including prosecution, negotiation, waiver, and/or settlement of any Litigation Claims. Unless otherwise provided in the Plan, the Confirmation Order, or the Liquidation Trust Agreement, the duties and powers of the Liquidation Trustee shall include the following, without need of further Court approval, the power to:

(i) Implement the Plan, including any other powers necessary or incidental thereto;

(ii) Exercise all power and authority that may be exercised, to commence, pursue, abandon, and/or settle all proceedings (including the power to continue any actions and proceedings that may have been commenced by the Debtors prior to the Effective Date) that may be commenced, and to take all actions that may be taken to consummate the Plan and all transfers thereunder;

(iii) Make Distributions, or enable the Reorganized Debtors to make Distributions, to Holders of Allowed Claims, and take other actions required under or consistent with the Plan, including the maintenance of appropriate reserves;

(iv) Use, manage, sell, lease, license, abandon, convert to Cash, and/or otherwise dispose of the Liquidation Trust Assets for the purpose of making Distributions and fully consummating the Plan;

(v) Prosecute objections to Claims, including Administrative Expense Claims, and compromise, settle, and/or litigate any such Claims (Disputed or otherwise);

(vi) Investigate and prosecute any and all Litigation Claims and compromise, settle, waive, and/or litigate any Litigation Claims;

(vii) Prepare and file tax returns for the Liquidation Trust to the extent required by law;

(viii) Employ and compensate any and all such professionals and agents as the Liquidation Trustee, in his sole discretion, deems reasonably necessary to perform his duties

1   under the Plan and Liquidation Trust Agreement, without further order of the Bankruptcy Court;

2          (iv) Satisfy and pay all Trust Expenses;

3          (x) Participate in or file any post-Effective Date motion(s) to amend or modify the Plan

4   or the Liquidation Trust Agreement, or any appeal(s) of the Confirmation Order;

5          (xi) Participate in or file any action to enforce or interpret the Plan;

6          (xii) Bind the Liquidation Trust; and

7          (xiii) Take all other actions not inconsistent with the provisions of the Plan that the

8   Liquidation Trustee deems reasonably necessary or desirable in connection with the

9   administration or implementation of the Plan, including filing all motions, pleadings, reports, and

10  other documents in connection with the administration and closing of the Chapter 11 Cases.

11         **12.    Prosecution of the Quintairos Claims and Quintairos Non-Debtor Claims.**  In

12  exchange for the benefits and releases provided in the Global Settlement Agreement, the

13  Liquidation Trust and the NuMale Settling Defendants shall jointly prosecute their respective

14  Quintairos Claims and Quintairos Non-Debtor Claims, which claims shall be jointly prosecuted

15  under the sole direction and control of the Liquidation Trustee.  In exchange for the benefits and

16  releases received under the Global Settlement Agreement, the NuMale Settling Defendants agree

17  that the Liquidation Trustee shall have sole authority to retain counsel, determine litigation

18  strategy, engage in settlement negotiations, approve a settlement, and/or make other decisions

19  with respect to such joint litigation of the Quintairos Claims and Quintairos Non-Debtor Claims,

20  though the Liquidation Trustee agrees to consult with, and keep informed, the NuMale Settling

21  Defendants regarding ongoing negotiations, strategy, and any resolution or settlement.

22         The NuMale Settling Defendants shall fully cooperate with, and assist the Liquidation

23  Trustee in, prosecuting the Quintairos Claims and Quintairos Non-Debtor Claims, including in

24  connection with providing documents and testimony necessary for the successful prosecution of

25  such claims.

26         To the extent that the Quintairos Claims and Quintairos Non-Debtor Claims produce a

27  monetary recovery, and to the extent they cannot otherwise agree, the Liquidation Trustee and

28  the NuMale Settling Defendants shall participate in a mediation to determine how such recovery

shall be allocated between the Quintairos Claims and Quintairos Non-Debtor Claims after payment of retained counsel and experts' fees and costs. Within ten (10) days' written notice from the Liquidation Trustee that there is a monetary recovery on account of the Quintairos Claims and Quintairos Non-Debtor Claims, the Liquidation Trustee and the NuMale Settling Defendants shall jointly select a mediator to determine the allocation of such recovery amongst themselves. If an agreement cannot be reached with respect to the identification of the mediator, one of the following mediators will be selected by the Liquidation Trustee: Bruce Markell or Miles Ruthberg. The mediation will occur within thirty (30) days of the selection of the meditator unless otherwise agreed in writing by the Liquidation Trustee and each of the NuMale Settling Defendants. If the Liquidation Trustee and each of the NuMale Settling Defendants cannot agree on an allocation of the proceeds from the recovery of the Quintairos Claims and Quintairos Non-Debtor Claims at the mediation and the mediator determines, in the mediator's sole discretion, that the parties have reached an impasse, the mediator shall present a mediator's proposal for the proper allocation of the recovery from the Quintairos Claims and Quintairos Non-Debtor Claims between the Liquidation Trust and each of the NuMale Settling Defendants, which mediator's proposal shall be immediately binding on the Liquidation Trust and each of the NuMale Settling Defendants without any further order, act, or approval and without any right of appeal.

**13.    Liquidation Trust Beneficiaries.** Each of the Liquidation Trust Beneficiaries shall be recorded and set forth in a schedule maintained by the Liquidation Trustee expressly for such purpose based upon the Liquidation Trust Beneficiaries' Allowed Claim.

The ownership of Liquidation Trust Interests shall not entitle any Liquidation Trust Beneficiary to any title in or to the Liquidation Trust Assets; any right to call for a partition or division of such Liquidation Trust Assets; or to require an accounting, except as may be specifically provided herein. Ownership of a Liquidation Trust Interest (i) shall be noted in the books and records of the Liquidation Trust; and (ii) shall not be evidenced by any certificate, note, or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidation Trust by the Liquidation Trustee.

As set forth in more detail in the Liquidation Trust Agreement, the Liquidation Trust Interests may not be transferred, sold, assigned, hypothecated, or pledged, except as they may be assigned or transferred by will, intestate succession, or operation of law.

