Joseph G. Went, Esq.
Nevada Bar No. 9220
Lars K. Evensen, Esq.
Nevada Bar No. 8061
Sydney R. Gambee, Esq.
Nevada Bar No. 14201
**HOLLAND & HART LLP**
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Phone: 702.669.4600
Fax: 702.669.4650
jgwent@hollandhart.com
lkevensen@hollandhart.com
srgambee@hollandhart.com

*Attorneys for Brad Palubicki*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Lead Case No.: 25-10341-NMC |
| | Chapter 11 |
| NUMALE CORPORATION, | |
| | *Jointly Administered with:* |
| ☐ AFFECTS THIS DEBTOR, | |
| | Feliciano NuMale Nevada PLLC |
| ☐ AFFECTS FELICIANO | Case No. 25-10342-nmc |
| NUMALE NEVADA PLLC, | |
| | NuMedical SC |
| ☐ NUMEDICAL SC, | Case No. 25-10343-nmc |
| ☐ NUMALE COLORADO SC, | NuMale Colorado SC |
| | Case No. 25-10344-nmc |
| ☐ NUMALE FLORIDA TB PLLC, | |
| | NuMale Florida TB PLLC |
| ☐ NUMALE NEBRASKA LLC, | Case No. 25-10345-nmc |
| | NuMale Nebraska LLC |
| ☐ NUMALE NEW MEXICO SC, | Case No. 25-10346-nmc |
| ☒ NUMALE ALL DEBTORS, | NuMale New Mexico SC |
| | Case No. 25-10347-nmc |
| Debtors. | |
| | **Hearing Date: September 2, 2025** |
| | **Hearing Time: 9:30 a.m.** |

-1-

**BRAD PALUBICKI'S OPPOSITION TO MOTION PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. §§ 363 AND 105 TO AUTHORIZE AND APPROVE GLOBAL SETTLEMENT AND ASSOCIATED RELEASES AND AUTHORIZE INSURANCE POLICIES BUYBACK  (ECF NO. 430)**

BRAD PALUBICKI ("Palubicki"), by and through his attorneys of the law firm of Holland & Hart, LLP, hereby files this *Opposition to Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 33 and 105 to Authorize and Approve Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* (the "Motion"), on file herein as ECF No. 430.   This Opposition is based on the declaration of Palubicki filed concurrently herewith and incorporated herein by reference.

Dated: August 19, 2025.

**HOLLAND & HART LLP**

*/s/ Joseph G. Went, Esq.*
Joseph G. Went, Esq.
Las K. Evensen, Esq.
Sydney R. Gambee, Esq.
9555 Hillwood Drive 2nd Floor
Las Vegas, NV 89134

*Attorneys for Brad Palubicki*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

1.    On January 22, 2025, NuMale Corporation ("NuMale") and six bankruptcy affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  *See*, *e.g.,* ECF No. 1. Some entities included in the Global Settlement Agreement never filed bankruptcy and remain outside of the Trustee's control.

2.    NuMale affiliates that filed bankruptcy petitions include Feliciano NuMale Nevada PLLC ("Feliciano NuMale"), NuMedical SC ("NuMale SC"), NuMale Colorado SC ("NuMale Colorado"), NuMale Florida TB PLLC ("NuMale Florida"), NuMale Nebraska LLC

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

("NuMale Nebraska"), and NuMale New Mexico SC ("NuMale New Mexico") (collectively, the "Debtors").

3.    Palubicki previously served as President of NuMale and was the signatory on the bankruptcy petitions filed by Debtors.  *See* ECF No. 15 at ¶ 2.

4.    Palubicki is a defendant identified in the Jury Verdict, as that term is used in the Motion.  *See* ECF No. 431 at ¶ 23.

5.    The Motion seeks approval of the Global Settlement Agreement, which contains the following components to which Palubicki objects.

   a.    Purporting to control and require "Affiliate Entities" to provide releases. *See* ECF No. 430-1 at p. 10.

   b.    "Affiliate Entities" is defined in the Global Settlement Agreement as including NMC Illinois, LLC ("NMC Illinois"), NuMale Wisconsin GB, SC ("NuMale GB"), NuMale Green Bay, LLC ("NuMale Green Bay"), NuMale Denver, LLC ("NuMale Denver"), among others. *See* ECF No. 430-1 at p. 2.

   c.    Purporting to control and require non-debtor entities over which the Trustee has no control to terminate the employment of Palubicki. *See* ECF No. 430-1 at Art. II, Section F.

6.    NuMale GB is a signatory to the Global Settlement Agreement, but neither the Trustee nor Dr. Adam Aicher have the ability to control NuMale GB. The entity is controlled by Dr. Carlos Feliciano through his 51% voting rights, despite Dr. Aicher's 75% economic ownership.

7.

   a.    In or around July 2014, NuMale GB was formed as a Wisconsin Service Corporation.  A true and correct copy of the Articles of Incorporation for NuMale GB is attached hereto as **Exhibit A** and incorporated herein by reference.  *See* Wisc. Stat. 180.1903.

   b.    Pursuant to the July 1, 2014 *Shareholder Agreement*, 10,000 shares were issued, comprised of 1,000 voting shares and 9,000 non-voting shares.  A true and correct copy

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

of the Shareholder Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

        c.      The voting shares were distributed as follows: 490 voting shares to Dr. Aicher, 255 voting shares to Dr. Asandra, and 255 voting shares to Dr. Feliciano.  *See* Ex. B.

        d.      Pursuant to the *Subscription Agreement and Investment Letter* for NuMale GB dated July 23, 2014, Dr. Aicher expressly acknowledged that he had no control over the business affairs of the company and that he acquired a minority of the voting shares. A true and correct copy of the Subscription Agreement is attached hereto as **Exhibit C** and incorporated herein by reference. Dr. Aicher's written acknowledgment states: "I will effectively have no ability whatsoever to influence or control the management or operations of the Company."

        e.      On or about December 31, 2020, pursuant to the *Consent Resolution of the Shareholders of Attached Exhibit "A"* (the "Consent Resolution"), Dr. Asandra transferred all of his shares in NuMale GB to Dr. Feliciano.  A true and correct copy of the Consent Resolution is attached as **Exhibit D** and incorporated herein by reference.

        f.      As a result of the transfer contemplated by the Consent Resolution, Dr. Feliciano became the owner of 51% of voting shares of NuMale GB. *Id.*

        g.      According to the *Bylaws of NuMale Wisconsin GB, S.C.* (the "Bylaws"), the company is managed by the Board and the Board is elected by shareholders holding voting shares. A true and correct copy of the Bylaws is attached hereto as **Exhibit E** and incorporated herein by reference. *See* Ex. E at Article III.

        h.      By virtue of Dr. Feliciano's 51% ownership of the voting shares, he is the controlling voting shareholder.  *Id.*

    8.      Palubicki is an insured under the NuMale-Beazley Policies.

        a.      Under that policy described as certain Underwriters at Lloyd's, London Syndicates 2623/623 (collectively, "Beazley") subscribing to a $1 million Miscellaneous Medical Professional Liability Claims Made and Reported Insurance (Policy No. W14CC4190601) (the "Primary Policy"), Palubicki is an insured.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

b. Under section II of the Primary Policy, "Insureds" include coverage for executive officers. *See* ECF No. 431-4 at p. 32, section II(3). During the entire policy period from 2019 through 2025, Palubicki served continuously as President of NuMale, qualifying him for coverage.

c. NuMale is a "Named Insured." *Id.* at p. 24.

d. During the policy period, Palubicki served as an executive officer of NuMale.

e. Under the Excess Insurance Policy (Policy No. W1561E190601) (the "Excess Policy"), an "Insured" includes all "persons and entities insured under the Primary Policy. *See* ECF No. 431-5 at p. 13.

f. Beazley has not disputed Palubicki's status as an "Insured" under the NuMale-Beazley Policies. A true and correct copy of the January 13, 2021 letter from Beazley is attached hereto as **Exhibit F** and incorporated herein by reference.

g. The Trustee contends that "any bad faith claim(s) on the NuMale-Beazley Policies, are also property of the Estates." *See* ECF No. 430 at 27:15-19.

h. Not only does the Trustee believe that Palubicki's bad faith claims related to the NuMale-Beazley Policies are "rendered valueless and/or void by the Global Settlement Agreement," he believes that Palubicki's claims belong to the Estates. *Id.* at 30:15-20.

i. Even though the Trustee believes that Palubicki's bad faith claims against Beazley are "valueless and/or void," Pulliam's similar claims comprise a component of the "New Value Contribution" that Pulliam is contributing in order to obtain the benefits provided by the Global Settlement Agreement. *See* ECF No. 430-1 at p. 8, Article V(A).

j. The Global Settlement Agreement proposes to extinguish all claims against the NuMale-Beazley Policies, including any claims belonging to Palubicki. *See* ECF No. 430-1 at Article IX(A).

9. On or about December 27, 2023, Newtek Bank, a National Association ("Newtek") entered into a *Business Loan Agreement* with NuMale. *See* Claim 24-1 at p. 15.

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

a. Pursuant to the Business Loan Agreement, Newtek agreed to loan and NuMale agreed to borrow the original principal sum of $5,000,000.00. *Id.*

b. In connection with the Business Loan Agreement, Newtek and NuMale executed a *Note* whereby NuMale agreed to pay to Newtek the original principal sum of $5,000,000.00, together with interest, fees and costs thereon. *See* Claim 24-1 at p. 25.

c. Palubicki, Pulliam, and his wife, Irma Pulliam, and others guaranteed the obligations of NuMale under the Newtek Note. *See* Claim 24-1 at p. 16.

d. Newtek filed a proof of claim in the amount of $5,033,301.46. *See* Claim 24-1.

e. Newtek alleged that its claim is secured by property valued at $73,000.00, and that the unsecured portion of its claim amounts to $4,960,301.45. *Id.*

f. Pursuant to the Plan, the Trustee proposes to satisfy the secured portion of the Newtek claim for a payment of $1,000,000.00. *See* ECF No 430-1 at p.67, Plan at § 1.1.86.

## II.

## LEGAL ARGUMENT

### A. Applicable Legal Standards.

FRBP 9019(a) authorizes a bankruptcy trustee to seek court approval of a compromise or settlement after notice and a hearing. The trustee bears the burden of proving that the proposed compromise or settlement is in the best interests of the estate. Appropriate weight is given to a trustee's business judgment, but the requirement of notice and a hearing assures that decisions of a trustee are not simply rubber stamped. *See, e.g., In re Hyloft, Inc.*, 451 B.R. 104, 109 (Bankr. D. Nev. 2011). In determining whether a proposed compromise or settlement is in the best interests of the estate, a bankruptcy court is directed to consider four factors:

> (a)The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Martin v. Kane (In re A&C Properties),* 784 F.2d 1377, 1381 (9th Cir. 1986), quoting *In re Flight*

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

*Transportation Corporation Securities Litigation*, 730 F.2d 1128, 1135 (8th Cir. 1984), cert. denied, 469 U.S. 1207 (1985) ("A&C Factors").

**B.      Probability of Success in the Litigation.**

The Trustee contends that the probably of success in litigation factor weighs in favor of approving the Global Settlement Agreement.  *See* ECF No. 430 at 28:18-19. As noted by the Trustee, Palubicki contends otherwise.  The seemingly contradictory position asserted by the Trustee obscures one of the key facts warranting a finding that this factor has not been met: the Global Settlement Agreement purports to provide a nonconsensual release of a non-debtor third party, Beazley, under the NuMale-Beazley Policies, for claims belonging to Palubicki, a non-debtor not under the Trustee's control. *See* ECF No. 430-1 at Article IX(A). This directly violates the Supreme Court's June 27, 2024 holding in Harrington v. Purdue Pharma L.P., 144 S. Ct. 2071 (2024).

**1.      Palubicki's claims are not property of the estate and cannot be sold under 11 U.S.C. § 363(b)(1).**

The contradictory position asserted by the Trustee includes the contention that Palubicki's bad faith claims, if they exist at all, belong to the Estates, yet Pulliam's bad faith claims, which are similar to Palubicki's, constitute a component of the "New Value Contribution" made by Pulliam to obtain the benefits of the Global Settlement Agreement. *See* ECF No. 430-1 at p. 8, Article V(A).  Palubicki's bad faith claims belong to the Estates, have no value, or are void, but for Pulliam, they have value and support his receipt of benefits under the Global Settlement Agreement.

The Bankruptcy Code broadly defines property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see also Cusano v. Klein*, 264 F.3d 936, 945 (9th Cir. 2001). As Palubicki is not a debtor, his interest in his bad faith claims is not property of the estate under section 541.

The Trustee wishes to effectuate the buyback of the NuMale-Beazley Policies as contemplated in the Global Settlement Agreement.  *See* ECF No. 430 at 34:4-6.  The buyback described in the Global Settlement Agreement results in Palubicki's loss of any bad faith claims

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

he has against Beazley.  *See* ECF No. 430-1 at p. 13.  By its terms, § 363(b)(1) only allows a bankruptcy estate to sell "property of the estate." A*&D Prop. Consultants, LLC v. A&S Lending, LLC (In re Groves)*, 2024 U.S. App. LEXIS 14761, at *2 (9th Cir. June 18, 2024).

The harm to Palubicki is not speculative. As President of NuMale during the relevant period, Palubicki faces potential personal liability in the underlying litigation. The NuMale-Beazley Policies provide his only source of defense and indemnity. The proposed buyback strips Palubicki of his bad faith claims against Beazley.  This proposal constitutes a taking of an asset of Palubicki, not the Estates, which is beyond the trustee's authority under § 363.

**2.      The Newtek settlement.**

The Trustee seeks approval of a settlement that purports to resolve litigation - which includes "the ability to successfully reorganize these Debtors."   The Global Settlement Agreement is integral to the Plan, because the proceeds from it will be used to resolve certain claims, such as the Newtek secured claim. The Trustee negotiated a $1 million payment to Newtek in exchange for the release of a $73,000 secured claim, as well as the release of Pulliam and his wife from personal liability. *See* ECF No. 430-1 at p. 67, Plan at § 1.1.88.  This payment, which is over 13x the amount of the secured claim, is apparently warranted because Pulliam is assigning his bad faith claims against Beazley to the Estates.

The premium paid to Newtek to secure Pulliam's cooperation in surrendering any claims has a punitive effect on those that do not surrender their claims. The Estates will pay $1 million for Newtek's $70,000 secured claim solely to purchase Pulliam's release while leaving Palubicki fully exposed.  Guarantors of the Newtek obligation, like Palubicki, remain exposed to the very same creditor with which the Trustee negotiated to secure Pulliam's release in exchange for a payment from estate proceeds. No creditor would support paying a massive premium to protect some parties while leaving others exposed to the same liability. This factor strongly weighs against approval.

. . .

. . .

. . .

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

**3.** **The proposed release of liability under the NuMale-Beazley Policies violates** ***Purdue Pharma.***

The Supreme Court recently held in *Harrington v. Purdue Pharm L.P.,* 144 S. Ct. 2071, 219 L. Ed. 2d 721 (2024), that non-debtors may not receive permanent injunctive relief in the form of a third-party release, under a plan of reorganization, even when a bankruptcy court finds that the release is necessary to facilitate the debtor's reorganization. *Harrington v. Purdue Pharma L.P.,* 603 U.S. 204, 227, 144 S. Ct. 2071, 2088 (2024) ("Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

The Global Settlement Agreement provides for a comprehensive release of all claims that could be made under the NuMale-Beazley Policies, including bad faith claims belonging to Palubicki. *See* ECF No. 430-1 at Article IX(A). The proposed order approving the Motion includes just such an injunction provision. *See* ECF No. 430-1 at p. 45. Moreover, the proposed *Joint Plan of Reorganization* (the "Plan") contains a broad injunction provision that would bar Palubicki from pursuing claims that are in contravention of the order approving the Global Settlement Agreement or the Global Settlement Agreement. *See* ECF No. 430-1 at p. 93, Plan at § 8.6.

"Litigation" is broadly referred to in the Motion as including the "ability to successfully reorganize these Debtors in the absence of the Global Settlement Agreement." *See* ECF No. 430 at 27:10-12. The request to dispose of bad faith claims belonging to Palubicki as a nondebtor should weigh in favor of finding that the probability of success in the litigation factor does not support approval of the Motion. Further, the request to provide a comprehensive release to nondebtor Beazley for actions arising under the NuMale-Beazley Policies without the consent of a potential claimholder (Palubicki) violates the holding in *Purdue Pharma* and should weigh in favor of finding that this factor has not been met.

. . .

. . .

C.    **Complexity, Expense and Delay.**

The Global Settlement Agreement creates new complexities that may require future litigation. Those complexities include:

- Binding and enforcing obligations against non-debtor entities over which the Trustee has no control, like NuMale GB.

- Creating a potential conflict with the holding of *Purdue Pharma* that may require appellate review.

- Resolving the Newtek secured claim in a manner that applies estate proceeds to benefit one guarantor over similarly situated guarantors.

These complexities may generate more litigation rather than avoiding it. This factor does not support approval.

D.    **The Interests of Creditors.**

The above-captioned cases are jointly administered, but there has been no substantive consolidation of the estates of the listed debtors, or the estates of the nondebtor Affiliate Entities, as that term is used in the Global Settlement Agreement. The Global Settlement Agreement seeks to consolidate the assets of the estates to create a single fund from which all claims against the debtors are satisfied. The Plan proposes to substantively consolidate the Debtors for plan purposes. *See* ECF No. 430-1 at 79, Plan at § 5.3.