**14.**    **Distribution of Liquidation Trust Interests.**  The Liquidation Trust Interests are defined as "[c]ollectively, the beneficial interests in the Liquidation Trust distributed to the Holders of the: (i) Allowed Administrative Claims that have agreed in writing to defer payment or partial payment of such Allowed Claims; (ii) Contingent Expense Reimbursement; (iii) Allowed Sanchez Claim; (iv) Allowed General Unsecured Claims; (v) Allowed Subordinated Claims; and (vi) Beazley solely with respect to the Palubicki and Feliciano Claims."[15]  Upon the Effective Date, the Liquidation Trust Interests shall be distributed to the Liquation Trust Beneficiaries.

**15.**    **Net Distributable Assets and Distribution Waterfall.**    The source of all Distributions and payments under the Plan will be the Distributable Assets and the proceeds thereof.   Distributions to the Liquidation Trust Beneficiaries will be funded entirely from Liquidation Trust Assets consisting of Net Distributable Assets.

As more fully set forth in the Liquidation Trust Agreement, Distributions of the Net Distributable Assets on account of the Liquidation Trust Interests shall be made in the following order and priority:

(i)    First, all Liquidation Trust Expenses shall be paid in full.

(ii)    Second, any Allowed Administrative Claims that were not satisfied by the Reorganized Debtors and were deferred for payment by the Liquidation Trust shall be paid in full.

(iii)    Third, the Contingent Expense Reimbursement (capped at $5,000,000) shall be paid in full.

---

[15] The "Palubicki and Feliciano Claims" is a defined as "[a]ll Litigation Claims, Causes of Action or rights held by the Debtors or their Estates or their respective direct and indirect subsidiaries, whether arising prior to or after the Petition Date, against Brad Palubicki, Eva Gabriela Farmer de la Torre, Carlos Feliciano, any entities they respectively own or control and any of their respective subsequent transferees, including the claims and causes of action asserted adversary proceeding number 25-01155-nmc and the Palubicki Whistleblower Claims (as defined in the Global Settlement Agreement).

(iv)     Fourth, Allowed General Unsecured Claims shall receive their Pro Rata share of the Net Distributable Assets until all Allowed General Unsecured Claims are paid in full.

(v)     Fifth, Allowed Subordinated General Unsecured Claims shall receive their Pro Rata share of the Net Distributable Assets until all Allowed Subordinated Unsecured Claims are paid in full.

Distributions of Net Distributable Assets shall not be made in respect of Allowed General Unsecured Claims and Allowed Subordinated General Unsecured Claims until Disputed Administrative Claims have been Allowed or Disallowed, and until all contingencies that could give rise to a liquidated Contingent Expense Reimbursement Claim have been finally resolved, including, where applicable, by a Final Order, and all payments in respect of the Contingent Expense Reimbursement Claim have been made.

**16.     Reorganization of Debtors and Vesting of Non-Litigation Assets.**   On the Effective Date, all Assets, including the 363 Assets if the 363 Sale has not yet closed (and solely excluding the Liquidation Trust Assets that shall vest in the Liquidation Trust as set forth in the Plan, and the Palubicki and Feliciano Claims, which shall be transferred to Beazley in connection with the Global Settlement Agreement) shall be vested in the Reorganized Debtors free and clear of all Liens, Claims, and Equity Interests, expect as otherwise expressly provided in the Plan. For the avoidance of doubt, the Assets (other than the Liquidation Trust Assets and the Palubicki and Feliciano Claims) shall vest in the respective Reorganized Debtor that owned such revested Assets prepetition.  In exchange for Justin Pulliam's New Value Contribution, on the Effective Date, title to the Debtors' 2019 Ford F150 shall vest in Justin Pulliam, free and clear of all Liens, Claims, and Equity Interests.

On and after the Effective Date, subject to the requirements of the Plan, each Debtor will continue to exist as a separate limited liability company or corporation, as applicable, and shall retain all of the powers of a limited liability company or corporation, as applicable, under applicable non-bankruptcy law, and without prejudice to any right to amend its operating agreement or articles of incorporation (as applicable), dissolve, merge, or convert into another form of business entity, or to alter or terminate its existence.

Michael W. Carmel, the Trustee, shall have sole control and authority over each of the Reorganized Debtors and their property and shall be deemed to have been admitted as the manager or director, as applicable, of each Debtor under applicable non-bankruptcy law and shall be authorized to exercise all of the rights and powers of as managers or directors, as applicable, as provided by the Plan, including effectuation of the 363 Sale.  The Trustee shall continue to be compensated in accordance with the provisions of section 326 of the Bankruptcy Code.  Further, each of the Debtors' operating agreements or articles of incorporation, as applicable, shall be deemed to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code.

Neither the occurrence of the Effective Date, nor the effectiveness of the Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of the Debtors, which shall be continued as limited liability companies or corporations, as applicable, under the control of the Trustee following the Effective Date and subject to the terms of the Plan.

17.    **363 Sale.**  To the extent that the 363 Sale has not closed prior to the Effective Date, the Reorganized Debtors shall effectuate the 363 Sale as soon as practicable after the Effective Date in accordance with the 363 Bid Procedures and the 363 Sale Order.

18.    **Winddown of the Reorganized Debtors.**  Upon completion of the 363 Sale, the transfer of the 363 Assets to the prevailing bidder(s) in accordance with the terms of the 363 Sale Order, the transfer of the proceeds of the 363 Sale to the Liquidation Trust, the resolution of Disputed Claims with funds held in the Disputed Claims Reserve, and the completion of the Distributions required to be made by the Reorganized Debtors under the Plan, the Trustee shall take the necessary actions, in his business judgment, to wind-down and dissolve each of the Reorganized Debtors in accordance with applicable state law.  For the avoidance of doubt, prior to winding down and dissolving the Reorganized Debtors, the Trustee may take all actions necessary to preserve the value of the Reorganized Debtors in his sole discretion without obtaining approved of the Bankruptcy Court; provided, however, that the Trustee may, in his sole discretion, seek approval of, or file applicable motions with, the Bankruptcy Court prior to

causing the Reorganized Debtors to take any actions.

19. **Notice of Effectiveness.** When the steps contemplated by Section 7.2 have been completed, the Debtors shall file with the Bankruptcy Court and serve upon all Creditors and potential Holders of Administrative Claims reasonably known to the Trustee (whether or not Disputed), a Notice of Effective Date of Plan, which shall include a notice of the Administrative Claim Bar Date.