Substantive consolidation is an equitable remedy that permits the "bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 764 (9th Cir. 2000). The policy underlying this doctrine "is to ensure the equitable treatment of all creditors." *Id*. Although the essential purpose of the doctrine is to ensure fairness to all creditors, the doctrine must be used sparingly. *Id.* at 764 and 768; *In re Aroonsakool*, 2014 WL 1273696 at *8 (B.A.P. 9th Cir. Mar. 28, 2014). In the Ninth Circuit, substantive consolidation is only appropriate where: (1) creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) the affairs of

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

the debtor are so entangled that consolidation will benefit all creditors. *In re Bonham*, 229 F.3d at 767.

There is nothing to suggest that creditors dealt with Debtors and Affiliate Entities as a single economic unit. The Jury Verdict does not identify all of the Debtors or the Affiliate Entities as defendants. Consolidation is only proper under the first factor where creditors dealt with a debtor and its affiliates as if they were one corporation and failed to demonstrate reliance on credit of any separate legal entity. *In re Augie/Restivo*, 860 F.2d at 518.

To satisfy the first factor, bankruptcy courts must examine whether a debtor and its affiliates are, in fact, separate entities. *In re LLS Am., LLC*, No. BAP EW-11-1524-DHPA, 2012 WL 2042503, at *11 (B.A.P. 9th Cir. June 5, 2012). The Debtors and the Affiliate Entities are indeed separate entities. For example, NuMale GB is an improper signatory to the Global Settlement Agreement, but is independent and controlled by Feliciano, not the Trustee. *See* Exs. A-E.

There is no evidence to suggest that Beazley, Sanchez or any other party treated the Debtors as a single economic unit. The NuMale-Beazley Policies suggest the opposite, as the list of "Insureds" indicates that Beazley knew it was dealing with entities with a separate and distinct existence from NuMale. The Jury Verdict does not implicate every one of the Debtors. The Motion and Global Settlement Agreement lack information or evidence on the results to creditors in the absence of substantive consolidation. Creditors of the Debtors that are not NuMale Defendants may fare better if the cases are not substantively consolidated.

. . .

. . .

. . .

## III.

## CONCLUSION

Based on the foregoing, Palubicki respectfully requests that this Court deny the Motion.

Dated: August 19, 2025.

HOLLAND & HART LLP

/s/ Joseph G. Went, Esq.
Joseph G. Went, Esq.
Las K. Evensen, Esq.
Sydney R. Gambee, Esq.
9555 Hillwood Drive 2nd Floor
Las Vegas, NV 89134

*Attorneys for Brad Palubicki*

-12-

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

## CERTIFICATE OF SERVICE

1.    On the August 19, 2025 I served the following document(s) *(specify):*

***A.    BRAD PALUBICKI'S OPPOSITION TO MOTION PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. §§ 363 AND 105 TO AUTHORIZE AND APPROVE GLOBAL SETTLEMENT AND ASSOCIATED RELEASES AND AUTHORIZE INSURANCE POLICIES BUYBACK  (ECF NO. 430).***

2.    I served the above-named document(s) by the following means to the persons as listed below*: (Check all that apply)*

**_X_    a.    ECF System *(You must attach the "Notice of Electronic Filing", or list all persons and addresses and attach additional paper if necessary):*

RYAN A. ANDERSEN on behalf of Creditor JUSTIN PULLIAM
ryan@aandblaw.com, melissa@aandblaw.com, ecf-df8b00a4597e@ecf.pacerpro.com

LORI M. BENCOE on behalf of Creditor Michael E. Sanchez
lori@bencoelaw.com, maggie@bencoelaw.com

OGONNA M. BROWN on behalf of Creditor Michael E. Sanchez
Ogonna.Brown@wbd-us.com, ogonna-brown-4984@ecf.pacerpro.com, dberhanu@lewisroca.com, ombcalendar@lewisroca.com, klopez@lewisroca.com, Renee.Creswell@wbd-us.com

CANDACE C CARLYON on behalf of Creditor TOP TIER CAPITAL
ccarlyon@carlyoncica.com,CRobertson@carlyoncica.com, nrodriguez@carlyoncica.com, jang@carlyoncica.com, 9232006420@filings.docketbird.com, Dcica@carlyoncica.com, tfrey@carlyoncica.com

MICHAEL W. CARMEL
michael@mcarmellaw.com

GREGORY E GARMAN on behalf of Plaintiff MICHAEL W. CARMEL, CHAPTER 11 TRUSTEE
ggarman@gtg.legal, bknotices@gtg.legal

GREGORY E GARMAN on behalf of Trustee MICHAEL W. CARMEL
ggarman@gtg.legal, bknotices@gtg.legal

TALITHA B. GRAY KOZLOWSKI on behalf of Plaintiff MICHAEL W. CARMEL, CHAPTER 11 TRUSTEE
tgray@gtg.legal, bknotices@gtg.legal

-13-

TALITHA B. GRAY KOZLOWSKI on behalf of Trustee MICHAEL W. CARMEL
tgray@gtg.legal, bknotices@gtg.legal

RICHARD F. HOLLEY on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S LONDON SYNDICATES 623/2623
rholley@spencerfane.com, oswibies@spencerfane.com,
richard-holley-0715@ecf.pacerpro.com

MATTHEW L. JOHNSON on behalf of Creditor Prospect Rainbow, LLC
mjohnson@mjohnsonlaw.com, annabelle@mjohnsonlaw.com,
kristi@mjohnsonlaw.com, kathra@mjohnsonlaw.com,
admin@mjohnsonlaw.com

MARY LANGSNER on behalf of Plaintiff MICHAEL W. CARMEL, CHAPTER 11 TRUSTEE
mlangsner@gtg.legal, bknotices@gtg.legal

MARY LANGSNER on behalf of Trustee CHAPTER 11 - LV
mlangsner@gtg.legal, bknotices@gtg.legal

MARY LANGSNER on behalf of Trustee MICHAEL W. CARMEL
mlangsner@gtg.legal, bknotices@gtg.legal

DAVID A RIGGI on behalf of Debtor FELICIANO NUMALE NEVADA PLLC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Debtor NUMALE COLORADO SC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Debtor NUMALE CORPORATION
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Debtor NUMALE FLORIDA TB PLLC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Debtor NUMALE NEBRASKA LLC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Debtor NUMALE NEW MEXICO SC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Debtor NUMEDICAL SC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Jnt Admin Debtor FELICIANO NUMALE NEVADA PLLC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Jnt Admin Debtor NUMALE COLORADO SC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

DAVID A RIGGI on behalf of Jnt Admin Debtor NUMALE FLORIDA TB PLLC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Jnt Admin Debtor NUMALE NEBRASKA LLC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Jnt Admin Debtor NUMALE NEW MEXICO SC
darnvbk@gmail.com, 2782@notices.nextchapterbk.com

DAVID A RIGGI on behalf of Jnt Admin Debtor NUMEDICAL SC
, 2782@notices.nextchapterbk.com

ALYSSA A. ROGAN on behalf of U.S. Trustee U.S. TRUSTEE - LV - 11
alyssa.rogan@usdoj.gov

DAVID A. STEPHENS on behalf of Creditor NEWTEK SMALL BUSINESS FINANCE INC
dstephens@davidstephenslaw.com, dstephens@lvcoxmail.com

DAVID A. STEPHENS on behalf of Creditor NEWTEK SMALL BUSINESS FINANCE, LLC
dstephens@davidstephenslaw.com, dstephens@lvcoxmail.com

U.S. TRUSTEE - LV - 11
USTPRegion17.lv.ecf@usdoj.gov

JUSTIN CHARLES VALENCIA on behalf of U.S. Trustee U.S. TRUSTEE - LV - 11
justin.c.valencia@usdoj.gov

MARK M. WEISENMILLER on behalf of Creditor JUSTIN PULLIAM
mark@abwfirm.com,mark-weisenmiller-1991@ecf.pacerpro.com,
weisenmiller.markm.b117998@notify.bestcase.com, melissa@abwfirm.com

JOSEPH G. WENT on behalf of Debtor BRAD PALUBICKI
jgwent@hollandhart.com, vlarsen@hollandhart.com,
IntakeTeam@hollandhart.com, tlpond@hollandhart.com

STUART FREEMAN WILSON-PATTON on behalf of Creditor TN Dept of Revenue
stuart.wilson-patton@ag.tn.gov

RYAN J. WORKS on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S
LONDON SYNDICATES 623/2623
rworks@mcdonaldcarano.com, kkirn@mcdonaldcarano.com, bgrubb@mcdonaldcarano.com

MATTHEW C. ZIRZOW on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S
LONDON SYNDICATES 623/2623
mzirzow@lzlawnv.com, hannah@lzlawnv.com,
carey@lzlawnv.com, trish@lzlawnv.com,

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

jennifer@lzlawnv.com, bchambliss@lzlawnv.com

**X**     **b.**     **US Mail** by depositing same in the United States mail, first class postage fully prepaid to the persons and addresses listed below:

SUMMER CRAIG on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S LONDON SYNDICATES 623/2623
SIMPSON THACHER AND BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, NY 10017

BRYCE FRIEDMAN on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S LONDON SYNDICATES 623/2623
SIMPSON THACHER AND BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, NY 10017

Ford Motor Credit Company, LLC, c/o AIS Portfolio Services, LLC
4515 N Santa Fe Ave. Dept. APS
Oklahoma City, OK 73118

GARMAN TURNER GORDON LLP on behalf of Trustee MICHAEL W. CARMEL
7251 AMIGO ST., STE. 210
LAS VEGAS, NV 89119

MCAFEE AND TAFT LLP
,

PAUL, WEISS, RIFKIND, WHARTON AND GARRISON LLP
,

RIGGI LAW FIRM on behalf of Debtor NUMALE CORPORATION
7900 W SAHARA AVE
SUITE 100
LAS VEGAS, NV 89117

RIGGI LAW FIRM on behalf of Jnt Admin Debtor FELICIANO NUMALE NEVADA PLLC
7900 W SAHARA AVE
SUITE 100
LAS VEGAS, NV 89117

RIGGI LAW FIRM on behalf of Jnt Admin Debtor NUMALE COLORADO SC
7900 W SAHARA AVE
SUITE 100
LAS VEGAS, NV 89117

RIGGI LAW FIRM on behalf of Jnt Admin Debtor NUMALE FLORIDA TB PLLC
7900 W SAHARA AVE
SUITE 100

HOLLAND & HART LLP
9555 HILLWOOD DRIVE, 2ND FLOOR
LAS VEGAS, NV 89134

LAS VEGAS, NV 89117

RIGGI LAW FIRM on behalf of Jnt Admin Debtor NUMALE NEBRASKA LLC
7900 W SAHARA AVE
SUITE 100
LAS VEGAS, NV 89117

RIGGI LAW FIRM on behalf of Jnt Admin Debtor NUMALE NEW MEXICO SC
7900 W SAHARA AVE
SUITE 100
LAS VEGAS, NV 89117

RIGGI LAW FIRM on behalf of Jnt Admin Debtor NUMEDICAL SC
7900 W SAHARA AVE
SUITE 100
LAS VEGAS, NV 89117

RODEY, DICKASON, SLOAN, AKIN AND ROBB, P.A.
,

Jacob Nathan Rubin
,

ZACHARY WEINER on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S
LONDON SYNDICATES 623/2623
SIMPSON THACHER AND BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, NY 10017

Ryan J Works on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S LONDON
SYNDICATES 623/2623
McDonald Carano LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, NV 89102

DAVID ZYLBERBERG on behalf of Creditor CERTAIN UNDERWRITERS AT LLOYD'S
LONDON SYNDICATES 623/2623
SIMPSON THACHER AND BARTLETT LLP
425 LEXINGTON AVENUE
NEW YORK, NY 10017

**I declare under penalty of perjury that the foregoing is true and correct.**

DATED this 19th day of August, 2025.


*/s/ Tiffany Pond*_____
SIGNATURE OF DECLARANT

# EXHIBIT A

# EXHIBIT A

ARTICLES OF INCORPORATION
Stock, For-Profit Corporation

Γ

   Christopher Asandra, MD
   2600 N Mayfair Road, STE 505
   Wauwatosa, WI 53226

L

▲ Your **return address** and **phone number** during the day: ( (414) 292-0450 _____

INSTRUCTIONS (Continued)

Articles 4 & 5. The corporation must have a registered agent located at a registered office in Wisconsin. The address of the registered office is to describe the physical location where the registered agent maintains their business office. Provide the street number and name, city and ZIP code in Wisconsin. P O Box addresses may be included as part of the address, but are insufficient alone. The corporation may not name itself as its own registered agent.

Article 6. This space is provide for insertion of any desired material, such as grant or limit of preemptive rights, or other information not inconsistent with law.

Article 7. Print the name and complete address of each incorporator. At least one incorporator is required to sign the document, although all incorporators may sign.

If the document is executed in Wisconsin, sec. 182.01(3), Wis. Stats., provides that it shall not be filed unless the name of the drafter (either an individual or a governmental agency) is printed in a legible manner. If the document is not executed in Wisconsin, enter that remark.

No certificate of incorporation will be issued. The "FILED" endorsement applied to this document by the Department of Financial Institutions is evidence that the articles of incorporation have been accepted. One or more "Received" endorsements may appear on the document, but do not indicate its acceptance for filing.

This document may declare a delayed effective date. To do so, enter a remark under Article 6: "This document has a delayed effective date of (enter the future date)." The delayed effective date may not be before, or more than 90 days after, the document is received by the Department of Financial Institutions for filing.

**FILING FEE - $100. Make check payable to Department of Financial Institutions.**

DFI/CORP/**2**(R11/12)                                                                      3 of 3

Sec. 180.0202
Wis. Stats.

**State of Wisconsin**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
Division of Corporate & Consumer Services



## ARTICLES OF INCORPORATION – STOCK FOR-PROFIT CORPORATION

Executed by the undersigned for the purpose of forming a Wisconsin for-profit corporation under Ch. 180 of the Wisconsin Statutes:

NuMale Wisconsin GB, S.C.

Article 1.  Name of the corporation: _____

Article 2.  The corporation is organized under Ch. 180 of the Wisconsin Statutes.

Article 3.  The corporation shall be authorized to issue  1,000 _____ shares.

Article 4.  Name of the initial registered agent: Christopher Asandra, MD _____

Article 5.  Street address of the initial registered
           office: (*The complete address, including
           street and number, if assigned, and ZIP
           code.  P O Box address may be included
           as part of the address, but is insufficient
           alone.*)

2600 N Mayfair Road, STE 505
Wauwatosa, WI 53226

Article 6.  Other provisions (OPTIONAL):

## FILING FEE  - $100.00

DFI/CORP/**2**(R11/12)  Use of this form is voluntary.

1 of 3

Article 7.  **Name** and **complete address** of each incorporator:

Christopher Asandra, MD

2600 N Mayfair Road, STE 505
Wauwatosa, WI 53226

_____          _____
        Incorporator's signature                          Incorporator's signature
                              Christopher Asandra, MD
This document was drafted by  _____
                                        (Name the individual who drafted the document)

▶ OPTIONAL – Second choice corporate name if first choice is not available:

_____

**INSTRUCTIONS** (Ref. sec. 180.0202 Wis. Stats. for document content)

Submit one original and one exact copy to Department of Financial Institutions, P O Box 7846, Madison
WI, 53707-7846, together with the appropriate **FILING FEE of $100**.  Filing fee is **non-refundable**.  (If
sent by Express or Priority U.S. mail, address to 201 W. Washington Ave., Suite 300, Madison WI,
53703).  Sign the document manually or otherwise as allowed under sec. 180.0120(3)(c), Wis. Stats.
**NOTICE:**  This form may be used to accomplish a filing required or permitted by statute to be made with
the department.  Information requested may be used for secondary purposes.  If you have any questions,
please contact the Division of Corporate & Consumer Services at 608-261-7577.  Hearing-impaired may
call 608-266-8818 for TTY.  This document can be made available in alternate formats upon request to
qualifying individuals with disabilities.

Article 1.  The name must contain "corporation", "incorporated", "company", or "limited" or the
abbreviation "corp.", "inc.", "co." or "ltd." or comparable words or abbreviations in another language.
If you wish to provide a second choice name that you would accept if your first choice is not available,
enter it in the "Optional" area on page 2.

Article 2.  This statement is required by sec. 180.0202(1)(a).

Article 3.  Some quantity of shares must be authorized.

DFI/CORP/**2**(R11/12)                                                                      2 of 3

# EXHIBIT B

# EXHIBIT B

EXECUTION COPY

# SHAREHOLDER AGREEMENT

**THIS SHAREHOLDER AGREEMENT** (this "*Agreement*"), is made as of July 1, 2014, by and among **NuMale Wisconsin GB, S.C.**, a Wisconsin service corporation ("*Corporation*") and **Christopher D. Asandra, M.D., Carlos Feliciano, M.D.,** and **Adam Aicher, D.O.** (individually, a "*Shareholder*", collectively, the "*Shareholders*"). Capitalized terms used in this Agreement without definition shall have the meanings assigned to them in Exhibit A, attached hereto and incorporated herein.

## RECITALS

**WHEREAS,** the Shareholders are the holders of all of Corporation's presently issued and outstanding Common Stock (the "*Shares*"), which consist of voting Shares ("*Voting Shares*") and non-voting Shares ("*Non-Voting Shares*");

**WHEREAS,** the Shareholders paid the amount set forth on Exhibit B, which is attached hereto and incorporated herein, to subscribe for the ownership of the Shares also as set forth in Exhibit B.