20. **Final Decree.** At any time following the Effective Date, the Liquidation Trustee shall be authorized to file a motion for the entry of a final decree closing one or more of the Chapter 11 Cases pursuant to section 350 of the Bankruptcy Code.

21. **No Corporate Action.** As of the Effective Date: (i) the adoption, execution, delivery, and implementation or assignment of all contracts, leases, instruments, releases and other agreements related to or contemplated by the Plan and the Global Settlement Agreement; and (ii) the other matters provided for under or in furtherance of the Plan and the Global Settlement Agreement involving corporate action to be taken by or required of Debtors shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without further order of the Bankruptcy Court or any requirement of further action by the members or officers of Debtors or the Trustee.

**B.**    **Executory Contracts and Leases.**

1. **Executory Contracts.**

Except for: (i) the Beazley Policies, and (ii) Executory Contracts and Unexpired Leases specifically addressed in the Plan or set forth on the schedule of Rejected Executed Contracts and Unexpired Leases attached as Schedule 6.1 to the Plan (which may be supplemented and amended up to the date the Bankruptcy Court enters the Confirmation Order), all Executory Contracts and Unexpired Leases that exist on the Confirmation Date shall be deemed assumed by the respective Debtor(s) on the Effective Date and assigned to the prevailing bidder(s) in connection with the 363 Sale.

2. **Approval of Assumption or Rejection.**

Entry of the Confirmation Order shall constitute as of the Effective Date: (i) approval,

pursuant to Bankruptcy Code section 365(a) of the assumption by the respective Debtor(s) and assignment to the prevailing bidder(s) in connection with the 363 Sale of each Executory Contract and Unexpired Lease to which any Debtor is a party that is not the Beazley Settlement Policies, not listed on Schedule 6.1 to the Plan, not otherwise provided for in the Plan, and neither assigned, assumed and assigned, nor rejected by separate order of the Bankruptcy Court prior to the Effective Date; and (ii) rejection by the applicable Debtor(s) of each Executory Contract and Unexpired Lease to which such Debtor(s) are a party that is listed on Schedule 6.1 to the Plan.  Upon the Effective Date, each counterparty to an assumed Executory Contract or Unexpired Lease listed shall be deemed to have consented to an assumption and assignment contemplated by Section 365(c)(1)(B) of the Bankruptcy Code, to the extent such consent is necessary for such assumption and assignment.  To the extent applicable, all Executory Contracts or Unexpired Leases assumed pursuant to this Article 6 shall be deemed modified such that the transactions contemplated by the Plan shall not be a "change of control," regardless of how such term may be defined in the relevant Executory Contract or Unexpired Lease and any required consent under any such Executory Contract or Unexpired Lease shall be deemed satisfied by confirmation of the Plan.

### 3.    Cure of Defaults.

The Reorganized Debtors shall make the Cure payments upon the latest of: (i) closing of the 363 Sale; (ii) such dates as may be fixed by the Bankruptcy Court or agreed upon by the applicable Reorganized Debtor(s); or (iii) the first (1st) Business Day that is fourteen (14) days after the entry of a Final Order resolving any dispute regarding: (a) a Cure amount; (b) the ability of the prevailing bidder(s) in connection with the 363 Sale to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan in accordance with Section 365(b)(1) of the Bankruptcy Code; or (c) any matter pertaining to assumption, assignment, or the Cure of a particular Executory Contract or an Unexpired Lease.

### 4.    Objection to Cure Amounts.

Any party to an Executory Contract or Unexpired Lease that is being assumed pursuant

hereto who objects to the Cure amount identified on Schedule 6.3 or any alleged Cure amount that is not identified on Schedule 6.3 must file and serve an objection on the Trustee and all parties entitled to notice by ECF in the Chapter 11 Cases, no less than five (5) days prior to the Confirmation Hearing.  Failure to file and serve a timely objection shall be deemed consent to the Cure amounts identified on Schedule 6.3 of the Plan.  If there is a dispute regarding: (i) the amount of any Cure payment; (ii) the ability of the prevailing bidder(s) in connection with the 363 Sale to provide "adequate assurance of future performance" under the Executory Contract or Unexpired Lease to be assumed or assigned; or (iii) any other matter pertaining to assumption, the Cure payments required by Section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

**5.**      **Confirmation Order.**

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption and assignment described in this Article 6 pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Notwithstanding the forgoing, if, as of the date the Bankruptcy Court enters the Confirmation Order, there is pending before the Bankruptcy Court a dispute concerning the Cure amount or adequate assurance for any particular Executory Contract or Unexpired Lease, the assumption of such Executory Contract or Unexpired Lease shall be effective as of the date the Bankruptcy Court enters an order resolving any such dispute and authorizing assumption and assignment by the respective Debtor(s).

**6.**      **Post-Petition Date Contracts and Leases.**

Executory Contracts and Unexpired Leases entered into and other obligations incurred after the Petition Date by Debtors shall be assumed by the applicable Reorganized Debtor(s) on the Effective Date.  Each such Executory Contract and Unexpired Lease shall be performed by the applicable Reorganized Debtor(s) in the ordinary course of its business.

**7.**      **Bar Date.**

All proofs of Claims with respect to Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be filed no later than fifteen (15) days after the Effective Date. Any Claim not filed within such time shall be forever barred.

C.     **Conditions to Confirmation and Effectiveness of the Plan.**

Confirmation of the Plan is conditional upon the Confirmation Order being entered and being in form and substance reasonably acceptable to the Trustee and the Global Settlement Agreement shall have been approved in open Court by the Bankruptcy Court.

The following are the conditions precedent to the occurrence of the Effective Date of the Plan:

- The Confirmation Order shall be a Final Order, except that the Trustee reserves the right to cause the Effective Date to occur notwithstanding the pendency of an appeal of the Confirmation Order if no stay pending appeal has been obtained;

- The Liquidation Trust shall have been established;

- The Disputed Claim Reserve shall have been established;

- The Global Settlement Agreement has become effective in accordance with its terms;

- The Beazley Settlement Payment shall have been received by the Trustee; and

- All documents necessary to implement the transactions contemplated by the Plan shall be in form and substance reasonable acceptable to the Trustee.