**WHEREAS,** Shareholders may subscribe for additional Shares in the future; and

**WHEREAS,** Shareholders and Corporation agree that it is in the best interests of Shareholders and Corporation to provide for the retention of the Shares according to the terms in this Agreement.

**NOW, THEREFORE,** the parties hereto agree as follows:

## ARTICLE I
## TRANSFER OF SHARES

No Shareholder may Transfer any or all of the Shareholder's Shares except in strict compliance with the terms hereof and any Transfer, attempted Transfer, or purported Transfer in violation of this Agreement's terms and conditions shall be null and void *ab initio*. Upon any Transfer, regardless of whether permitted by or made in compliance with this Article I, the Shares transferred shall automatically become Non-Voting Shares, as that term is defined in the Articles and Bylaws of the Corporation, and shall be reinstated as Voting Shares, as that term is defined in the Articles and Bylaws of the Corporation, if and at such time as the Transferee is admitted as a Shareholder by the majority consent of the Shareholders entitled to vote as provided in the Articles or Bylaws of the Corporation.

**1.1**    **Absolute Restriction on Transfer.** Notwithstanding any provision of this Agreement expressly or implicitly to the contrary, no Transfer of any Shares may be made if, in the opinion of the Corporation's legal counsel, the transfer or assignment will violate any applicable federal or state securities laws. Before making any Transfer of any Shares, the Transferor must notify the Corporation in writing, and the President shall, if the President believes there is a material risk of violating this this prohibition, obtain an opinion from the

Corporation's legal counsel confirming whether the proposed Transfer will cause such a violation of securities laws. Legal fees shall be the Transferor's responsibility.

**1.2** **Permitted Transfers.** A Shareholder may Transfer any or all of the Shareholder's Shares to a Permitted Transferee, provided the applicable provisions of this Section 1.2 are complied with before the Transfer becomes effective.

(a) Signature. The Permitted Transferee must sign a counterpart to this Agreement, agreeing for the other Shareholders' benefit to be bound by this Agreement to the same extent as if the Permitted Transferee had been an original party to the Agreement as a Shareholder. The spouse of the Permitted Transferee must sign a Spouse's Consent in substantially the form of Exhibit C.

(b) Approval. If the Transfer is to a trust, the Corporation must approve of the trustee in writing before the Transfer.

(c) Document. The Permitted Transferee must take all actions and execute all instruments required by the Corporation in order for the Transfer to comply with any applicable federal or state laws and regulations relating to the Transfer of a Share or with this Agreement.

**1.3** **Voluntary Sale or Transfer of Shares.**

(a) Offer Notice. If any Transferor desires to Transfer any or all of his Shares to a Transferee, the Transferor shall (i) give notice to the President (an "*Offer Notice*") specifying the name and address of the proposed Transferee, number of Shares proposed to be transferred (the "*Offered Shares*"), the price to be paid by the proposed Transferee for the Offered Shares (the "*Offered Price*"), and all other terms and conditions of the proposed Transfer; and (ii) provide such additional information about the proposed Transferee as the Corporation may reasonably request within ten (10) days of such request.

(b) Purchase Price. Delivery of an Offer Notice to the President shall constitute an offer by the Transferor (the effective date of such notice under Section 4.1 being the "*Offer Date*") to sell the Offered Shares to the Corporation and/or the remaining Shareholders as provided in Section 1.4, at the "*Purchase Price*" which shall be the lesser of (i) the Determined Price under Section 1.6 or (ii) the Offered Price. If the Offered Shares are proposed to be sold to the proposed Transferee for consideration other than solely cash, the Purchase Price shall be deemed to be the sum of (i) the fair market value of the consideration other than cash offered for the Offered Shares as determined in good faith by the President, and (ii) any cash consideration so offered.

**1.4** **Other Events Constituting an Offer to Transfer Shares.**

(a) Transfer Events. Any one or more of the following events or conditions shall be deemed to constitute an offer to sell Shares held by the Shareholder and any Shares held by his Permitted Transferees:

(1) the filing of a petition in bankruptcy by or against the Shareholder;

(2)    the entry of an order by a court of competent jurisdiction adjudicating the Shareholder incompetent to manage the Shareholder's person or estate;

(3)    any general assignment by the Shareholder for the benefit of his creditors;

(4)    any transfer, award, or confirmation of any such Shares to the Shareholder's spouse pursuant to a decree of divorce, dissolution, or separate maintenance, or pursuant to a property settlement or separation agreement;

(5)    the merger, change in control, sale of substantially all the assets, liquidation or dissolution of any Shareholder that is not a natural person;

(6)    the death of any Shareholder who is a natural person;

(7)    an event occurs whereby a continued ownership interest in the Corporation by a Shareholder would cause the Corporation to fail to qualify for any license or registration necessary to conduct its business or otherwise violate or fail to comply with any law or regulation with regard thereto;

(8)    a Shareholder's offer or deemed offer of his units of NuMale Green Bay, LLC, a Wisconsin limited liability company ("*NuMale Green Bay, LLC*");

(9)    a Shareholder's ceasing to be an employee of or provide professional services to the Corporation for any reason; or

(10)    any other event occurs which, were it not for the provisions of this Agreement, would cause any such Shares, or any interest therein, to be sold, assigned, awarded, confirmed, or otherwise transferred, for consideration or otherwise, to any Person, whether voluntarily, involuntarily, or by operation of law under circumstances that would not bring such event within Sections 1.1 or 1.2.

(b)    Purchase of Shares.

(1)    Upon the occurrence of any event specified in Subsection (a) (except that set forth in Subsection (a)(4)), first the Corporation and then the Shareholders shall have the sequential right to purchase such Shares on the same terms and conditions as if such Shareholder had made an offer to sell such Shares pursuant to and on the terms and procedures provided in Section 1.3 and Sections 1.5 through 1.7 at the Determined Price.

(2)    Upon the occurrence of an event specified in Subsection (a)(4), first the affected Shareholder, and second, the Corporation and third, the other Shareholders shall have the sequential right to purchase any or all of such Shares from the Shareholder's spouse on the same terms and conditions as if such Shareholder had made an offer to sell such Shares pursuant to and on the terms and procedures provided in Section 1.3 and Sections 1.5 through 1.7 at the Determined Price. The period for a Shareholder to exercise his or her right under this Subsection (b)(2) shall be sixty (60) days from the Offer Date determined in accordance with Subsection (c) (the "*Spousal Offer Period*") and, unless he or she purchases all of the affected

Shares from his or her spouse, shall be deemed to have given an Offer Notice to the President under Section 1.3(a) with respect to any Shares not so purchased on the first (1st) day following expiration of the Spousal Offer Period.

        (c)     Offer Notice; Purchase Price.  Within thirty (30) days after the occurrence of an event described in Subsection (a), the affected Shareholder or his trustee in bankruptcy, personal representative, guardian, executor, or administrator (as appropriate) shall give notice to the President of such event specifying the date of such event, describing in reasonable detail the nature of the event and the number of Shares affected.  Such notice shall be deemed to be the Offer Notice under Section 1.3, the number of Shares affected shall be the Offered Shares, the effective date of such notice shall be the Offer Date and the purchase price shall be the Determined Price.  If the President has not received this notice upon the expiration of the thirty (30) day period, any Shareholder who has knowledge of such event may give notice to the President at any time after the end of such period; such notice shall be deemed to be the Offer Notice and the effective date of such notice shall be deemed to be the Offer Date.

      **1.5**    **Purchase Procedures.**  Each purchase of Offered Shares by the Corporation or by the remaining Shareholders who elect, under Subsection (b) to purchase a portion of the Offered Shares (the "*Purchasing Shareholders*") pursuant to this Section 1.5 shall be made in accordance with the following procedures:

        (a)     The Corporation shall have the first right to purchase all or any portion of the Offered Shares, such right to be exercised by giving notice to the Transferor (the "*Corporation Acceptance Notice*") during the sixty (60) day period following the Offer Date (the "*Corporation Offer Period*").  The Corporation Acceptance Notice shall state the number of Offered Shares that the Corporation elects to purchase.  Delivery of the Corporation Acceptance Notice to the Transferor shall create a binding contract between the Corporation and the Transferor for the purchase and sale of the number of Offered Shares specified therein at the Purchase Price and on the terms specified herein.  The decision as to whether the Corporation shall elect purchase any or all of the Offered Shares shall be in the President's sole discretion.

        (b)     Unless the Corporation elects to purchase all of the Offered Shares in their entirety, each of the Shareholders (other than the Transferor) shall have the right to purchase a fraction of the Offered Shares that the Corporation has not elected to purchase (the "*Remaining Offered Shares*") as determined under Subsection (d).  Promptly after expiration of the Corporation Offer Period, the President shall give notice to each of the Shareholders (other than the Transferor) as to the availability of the Remaining Offered Shares for purchase in accordance herewith.

        (c)     During the sixty (60) day period following giving of notice to the Shareholders under Subsection (b) (the "*Shareholder Offer Period*"), each Shareholder desiring to purchase all or part of the Remaining Offered Shares (a "*Purchasing Shareholder*") shall give notice of his acceptance of the offer (the "*Shareholder Acceptance Notice*") to the President specifying the number of the Remaining Offered Shares that he agrees to purchase.  The giving of a Shareholder Acceptance Notice to the President shall create a binding contract between the Purchasing Shareholder and the Transferor for the purchase and sale, at the Purchase Price and

on the terms specified herein, of that number of the Remaining Offered Shares allocated to such Purchasing Shareholder under Subsection (d).

(d)     Unless otherwise agreed in writing, each Purchasing Shareholder shall first be allocated such number of the Remaining Offered Shares as the number of Shares held by such Purchasing Shareholder bears to the total number of Shares held by all Purchasing Shareholders, but limited by the number of the Remaining Offered Shares specified in his Shareholder Acceptance Notice. If any Purchasing Shareholder agrees to purchase less than his *pro rata* portion of the Remaining Offered Shares determined under the preceding sentence, each Purchasing Shareholder who agrees to purchase more than his *pro rata* portion of the Remaining Offered Shares shall be allocated such additional number of the Remaining Offered Shares not so allocated under the preceding sentence as the Shares held by such Purchasing Shareholder bears to the total number of Shares held by all Purchasing Shareholders who agree to purchase more than their pro rata portion of the Remaining Offered Shares, but again limited by the number of the Remaining Offered Shares specified in his Shareholder Acceptance Notice. This procedure shall be continued until all of the Remaining Offered Shares have been allocated among the Purchasing Shareholders to the extent specified in their respective Shareholder Acceptance Notices.

(e)     If the Purchasing Shareholders have not agreed to purchase the Remaining Offered Shares in their entirety, the Transferor may transfer the remainder, if any, of the Offered Shares to the proposed Transferee at any time within sixty (60) days after the Closing Date, at the Purchase Price and on the terms and conditions stated in the Offer Notice only, provided that the proposed Transferee shall have first executed a Consent to Be Bound by this Agreement in substantially the form of <u>Exhibit D</u>. The Shares thus transferred shall continue to be subject to the restrictions in this Agreement with respect to any subsequent transfer by the Transferee.

**1.6    Determined Price.** "*Determined Price*" means the fair market value of Shares subject to purchase under this Article I, determined as follows:

(a)     At any time that a Determined Price must be computed, the net pretax profits of the Corporation for each of the two (2) complete fiscal years immediately preceding the date of the Offer Notice shall be determined, using the accrual method of accounting (regardless of the Corporation's actual method of accounting at such time). The sum of net pretax profits for the two (2) years shall be divided by two (2) and the result multiplied by five (5), which shall be the fair market value of the Corporation.

(b)     If the Corporation has been in existence for fewer than two (2) complete fiscal years immediately preceding the date of the Offer Notice, the Determined Price shall be computed by dividing the sum of the Corporation's net pretax profits (determined on an accrual basis) for the period the Corporation has been in existence by the number of full months in such period, and the resulting amount shall be multiplied by sixty (60) to determine the fair market value of the Corporation.

(c)     The Determined Price of any Offered Shares shall be (i) the fair market value of the Corporation *divided by* (ii) the number of issued and outstanding Shares on the date

the fair market value was determined; *multiplied by* (iii) the number of Shares subject to purchase under this Article I.

**1.7    Closing and Payment.**

(a)    Closing.  The transfer of all or part of the Offered Shares purchased by the Corporation and/or the Purchasing Shareholders (the "*Accepted Shares*") to the Corporation and/or to Purchasing Shareholders shall be consummated on a date set by the President (the "*Closing Date*") not less than fifteen (15) nor more than thirty (30) days after expiration of (i) the Corporation Offer Period if the Corporation is purchasing the Offered Shares in their entirety; or (ii) the Shareholder Offer Period if the Corporation is not purchasing all of the Offered Shares. Within seven (7) days after the expiration of the Corporation Offer Period or the Shareholder Offer Period, as applicable, the President shall give notice to the Transferor and all the Purchasing Shareholders, if any, specifying the number, the Offered Shares to be purchased by the Corporation and each of the Purchasing Shareholders and specifying the Closing Date.  All incidents of ownership of the Accepted Shares shall cease on the Closing Date.  Transfer of the Accepted Shares shall be deemed to have been consummated as of the Closing Date such that the Transferor shall have no further rights or entitlement to distributions or allocation of profits or losses of the Corporation, and no further voting rights, in respect of the Accepted Shares from and after such Closing Date.  If and to the extent that the Corporation is the purchaser of the Affected Shares and elects to pay the Purchase Price in installments as permitted under Subsection (b)(2), the Transferor shall be a general, unsecured creditor of the Corporation without preference or priority over any other general unsecured creditor.

(b)    Payment.  The Purchase Price for the Accepted Shares may be paid on any terms that may be agreed to in writing between the Transferor and the Corporation or a Purchasing Shareholder, as the case may be (which terms need not be identical as between the Transferor and the Corporation or between the Transferor and any Purchasing Shareholder, individually).  However, unless such agreement has been made prior to the Closing Date:

(1)    Except as provided in Subsections (2) or (3), below, the Purchase Price for the Accepted Shares shall be paid in cash in a lump sum at the Closing.

(2)    The Corporation may elect to pay the Purchase Price for the Accepted Shares in five (5) equal annual installments, together with interest on the unpaid balance at a per annum rate equal to the greater of (i) the publicly announced prime rate in effect at the time the first installment is paid of the Corporation's primary bank at such time, plus one-half of one percent (0.5%) or (ii) the minimum rate of interest per annum necessary to avoid the imputation of interest under federal income tax laws. The first installment of principal and interest shall be paid not later than ninety (90) days following the end of the Corporation's fiscal year in which the triggering event giving rise to the right to purchase Shares under Section 1.3 or Section 1.4 occurs.  Interest shall accrue commencing on the Closing Date.  The unpaid balance of the Purchase Price for the Accepted Shares may be paid in whole or in part at any time without penalty, and may be accelerated in the event of failure to pay any installment when due, in which case reasonable attorneys' fees and costs may also be recovered if any legal action for collection is commenced.

(3)    If the purchase of the Accepted Shares results from the proposed sale of the Transferor's Shares to a third-party Transferee and the Offer Notice under Section 7.3(a) indicates that the Purchase Price for the Shares proposed to be transferred is to be paid in any manner other than in cash in a lump sum at the Closing ("*Alternative Payment Terms*"), then either the Corporation or any one or more Purchasing Shareholders may elect to pay the Purchase Price for the Accepted Shares on the Alternative Payment Terms.

**1.8    Additional Subscriptions.**  Upon the request of the Board of Directors of the Corporation, if a Shareholder (the "*Electing Shareholder*") is a member of NuMale Green Bay, LLC who exercises his right-of-first-refusal under Section 3.3 of that certain Operating Agreement for NuMale Green Bay, LLC, then all Shareholders (regardless of whether they are Members of NuMale Green Bay, LLC) shall be deemed to have subscribed for and agreed to purchase such number of additional shares of the Corporation at such subscription price as are provided below:

(a)    There shall be determined a ratio by dividing (i) the dollar amount of the Electing Shareholder's additional capital contribution to NuMale Green Bay, LLC required upon exercise of the right-of-first-refusal, by (ii) the dollar amount of the Electing Shareholder's original capital contribution to NuMale Green Bay, LLC (the "*Ratio*").

(b)    The number of Voting Shares subscribed for by each Shareholder shall be equal to the number of Voting Shares initially issued to him as set forth in Exhibit B, multiplied by the Ratio, and the number of Non-Voting shares subscribed for by each shareholder shall be equal to the number of Non-Voting Shares initially issued to him as set forth in Exhibit B, multiplied by the Ratio.

(c)    The subscription price for the Shares referred to in Subsection (b) shall be equal to the dollar amount of each Shareholder's original subscription as set forth in Exhibit B, multiplied by the Ratio.  The subscription price for the shares referred to in Subsection (b) shall be payable within five (5) business days of demand therefor by the Corporation and, if not paid, any such non-paying Shareholder shall be liable to the Corporation for the amount thereof, plus interest at the rate of 18% per annum, until paid; and the Corporation shall have a lien upon any dividend or distribution payable to such shareholder to secure such obligation.

(d)    For the avoidance of doubt, if the right-of-first-refusal belonging to any Shareholder who is a member of NuMale Green Bay, LLC expires and is voided according to the terms of Section 3.3 of that certain Operating Agreement for NuMale Green Bay, LLC, then this Section 1.8 shall be of no further force and effect except insofar as any Shareholder has an unpaid liability to the Corporation under Subsection (c).