The conditions to Consummation of the Plan set forth in Section 7.2 of the Plan may be waived by written agreement of the Trustee with the consent of Beazley and Sanchez, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.     **Discharge, Injunction, and Exculpation.**

It is important that all parties-in-interest closely review the Plan's discharge, injunction, and exculpation provisions.  Accordingly, they are set forth below verbatim.

- **General.  Notwithstanding anything contained in the Plan to the contrary, the allowance, classification, and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal, and equitable**

subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, unless specifically provided otherwise in this Plan or the Liquidation Trust Agreement, after the Effective Date the Liquidation Trustee may, in his sole and absolute discretion, (i) compromise and settle Claims against the Debtors, and (iii) compromise and settle Litigation Claims against other Persons.

• **Global Settlement Agreement and Mutual Releases.** The terms of the Global Settlement Agreement and Global Settlement Order, including the mutual releases granted therein, are incorporated fully into this Plan as set forth herein, and are fully enforceable.

• **Limitation on Liability of the Liquidation Trustee.** The Liquidation Trustee will not be liable for any act he may do or omit to do in such capacity under the Plan and the Liquidation Trust Agreement, as applicable, while acting in good faith and in the exercise of his reasonable business judgment; nor will he be liable in any event except for gross negligence, willful misconduct or intentional breaches of the Plan, the Global Settlement Agreement, or the Liquidation Trust Agreement, or fraud as determined by a Final Order of a court of competent jurisdiction. The foregoing limitation on liability also will apply to any Person employed by the Liquidation Trustee (including any professional employed or retained by the Liquidation Trustee) and acting on behalf of such party in the fulfillment of their respective duties hereunder or under the Liquidation Trust Agreement. Also, the Liquidation Trustee and any Person employed by such parties (including any professional employed or retained by the Liquidation Trustee) and acting on behalf of such a party shall be entitled to indemnification out of the assets of the Liquidation Trust against any losses, liabilities, expenses (including attorneys' fees

and disbursements), damages, taxes, suits, or claims that they may incur or sustain by reason of being, having been, or being employed by such party, or for performing any functions incidental to such service.

- **Discharge.** On the Effective Date, except as otherwise provided in this Plan, the Debtors shall be discharged from any and all Claims and all Equity Interests to the fullest extent provided in sections 524 and 1141 of the Bankruptcy Code. The Discharge shall be to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, and, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan and shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any kind or nature whatsoever against the Debtors or any of their Assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtors shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code. Nothing in this Plan or Confirmation Order shall operate to expand the Debtors' discharge as provided for in this Section 8.5 beyond that allowed by the Bankruptcy Code. Nothing herein shall prevent or limit the rights of any Person to enforce the terms of, or their rights under, the Plan, the Global Settlement Agreement, or the Global Settlement Order.

- **Injunction.** Except as otherwise provided in the Plan, from and after the Effective Date, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtors or their Estates, are permanently enjoined from taking any action in furtherance of such Claim, Equity Interest, and/or any other

cause of action released and/or discharged under the Plan, including, without limitation, the following actions: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind against the Trustee, the Debtors, the Debtors' property, the Debtors' Estates, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Assets, or the Reorganized Debtors with respect to any such Claim, Equity Interest, and/or other cause of action, or taking any act to recover such Claim or Equity Interest outside of the claims allowance procedures discussed in this Plan, the Bankruptcy Code, and Bankruptcy Rules; (ii) creating, perfecting, or enforcing in any manner, directly or indirectly, any Lien, security interest, or encumbrance of any kind against the Debtors, the Debtors' property, the Debtors' Estates, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Assets, or the Reorganized Debtors on account of any such Claim, Equity Interest, and/or other cause of action; (iii) enforcing, levying, attaching, collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against the Trustee, the Debtors, the Debtors' property, the Debtors' Estates, the Liquidation Trust, the Liquidation Trustee, the Liquidation Trust Assets, or the Reorganized Debtors, on account of any such Claim, Equity Interest, and/or other cause of action; and (iv) asserting any right of setoff or subrogation of any kind, directly or indirectly, against any debt, liability or obligation due from or to the Debtors, the Debtors' Estates, the Liquidation Trust, the Liquidation Trustee, or the Liquidation Trust Assets, or against the property or interests in property of the Debtors, the Debtors' Estates, the Liquidation Trust, the Liquidation Trustee the Liquidation Trust Assets, or the Reorganized Debtors, on account of any such Claim, Equity Interest, and or other cause of action.  By accepting Distributions, each Holder of an Allowed Claim or Equity Interest will be deemed to have specifically consented to the injunctions in the Plan.  Such injunctions shall extend for the benefit of the Trustee, the Reorganized Debtors, the Liquidation Trustee,

any successors of the Debtors, and to property and interests in property subject to this Plan.  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Effective Date.  For the avoidance of doubt, from and after the Effective Date, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtors or their Estates, are permanently enjoined from taking any action that violates the Global Settlement Agreement, the Global Settlement Order, or the mutual releases provided therein.  Nothing herein shall prevent or limit the rights of any Person to enforce the terms of, or their rights under, the Plan, the Global Settlement Agreement, or the Global Settlement Order.

- **Exculpation.  From and after the Effective Date, neither Debtors, the Trustee, the Reorganized Debtors, the Liquidation Trustee, Sanchez, Beazley and their respective professionals nor any of their respective present or former members, directors, officers, managers, employees, advisors, attorneys, or agents, shall have or incur any liability to any holder of a Claim or Equity Interest or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of (from the Petition Date forward), the Chapter 11 Cases, the pursuit of confirmation of this Plan, or the consummation of this Plan, except for gross negligence and willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan or in the context of the Chapter 11 Cases.   Under no condition, however, shall this exculpation apply to Brad Palubicki, Carlos Feliciano, any entity controlled by Messrs. Palubicki and/or Feliciano, or the Palubicki and Feliciano Claims, nor with respect to any of the preserved Litigation Claims, including the Litigation Claims identified on Schedule 1.1.82 hereto.**

- **Notwithstanding anything to the contrary herein, nothing in the Plan shall release, discharge, enjoin, or otherwise modify or affect the rights of Beazley to pursue the Palubicki and Feliciano Claims or any claims against NuMale Chicago LLC, NuMale Medical Center, LLC, and NuMale North Carolina, PLLC.**

## VII.
## RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH IN ARTICLES II AND IX OF THIS PLAN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' ASSETS OR THE PLAN AND ITS IMPLEMENTATION.**

1.     **Projected Recoveries Are Estimates Only and Subject to Change.**

The projected recoveries and all claim estimates set forth in this Disclosure Statement are estimates only and therefore are subject to change. For certain classes of claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in this Disclosure Statement.