## ARTICLE II
## NON-COMPETE; PROPRIETARY INFORMATION

**2.1    Non-Competition Covenants.**  Without the written consent of the President, no Shareholder may, directly or indirectly through an Affiliate or otherwise, serve as a director, officer, employee, or consultant of, or own any interest in, any corporation, partnership, limited liability company, or other entity or facility that operates similar business as the Corporation, within the Territory. This non-competition prohibition shall remain effective as to each Shareholder so long as such Shareholder retains an interest in the Corporation for a period of three (3) years following the withdrawal or exit of such Shareholder from the Corporation.

(a)    The Shareholders hereby acknowledge that their agreement not to engage in the activities prohibited under this Section 2.1 for the period of time provided herein are manifestly reasonable upon their face and that they are reasonable as to time and scope as is required for the reasonable protection of the Corporation and the other Shareholders in light of the substantial harm that the Corporation and the other Shareholders will suffer should a Shareholder breach any of the provisions of this Section 2.1.  The Shareholders further agree that the nature, kind, and character of the activities prohibited herein are reasonably necessary to protect the interests of the Corporation and the other Shareholders.

(b)    If a judicial determination is made that any of the provisions of this Section 2.1 constitute an unreasonable or otherwise unenforceable restriction against the Shareholder, the provisions of this Section 2.1 shall be rendered void only to the extent that such judicial determination finds such provisions to be unreasonable or otherwise unenforceable.  Any judicial authority construing this Section 2.1 shall be empowered to sever any portion of the Territory or prohibited activity from the coverage of this Section 2.1 and to apply the provisions of this Section 2.1 to the remaining portion of the Territory or the remaining activities not so severed by such judicial authority.

(c)    The foregoing provisions shall be subject to and superseded by comparable provisions of any employment or non-compete agreement that a Shareholder may have with any Affiliate, or any customer or vendor, of the Corporation.

**2.2    Proprietary Information.**  At all times during the term hereof and following the termination of this Agreement, all trade secrets and proprietary confidential information of the Corporation, including without limitation, all forms of contracts and other business documents or information of the Corporation, whether currently or in the future developed or maintained by the Corporation and including any and all deletions, additions, modifications and amendments thereto (collectively, the "*Corporation's Proprietary Materials*"), shall be the exclusive, sole and absolute property of the Corporation.  The Shareholders acknowledge and agree that the Corporation has developed the Corporation's Proprietary Materials at significant expense, and that said Proprietary Materials are not available for review or use by Shareholders of the public. All of the Corporation's Proprietary Materials are and shall at all times remain confidential and proprietary and constitute valuable trade secrets of the Corporation.  Except in the ordinary course of performing its obligations under this Agreement and except upon the Corporation's prior written consent, no Shareholder shall disclose to anyone, use, copy, or take any Corporation's Proprietary Materials for such Shareholder's benefit or gain either during the term

of this Agreement or at any time after the termination hereof.  Upon any expiration or earlier termination of this Agreement for any reason, no Shareholder shall, without the prior written consent of the Corporation, take or use any of the Corporation's Proprietary Materials, and each shall return to the Corporation all of the Corporation's Proprietary Materials in such Shareholder's possession or control.  The provisions of this Section 2.2 shall survive the termination of this Agreement.

**2.3    Equitable Remedies.**    The Shareholders agree and acknowledge that any violation of Section 2.1 or Section 2.2 by any Shareholder will result in irreparable injury to the Corporation and the other Shareholders, that a remedy at law for any breach or threatened breach of the covenants contained herein will be inadequate and that in the event of any such breach, the Corporation, in addition to any other remedies or damages available to it at law or in equity, shall be entitled to temporary injunctive relief before trial from any court of competent jurisdiction as a matter of course and to permanent injunctive relief without the necessity of proving actual damages or securing or posting any bond.  In the event of any breach of Section 2.1 or Section 2.2 by a Shareholder and in addition to an injunction, the Corporation shall also be entitled to recover the amount of fees and other compensation earned by such Shareholder as a result of any such breach, plus any other damages a court of competent jurisdiction may find appropriate.  The time periods set forth in this Section 2.3 shall be tolled and suspended for a period of time equal to the aggregate quantity of time during which a Shareholder violates such prohibitions in any respect.

### ARTICLE III
### DISPUTE RESOLUTION

**3.1    Disputes Among Shareholders.**

(a)    The Shareholders agree that in the event of any dispute or disagreement solely between or among any of them arising out of, relating to or in connection with this Agreement or the Corporation or its organization, formation, business or management ("*Shareholder Dispute*"), the Shareholders shall use their best efforts to informally resolve any Shareholder Dispute by good-faith negotiation and mutual agreement.

(b)    In the event that the Shareholders are unable to resolve any Shareholder Dispute, such parties shall first attempt to settle such dispute through non-binding mediation. Should settlement occur, the parties shall execute a Settlement Agreement and Mutual Release detailing the terms of the settlement.  In no event shall the results of any mediation proceeding be admissible in any arbitration or judicial proceeding.

**3.2    Mediation.**

(a)    Mediation proceedings shall be conducted in accordance with the Commercial Mediation Rules of the American Arbitration Association (the "*AAA*") in effect on the date the notice of mediation was served, other than as specifically modified in this Agreement, and shall be non-binding on the parties thereto.

(b)    Any Shareholder may commence a mediation proceeding by serving written notice thereof to the other Shareholders designating the issue(s) to be mediated and the

specific provisions of this Agreement under which such issue(s) and dispute arose. The initiating party shall simultaneously file two copies of the notice with the AAA, along with a copy of this Agreement. A Shareholder may withdraw from the Shareholder Dispute by signing an agreement to be bound by the results of the mediation, to the extent the mediation results are accepted by the other Shareholders as provided in this Agreement. A Shareholder who withdraws shall have no further right to participate in the Shareholder Dispute.

(c)    The Shareholders shall select one (1) neutral third party AAA mediator (the "*Mediator*") with expertise in the area that is in dispute. If a Mediator has not been selected within five (5) business days thereafter, then a Mediator shall be selected by the AAA in accordance with the Commercial Mediation Rules of the AAA.

(d)    The Mediator shall schedule sessions, as necessary, for the presentation by all Shareholders of their respective positions, which, at the option of the Mediator, may be heard by the Mediator jointly or in private, without any other Shareholders present. The mediation proceeding shall be held in the city that is the Corporation's principal place of business or such other place as agreed by the Mediator and all of the Shareholders. The Shareholders may submit to the Mediator, no later than ten (10) business days prior to the first scheduled session, a brief memorandum in support of their position.

(e)    The Mediator shall make written recommendations for settlement in respect of the dispute, including apportionment of the mediator's fee, within ten (10) business days of the last scheduled session. If any Shareholder involved is not satisfied with the recommendation for settlement, he may commence an arbitration proceeding.

**3.3    Arbitration.**

(a)    Arbitration proceedings shall be conducted under the Commercial Arbitration Rules and Mediation Procedures (including procedures for large complex commercial disputes) in effect at the time of execution of this Operating Agreement. (the "*Rules*"). A Shareholder may withdraw from the Shareholder Dispute by signing an agreement to not dispute the Shareholder Dispute and be bound by the results of any resulting arbitration and waives their right to appeal the arbitration results. Such withdrawal waives the Shareholder's further right to participate in the Shareholder Dispute.

(b)    The arbitration panel shall consist of one (1) arbitrator. The Shareholders shall select one (1) neutral third party AAA arbitrator (the "*Arbitrator*") with expertise in the area that is in dispute. If an Arbitrator has not been selected within five (5) business days thereafter, then an Arbitrator shall be selected by the AAA in accordance with the Rules. The arbitration proceeding shall be held in the city that is the Corporation's principal place of business or such other place as agreed by the Arbitrator and all of the Shareholders. The selected arbitrator shall disclose promptly to the AAA and all parties any financial or personal interest the arbitrator may have in the result of the arbitration and/or any other prior or current relationship, or expected or discussed future relationship, with the parties or their representatives.

(c)     In any final award and/or order, the arbitrator shall apportion all the costs (other than attorney's fees incurred in conducting the arbitration equally amongst all parties. Each party shall bear his or its own attorney's fees.

(d)     Discovery shall be permitted as allowed by the Rules, or as otherwise agreed to by all the parties of the Shareholder Dispute.  The Shareholders agree to make available to one another and to the arbitrator, for inspection and photocopying, all documents, books and records, if determined by the arbitration panel to be relevant to the dispute, and by making available to one another and to the arbitration panel personnel directly or indirectly under their control, for testimony during hearings if determined by the arbitration panel to be relevant to the dispute.  The Shareholders agree, unless undue hardship exists, to conduct arbitration hearings to the greatest extent possible on consecutive business days and to strictly observe time periods established by the Rules or by the arbitrator for the submission of evidence and of briefs.  Unless otherwise agreed to by the Shareholders, a stenographic record of the arbitration proceedings shall be made and a transcript thereof shall be ordered for each Shareholder, with each party paying an equal portion of the total cost of such recording and transcription.

(e)     The Arbitrator shall have all powers of law and equity, which it can lawfully assume, necessary to resolve the issues in dispute including, without limiting the generality of the foregoing, making awards of compensatory damages, issuing prohibitory and mandatory orders in the nature of injunctions and compelling the production of documents and witnesses for presentation at the arbitration hearings on the merits of the case.  The Arbitrator shall neither have nor exercise any power to act as *amicable compositeur* or *ex aequo et bono*; or to award special, indirect, consequential or punitive damages.  The Arbitrator shall issue a written decision and state the reasons upon which it is based.  The statutory, case law and common law of the State of Wisconsin shall govern in interpreting their respective rights, obligations and liabilities arising out of or related to the transactions provided for or contemplated by this Agreement, including without limitation, the validity, construction and performance of all or any part of this Agreement, and the applicable remedy for any liability established thereunder, and the amount or method of computation of damages which may be awarded, but such governing law shall not include the law pertaining to conflicts or choice of laws of Wisconsin; provided, however, that should the parties refer a dispute arising out of or in connection with an ancillary agreement or an agreement between some or all of the Shareholders which specifically references this Article III, then the statutory, case law and common law of the State whose law governs such agreement (except the law pertaining to conflicts or choice of law) shall govern in interpreting the respective rights, obligations and liabilities of the parties arising out of or related to the transactions provided for or contemplated by such agreement, including, without limitation, the validity, construction and performance of all or any part of such agreement, and the applicable remedy for any liability established thereunder, and the amount or method of computation of damages which may be awarded.

(f)     Any action or proceeding subsequent to any Award rendered by the Arbitrator in the Shareholder Dispute, including, but not limited to, any action to confirm, vacate, modify, challenge or enforce the Arbitrator's decision or award shall be filed in a court of competent jurisdiction in the same county where the arbitration of the Shareholder Dispute was conducted, and Wisconsin law shall apply in any such subsequent action or proceeding.

# ARTICLE IV
# MISCELLANEOUS

**4.1** <u>Notice</u>. Any notice required under this Agreement shall be sufficient if given in writing. Such notice shall be deemed to have been duly given on the date of service, if served by personal delivery, facsimile or email with reply required, or given within forty-eight (48) hours of service, if served by certified first class mail or private carrier properly addressed to the Corporation's principal place of business or the address provided below the Shareholder's signature as amended by written notice from time to time.

**4.2** <u>Legend on Certificates</u>. Each certificate for Shares restricted by this Agreement shall have conspicuously endorsed thereon the following words:

> "Transfer, encumbrance or other disposition of these Shares is restricted by one or more Agreements between Shareholder and the Corporation, including a certain Shareholder Agreement dated _____, as amended and restated from time to time. All Agreements are on file at the offices of the Secretary of the Corporation. No transfer, encumbrance or other disposition of these Shares will be valid unless it complies with such Agreements. By acceptance of this Certificate the holder thereof confirms Shareholder's agreement to be bound by the terms of such Agreement."

**4.3** <u>Shareholder's Estate Plan</u>. Shareholder agrees to include in Shareholder's estate planning documents a direction and authorization to Shareholder's fiduciary to comply with the provisions of this Agreement and to sell Shareholder's Shares in accordance with this Agreement. However, Shareholder's failure to do so shall not affect the validity or enforceability of this Agreement.

**4.4** <u>Binding Effect</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties to it, as well as their respective heirs, legal representatives, successors and assigns.

**4.5** <u>Specific Performance</u>. The Shares of the Corporation cannot be readily purchased or sold in the open market. Further, it is impossible to measure in money the damages which will arise by reason of the failure to perform any obligations under this Agreement. For these reasons, among others, the parties will be irreparably damaged and have no adequate remedy at law in the event this Agreement is not specifically enforced. Should any controversy arise concerning the rights or obligations of the parties under this Agreement, such rights or obligations shall be enforceable in a court of equity by a decree of specific performance. Furthermore, the Corporation may seek immediate injunctive relief without prejudice to other rights under this Agreement or at law, should Shareholder breach or threaten to breach any provision in this Agreement.

**4.6** <u>Necessary Acts</u>. Each party to this Agreement agrees to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

**4.7** **Validity.** It is intended that each Section of this Agreement shall be viewed as separate and divisible. In the event any Section is held to be invalid or overbroad, such Section shall be judicially amended so that it may be judicially enforceable and the remaining Sections shall continue to be in full force and effect. The waiver by any party to the breach of any provision of this Agreement shall not be construed as waiver of a subsequent breach.

**4.8** **Governing Law.** Except as otherwise specifically indicated, this Agreement is made pursuant to and shall be construed in accordance with the laws of the State of Wisconsin.

**4.9** **Entire Agreement.** This Agreement supersedes all prior oral or written agreements or understandings between the Parties regarding the subject matter of this Agreement.

**4.10** **Amendment.** No provision may be waived, altered or amended, in whole or in part, unless such waiver, alteration or amendment is in writing and signed by all the parties.

**4.11** **Termination.** This Agreement shall terminate on:

    (a)    The written agreement of all parties; or

    (b)    The dissolution, bankruptcy, or insolvency of the Corporation.

**4.12** **Counterparts.** This Agreement may be executed in several counterparts and/or by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**4.13** **Headings.** Headings are for the convenience of the parties only and shall not affect the interpretation or application of this Agreement.

**4.14** **Recitals.** The Recitals are incorporated into and made a part of this Agreement.

**4.15** **Independent Counsel.** THE SHAREHOLDERS EXPRESSLY ACKNOWLEDGE THAT THEY HAVE BEEN ADVISED THAT THEY HAVE THE RIGHT TO OBTAIN INDEPENDENT LEGAL COUNSEL WITH RESPECT TO THIS AGREEMENT. THE LAW FIRM OF VON BRIESEN & ROPER, S.C. HAS REPRESENTED THE CORPORATION ONLY IN THIS MATTER. THE SHAREHOLDER ACKNOWLEDGES THAT THEY HAVE EITHER RETAINED INDEPENDENT COUNSEL OR HAVE DETERMINED NOT TO DO SO.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Shareholder Agreement to be executed as of the date first set forth above.

NUMALE WISCONSIN GB, S.C.

By: _____

Name: _____

Title: _____

SHAREHOLDERS

_____
Christopher D. Asandra, M.D.
Address: 2600 N. Mayfair Rd. Ste 505
         Wauwatosa, WI 53226

_____
Carlos Beltciane, M.D.
Address: 106 W. Wisconsin, Ste 505 2000
         Milwaukee, WI 53203

_____
Adam Aicher, D.O.
Address: 2875 Shelter Creek Ct.
         Green Bay, WI 54313

# EXHIBIT A

## DEFINITIONS

In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth in this <u>Exhibit A</u> and any derivatives of the terms shall have correlative meanings:

*<u>Affiliate</u>* – means, with respect to any Person, any Person controlling, controlled by or under common control with the Person in question, where "controlling," "controlled" and "control" mean the possession of the power, directly or indirectly, to direct the management of a Person whether through ownership of voting securities, by contract, or otherwise.

*<u>Code</u>* – the Internal Revenue Code of 1986, as amended (or any corresponding provisions of succeeding law).

*<u>Permitted Transferee</u>* – with respect to any Transferor: (i) another Shareholder (except if the proposed Transfer, if consummated, would result in the Transferee owning a fifty percent (50%) or greater interest in the Corporation, in which case such other Shareholder shall be a Permitted Transferee (1) only with respect to that number of Shares that, if Transferred, would not cause such Transferee's ownership in the Corporation to equal or exceed fifty percent (50%) or (2) if the Permitted Transferee is an employer or owner of NuMale Corporation, a Nevada Corporation); (ii) a trust for the benefit of the Transferor; or (iii) the Corporation.

*<u>Person</u>* – means an individual, a partnership, a limited liability company, a trust, an estate, an association, a corporation or any other legal or commercial entity.

*<u>Territory</u>* – any location within a fifty (50) mile radius of Green Bay, Wisconsin.

*<u>Transfer</u>* – to sell, assign, give, bequeath, pledge, or otherwise encumber, divest, dispose of, or transfer ownership or control of all of, any part of, or any interest in a Share to any Person, whether voluntarily or by operation of law, whether *inter vivos* or upon death.

*<u>Transferee</u>* – any Person who proposes to acquire any or all of a Shareholder's Shares, or a Person acquiring a Unit pursuant to Article I.

*<u>Transferor</u>* – a Member who proposes to transfer any or all of his Units pursuant to Article I.