2.     **No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Trustee, Reorganized Debtors, and/or Liquidation Trustee may seek to investigate, file, and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims.

3. **The Trustee or Another Party in Interest May Object to Your Claim or Classification.**

Except as otherwise provided in the Plan or the Global Settlement Agreement, the Trustee reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection, counterclaim, or other suit by the Debtors, the Reorganized Debtor, or any successor thereto, including the Liquidation Trustee. Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

4. **Parties in Interest May Object to the Trustee's Classification of Claims.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Trustee believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Trustee created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

5. **The Conditions Precedent to the Effective Date May Not Occur.**

As more fully set forth in Section 7.2 of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent, the most significant of which is approval of the Global Settlement Agreement. If such conditions precedent are not waived or not met, the Effective Date will not take place.

6. **The Trustee May Not Satisfy the Vote Requirement.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Trustee intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Trustee may seek to accomplish an alternative chapter 11 plan in conformity with the Global Settlement Agreement.

1   There can be no assurance that the terms of any such alternative chapter 11 plan would be similar

2   or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3        **7.**     **The Trustee May Not Secure Confirmation of the Plan.**

4          Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a

5   chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (a) such

6   plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-

7   accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a

8   need for further financial reorganization unless such liquidation or reorganization is

9   contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims

10  within a particular class under such plan will not be less than the value of distributions such

11  holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

12         There can be no assurance that the requisite acceptances to confirm the Plan will be

13  received.  Even if the requisite acceptances are received, there can be no assurance that the

14  Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might

15  challenge either the adequacy of this Disclosure Statement or whether the balloting procedures

16  and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if

17  the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and

18  voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it

19  found that any of the statutory requirements for confirmation had not been met, including the

20  requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable"

21  to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy

22  Court.

23         The Trustee subject to the terms and conditions of the Plan and the Global Settlement

24  Agreement, reserves the right to modify the terms and conditions of the Plan as necessary for

25  confirmation. Any such modifications could result in less favorable treatment of any non-

26  accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment

27  currently provided in the Plan.  Such less favorable treatment could include a distribution of

28  property to the Class affected by the modification of a lesser value than currently provided in the

Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy Code permits the Trustee to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Trustee may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification, the modifications are permitted by the Global Settlement Agreement, and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation. The Trustee will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

### 8. Nonconsensual Confirmation of the Plan May Be Necessary.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Trustee believes that the Plan satisfies these requirements and the Trustee intends to request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that one of the Voting Classes does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 9. The Chapter 11 Cases May be Converted to Chapter 7.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the

priorities established by the Bankruptcy Code. The Trustee believes that liquidation under chapter 7 would result in materially smaller distributions being made to creditors than those provided for in the Plan because of (a) the Debtors have few assets beyond litigation claims, (b) the additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) the additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

## VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**THE FOLLOWING SUMMARY DOES NOT CONSTITUTE EITHER A TAX OPINION OR TAX ADVICE TO ANY PERSON. NO REPRESENTATIONS REGARDING THE EFFECT OF IMPLEMENTATION OF THE PLAN ON INDIVIDUAL CREDITORS ARE MADE HEREIN OR OTHERWISE. RATHER, THE TAX DISCLOSURE IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL CREDITORS ARE URGED TO CONSULT THEIR RESPECTIVE TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

The following discussion summarizes certain material U.S. federal income tax consequences to the Holders of Claims and the Liquidation Trust. This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"). There can be no assurance that the IRS will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to Holders of Claims, the Liquidation Trust, or any Debtor. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only.  The tax treatment of a Holder of a Claim may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, and Holders that have acquired Claims in connection with the performance of services.  The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder.  Therefore, each Holder should consult its tax

advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

Holders of Allowed Claims as of the Effective Date that are beneficiaries of the Liquidation Trust should be treated as receiving from the Debtors their respective shares of the applicable assets of the Liquidation Trust in satisfaction of their Allowed Claims, and simultaneously transferring such assets to the Liquidation Trust. Accordingly, a Holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a holder in a Claim will generally be equal to the Holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year. Additionally, Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidation Trust on an annual basis.

A creditor who received Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who

1  previously included in its income accrued but unpaid interest attributable to its Claim should

2  recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied,

3  regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it

4  may receive under the Plan on account of its Claim.

5        Under the Plan, the Holders of certain Claims, including Unsecured Claims in Classes 8

6  though 12, may receive only a partial distribution on account of their Allowed Claims.  Whether

7  the applicable Holder of such Claims will recognize a loss or any other tax treatment will depend

8  upon facts and circumstances that are specific to the nature of the holder and its Claims.

9  Creditors should consult their own tax advisors.

10        Additionally, the Liquidation Trust is intended to qualify as a liquidating trust pursuant to

11  Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a

12  trade or business.  In general, a liquidating trust is not a separate taxable entity but rather is

13  treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a disregarded entity).

14  However, merely establishing a liquidating trust does not ensure that it will be treated as a

15  grantor trust for U.S. federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-

16  2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status

17  of a liquidating trust under a chapter 11 plan.  The Liquidation Trust has been structured with the

18  intention of complying with such general criteria. The Liquidation Trust Agreement will limit the

19  investment powers of the Liquidation Trustee in accordance with Rev. Proc. 94-45 and will

20  require the Liquidation Trust to distribute at least annually to the Liquidation Trust Beneficiaries

21  (as such may have been determined at such time) its net income (net of any payment of or

22  provision for Taxes), except for amounts retained as reasonably necessary to maintain the value

23  of the Liquidation Trust Assets or to meet claims or contingent liabilities.  In accordance with

24  Rev. Proc. 94-45, the Liquidation Trust Agreement will require all relevant parties to treat, for

25  federal income tax purposes, the transfer of the Debtors' Assets to the Liquidation Trust as (i) a

26  transfer of such assets to the Liquidation Trust Beneficiaries (to the extent of the value of their

27  respective interests in the applicable Liquidation Trust Assets) followed by (ii) a transfer of such

28  assets by such Liquidation Trust Beneficiaries (to the extent of the value of their respective

interests in the applicable Liquidation Trust Assets), with the beneficiaries of the Liquidation Trust being treated as the grantors and owners of the Liquidating Trust. Beneficiaries of the Liquidation Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date.