**EXHIBIT B**

**SHAREHOLDERS AND SHARES**

| Shareholder | Initial Paid In Capital | Voting Shares | Non-Voting Shares | Total Shares |
|---|---|---|---|---|
| Christopher D. Asandra, M.D. | $156.25 | 255 | 995 | 1,250 |
| Carlos Feliciano, M.D. | $156.25 | 255 | 995 | 1,250 |
| Adam Aicher, D.O. | $3,937.50 | 490 | 7,010 | 7,500 |
| | $4,250.00 | 1,000 | 9,000 | 10,000 |

EXHIBIT C

SPOUSE'S CONSENT

I, _____, spouse of _____
of NUMALE WISCONSIN GB, S.C. ("*Corporation*"), a Wisconsin service corporation,
acknowledge that I have reviewed the Shareholder Agreement on file with the Secretary of the
Corporation which affects the stock of the Corporation, including that stock held by my spouse, I
fully understand the terms and ramifications thereof, including that signing this Counterpart shall
bind whatever interest I may have or acquire in the Corporation's stock, and I hereby willfully
agree to be bound by the terms and restrictions of said Shareholder Agreement.

_____

STATE OF WISCONSIN      )
                          ) ss.
_____ COUNTY      )

Personally came before me this ____ day of _____, 2014, the above named
_____, to me known to be the person who executed the foregoing
instrument and acknowledged the same.

_____
_____, Notary Public,
State of Wisconsin
My commission is permanent/expires:_____

## EXHIBIT D

### NUMALE WISCONSIN GB, S.C.
### CONSENT TO BE BOUND BY SHAREHOLDER AGREEMENT

In consideration of the issuance, sale, pledge, or other transfer to the undersigned of Shares in NUMALE WISCONSIN GB, S.C., a Wisconsin service corporation, the undersigned hereby consents and agrees to become a party to and be bound by the Shareholder Agreement dated as of the _23rd_ day of ___July___, 2014, as amended, receipt of a copy of which is hereby acknowledged, as fully as if he, she or it were one of its original parties, and all of the Shares owned by the undersigned shall be held in accordance with and restricted by the terms of such Shareholder Agreement.

Signature: _____

Date: _7/23/14_____

Name: _Adam Aicher_____

Address: _2875 Shelter Creek Ct_

_Green Bay, WI  54313_

Social Security Number: _██████  8829_

24664312_1.DOC

## EXHIBIT C

## SPOUSE'S CONSENT

I, _Sara Aicher_____, spouse of _Adam Aicher_____ of NUMALE WISCONSIN GB, S.C. ("_Corporation_"), a Wisconsin service corporation, acknowledge that I have reviewed the Shareholder Agreement on file with the Secretary of the Corporation which affects the stock of the Corporation, including that stock held by my spouse, I fully understand the terms and ramifications thereof, including that signing this Counterpart shall bind whatever interest I may have or acquire in the Corporation's stock. and I hereby willfully agree to be bound by the terms and restrictions of said Shareholder Agreement.

_____

STATE OF WISCONSIN          )
                            ) ss.
_Brown_____ COUNTY          )

Personally came before me this _28th_ day of _July_____, 2014, the above named _Sara Aicher_____, to me known to be the person who executed the foregoing instrument and acknowledged the same.

_Adam G. Pritzl_____, Notary Public,
State of Wisconsin, _County of Brown_
My commission is permanent/expires: _November 10, 2017_

ADAM G. PRITZL
NOTARY
PUBLIC
STATE OF WISCONSIN

# EXHIBIT C

# EXHIBIT C

EXECUTION COPY

# SUBSCRIPTION AGREEMENT AND INVESTMENT LETTER
## FOR
## NuMale Wisconsin GB, S.C.
### a Wisconsin service corporation

July 23, 2014

Dr. Christopher Asandra, President
NuMale Wisconsin GB, S.C.
2600 North Mayfair Road
Suite 505
Wauwatosa, WI 53226

Dear Dr. Asandra:

I, the undersigned Adam Aicher, D.O. hereby subscribe for and agree to purchase seven thousand five hundred (7,500) shares of common stock (comprising 490 shares of "Class A Voting Common Stock" and 7,010 shares of "Class B Nonvoting Common Stock" (collectively, the "*Shares*")) representing an undivided ownership interest in NuMale Wisconsin GB, S.C., a service corporation organized under the laws of the State of Wisconsin (the "*Company*"), for the aggregate purchase price of THREE THOUSAND NINE HUNDRED THIRTY SEVEN AND 50/100 DOLLARS ($3,937.50) tendered herewith in immediately available funds, on the terms and conditions herein set forth.

AS AN INDUCEMENT to the Company to sell the Shares to me, by my execution and delivery of this letter (the "*Investment Letter*"), I hereby make and agree to all of the terms, provisions, representations, warranties and conditions contained in this Investment Letter.

1.    **LLC Subscription.** Pursuant to a Subscription Agreement and Investment Letter of even date herewith (the "*LLC Subscription*") I am simultaneously subscribing for and agreeing to purchase membership Units in NuMale Green Bay, LLC, a Wisconsin limited liability company (the "*Services Entity*") being formed for the purpose of providing managerial and other services to the "Green Bay Clinic" (as defined below) to be owned and operated by the Company. My statements, representations and warranties in the following Paragraphs of the LLC Subscription are incorporated by reference and made a part hereof: Paragraph #1 (accredited investor status), #3 (financial sophistication), #4 (investment intent) #11 (access to information), #12 (no reliance on projections), #13 (no general solicitation or advertising), #14 (residence; tax id) and #15 (access to professional advice).

2.    **Organic Documents; Shareholder Agreement .** I have received and read in its entirety copies of the Articles of Incorporation and Bylaws of the Company (together, the "*Organic Documents*"), and the form of Shareholder Agreement by and among the Company and its shareholders, including me. I agree to be bound by each and every term and provision of the Organic Documents and the Shareholder Agreement as the same may be amended from time to time in accordance with their respective terms.

3.    **Limited ability to transfer.** I understand and acknowledge that the Company Organic Documents and the Shareholder Agreement impose substantial limitations on my ability to transfer or dispose

Page 1 of 4

Initials: _____

of my Shares. I am also aware that the Shares have not been registered (nor is registration contemplated) under the Securities Act or under any state securities laws and, accordingly, that federal and state securities laws require that the Shares be held indefinitely unless they are subsequently registered under the Securities Act and applicable state securities laws, or unless, in the opinion of counsel for the Company, a sale or transfer may be made without registration thereunder. I understand that the Company is under no obligation, and has not given any commitment whatsoever, to register the Interest under the Securities Act, or to disseminate publicly information concerning the Company pursuant to the Securities Exchange Act of 1934 or any applicable state securities laws. Accordingly, I understand that I must bear the economic risk of an investment in the Company for an indefinite period of time.

4.   **LLC's and Members' purchase rights.**. I am aware that if I should propose to voluntarily transfer all or any portion of my Shares to a third party, and under certain circumstances if my Shares become the subject of an involuntary Transfer, the Company and the other Shareholders of the Company have the right to purchase any or all of my Shares at a predetermined price set forth in the Shareholder Agreement that may not reflect the fair market value of the Shares (or portion thereof) at the time of such Transfer. I agree that it is in the best interests of the shareholders (including me) and the Company that no person (including me) shall be permitted to own Shares in the Company without also owning a membership interest in the Services Entity, and vice versa. I AM AWARE THAT, UNDER THE SHAREHOLDER AGREEMENT, MY TRANSFER OR ATTEMPT TO TRANSFER OR OFFER OR DEEMED OFFER TO SELL ANY OR ALL OF MY MEMBERSHIP UNITS IN THE SERVICES ENTITY (WHETHER TO THE SERVICES ENTITY, OTHER MEMBERS OF THE SERVICES ENTITY OR A THIRD PARTY OR PARTIES) WILL CONSTITUTE AN OFFER BY ME TO SELL TO THE COMPANY AND THE OTHER SHAREHOLDERS ALL OF MY SHARES IN THE COMPANY AT THE PRICE AND ON THE TERMS PROVIDED IN THE SHAREHOLDER AGREEMENT.

5.   **No ability to affect management.** I understand and acknowledge that Dr. Christopher Asandra ("*Asandra*") and Dr. Carlos Feliciano ("*Feliciano*") will be the sole members of the Board of Directors ("*Board*") of the Company and that Asandra will be the President and Feliciano will be the Vice President of the Company, and that the Organic Documents and the Wisconsin Business Corporation Law ("*WBCL*") give Asandra and Feliciano, in their respective capacities, almost absolute discretion and control over the business and affairs of the Company. I also understand that I have not been elected or appointed as a director or officer of the Company. Accordingly, I will effectively have no ability whatsoever to influence or control the management or operations of the Company. I further understand and acknowledge that I will own a minority (49%) of the Voting Shares of the Company and Asandra and Feliciano, together, will own a majority (51%) of the Voting Shares. I further understand that although I will own a majority of the Nonvoting Shares, such Nonvoting Shares do not entitle me to vote on any matter that comes before the shareholders of the Company except with respect to certain matters for which voting rights may not be denied under the WBCL. Accordingly, I will have no means by which to effect a change in the Board of Directors of the Company or any other matter in which shareholders are entitled to vote.

6.   **No correlation between initial subscription amounts and percentage ownership.** I understand that (i) Asandra and Feliciano are each simultaneously acquiring a 12.5% ownership interest in the Company in exchange for a capital contribution of One Hundred Fifty-six and 25/100 Dollars ($156.25); and (ii) that the relative proportion of the capital contributed by me (approximately ninety-two and six tenths percent (92.6%) will be substantially greater than my seventy-five percent (75.0%) ownership interest in the Company represented by the Shares, which means that, even though I am contributing approximately 92.6% of the Company's initial capital, I will only be entitled to receive (or have allocated to me) 75.0% of the profits and losses of the Company, of any distributions made by the Company or of the Company's assets upon its dissolution.

7.   **Tax and other distributions not assured.** I understand that the Organic Documents provide

Page 2 of 4

Initials: ___

24662401_2.DOCX

for quarterly Tax Distributions (cash distributions for the purpose of enabling the Company's shareholders, including me, to pay federal and state income tax on Company income allocated to them) and that the amount of such Tax Distributions will be determined in accordance with a formula set forth in the Organic Documents. I acknowledge (i) that from time to time, the Company may not have sufficient cash with which to make Tax Distributions in full or at all, and (ii) that, even if made in full, the amount of such Tax Distributions may be insufficient to enable me to pay the federal and state income tax on Company income allocated to me if my personal tax situation places me in a higher "tax bracket" than that on which the formula is based and, in either case, that Company income may be allocated to me and result in a personal income tax liability to me without a corresponding distribution from the Company sufficient to pay any or all of such personal income tax liability. I further acknowledge that any other distributions from the Company will be determined in the sole and absolute discretion of the Board and that I have been advised not to expect, and do not expect, any other distributions from the Company.

8.    **Potential management conflicts-of-interest.** I understand that there may be conflicts of interest between or among the Company, the Services Entity and NuMale Corporation, a Nevada corporation (the "_Corporation_") and their respective officers, directors, shareholders, owners and managers, because (i) the Company's business, operations and management is and will be controlled almost exclusively by Asandra; (ii) Asandra is an officer, director and principal owner of the Corporation; and (iii) the Corporation is an owner and the sole Manager of the Services Entity and, as such, has and will have almost exclusive control over the business, operations and management of the Services Entity. Contracts, transactions or business arrangements between the Company and the Services Entity have not been and will not be negotiated at arm's length and may not be on terms as favorable to the Company as the Company might be able to obtain through arm's length negotiations with unaffiliated third parties. HOWEVER, I acknowledge that because of my ownership interest in the Services Entity (in the same proportion as my ownership interest in the Company), I will personally benefit from any such arrangement to the extent that it favors the Services Entity at the expense of the Company. I SPECIFICALLY AND EXPRESSLY CONSENT TO AND APPROVE OF ANY SUCH CONFLICTS OF INTEREST, THE CONTRACTS REFERRED TO ABOVE, AND OTHER CONTRACTS, TRANSACTIONS AND BUSINESS RELATIONSHIPS ESTABLISHED BY THE COMPANY BETWEEN THE COMPANY AND THE SERVICES ENTITY.

> **I RECOGNIZE, ACKNOWLEDGE AND AGREE THAT THE PURCHASE OF AN OWNERSHIP INTEREST IN THE COMPANY INVOLVES SUBSTANTIAL RISK, INCLUDING BUT NOT LIMITED TO THE RISK OF LOSS OF MY ENTIRE INVESTMENT, AND I HAVE TAKEN FULL COGNIZANCE OF AND UNDERSTAND ALL OF THE RISK FACTORS RELATED TO MY INVESTMENT IN THE COMPANY.  I ACKNOWLEDGE THAT THE RISKS DESCRIBED IN THIS INVESTMENT LETTER AND IN THE LLC SUBSCRIPTION ARE NOT THE ONLY RISKS THE COMPANY FACES OR WILL FACE AND THAT SOME OF SUCH RISKS HAVE NOT BEEN DESCRIBED HEREIN AND IN SOME CASES MAY BE UNKNOWN TO MANAGEMENT OR NOT ANTICIPATED TO OCCUR.**

I understand the meaning and legal consequences of the representations, warranties and statements made herein, and I acknowledge that the Company is relying on my representations, warranties and statements in making its determination to accept or reject this subscription. I agree to indemnify and hold harmless the Company, its directors, officers and each employee or agent thereof from and against any and all loss, damage or liability, including costs and attorneys' fees, due to or arising out of a breach of any representation or warranty or inaccuracy of any statement made by me in this Investment Letter. I agree to execute and deliver such other and further documents as may be reasonably requested by the Company to give effect to the covenants and agreements herein.

Initials: _____

EXECUTION COPY

_____

Adam Aicher, D.O.

Address:

24662401_2.DOCX

Initials: _____

# EXHIBIT D

# EXHIBIT D

EXECUTION COPY

## CONSENT RESOLUTION OF
## THE SHAREHOLDERS OF
## ATTACHED EXHIBIT "A"

The undersigned, being the managing members and/or owners (the "*Managers*") of all the entities listed on Exhibit "A" (the "*Entities*"), hereby unanimously consent, to the following actions:

**WHEREAS**, the Entities listed on Exhibit "A" wish to transfer all ownership interest that Christopher Asandra, MD has to Carlos Feliciano, MD.

**WHEREAS**, the Entities listed on Exhibit "B" wish to transfer all ownership interest that Carlos Feliciano, MD has to Christopher Asandra, MD.

**WHEREAS**, the Entities listed on Exhibit "C" will have a final tax return filed and that entity will be closed with the state of California.

**WHEREAS**, the Entities listed on Exhibit "D" wish to transfer all ownership interest that Christopher Asandra, MD has to NuMale Corporation.

**WHEREAS**, the Entities listed on Exhibit "E" wish to transfer all ownership interest that Christopher Asandra, MD has to NuMale Medical Center, LLC.

**WHEREAS**, the Entity named Asandra NuMale Nevada PLLC will be changed to Feliciano NuMale Nevada PLLC.

**IN WITNESS WHEREOF**, the undersigned execute this Consent Resolution effective as of December 31, 2020 with the signatures appearing below.