All parties (including the Liquidation Trustee and Liquidation Trust Beneficiaries) are required to treat, for U.S. federal income tax purposes, the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Consistent with the treatment of the Liquidation Trust as a grantor trust, each Holder must report on its U.S. federal income tax return its allocable share of the Liquidation Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidation Trust whether or not the Liquidation Trust has made any distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a distribution of underlying assets from the Liquidation Trust to a beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Liquidation Trust.

The Liquidation Trust Beneficiaries will be treated as receiving an amount equal to the fair market value of their interests in the Liquidation Trust in exchange for their Claims. The Liquidation Trust Beneficiaries will be treated for U.S. federal income tax purposes as owning their shares of the Liquidation Trust Assets, including any Litigation Claims, and will be required to include their allocable shares of each item of income, gain, deduction, loss and credit of the Liquidation Trust in determining their taxable income. The Liquidation Trust Agreement will require consistent valuation of the Liquidation Trust Assets by the Liquidation Trustee and the Liquidation Trust Beneficiaries for all U.S. federal income tax and reporting purposes. The Liquidation Trustee will file with the IRS tax returns for the Liquidation Trust as a grantor trust

pursuant to Treasury Regulation Section 1.671-4(a) and send to each Liquidation Trust Beneficiary a statement setting forth the information necessary for such Liquidation Trust Beneficiary to determine its share of items of income, gain, loss, deduction, or credit of the Liquidation Trust for federal income tax purposes.

This discussion assumes that the Liquidation Trust will be so treated for federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidation Trust and the Liquidation Trust Beneficiaries could vary from those discussed herein.

Finally, Distributions pursuant to the Plan will be subject to any applicable federal income tax reporting and withholding. The IRC imposes "backup withholding" on certain "reportable" payments to certain taxpayers, including payments of interest. Under the IRC's backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A Holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE**

1  **PLAN.**

2                                                    **IX.**
                                    **CONFIRMATION OF THE PLAN**

3  **A.**     <u>**Confirmation of the Plan.**</u>

4          Pursuant to Section 1128(a), the Bankruptcy Court will hold hearings regarding

5  confirmation of the Plan and final approval of the Disclosure Statement at the United States

6  Bankruptcy Court, 300 Las Vegas Blvd. South, Las Vegas, Nevada, 89101, **on September 24,**

7  **2025, at 9:30 a.m. prevailing Pacific Time**.  To the extent necessary, the Bankruptcy Court will

8  schedule additional hearing dates.

9  **B.**     <u>**Objections to Confirmation of the Plan.**</u>

10          Section 1128(b) provides that any party-in-interest may object to confirmation of a plan.

11  Any objections to confirmation of the Plan must be in writing, must state with specificity the

12  grounds for any such objections, and must be timely filed with the Bankruptcy Court and served

13  upon counsel for the Trustee at the following address:

14                                 Garman Turner Gordon LLP
15                                 Attn:  Gregory E. Garman, Esq.
                                   Attn: Talitha Gray Kozlowski, Esq.
16                                 Attn: Mary Langsner, Ph.D.
                                   7251 Amigo Street, Suite 210
17                                 Las Vegas, NV  89119
                                   (725) 777-3000 Telephone
18                                 Email:  ggarman@gtg.legal
19                                 Email:  tgray@gtg.legal
                                   Email:  mlangsner@gtg.legal
20

21          For the Plan to be confirmed, the Plan must satisfy the requirements stated in Section

22  1129.  In this regard, the Plan must satisfy, among other things, the following requirements.

23          **1.**     <u>**Best interest of Creditors and liquidation analysis.**</u>

24          Pursuant to Section 1129(a)(7), for the Plan to be confirmed it must provide that

25  Creditors and Holders of Equity Interests will receive at least as much under the Plan as they

26  would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code (the "<u>Best</u>

27  <u>Interest Test</u>").  The Best Interest Test with respect to each impaired Class requires that each

28  Holder of an Allowed Claim or Equity Interest of such Class either: (i) accepts the Plan; or (ii)

receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the value received under the Plan by the Holders of Allowed Claims in each Class of Creditors or Equity Interests equals or exceeds the value that would be allocated to such Holders in a liquidation under Chapter 7 of the Bankruptcy Code. The Trustee believes that the Plan meets the Best Interest Test and provides value which is not less than that which would be recovered by each such holder in a Chapter 7 bankruptcy proceeding.

Generally, to determine what Holders of Allowed Claims and Equity Interests in each impaired Class would receive if the Debtors were liquidated, the Bankruptcy Court must determine what funds would be generated from the liquidation of the Debtor's Assets in the context of a Chapter 7 liquidation case, which for unsecured Creditors would consist of the proceeds resulting from the disposition of the Assets of the Debtor, including the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Claims and Priority Unsecured Claims as may result from the use of Chapter 7 for the purpose of liquidation.

In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based on the liquidation of the non-exempt assets of the Debtors. Such assets would include the same assets being collected and liquidated under the Plan. However, the net proceeds from the collection of property of the Estate available for distribution to Creditors would be reduced by any commission payable to the Chapter 7 trustee and the trustee's attorney's and accounting fees, as well as the administrative costs of the Chapter 11 estate (such as the compensation for Chapter 11 professionals).

In a Chapter 7 case, there is a reasonable likelihood that Creditors would "pay again" as the Chapter 7 trustee would incur the costs of retaining new professionals that would need to "get up to speed" to have the necessary knowledge base to complete the liquidation of Estate Assets and distributions to Holders of Allowed Claims. Additionally, where the Debtors operate

medical clinics providing patient treatment, the hypothetical Chapter 7 trustee would still likely need to hire estate professionals to assist and advise the Chapter 7 trustee with his or her rights and responsibilities in liquidating a health care business.  As such, although the Debtor's business would no longer be operational in the Chapter 7 Case, the Chapter 7 trustee would likely incur additionally professional fees and expenses specifically associated with patient care issues that come up in connection with winding down the Debtors' affairs.  For example, In a Chapter 7 Case, all patient care would need to be terminated, and patients would need to be transitioned to other clinics.  Patient records would also need to be handled in accord with appropriate governing law.  As such, even in a Chapter 7 liquidation it is anticipated that a Patient Care Ombudsman would be needed to assist the Chapter 7 Trustee with wind-down matters relating to patient care.  This would be an additional, and significant, administrative expense incurred by the Chapter 7 estates.