*Chris Asandra*
Chris Asandra (Dec 31, 2020 10:53 PST)

Christopher Asandra, MD

*Brad Palubicki*
Brad Palubicki (Dec 31, 2020 11:07 PST)

Brad Palubicki

Carlos Feliciano (Dec 31, 2020 12:06 CST)

Carlos Feliciano, MD

*Justin Pulliam*
Justin Pulliam (Dec 31, 2020 10:55 PST)

Justin Pulliam

**EXHIBIT "A"**

NuMale New Mexico SC
NuMedical, SC
NuMale Colorado SC
NuMale Wisconsin GB SC
NuMale Oklahoma SC
NuMale Chicago LLC
NuMale North Carolina PLLC
Asandra NuMale Nevada PLLC
NuMale Florida TB, PLLC
NuMale Nebraska, LLC

**EXHIBIT "B"**

Asandra MD PC

**EXHIBIT "C"**

NuMale Beverly Hills LLC

**EXHIBIT "D"**

NuMale Corporation
NuMale Albuquerque, LLC
NuMale Charlotte LLC
NuMale Green Bay LLC
NuMale Denver LLC
NuMale OKC LLC
NuFemme Milwaukee, LLC
NuMale Omaha LLC
NuMale Tampa LLC
Nevada NuMale LLC
NMC Illinois, LLC

**EXHIBIT "E"**

NuMale Medical Center, LLC

# Board Resolution to Change all entities with Forms 12.31.2020

Final Audit Report                                                2020-12-31

| | |
|---|---|
| Created: | 2020-12-31 |
| By: | Gabby de la Torre (gabby@numale.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAlH5eM28bEEH5QmXNCh6OS-OoLbnIStie |

## "Board Resolution to Change all entities with Forms 12.31.2020" History

📄 Document created by Gabby de la Torre (gabby@numale.com)
   2020-12-31 - 6:48:49 PM GMT- IP address: 24.234.173.44

📧 Document emailed to Chris Asandra (drchris@asandramd.com) for signature
   2020-12-31 - 6:50:19 PM GMT

📄 Email viewed by Chris Asandra (drchris@asandramd.com)
   2020-12-31 - 6:51:45 PM GMT- IP address: 76.87.140.255

✍ Document e-signed by Chris Asandra (drchris@asandramd.com)
   Signature Date: 2020-12-31 - 6:53:53 PM GMT - Time Source: server- IP address: 76.87.140.255

📧 Document emailed to Justin Pulliam (justinp@numale.com) for signature
   2020-12-31 - 6:53:55 PM GMT

📄 Email viewed by Justin Pulliam (justinp@numale.com)
   2020-12-31 - 6:54:53 PM GMT- IP address: 47.152.217.228

✍ Document e-signed by Justin Pulliam (justinp@numale.com)
   Signature Date: 2020-12-31 - 6:55:17 PM GMT - Time Source: server- IP address: 47.152.217.228

📧 Document emailed to Carlos Feliciano (dr.feliciano@numale.com) for signature
   2020-12-31 - 6:55:19 PM GMT

📄 Email viewed by Carlos Feliciano (dr.feliciano@numale.com)
   2020-12-31 - 7:06:35 PM GMT- IP address: 50.249.203.164

✍ Document e-signed by Carlos Feliciano (dr.feliciano@numale.com)
   Signature Date: 2020-12-31 - 7:06:56 PM GMT - Time Source: server- IP address: 50.249.203.164

 Adobe Sign

Document emailed to Brad Palubicki (brad@numale.com) for signature
2020-12-31 - 7:06:58 PM GMT

Email viewed by Brad Palubicki (brad@numale.com)
2020-12-31 - 7:07:21 PM GMT- IP address: 50.249.203.164

Document e-signed by Brad Palubicki (brad@numale.com)
Signature Date: 2020-12-31 - 7:07:38 PM GMT - Time Source: server- IP address: 50.249.203.164

Agreement completed.
2020-12-31 - 7:07:38 PM GMT

Adobe Sign

# EXHIBIT E

# EXHIBIT E

# BYLAWS
## OF
## NUMALE WISCONSIN GB, S.C.,
## A WISCONSIN SERVICE CORPORATION

## ARTICLE I.
## OFFICES; REGISTRATION AND RECORDS

**Section 1.01   Business Offices.**  The principal business office (the "*Principal Office*") of NuMale Wisconsin GB, S.C. (the "*Corporation*") shall be located at 2600 N. Mayfair Rd., Suite 505, Wauwatosa, Wisconsin 53226, or such other location in the State of Wisconsin as the Board of Directors (the "*Board*") may designate from time to time.

**Section 1.02   Registrations.**  The Corporation shall maintain such registrations and registered offices as may be necessary from time to time to conduct its business in the State of Wisconsin.

**Section 1.03   Records.**  The business and corporate records of the Corporation shall be maintained at the Principal Office established under Section 1.01.

## ARTICLE II.
## SHAREHOLDERS

**Section 2.01   Shareholder Qualifications.**  Each shareholder of the Corporation must at all times meet the qualifications specified in Section 2.2 of the Articles of Incorporation (as may be amended from time to time, the "*Articles*").  A natural person who is not so qualified may not have any part in the ownership or control of the Corporation.

**Section 2.02   Annual Meeting.**  The annual meeting of shareholders, for the purpose of electing Directors and for the transaction of such other business as may come before the meeting, shall be held in the month of December at a date and hour to be fixed by resolution by or under the authority of the Board.  If the day fixed for the annual meeting is a legal holiday in the State of Wisconsin, such meeting shall be held on the next succeeding business day.  If the election of Directors shall not be held on the day fixed or otherwise provided herein for the annual meeting of shareholders, or any adjournment thereof, the Board may cause the election to be held at a special meeting of shareholders as soon thereafter as convenient.

**Section 2.03   Special Meetings.**  Special meetings of shareholders may be called by or at the request of the President, the Board, or any other officer whom the Board may so authorize from time to time, and shall be called by the President or Secretary upon the written demand(s), signed, dated, and delivered to the Corporation, of the holders of not less than Ten Percent (10%) of all votes entitled to be cast on any issue proposed to be considered at the special meeting.

Only business within the purpose(s) described in the special meeting notice may be conducted at the meeting.

        **Section 2.04**   **Place of Meeting**.  The Board may designate any place either within or outside the State of Wisconsin as the place of meeting for the annual meeting or for any special meeting called by the Board.  A waiver of notice signed by all shareholders entitled to vote may designate any place for the holding of any meeting.  If no designation is made, or if a special meeting is called otherwise than by the Board, the place of meeting shall be the Principal Office, or if none, the Corporation's registered office; but any meeting may be adjourned to reconvene at any place designated by vote of a majority of the shares represented thereat.

        **Section 2.05**   **Notice of Meetings**.

        (a)    <u>Required Notice</u>.  Written notice stating the place, day, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be communicated not less than five (5) nor more than sixty (60) days before the date of the meeting (unless a different time is provided by law or the Articles), by or at the direction of the Secretary or other officer or person(s) calling the meeting, to each holder of record of shares of the Corporation's Class A (Voting) Common Stock ("<u>*Voting Shares*</u>") entitled to vote at such meeting and, to the extent required to by law or the Articles) any other shareholder, including holders of shares of the Corporation's Class B (Non-voting) Common Stock ("<u>*Non-voting Shares*</u>" and, sometimes referred to herein together with Voting Shares as "<u>*Shares*</u>").  Notice may be communicated in person, by telephone, e-mail, facsimile, or other form of wire or wireless communication, or by mail or private carrier.  If mailed, such notice shall be effective when deposited in the United States mail, addressed to each shareholder at his or her address as it appears on the stock record books of the Corporation, with postage thereon prepaid.  Notice provided in any other manner is effective when received.

        (b)    <u>Adjourned Meeting</u>.  If any shareholder meeting is adjourned to a different date, time, or place, notice need not be given of the new date, time, and place if such information is announced at the meeting before adjournment.  However, if a new record date for the adjourned meeting is or must be fixed, then notice must be given pursuant to the requirements of Paragraph (a) of this Section 2.05 to those persons who are shareholders as of the new record date.

        (c)    <u>Waiver of Notice</u>.  Whenever any notice whatever is required to be given to any shareholder of the Corporation, a waiver thereof in writing, signed at any time whether before or after the time of meeting by the shareholder entitled to such notice, and delivered to the Corporation for inclusion in the corporate records, shall be deemed equivalent to the giving of such notice; provided that such waiver in respect to any matter of which notice is required under any provision of the Wisconsin Business Corporation Law, Chapter 180 of the Wisconsin Statutes (as amended from time to time, the "<u>*WBCL*</u>") shall contain the same information as would have been required to be included in such notice, except the time and place of meeting.  A shareholder's attendance at a meeting, in person or by proxy, waives objection to the following:

-2-

        (1)     Lack of notice or defective notice of the meeting, unless the share-holder at the beginning of the meeting or promptly upon arrival objects to holding the meeting or transacting business at the meeting.

        (2)     Consideration of a particular matter at the meeting that is not with-in the purpose(s) described in the meeting notice, unless the shareholder objects to con-sidering the matter when it is presented.

    **Section 2.06   Fixing of Record Date.**  For the purpose of determining shareholders en-titled to notice of or to vote at any meeting of shareholders or adjournment thereof, or sharehold-ers entitled to receive payment of any distribution or dividend, or in order to make a determina-tion of shareholders for any other proper purpose, the Board may fix in advance a date as the record date, such date to be not more than 70 days prior to the date on which the particular action requiring such determination of shareholders is to be taken.  If no record date is so fixed for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, such determination shall be made at the close of business on the day before:

        (a)     With respect to an annual meeting or any special meeting called by the Board or any person specifically authorized by the Board or these Bylaws to call such meeting, the date the first notice is communicated to shareholders;

        (b)     With respect to a special meeting demanded by the shareholders, the date the Corporation receives the first such written demand; or

        (c)     With respect to actions taken in writing without a meeting (pursuant to Section 2.12), the date the Corporation receives the first such written consent.

If no record date is so fixed for the determination of shareholders entitled to receive a distribution or dividend (other than a distribution involving a purchase or other redemption of shares), such determination shall be made at the close of business on the date of adoption of the Board resolution declaring such distribution or dividend.  When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this Section 2.06 such determination shall apply to any adjournment thereof unless the Board fixes a new record date.  A new record date must be set if a meeting is adjourned to a date more than 120 days after the date fixed for the original meeting.

    **Section 2.07   Quorum and Voting Requirements.**  A majority of the votes entitled to be cast by shares entitled to vote on a matter, represented in person or by proxy, shall constitute a quorum of that voting group with respect to such matter at a meeting of shareholders, and a majority of votes cast on a matter for which a quorum exists shall be decisive of any motion or election, unless a different number of affirmative votes (for quorum or voting purposes) is required by law or by the Articles or these Bylaws.

    **Section 2.08   Conduct of Meetings.**  In descending order, the President, or a Vice Pres-ident in the order provided in Section 4.06, and in their absence, any person chosen by the

-3-

shareholders present, shall call the meeting to order and shall act as chairperson of the meeting. The Secretary shall act as secretary of all meetings of the shareholders, but in the absence or in lieu thereof, the presiding officer may appoint any other person to act as secretary of the meeting.

Section 2.09    **Proxies.**    At all meetings of shareholders, a shareholder entitled to vote may vote in person or by proxy appointed in writing by the shareholder or by his or her duly authorized attorney-in-fact.  Such proxy appointment shall be filed with the Secretary or other officer or agent of the Corporation authorized to tabulate votes, before or at the time of the meeting.  Unless otherwise provided in a legally irrevocable proxy appointment form, such appointment may be revoked at any time by written notice filed in like manner or by oral notice at the meeting.  The presence of a shareholder who has filed a proxy appointment shall not of itself constitute a revocation of same.  No proxy appointment shall be valid after 11 months from the date of its execution, unless otherwise provided in the appointment form.  The Board shall have the power to make rules, consistent with the WBCL, as to the validity and sufficiency of proxy appointments.  In no event shall a proxy to vote any shares of the Corporation be given to a person who is a health care professional, as defined by the WBCL.

Section 2.10    **Voting of Shares.**    Each outstanding share shall be entitled to one vote upon each matter submitted to a vote at a meeting of shareholders, except to the extent that the voting rights of the shares of any class or classes are enlarged, limited, or denied by the Articles or the WBCL.

Section 2.11    **Voting of Shares by Certain Holders.**

(a)    Shares held by a personal representative, guardian, conservator, trustee in bankruptcy, receiver, or assignee for the benefit of creditors may be voted by such fiduciary, either in person or by proxy, without a transfer of such shares into such fiduciary's name; provided, that there is filed with the Secretary before or at the time of the meeting proper evidence of the fiduciary's incumbency and the number of shares held.  Shares standing in the name of a fiduciary may be voted by such person, either directly or by proxy.

(b)    A shareholder whose shares are pledged shall be entitled to vote such stock until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.

(c)    Shares held by a person who is a minor or under other legal disability may be voted by such person directly or by proxy, and no such vote shall be subject to disaffirmance or avoidance unless prior thereto the Secretary of the Corporation has written notice of or actual knowledge that such shareholder is under disability or that legal proceedings have been commenced for appointment of a guardian.

(d)    Shares registered in the names of two or more individuals as joint tenants may be voted directly or by proxy by any one or more of such individuals if either:  no other such individual or his or her legal representative is present and claims the right to participate in

-4-

the voting of such shares, or prior to the vote files with the Secretary a contrary written voting authorization or direction or written denial of authority of the individual present or signing the proxy appointment proposed to be voted; or all other such individuals are deceased and the Secretary has no actual knowledge that some person other than the survivor has been adjudicated the successor to the interests of those deceased.

       **Section 2.12    Action Without Meeting.**  Any action required or permitted to be taken at a meeting of the shareholders may be taken without a meeting if one or more consents in writing, setting forth the action so taken and delivered to the Corporation for inclusion in the corporate records, shall be signed by all of the shareholders entitled to vote.  Any action taken is effective when consents representing the required number of shares are delivered to the Corporation, unless the consent specifies a different effective date.  A consent has the effect of a meeting vote and may be described as such in any document.  If the action to be taken requires that notice be given to nonvoting shareholders, the Corporation shall give the nonvoting shareholders written notice of the proposed action at least 10 days before the action is taken, which notice shall comply with all legal requirements and contain or be accompanied by the same material that would have been required if a formal meeting had been called to consider the action.

## ARTICLE III.
## BOARD OF DIRECTORS

       **Section 3.01    General Powers and Number.**  All corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, the Board.  The initial number of Directors shall be not less than one and not more than five.  Such number may be increased or decreased from time to time, but no decrease shall have the effect of shortening the term of an incumbent Director.

       **Section 3.02    Election, Tenure, and Qualifications.**  Directors shall be elected by a majority of the votes cast by shareholders entitled to vote with respect thereto.  Each Director shall hold office until the next annual meeting of shareholders and until his or her successor shall have been duly elected, or until his or her prior death, resignation, or removal.  Any Director may be removed from office by a majority of the votes cast at a meeting of shareholders called and noticed for that purpose.  Unless the Articles provide to the contrary, such removal may be with or without cause.  If a Director is elected by a voting group of shareholders, only the share-holders of that voting group may participate in the vote of removal.  A Director may resign at any time by filing his or her written resignation with the President or the Secretary.  Directors need not be residents of the State of Wisconsin.  Each Director of the Corporation must at all times be a qualified shareholder of the Corporation.

       **Section 3.03    Regular Meetings.**  A regular meeting of the Board shall be held without notice and shall occur immediately after the annual meeting of shareholders and each adjourned session thereof, at the same place as the meeting which precedes it or at such other suitable place as may be announced at the preceding shareholders meeting.  The Board by resolution may

provide the time and place, either within or outside the State of Wisconsin, for the holding of additional regular meetings without other notice than such resolution.

Section 3.04    **Special Meetings.**  Special meetings of the Board may be called by or at the request of the President, the Secretary, or any Director.  The person(s) calling any special meeting may fix any place either within or outside the State of Wisconsin as the place for holding such meeting, and if no other place is fixed, the place of meeting shall be the Corporation's principal office in the State of Wisconsin.

Section 3.05    **Attendance by Communications Technology.**  The Board may permit any or all Directors to participate in a regular or special meeting of the Board by, or to conduct the meeting through the use of, telephone or any other means of communication by which either:

(a)    All participating Directors may simultaneously hear each other during the meeting; or

(b)    All communication during the meeting is immediately transmitted to each participating Director, and each participating Director is able to immediately send messages to all other participating Directors.

All participating Directors shall be informed that a meeting is taking place at which official business may be transacted.  A Director participating in a meeting by any such means is deemed to be present in person at the meeting.

Section 3.06    **Notice and Waiver of Notice.**  Written notice of each special meeting of the Board shall be communicated in person, or by telegraph, teletype, facsimile, or other form of wire or wireless communication, at least 24 hours prior thereto, or by mail or private carrier, at least three days prior thereto, to each Director at his or her business address or at such other address as the Director shall have designated in writing filed with the Secretary.  If mailed, such notice shall be effective when deposited in the United States mail so addressed, with postage thereon prepaid.  Notice provided in any other manner is effective when received.  Whenever any notice whatever is required to be given to any Director of the Corporation, a waiver thereof in writing, signed at any time whether before or after the time of meeting by the Director entitled to such notice, and delivered to the Corporation for inclusion in the corporate records, shall be deemed equivalent to the giving of such notice.  A Director's attendance at or participation in a meeting waives any required notice to him or her of the meeting unless the Director at the beginning of the meeting or promptly upon his or her arrival objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.  Neither the business to be transacted at nor the purpose of any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 3.07    **Quorum and Voting Requirements.**  A majority of the number of Directors set forth in Section 3.01 shall constitute a quorum for the transaction of business at any meeting of the Board, but a majority of the Directors present, though less than such quorum, may adjourn the meeting from time to time without further notice.  The affirmative vote of a majority

-6-

of Directors present at a meeting at which a quorum is present shall be the act of the Board, except where a greater number of affirmative votes is required by law or these Bylaws.

**Section 3.08    Conduct of Meetings.**  In descending order, the President, or a Vice President in the order provided in Section 4.06 hereof, and in their absence, any person chosen by the Directors present, shall call the meeting to order and shall act as chairperson of the meeting.  The Secretary shall act as secretary of all meetings of the Board, but in the absence or in lieu thereof, the presiding officer may appoint any other person to act as secretary of the meeting.  If requested by a Director, minutes of any regular or special meeting shall be prepared and distributed to each Director.

**Section 3.09    Vacancies.**  Any vacancy occurring in the Board, including a vacancy created by an increase in the number of Directors, may be filled by the shareholders or the Board.  If the Directors remaining in office constitute fewer than a quorum of the Board, the Directors may fill a vacancy by the affirmative vote of all Directors remaining in office.  If the vacant office was held by a Director elected by a voting group of shareholders, only the holders of shares of that voting group may vote to fill the vacancy if it is filled by shareholders; and only the remaining Directors elected by that voting group may vote to fill the vacancy if it is filled by the Directors.

**Section 3.10    Compensation and Expenses.**  The Board, irrespective of the personal interest of any of its members, may fix the compensation of Directors and provide for payment or reimbursement of expenses incurred in the performance of the Directors' duties.  The term "compensation" shall include pensions, disability or death benefits, and all other types of benefits or payments to Directors and to their estates, families, dependents, or other beneficiaries, on account of present or past services rendered.