Furthermore, as discussed in the detailed notes accompanying each of the Liquidation Analysis annexed hereto as **Exhibit 2**, conversion to Chapter 7 will have a detrimental impact on the ability to recover on the Litigation Claims, all of which are complex and will require contingency counsel able and willing to front expenses.  As the Litigation Claims are the most valuable assets to the Estates, jeopardizing their potential recovery will have a direct and significant impact on reducing distributions to creditors.

It is further anticipated that a Chapter 7 liquidation would result in significant delay in the payment to Holders of Allowed Claims.  Among other things, a Chapter 7 case could trigger a new bar date for filing Claims that would be more than ninety (90) days following conversion of the Chapter 11 Case to Chapter 7.  Hence, a Chapter 7 liquidation would not only delay distribution but also raises the prospect of additional claims that were not asserted in the Chapter 11 Case.  Moreover, Claims that may arise in the Chapter 7 case or result from the Chapter 11 Case would be paid in full from the Assets before the balance of the Assets would be made available to pay pre-Chapter 11 Allowed Priority Unsecured Claims.

The distributions from the Assets would be paid pro rata according to the amount of the aggregate Allowed Claims.  The Trustee believes that the most likely outcome under Chapter 7

would be the application of the "absolute priority rule."  Under that rule, no junior creditor may receive any distribution until all senior creditors are paid in full, with interest, and no Equity Interests Holder may receive any distribution until all Allowed Claims are paid in full.

As set forth in the Liquidation Analysis[16] and accompanying notes annexed hereto as **Exhibit 2,** the Trustee has determined that confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class[17] with no less of a recovery than they would receive if the Debtors were liquidated under Chapter 7.

### 2. Feasibility.

The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of Debtors (the "<u>Feasibility Test</u>").  For the Plan to meet the Feasibility Test, the Bankruptcy Court must find by a preponderance of the evidence that the Debtors will possess the resources and working capital necessary to meet obligations under the Plan.

As the Plan contemplates the liquidation and distribution of the Debtor's Assets through the 363 Sale and the Liquidation Trust, the Chapter 11 Trustee is able to demonstrate that confirmation of the Plan is not likely to be followed by a subsequent bankruptcy filing or liquidation.

### 3. Accepting impaired class.

Since various Classes of Claims are impaired under the Plan, for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class of Claims (not including the votes of insiders of Debtors).

. . .

. . .

---

[16] The Liquidation Analysis herein *infra* sets forth best estimates as to value and recoveries, for each of the Debtors, in the event that the Chapter 11 Cases are converted to cases under Chapter 7 of the Bankruptcy Code and Debtors' Assets are liquidated.

[17] The Impaired Classes are Classes 9 (Sanchez Claim), 10 (General Unsecured Claims), 11 (Intercompany Claims), and 12 (Subordinated Claims).

4. **Acceptance of Plan.**

For an impaired Class of Claims to accept the Plan, those representing at least two-thirds (2/3) in amount and a majority in number of the Allowed Claims voted in that Class must be cast for acceptance of the Plan.

5. **Confirmation over a dissenting Class ("Cram Down").**

If there is less than unanimous acceptance of the Plan by Impaired Classes of Claims, the Bankruptcy Court nevertheless may confirm the Plan at the Trustee's request. Section 1129(b) provides that if all other requirements of Section 1129(a) are satisfied and if the Bankruptcy Court finds that (i) the Plan does not discriminate unfairly; and (ii) the Plan is fair and equitable with respect to the rejecting Class(es) of Claims or Equity Interests impaired under the Plan, the Bankruptcy Court may confirm the Plan despite the rejection of the Plan by a dissenting impaired Class of Claims or Equity Interests.

The Trustee will request confirmation of the Plan pursuant to Section 1129(b) with respect to any Impaired Class of Claims that does not vote to accept the Plan. The Trustee believes that the Plan satisfies all of the statutory requirements for Confirmation, that the Trustee has complied with or will have complied with all the statutory requirements for Confirmation of the Plan, and that the Plan is proposed in good faith. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the statutory requirements for Confirmation.

6. **Allowed Claims.**

An Allowed Claim is a Claim or any portion thereof that is not a Disputed Claim: (i) that is allowed pursuant: (w) to the Plan or Final Order of the Bankruptcy Court, including the Global Settlement Order, (x) to any stipulation executed prior to the Confirmation Date and approved by the Bankruptcy Court, (y) to any stipulation with Debtors or the Liquidation Trustee, as applicable, executed on or after the Confirmation Date and approved by the Bankruptcy Court, or (z) to any contract, instrument, or other agreement entered into or assumed in connection herewith; (ii) proof of which, requests for payment of which, or application for allowance of which, was filed or deemed to be filed on or before the Bar Date for filing proofs of Claim or

requests for payment of Claims of such type against Debtors; or (iii) if no proof of Claim is filed, which has been or hereafter is listed by Debtors in the Schedules as liquidated in amount and not disputed or contingent; and in the case of (ii) or (iii), no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or the Bankruptcy Court has entered a Final Order Allowing all or a portion of such Claim

Under the Plan, the deadline for filing objections to Claims is thirty (30) days after the Effective Date.  If your Claim is not an Allowed Claim, it is a Disputed Claim, and you will not be entitled to vote on the Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting purposes pursuant to Federal Rule of Bankruptcy Procedure 3018.  If you are uncertain as to the status of your Claim or Equity Interests or if you have a dispute with Debtors, you should check the Bankruptcy Court record carefully, including the Schedules of Debtors, and you should seek appropriate legal advice.  The Trustee and his professionals cannot advise you about such matters.

**7.    Impaired Claims and Equity Interests.**

Impaired Claims and Equity Interests include those whose legal, equitable, or contractual rights are altered by the Plan, even if the alteration is beneficial to the Holder of the Claim or Equity Interests, or if the full amount of the Allowed Claims will not be paid under the Plan. Holders of Claims which are not impaired under the Plan are deemed to have accepted the Plan pursuant to Section 1126(f), and Debtors need not solicit the acceptances of the Plan of such Unimpaired Claims.  As such, only Holders of Claims in Impaired Classes 9, 10, 11, and 12 under the Plan are entitled to vote.