**Section 3.11    Director's Assent.**  A Director of the Corporation who is present and is announced as present at a meeting of the Board, at which action on any corporate matter is taken, shall be deemed to have assented to the action taken unless:

(a)    The Director objects at the beginning of the meeting or promptly upon his or her arrival to holding the meeting or transacting business at the meeting;

(b)    The Director dissents or abstains from an action taken and minutes of the meeting are prepared that show such dissent or abstention;

(c)    The Director delivers written notice of his or her dissent or abstention to the presiding officer of the meeting before its adjournment or to the Corporation immediately after adjournment of the meeting; or

(d)    The Director dissents or abstains from an action taken, minutes of the meeting are prepared that fail to show such dissent or abstention, and the Director delivers to the Corporation written notice of that failure promptly after receiving the minutes.

BYLAWS/NUMALE WISCONSIN GB, S.C.
July 1, 2014
24663415_2.DOC

Such right to dissent or abstain shall not apply to a Director who voted in favor of the action taken.

**Section 3.12   Committees.**  The Board, by resolution adopted by the affirmative vote of a majority of all the Directors then in office, may create one or more committees, each to consist of two or more Directors, which to the extent provided in the resolution (as initially adopted and as thereafter supplemented or amended by further resolution adopted by a like vote) shall have and may exercise the authority of the Board; except that a committee may not:

(a)      Authorize distributions.

(b)      Approve or propose to shareholders action that the WBCL requires be approved by shareholders.

(c)      Fill vacancies on the Board or any of its committees, except that the Board may provide by resolution that any vacancies on a committee shall be filled by the affirmative vote of a majority of the remaining committee members.

(d)      Amend the Articles.

(e)      Adopt, amend, or repeal Bylaws.

(f)      Approve a plan of merger not requiring shareholder approval.

(g)      Authorize or approve reacquisition of shares, except according to a formula or method prescribed by the Board.

(h)      Authorize or approve the issuance, sale, or contract for sale of shares, or determine the designation and relative rights, preferences, and limitations of a class or series of shares, except within limits prescribed by the Board.

The Board may elect one or more of its members as alternate members of any such committee, who may take the place of any absent member or members at any meeting of such committee upon request by the Chairperson of the Board (if any), the President, or the chairperson of such meeting. The rules of procedure set forth in Sections 3.05 through 3.08, 3.11, and 3.13 shall apply to committees of the Board and to committee members in the same manner as they apply to the Board itself and to Directors (for these purposes, special meetings may be called by or at the request of any of the officers named in Section 3.04 or the chairperson of the committee, and a quorum of a committee shall consist of a majority of the number of Directors appointed to serve on the committee). In all other respects each committee shall fix its own rules governing the conduct of its activities and shall make such report of its activities to the Board as the Board may request. Unless otherwise provided by the Board in creating the committee, a committee may employ counsel, accountants, and other consultants to assist it in the exercise of its authority. The creation of a committee, delegation of authority to a committee, or action by a committee does not relieve the Board or any of its members of any responsibility imposed upon the Board or its members by law.

-8-

Unless otherwise provided by the Board, members of a committee shall serve at the pleasure of the Board.

      **Section 3.13    Action Without Meeting.**  Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if one or more consents in writing, setting forth the action so taken and delivered to the Corporation for inclusion in the corporate records, shall be signed by all of the Directors then in office.  Any action taken is effective when the last Director signs the consent, unless the consent specifies a different effective date.  A consent signed hereunder has the effect of a unanimous vote taken at a meeting at which all Directors were present, and may be described as such in any document.

# ARTICLE IV.
## OFFICERS

      **Section 4.01    Officer Qualifications.**  Each Officer of the Corporation must at all times be a qualified shareholder of the Corporation.

      **Section 4.02    General Powers.**  The principal officers of the Corporation shall be its President and any such other officer(s) as the Board shall designate, from time to time and for such periods of time as the Board shall order, including but not limited to one or more Vice Presidents (the number and functional designations, if any, to be determined by the Board from time to time), a Secretary, and a Treasurer, who shall have such authority and responsibilities as are usual to their respective offices, as more fully set forth below, and any further duties assigned by the Board; provided that the duties of any particular office may be transferred to and vested in such other officer(s) as the Board shall designate, from time to time and for such periods of time as the Board shall order.  To the extent these Bylaws specify the powers and duties of any office and there is no incumbent therein, or if these Bylaws do not then provide for such officer, said powers and duties shall be added to those of the President.  Any two or more offices may be held by the same person.

      **Section 4.03    Appointment and Term of Office.**  The principal officers shall be appointed by the Board at its first meeting held after each annual meeting of shareholders.  If the appointment of officers does not take place at such meeting, such appointment shall be made as soon thereafter as convenient.  Each officer shall hold office until his or her successor shall have been duly appointed or until his or her prior death, resignation, or removal.  A vacancy in any principal office may be filled by the Board at any time.

      **Section 4.04    Resignation and Removal.**  An officer may resign at any time by filing his or her written resignation with the Corporation, effective immediately unless such notice specifies a later effective date and the Corporation accepts the later date.  Any officer may be removed by the Board with or without cause and notwithstanding the contract rights, if any, of the person removed.  An officer's resignation or removal is subject to such remedies as may be

provided by any contract between the officer and the Corporation or as may be otherwise provided by law.  Appointment shall not of itself create contract rights.

Section 4.05   **President.**  The President shall be the chief executive officer of the Corporation and, subject to the control and direction of the Board, shall exercise general supervision and control over all of the business and affairs of the Corporation.  In the absence of the Chairperson of the Board (if any), he or she shall preside at all meetings of the shareholders and of the Board.  The President shall have authority, subject to such rules as may be prescribed by the Board, to appoint such agents and employees of the Corporation as may be deemed necessary, to prescribe their powers, duties, and compensation, and to delegate authority to them and to the other officers of the Corporation.  Such appointed agents and employees shall hold office at the discretion of the President.  He or she shall have authority on behalf of the Corporation to sign, execute, and acknowledge all documents or instruments necessary or proper to be executed in the course of the Corporation's regular business, or which shall be authorized by resolution of the Board.

Section 4.06   **Vice Presidents.**  In the absence of the President or in the event of his or her death, inability, or refusal to act, or if for any reason it shall be impracticable for the President to act personally, the Vice President (if any)--or if there is more than one Vice President, the Vice Presidents in the order designated by the Board, or in the absence of any designation, in the order of their appointment--shall perform the duties of the President and, when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  The execution of any instrument of the Corporation by any Vice President shall be conclusive evidence, as to third parties, of such Vice President's authority to act in the President's stead.

Section 4.07   **Secretary.**  In addition to those duties elsewhere assigned to him or her in these Bylaws, the Secretary (if any) shall:  keep or cause to be kept any minutes of the meetings of the shareholders and of the Board in one or more books provided for that purpose; see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; be custodian of the corporate records; keep or arrange for the keeping of a register of the post office address of each shareholder which shall be furnished to the Secretary by such shareholder; and have general charge of the stock transfer books of the Corporation.

Section 4.08   **Treasurer.**  The Treasurer (if any) shall:  have charge and custody of and be responsible for all funds and securities of the Corporation; receive and give receipt for moneys due and payable to the Corporation from any source whatsoever; and deposit all such moneys in the name of the Corporation in such banks, trust companies, or other depositories as shall be selected in accordance with the provisions of Article V of these Bylaws.  If required by the Board, the Treasurer shall give a bond for the faithful discharge of his or her duties in such sum and with such surety or sureties as the Board shall determine.

Section 4.09   **Assistant and Acting Officers.**  The Board and the President shall have the power to appoint any person to act as assistant to any officer, or to perform the duties of such officer whenever for any reason it is impracticable for such officer to act personally; and such

-10-

assistant or acting officer or other agent so appointed by the Board or President shall have the power to perform all the duties of the office to which he or she is so appointed to be assistant, or as to which he or she is so appointed to act, except as such power may be otherwise defined or restricted by the Board or the President.

      **Section 4.10   Compensation.**  The salary and other compensation of each principal officer shall be fixed from time to time by or under the authority of the Board or a duly authorized committee thereof, and no officer shall be prevented from receiving such compensation by reason of the fact that he or she is also a Director of the Corporation.

## ARTICLE V.
## CONTRACTS, LOANS, AND BANKING TRANSACTIONS

      **Section 5.01   Contracts.**  In addition to or notwithstanding the authorities otherwise conferred upon the officers of the Corporation, as set forth in the preceding Article, the Board may authorize any officer(s) or agent(s) to enter into any contract or execute or deliver any instrument in the name of and on behalf of the Corporation, and such authorization may be general or confined to specific instances.

      **Section 5.02   Loans.**  No indebtedness for borrowed money shall be contracted on behalf of the Corporation and no evidences of such indebtedness shall be issued in its name unless authorized by or under the authority of a resolution of the Board.  Such authorization may be general or confined to specific instances.  The Corporation may not lend money to or guarantee the obligation of a Director unless either of the following occurs:

            (a)   The particular loan or guarantee is approved by a majority of the votes of all outstanding voting shares of all classes, voting as a single group, excluding the votes of those shares owned by or voted under the control of the benefited Director.

            (b)   The Board determines that the loan or guarantee benefits the Corporation and either approves the specific loan or guarantee or a general plan authorizing loans and guarantees.

The preceding sentence, including Paragraphs (a) and (b), does not apply to an advance to a Director that is permitted by Article VIII of these Bylaws or that is made to defray expenses incurred by the Director in the ordinary course of the Corporation's business.

      **Section 5.03   Banking Transactions.**  All checks, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officers or agents of the Corporation and in such manner as shall from time to time be determined by or under the authority of a resolution of the Board.  All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the

Corporation in such banks, trust companies, or other depositories as may be selected by or under the authority of a resolution of the Board.


# ARTICLE VI.
## DISTRIBUTIONS TO SHAREHOLDERS

**Section 6.01   General Condition on Distributions.**  Subject to any restriction in the Articles, the Board may authorize distributions to the Corporation's shareholders, including any distribution for the purpose of purchase, redemption, or other acquisition of the Corporation's shares.  No distribution may be made if, after giving it effect:

(a)     The Corporation would not be able to pay its debts as they become due in the normal course of business.

(b)     The Corporation's total assets would be less than the sum of its total liabilities plus, unless the Articles permit otherwise, the amount that would be needed to satisfy all preferential rights upon dissolution of shareholders whose rights are superior to those receiving the distribution, if the Corporation were to be dissolved at the time of the distribution.

The Board may base a determination that the preceding sentence, including Paragraphs (a) and (b), does not prohibit a distribution on financial statements and other financial data prepared on the basis of accounting practices and principles that are reasonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances.

Notwithstanding the foregoing, the Board shall make tax distributions (the "*Tax Distribution*")on or before the applicable tax distribution dates, which shall be, January 15, April 15, June 15, and September 15 of each fiscal year (a "*Tax Distribution Date*").  The aggregate amount of the Tax Distribution made with respect to any given Tax Distribution Date shall be the product of (i) the Corporation's estimated federal taxable income under the provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), for the fiscal Period ending on the last day of the calendar month immediately preceding the Tax Distribution Date and commencing on the first day of the calendar month that includes the immediately previous Tax Distribution Date; multiplied by (ii) the applicable tax rate, which shall be the highest combined marginal income tax rate for federal and Wisconsin purposes for the fiscal period at issue applicable to individuals, assuming in determining the tax rate that state taxes are deductible for federal purposes, subject to the maximum applicability of the phase out of itemized deductions contained in Section 68 of the Code, provided, that when determining the tax rate, a separate tax rate shall be determined for ordinary income and long-term capital gains, respectively, if the Corporation has both types of income..  Notwithstanding the foregoing, to the extent the Corporation has had an estimated federal taxable loss for any prior fiscal period in that fiscal year, the amount in clause (i), above, shall be reduced by that portion of the loss remaining after reducing taxable income for prior fiscal periods in the fiscal year for the loss.  Each Shareholder shall receive a Tax Distribution proportional to the amount of federal taxable income to be allocated to such Shareholder.

-12-

**Section 6.02   Effective Date of Distribution.**  Except as provided in Section 6.03, the effect of a distribution for purposes of the general condition set forth in Section 6.01 is measured as of the following dates:

        (a)   In the case of distribution by purchase, redemption, or other acquisition of the Corporation's shares, as of the earlier of the date on which money or other property is transferred or corporate debt is incurred, or the date on which the shareholder ceases to be a shareholder with respect to the acquired shares.

        (b)   In the case of any other distribution of indebtedness, as of the date on which the indebtedness is distributed.

        (c)   In all other cases, as of the date on which the distribution is authorized if payment occurs within 120 days thereafter, and if not, the date on which payment is made.

**Section 6.03   Indebtedness.**  Indebtedness of the Corporation, including indebtedness issued as a distribution, is not considered a liability for purposes of determinations under Section 7.01 if its terms provide that payment of principal and interest are made only if and to the extent that payment of a distribution to shareholders could then be made under that Section.  If the indebtedness is issued as a distribution, each payment of principal or interest is treated as a distribution, the effect of which is measured on the date on which payment is actually made.  The Corporation's indebtedness to a shareholder incurred because of a distribution made in accordance herewith is at parity with the Corporation's indebtedness to its general, unsecured creditors, except to the extent subordinated by agreement.

## ARTICLE VII.
## INDEMNIFICATION

**Section 7.01   Indemnification for Successful Defense.**  Except as limited in the Articles, the Corporation shall indemnify a Director, Officer, or other employee of the Corporation, upon his or her written request, to the extent that he or she has been successful on the merits or otherwise in the defense of a proceeding, for all reasonable expenses incurred in the proceeding if such individual was a party because he or she is or was a Director, officer, or other employee of the Corporation.  For purposes of this Article, the term "proceeding" means any threatened, pending, or completed civil, criminal, administrative, or investigative action, suit, arbitration, or other proceeding, whether formal or informal; "expenses" include fees, costs, charges, disbursements, attorney fees, and any other expenses incurred in connection with the proceeding; and service as a "Director, officer, or other employee" includes (inter alia) service at the Corporation's request for any other corporation, partnership, trust, or employee benefit plan.

**Section 7.02   Other Indemnification.**  Except as limited in the Articles, in cases not included under Section 7.01 the Corporation shall indemnify a Director or Officer, upon his or her written request, against liability incurred by the Director or Officer in a proceeding to which

-13-

such individual was a party because he or she is or was a Director or Officer of the Corporation, unless liability was incurred because the Director or Officer breached or failed to perform a duty owed to the Corporation, and the breach or failure to perform constitutes any of the following:

       (a)     A willful failure to deal fairly with the Corporation or its shareholders in connection with a matter in which the Director or Officer has a material conflict of interest.

       (b)     A violation of criminal law, unless the Director or Officer had reasonable cause to believe that his or her conduct was lawful, or no reasonable cause to believe that his or her conduct was unlawful.

       (c)     A transaction from which the Director or Officer derived an impersonal personal profit.

       (d)     Willful misconduct.

The termination of a proceeding by judgment, order, settlement, or conviction, or upon a plea of no contest or the equivalent, does not by itself create a presumption that indemnification of the Director or Officer is not required hereunder.  For purposes of this Article, the term "liability" includes the obligation to pay a judgment, settlement, penalty, assessment, forfeiture, or fine, including an excise tax assessed with respect to an employee benefit plan, and reasonable expenses.

       **Section 7.03**   **Determination of Right to Recovery.**  Unless otherwise provided by the Articles or by written agreement between the Corporation and the Director or Officer seeking indemnification under Section 7.02, the latter shall select the means for determining his or her right to indemnification from among the alternatives set forth in the WBCL.  If it is determined that indemnification is required hereunder, the Corporation also shall pay all reasonable expenses incurred by the Director or Officer in connection with the determination process described in this Section 7.03.

       **Section 7.04**   **Advance of Expenses.**  Upon written request by a Director or Officer who is a party to a proceeding, the Corporation may pay or reimburse his or her reasonable expenses as incurred if the Director or Officer provides the Corporation with both of the following:

       (a)     A written affirmation of his or her good faith belief that he or she has not breached or failed to perform his or her duties to the Corporation.

       (b)     A written undertaking, executed personally or on his or her behalf, to repay the allowance (and if required by the Corporation, to pay reasonable interest on the allowance) to the extent that it is ultimately determined that indemnification is not required hereunder or under an order by a court of competent jurisdiction.  Such undertaking shall be an unlimited general obligation of the Director or Officer and may be accepted without security and without reference to his or her ability to repay the allowance.

       **Section 7.05**   **Nonexclusivity.**

-14-

    (a)   <u>Additional Indemnification</u>.  These provisions do not preclude any additional right to indemnification or allowance of expenses that a Director or Officer may have under the Articles or by resolution of the Corporation's voting shares (pursuant to majority vote of all such shares then issued and outstanding, after due notice), resolution of the Board, or written agreement between the Director or Officer and the Corporation.  Notwithstanding the previous sentence, the Corporation may not indemnify a Director or Officer, or permit a Director or Officer to retain any allowance of expenses, unless it is determined by or on behalf of the Corporation that the Director or Officer did not breach or fail to perform a duty that he or she owes the Corporation which constitutes conduct described in any of the paragraphs of Section 7.02.  A Director or Officer who is a party to the same or related proceeding for which indemnification or an allowance of expenses is sought may not participate in the foregoing determination.

    (b)   <u>Insurance</u>.  The Corporation may purchase and maintain insurance on behalf of any individual who is a Director, officer, other employee, or agent of the Corporation against liability asserted against or incurred by such individual in his or her capacity as Director, officer, other employee, or agent, or arising from his or her status as Director, officer, other employee, or agent, regardless of whether the Corporation is required or authorized to indemnify or allow expenses to the individual against the same liability under any other provision herein.