**8.    Voting procedures.**

**a.    Submission of ballots.**

All Creditors entitled to vote will be sent a Ballot, together with instructions for voting, a copy of this conditionally approved Disclosure Statement, and a copy of the Plan.  You should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot

that was sent with this Disclosure Statement.  You should complete your Ballot and return it as follows:

Garman Turner Gordon LLP
Attn: Talitha Gray Kozlowski, Esq.
7251 Amigo Street, Suite 210
Las Vegas, NV  89119
(725) 777-3000 Telephone
Email:  tgray@gtg.legal

TO BE COUNTED, YOUR BALLOT MUST BE **_RECEIVED_** AT THE ADDRESS LISTED ABOVE BY **September 10, 2025, at 5:00 p.m. prevailing PACIFIC TIME**.

        **b.**    **Incomplete ballots.**

Unless otherwise ordered by the Bankruptcy Court, Ballots which are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will be counted as a vote to accept the Plan.

        **c.**    **Withdrawal of ballots.**

A Ballot may not be withdrawn or changed after it is cast unless authorized in writing by the Trustee, or the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change.

        **d.**    **Questions and lost or damaged ballots.**

If you have any questions concerning these voting procedures, if your Ballot is damaged or lost, or if you believe you should have received a Ballot but did not receive one, you may contact Trustee's counsel as listed above regarding the submission of Ballots.

**X.**
**ALTERNATIVES TO THE PLAN**

The Trustee believes that the Plan provides Creditors with the best and most complete form of recovery available.  As a result, the Trustee believes that the Plan serves the best interests of all Creditors and parties-in-interest in the Chapter 11 Cases.  The Trustee believes not only that the Plan, as described herein, fairly adjusts the rights of various Classes of Claims and Equity Interests and enables them to realize the greatest sum possible under the circumstances, but also that rejection of the Plan in favor of some theoretical alternative method of reconciling

the Claims and Equity Interests of the various Classes will not result in a better recovery for any Class. It is not atypical for bankruptcy proceedings involving substantial entities to continue for months or years before a plan of reorganization is consummated and payments are made.

**A.    Alternative Plans of Reorganization.**

The exclusivity period for Debtors to file a plan of reorganization expired upon the appointment of the Chapter 11 Trustee. Since the expiration of the exclusivity period, no other person has filed a plan of reorganization. As such, the only alternative to the Chapter 11 Trustee's Plan is liquidation under Chapter 7 of the Bankruptcy Code.

**B.    Liquidation Under Chapter 7.**

If a plan cannot be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7, in which a Chapter 7 trustee would be elected or appointed to liquidate the assets of Debtors for distribution to and Holders of Allowed Claims and Equity Interests in accordance with the priorities established by the Bankruptcy Code.

As previously stated, the Trustee believes that a liquidation under Chapter 7 would result in a substantially reduced recovery of funds because of: (i) additional Administrative Expenses resulting from the Chapter 7 trustee retaining new attorneys and other professionals to assist the Chapter 7 trustee; (ii) additional expenses and Claims, some of which may be entitled to priority, which would be generated during the Chapter 7 liquidation; and (iii) the additional delay associated with the appointment of the new Chapter 7 trustee and the trustee's retention of new legal and potentially accounting professionals, who would need time to "get up to speed" and familiarize themselves with the facts and circumstances of these Chapter 11 Cases, and the expenses associated therewith. Additionally, because the Debtors operate clinics providing patients with elective medical treatment, a Chapter 7 liquidation of these Debtors would necessarily require a Chapter 7 Patient Care Ombudsman to ensure patient care was appropriately transitioned elsewhere, that patient records were maintained, transferred, and/or handled in accordance with all applicable laws, and any medicines relating to patient care was appropriately disposed of or returned to the appropriate authorities. All of these additional steps would require further administrative expenses incurred by the Chapter 7 estate, and, with the

Debtors currently operating four live clinics and servicing patients via telemedicine through two others, the anticipated patient-care related expenses of any wind-down should the Debtors be liquidated, would likely be significant.  Accordingly, the Trustee believes that all Holders of Claims will receive a smaller, if any, distribution under a Chapter 7 liquidation.

**XI.**
**RECOMMENDATION AND CONCLUSION**

The Plan provides the best possible recovery for all Creditors and Equity Interest Holders as a whole, and therefore the Trustee recommends that all Creditors and Equity Interest Holders who are entitled to vote on the Plan vote to accept the Plan.

DATED this 1st day of August, 2025.

NUMALE CORPORATION

By:  Michael W. Carmel
Its:   Chapter 11 Trustee


FELICIANO NUMALE NEVADA PLLC

By:  Michael W. Carmel
Its:   Chapter 11 Trustee


NUMEDICAL SC

By:  Michael W. Carmel
Its:   Chapter 11 Trustee


NUMALE COLORADO SC

By:  Michael W. Carmel
Its:   Chapter 11 Trustee

NUMALE FLORIDA TB PLLC

By:  Michael W. Carmel
Its:  Chapter 11 Trustee

NUMALE NEBRASKA LLC

By:  Michael W. Carmel
Its:  Chapter 11 Trustee

NUMALE NEW MEXICO SC

By:  Michael W. Carmel
Its:  Chapter 11 Trustee

**Prepared and Submitted:**

GARMAN TURNER GORDON LP

By: */s/ Talitha Gray Kozlowski*
     GREOGRY E. GARMAN, ESQ.
     TALITHA GRAY KOZLOWSKI, ESQ.
     MARY LANGSNER, Ph.D.
     2751 Amigo Street, Suite 210
     Las Vegas, Nevada 89119
     *Attorneys for Michael Carmel, Chapter 11 Trustee*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX**

EXHIBIT "1"        JOINT PLAN OF REORGANIZATION

EXHIBIT "2"        LIQUIDATION ANALYSIS FOR EACH DEBTOR

EXHIBIT "3"        DEBTORS' CASH FLOW Q2 2025

GARMAN TURNER GORDON
7251 Amigo St., Ste. 210
Las Vegas, NV 89119
725-777-3000