    (c)   <u>Nonduplication of Relief</u>.  The Corporation shall not indemnify any individual under the terms of this Article if such individual has previously received indemnification or allowance of expenses from any person, including the Corporation, in connection with the same proceeding.  However, any individual entitled to indemnification hereunder has no duty to look to any other person for indemnification.

    (d)   <u>Other Litigation Expenses</u>.  This Article does not affect the Corporation's power to pay or reimburse expenses incurred by a Director or Officer who is a witness in a proceeding to which he or she is not a party, or who is a plaintiff or petitioner in a proceeding because he or she is or was a Director, officer, other employee, or agent of the Corporation.


## ARTICLE VIII.
## CORPORATE SEAL

    The Corporation shall have no corporate seal, and all formal documents otherwise calling for any such imprint may instead be inscribed with the words "No Seal".

# ARTICLE IX.
## AMENDMENTS

**Section 9.01      By Shareholders.**  Unless otherwise provided herein, and except as set forth in this Section 9.01 these Bylaws may be amended or repealed and new Bylaws may be adopted by the shareholders in the manner described in Section 2.07 hereof.  If authorized by the Articles, the shareholders may adopt or amend a Bylaw that fixes, changes, or deletes a greater or lower quorum requirement or a greater voting requirement for shareholders or voting groups of shareholders than is provided in the WBCL, provided that such adoption or amendment must meet the same quorum requirement and be adopted by the same vote and voting groups required to take action under the quorum and voting requirement then in effect.

**Section 9.02      By Directors.**  Unless otherwise provided in the Articles or herein, and except as set forth in this Section, these Bylaws also may be amended or repealed and new Bylaws may be adopted by the Board in the manner described in Section 3.07 hereof.  However:

(a)      No Bylaw adopted, amended, or repealed by the shareholders may be amended, repealed, or readopted by the Board if the shareholders within the Bylaws preclude such action by the Board.

(b)      A Bylaw that fixes a greater or lower quorum requirement or a greater voting requirement for shareholders or voting groups of shareholders than is provided in the WBCL may not be adopted, amended, or repealed by the Board.

(c)      A Bylaw adopted or amended by the shareholders that fixes a greater or lower quorum requirement or a greater voting requirement for the Board than is provided in the WBCL may not be amended or repealed by the Board unless the Bylaw expressly so provides and there is compliance with any specified voting requirement established by the shareholders. Action by the Board to adopt or amend any Bylaw that changes the quorum or voting requirement for the Board must meet the same quorum requirement and be adopted by the same vote required to take action under the quorum and voting requirement then in effect (unless a different voting requirement is specified in the preceding sentence).

**Section 9.03      Implied Amendments.**  Any action taken or authorized by the shareholders or by the Board which would be inconsistent with the Bylaws then in effect, but which is taken or authorized by a vote that would be sufficient to amend the Bylaws to make same consistent with such action, shall be given the same effect as though the Bylaws had been temporarily amended or suspended so far, but only so far, as is necessary to permit the specific action so taken or authorized.

24663415_1.DOC

# EXHIBIT F

# EXHIBIT F

January 13, 2021

<u>**VIA E-MAIL**</u>
(*brad@numale.com*)

Brad Palubicki
NuMale Chicago, LLC
2600 North Mayfair Road, Suite 505
Wauwatosa, WI 53226

Re:    **Claimant:    Michael E. Sanchez**
       **Claim No.:    BEAZL100005026030**
       **Policy No.:    W14CC4190601**
       **Insured:    NuMale Chicago, LLC**

Dear Mr. Palubicki:

As you know, Beazley plc (hereinafter "Underwriters") issued Miscellaneous Medical Professional Liability Claims Made and Reported Insurance under Policy Number W14CC4190601 (the "Policy"), to NuMale Chicago, LLC ("NuMale") for the Policy Period of January 23, 2019 to January 23, 2020.

We take this opportunity to supplement our prior acknowledgement of this matter regarding the above-referenced individual. Underwriters are in receipt of the November 16, 2020 Complaint filed in the lawsuit, *Michael E. Sanchez v. NuMale Medical Center LLC, et al.*, 2nd Judicial District Court for Bernalillo County, New Mexico, Case No. D-202-CV-2020-06336 (the "Lawsuit"). The purpose of this letter is to advise NuMale that Underwriters agree to defend the NuMale Defendants against the Lawsuit subject to the reservations as explained below. Please provide a copy of this letter to Christopher Asandra, Carlos Feliciano, Brad Palubicki, Justin Pulliam, Stephen G. Chapman, and Mike Rivera. If you are unable to provide each of these individuals with a copy of this letter, please advise me and provide me with their contact information.

<u>**Background**</u>

The Complaint in the Lawsuit, names NuMale Medical LLC, NuMale Corporation, NuMale Albuquerque LLC, NuMale New Mexico S.C. Corp., (collectively, "NuMale"), Christopher Asandra, Carlos Feliciano, Brad Palubicki, Justin Pulliam, Stephen G. Chapman, and Mike Rivera as Defendants.

The Complaint alleges that Michael Sanchez ("Plaintiff") was a patient at NuMale's Albuquerque, New Mexico location, which is located at 7920 Wyoming Blvd. NE, Suite B-2. The Complaint alleges Steven Chapman, a Physician's Assistant at NuMale, and Mike Rivera, a NuMale employee, recommended Plaintiff undertake NuMale's Testosterone Replacement Therapy and erectile dysfunction treatment, despite Plaintiff's alleged lack of interest in erectile dysfunction treatment. The Complaint asserts that Plaintiff was given an "ICP prescription" as a part of his erectile dysfunction treatment plan that consisted of self-injecting his penis with a combination of FDA approved vasodilators. After telling Defendant Chapman that his current ICP prescription did not cause

Katelyn DeRuyter
Beazley Group

6 Concourse Parkway NE
Suite 2800
Atlanta, Georgia 30328
USA

T: (770) 351 1782
F: (770) 396 7197

Katelyn.DeRuyter@beazley.com
www.beazley.com



an erection, Plaintiff was given an increased dosage by Defendant Chapman. The Complaint alleges that the increased ICP prescription gave the Plaintiff an erection on Friday, November 17, 2017. After the erection would not subside, Plaintiff, on Defendant Chapman's recommendation, went to the emergency room on Monday, November 20, 2017, where he was allegedly diagnosed with ischemic priapism and ushered into emergency surgery. Plaintiff has allegedly not regained function in his penis since the emergency surgery and alleges that his condition is permanent and irreversible.

The Complaint asserts causes of action for ordinary and medical negligence, battery, negligent staffing, hiring, training and supervision, negligence *per se*, negligent and fraudulent misrepresentation, violation of the New Mexico Unfair Trade Practices Act, breach of fiduciary duty, alter ego, joint venture, and civil conspiracy. The Complaint seeks compensatory damages, actual damages, punitive damages, treble damages, attorneys' fees, and costs and interest.

This incident was first reported to Underwriters on December 9, 2019 when it received the December 4, 2019 attorney letter requesting Plaintiff's medical records.

## Policy

The applicable Policy Period is January 23, 2019 to January 23, 2020 with a Retroactive Date of August 4, 2014 for the NuMale New Mexico location, located at 7920 Wyoming Boulevard, Northeast, Suite B-2, Albuquerque, New Mexico. The Limits of Liability are $1,000,000 per Claim and $3,000,000 in the Aggregate. Claims Expenses reduce the Limits of Liability. The Policy is subject to a $10,000 Deductible that is reduced by Claims Expenses. Payment of the Deductible is a condition precedent to any payment owed by Underwriters  The Policy is governed by Illinois law.

## Coverage Analysis & Reservation of Rights

The Policy's Professional Liability Insuring Agreement states:

> *The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses** which the **Insured** shall become legally obligated to pay because of any **Claim** or **Claims** for **Bodily Injury** first made against any **Insured** during the **Policy Period** and reported to the Underwriters during the **Policy Period**, or any applicable **Extended Reporting Period**, arising out of any negligent act, error or omission of the **Insured** in rendering or failing to render **Professional Services** for others, on behalf of the **Named Insured** designated in Item 1. of the Declarations, except as excluded or limited by the terms, conditions and exclusions of this Policy.*

Policy, Section I.A.2.

1. Insureds under the Policy

As an initial matter, the Policy's Professional Liability Insuring Agreement covers Damages which the Insured shall become legally obligated to pay. Insured is defined in the Policy as including, "*the organization so designated and any executive officer, director, stockholder, **Employee**, employed medical director, …, or employed physician, surgeon, …, nurse practitioner, physician assistant, …, thereof while acting within the scope of his or her duties as such; provided, however, that coverage is contingent on any such employed physician,*

surgeon, osteopath, nurse practitioner, physician assistant, ..., being scheduled in Item 10 of the Declarations." Policy, Section II.(c).

Christopher Asandra, Carlos Feliciano, Brad Palubicki, and Justin Pulliam are all allegedly executive officers of NuMale. Therefore, Beazley agrees to consider these individuals as Insureds under the Policy but reserves the right to amend that consideration if it is determined these defendants are not executive officers or otherwise Employees of NuMale. Beazley notes that these individuals do not qualify as Insureds for any conduct outside the scope of their duties as executive officers or Employees of NuMale.

Mike Rivera is alleged to have been an Employee of NuMale at the time he provided care to the Plaintiff. Beazley agrees to treat Mr. Rivera as an Insured under the Policy but reserves the right to amend this coverage determination if it is determined that he was acting outside the scope of his duties as an Employee for NuMale.

Christopher Asandra, Carlos Feliciano, and Stephan Chapman are all listed as Scheduled Insureds by operation of the "*Amend Item 10. of the Declarations to Add Scheduled Insureds/Physicians and Retroactive and Termination Dates endorsement*." The Endorsement lists Christopher Asandra, Carlos Feliciano, and Stephan Chapman as Scheduled Insureds. As a result, these individuals qualify as Insureds regarding all conduct within their duties as Physicians or Physicians Assistants for NuMale.

The Policy contains the "*Additional Named Insured*" Endorsement that names several additional corporate entities as Named Insureds. Defendant NuMale New Mexico S.C. Corp. is not listed as an Additional Named Insured and does not otherwise qualify as an Insured on the Policy. Underwriters will defend NuMale New Mexico S.C. Corp. under a complete reservation of rights; however, Underwriters will not indemnify NuMale New Mexico S.C. Corp. for any settlement or judgment entered against it.

 2. Type of Damages Covered

The Policy only covers Damages incurred because of a Bodily Injury arising out of any negligent act, error or omission of the Insured in rendering or failing to render Professional Services. Professional Services "*means those professional services specifically identified in Item 11. of the Declarations.*" Item 11. of the Declarations includes "*Clinic providing low testosterone treatment, erectile dysfunction treatment, Neograft Procedures, anti-aging including hormone therapy, medi-spa, weight management services, laser hair removal; ... HCG Diet/Medical Weight Loss Treatments & HCG Injections; Bio identical Hormone Replacement Therapy; Testosterone Replacement (BioIdentical) (IM shots and subcutaneous pellet placement).*" Underwriters reserve the right to deny coverage for Damages arising out of conduct that does not fall within the definition of Professional Services, including but not limited to, the alleged battery, negligent staffing, hiring, training and supervision, negligent and fraudulent misrepresentation, violation of the New Mexico Unfair Trade Practices Act, breach of fiduciary duty, alter ego, joint venture, and civil conspiracy. Underwriters further reserve the right to deny coverage for damages arising out of injuries that do not qualify as Bodily Injury as defined by the Policy.

The Policy defines Damages to mean "*a civil monetary judgment, award or settlement and does not include: (1) the restitution of compensation and expenses paid to the **Insured** for services and goods; and (2) judgments or awards deemed uninsurable by law.*" Underwriters reserve the right to deny coverage for any damages that do not qualify as covered Damages.

3.  Exclusions that May Preclude or Limit Coverage for this Lawsuit

Please be advised that based on the present information, several exclusions may preclude or limit coverage for the Lawsuit.

Exclusion IV.(m) precludes coverage for "*any **Claim** or circumstance which might lead to a Claim known to any Insured prior to the inception of this Policy and not disclosed to the Underwriters at inception.*" The Lawsuit alleges that Plaintiff was injured following treatment provided by Defendant Chapman on November 17, 2017. Defendant Chapman was made aware of Plaintiff's injuries on November 20, 2017, and recommended that Plaintiff seek emergency treatment. The medical records included as exhibits to the Complaint show that Defendant Chapman contacted the hospital where Plaintiff sought treatment in order to check on Plaintiff's condition. Accordingly, Defendant Chapman was aware of the serious injuries suffered by Plaintiff. The notice materials also include a November 20, 2017 online complaint to the New Mexico Medical Board by Dr. Stefan Gutow against Defendant Chapman and NuMale regarding their treatment of Plaintiff. Despite the seriousness of Plaintiff's injuries and the allegations of the Medical Board Complaint, neither were disclosed to Underwriters prior to the 2018-2019 or 2019-2020 Policies incepting. Underwriters are further investigating the application of this exclusion and reserve the right to deny coverage for all Defendants under this exclusion.

Exclusion IV.(b) precludes coverage for "*any **Claim** arising out of any criminal, dishonest, fraudulent or malicious act, error or omission of any **Insured**, committed with actual criminal, dishonest, fraudulent or malicious purpose or intent.*" Exclusion IV.(d) precludes coverage for "*any **Claim** based upon an express or implied warranty or guarantee, or breach of contract in respect of any agreement to perform work for a fee.*" The Lawsuit asserts claims for negligent and fraudulent misrepresentation, violations of New Mexico's Unfair Trade Practices Act, and conspiracy. Underwriters reserve the right to limit or preclude coverage under Exclusion IV.(b) and Exclusion IV.(d).

Exclusion IV.(s) precludes coverage for "*any **Claim** for punitive or exemplary **Damages**, or **Damages** which are a multiple of compensatory **Damages**, fines, sanctions, taxes or penalties, or the return of or reimbursement for fees, costs or expenses charged by any **Insured**.*" Exclusion IV.(s). precludes coverage for the punitive damages and treble damages sought in the Lawsuit. Underwriters further reserve all rights under Exclusion IV.(s). as respects coverage for the attorneys' fees and costs also sought in the Lawsuit.

Exclusion IV.(x) precludes coverage for "*any **Claim** based upon or arising out of any actual or alleged violation of any federal, state, or local anti-trust, restraint of trade, unfair competition, or price fixing law, unfair or deceptive trade practices, or consumer protection any rules or regulations promulgated thereunder; to the extent a **Claim** alleges both professional negligence and any of the above excluded enumerated offenses, Underwriters and the **Insured** will use their best efforts to reach a fair allocation between covered and uncovered **Damages**.*" There is no coverage for any Damages awarded due to Defendants' alleged violation of New Mexico's Unfair Trade Practices Act.

Exclusion IV.(ap) precludes coverage for "*any **Claim** caused by or at the direction of the **Insured** with the knowledge that the act would violate the rights of another and would inflict **Bodily Injury**.*" The Lawsuit alleges Defendants made representations to Plaintiff they knew to be false and Plaintiff suffered bodily injury because of those misrepresentations. Underwriters reserve all rights under Exclusion IV.(ap).

The Policy contains a Surgical Services Exclusion endorsement that states "*the coverage under this Policy does not apply to **Damages** or **Claims Expenses** incurred with respect to any **Claim** arising out of any actual or alleged act, error or omission in the rendering or failing to render any surgical services, other than the incision of boils and superficial abscesses or suturing skin.*" The Lawsuit alleges that part of Plaintiff's treatment included the implantation of testosterone pellets and injecting his penis with a combination of FDA approved vasodilators. To the extent these qualify as surgical services, the Surgical Services Exclusion endorsement limit or preclude coverage. Underwriters reserve all rights under the Surgical Services Exclusion endorsement.

Additionally, Section X., **Other Insurance**, provides that: "*This insurance shall apply in excess of any other valid and collectible insurance or self-insurance available to any **Insured**, unless such other insurance is written only as specific excess insurance over the Limit of Liability of this Policy.*" Underwriters reserve all rights under the Other Insurance condition. If NuMale has not already done so, please notify all other insurers of the Lawsuit.

**<u>Conclusion</u>**

Nothing in this letter, and no actions taken by Underwriters or their representatives in the investigation of this matter, shall be construed as a waiver of any right, remedy or defense available to Underwriters under the Policy or applicable law. Underwriters specifically reserve the right to modify or supplement this coverage position at any time, including asserting additional defenses. Given the reservation of rights outlined in this letter, you are entitled to independent counsel to represent you. You also may proceed with the counsel recommended by Underwriters retained with your consent, Neil Blake, Esq. of Butt Thornton & Baehr PC.

Plaintiff has made a policy limits demand against the Defendants. Underwriters have denied this demand on the advice of defense counsel and pursuant to your wishes. NuMale should notify any excess insurers of the Lawsuit and the policy limits demand.

Please do not hesitate to contact me should you have any questions or concerns at +1 (770) 351-1782 or via email at Katelyn.DeRuyter@beazley.com.

Very truly yours,

Katelyn DeRuyter
**Beazley plc**

cc:    **<u>Via E-Mail</u>**

Theresa Rega (theresa.rega@amwins.com)

Jennifer Schoenthal (Jennifer.schoenthal@beazley.com)

Donte Codrington (donte.codrington@beazley.com)

HCAcknowledgements@beazley.com

