GARMAN TURNER GORDON LLP
GREGORY E. GARMAN
Nevada Bar No. 6654
E-mail: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000; Fax (725) 777-3112
*Attorneys for Michael Carmel,
Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| In re:<br><br>NUMALE CORPORATION,<br><br>☐ AFFECTS THIS DEBTOR,<br><br>☐ AFFECTS FELICIANO NUMALE NEVADA PLLC,<br><br>☐ NUMEDICAL SC,<br><br>☐ NUMALE COLORADO SC,<br><br>☐ NUMALE FLORIDA TB PLLC,<br><br>☐ NUMALE NEBRASKA LLC,<br><br>☐ NUMALE NEW MEXICO SC,<br><br>☒ NUMALE ALL DEBTORS,<br><br>Debtors. | Lead Case No.: 25-10341-nmc<br>Chapter 11<br><br>*Jointly administered with:*<br><br>Feliciano NuMale Nevada PLLC,<br>Case No. 25-10342-nmc<br><br>NuMedical SC<br>Case No. 25-10343-nmc<br><br>NuMale Colorado SC,<br>Case No. 25-10344-nmc<br><br>NuMale Florida TB PLLC,<br>Case No. 25-10345-nmc<br><br>NuMale Nebraska LLC<br>Case No. 25-10346-nmc<br><br>NuMale New Mexico SC<br>Case No. 25-10347-nmc<br><br>Hearing Date: September 2, 2025<br>Hearing Time: 9:30 a.m. |
|---|---|

**REPLY TO BRAD PALUBICKI'S OPPOSITION TO THE TRUSTEE'S MOTION PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C. §§ 363 AND 105 TO AUTHORIZE GLOBAL SETTLEMENT AND ASSOCIATED RELEASES AND AUTHORIZE INSURANCE POLICIES BUYBACK**

1

Michael Carmel, as the Chapter 11 trustee ("Trustee") of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors"), hereby submits his Reply to the Opposition [ECF No. 502] filed by Brad Palubicki[1] to the Trustee's *Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* [ECF No. 430] (the "Motion").[2]

This Reply is supported by the following Memorandum of Points and Authorities; the docket and record in the above-captioned Chapter 11 Cases, judicial notice of which is hereby requested pursuant to FED. R. EVID. 201(b) and (c) and 1101(a) and (b); and any argument or evidence the Court may consider.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The Global Settlement Agreement is an exceptional result for the creditors and the Estates—converting heavily contested, multi-front insurance and tort disputes (in multiple jurisdictions) into a certain, immediate cash recovery of $108.5 million, to pay creditors. The Trustee spent months negotiating the Global Settlement Agreement to specifically comply with the requirements of *A&C Properties*, as well as the Supreme Court's ruling in *Purdue Pharma*.

On this record and as detailed in the Motion and the Carmel Declaration, the *A&C Properties'* factors support approval: (i) success on the merits is uncertain, subject to protracted and near certain appeal, and finality is years in the future; (ii) the litigation is complex, expensive, and would delay distributions to creditors for years assuming the Trustee is successful; however,

---

[1] The only party objecting to approval of the Global Settlement Agreement—generating $108.5 million for the Estates—is Mr. Palubicki, for whom the Court has issued the *Order to Show Cause for Willful Violation of the Order Appointing the Trustee, Willful Violation of the Automatic Stay, and Turnover of Property of the Estate Pursuant to 11 U.S.C. §§ 105, 362, and 542* [ECF Nos. 455 and 500], and whom the Trustee has sued for, among other claims, avoidance of preferential and fraudulent transfers, breach of fiduciary duty, declaratory relief, and equitable subordination of claims [ECF No. 454].

[2] All capitalized, undefined terms have the meanings ascribed to them in the Motion.

there is a substantial risk the Trustee could lose, in which case, there may be no (or nominal) distribution to creditors; (iii) creditors overwhelmingly benefit; and (iv) the Trustee's decision reflects sound business judgment. The settlement unequivocally falls within the "reasonable range of litigation possibilities," is fair and equitable, and should be approved.

The Opposition improperly attempts to elevate the personal preferences of a single equity holder and former officer over the recoveries of all creditors and should be overruled. After months of negotiations, Mr. Palubicki chose to be a holdout to the Global Settlement Agreement, which is his right to do. However, the Opposition attempts to enhance his leverage by inaccurately characterizing the terms of the settlement before this Court. The principal legal attack in the Opposition —that the Global Settlement Agreement "purports to provide a nonconsensual release" of Beazley under Article IX(A)—misreads *Purdue Pharma*. *Purdue Pharma* invalidated plan imposed, nonconsensual third-party releases; it expressly preserved consensual releases. The Global Settlement Agreement implements consensual, bilateral releases among parties that do not extinguish any nonparty direct claim (if any) held by Mr. Palubicki. To avoid any doubt, the 9019 Order has been revised as follows to clarify that only estate/derivative claims are released and that any direct, personal claims of non-parties (including Mr. Palubicki) are not released and are expressly preserved for adjudication by this Court:

> For the avoidance of doubt, the Debtors' releases provided in the Global Settlement Agreement and this Order include (x) any claim or cause of action that is or was the property of the Debtors or the Debtors' Estates, including all derivative claims (the "Estate Causes of Action") and (y) any Interest in or against the Transferred Policies, but exclude any direct claim held against a non-Debtor by non-parties to the Global Settlement Agreement, in each case, that is not an Estate Cause of Action or an Interest in or against the Transferred Policies. This Court shall retain sole jurisdiction to determine what constitutes a released Estate Cause of Action or an Interest in the Transferred Policies.

*See* Redline of the revised 9019 Order, attached hereto as **Exhibit 1**.

The Motion and Carmel Declaration previously demonstrated that the buyback is a sale of estate assets[3] and the releases are ***consensual*** releases. Nonetheless, the clarified 9019 Order puts

---

[3] The Ninth Circuit has unequivocally held that insurance policies are property of the estate. *See In re Minoco Grp. of Companies, Ltd.*, 799 F.2d 517, 518 (9th Cir. 1986); *see also In re Roman Catholic Diocese of Rockville Ctr.,* 665

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

to rest any concern to the contrary, confirming that direct claims are not released.

Despite the fact that he chose not to be a signatory, far from being harmed, the Global Settlement Agreement provides personal benefits of more than $579 million of benefit to Mr. Palubicki. Specifically,

- Upon approval of the Global Settlement Agreement, Mr. Palubicki will be *released* from the over $579 million claim held by Michael Sanchez against Mr. Palubicki, NuMale Corporation, and the other defendants in the Sanchez Lawsuit arising from the Jury Verdict. *See* Global Settlement Agreement § VII.C; Motion § 26.

- Mr. Palubicki, like all of the other verdict defendants in the Sanchez Lawsuit, will be *dismissed* from the Sanchez Lawsuit, without Mr. Palubicki paying a cent to Mr. Sanchez. *See* Global Settlement Agreement § XI.A and Ex. E.

- Mr. Palubicki personally guaranteed the Newtek Bank, N.A. ("Newtek") loan. The payment of Newtek's $1 million secured claim and the pro rata payment of Newtek's unsecured claim under the *Joint Plan of Reorganization* [ECF No. 434] (the "Plan") provide a dollar-for-dollar reduction of Mr. Palubicki's potential guarantor exposure.

Mr. Palubicki will receive these benefits despite his rejection of multiple settlement offers from the Trustee. *See* Carmel Decl., ECF No. 431 ¶ 99. For the avoidance of doubt, the Trustee spent months negotiating with Mr. Palubicki and offered terms superior to those accepted by Mr. Pulliam, yet, Mr. Palubicki refused to accept any offer. *Id.* Having decided not to settle, Mr. Palubicki now seeks to thwart a hard-fought, good-faith, exceptional settlement, supported by all other parties-in-interest in these cases.

The Opposition's remaining objections are equally flawed. The Newtek compromise solves a $5,033,301.46 proof of claim secured by *sweeping collateral* into a $1 million secured claim, with the balance treated as an unsecured claim—increasing unsecured recoveries and

---

B.R. 71 (Bankr. S.D.N.Y. 2024) and *In re Hopeman Brothers, Inc.,* 667 B.R. 101 (Bankr. E.D. Va. 2025) (approving settlement agreements between debtors and insurance carriers, among others, involving insurance policy buybacks and releases pursuant to Section 363 and Bankruptcy Rule 9019 post-*Purdue Parma*).

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

reducing total guarantor exposure (including Mr. Palubicki's). Likewise, his NuMale Wisconsin GB, SC ("NuMale GB") governance quarrel is a non-debtor dispute and the Trustee neither requires nor asks the Court to adjudicate third-party control of a non-debtor. Importantly, however, Mr. Palubicki is not an owner or manager of NuMale GB and therefore lacks standing to contest NuMale GB's decision to be a party to the Global Settlement Agreement. It is also undisputed that Dr. Aicher is a member of NuMale GB and that Dr. Aicher (not the Trustee) signed the Global Settlement Agreement for NuMale GB. *See* Global Settlement Agreement, at p. 30 of 137.

Finally, Mr. Palubicki's substantive consolidation arguments are premature. The Global Settlement Agreement does not require substantive consolidation of the Estates for plan purposes. That is a Plan issue that will properly be addressed at the confirmation hearing on September 24, 2025.

All of the evidence before this Court establishes that the Global Settlement Agreement satisfies the *A&C Properties'* factors and is fair and equitable and in the best interest of the Estates and creditors. The Global Settlement Agreement lies well within the rage of reasonableness and serves the paramount interest of creditors. The Global Settlement Agreement should be approved and the revised 9019 Order should be entered.

## II. ANALYSIS

**A.  The Probability of Success in Litigation Factor Weighs Heavily in Favor of Approval of the Global Settlement Agreement.**

The Opposition ignores the multitude of litigation and claims settled through the Global Settlement Agreement. As established by the Motion and Carmel Declaration, even if the Trustee were initially successful in the pending litigation, he would nonetheless face years of appeals, making the probability of success risky, at best. Substituting a guaranteed $108.5 million now—paired with dismissal mechanics that end existential litigation—falls well within the range of reasonableness. The Opposition does not challenge the Trustee's prudent business judgment in settling these significant litigations and claims or the Trustee's probability of success evidence and analysis. Instead, the Opposition twists the terms of the settlement to try to create legal issues

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

where none exist.

### 1. The Global Settlement Agreement Does Not Release Direct Claims (If Any) Held By Mr. Palubicki.

*Purdue Pharma* is not applicable here as it addressed non-consensual, plan-imposed third-party releases that discharge nondebtor liability to nonconsenting creditors. "[W]e hold ***only*** that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor ***without the consent*** of affected claimants." 603 U.S. 204, 227 (2024) (emphasis added). The Supreme Court was careful to ensure that its holding was not expanded to include consensual releases.

> As important as the question we decide today are ones we do not. **Nothing in what we have said should be construed to call into question *consensual* third-party releases** offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. *See, e.g., In re Specialty Equipment Cos.,* 3 F.3d 1043, 1047 (CA7 1993).

*Id.* at 226 (emphasis added).

Here, as acknowledged by the Trustee, Messrs. Palubicki, Feliciano, Pulliam, and Asandra asserted that they hold direct bad faith claims against Beazley, while the Trustee contends that these claims are property of the Estates. *See* Carmel Decl. ¶ 72. The Trustee settled this dispute with Messrs. Asandra and Pulliam through the Global Settlement Agreement. *Id.* This dispute is not settled with respect to Messrs. Palubicki and Feliciano and will be decided by this Court. *See* Second Amended Complaint, ECF No. 454, pp. 5-6 (seeking declaratory relief on this issue).

To the extent this Court determines that Mr. Palubicki holds direct claims against Beazley, the Global Settlement Agreement does not release such direct claims. To make this clear, the proposed 9019 Order has been revised to state:

> For the avoidance of doubt, the Debtors' releases provided in the Global Settlement Agreement and this Order include (x) any claim or cause of action that is or was the property of the Debtors or the Debtors' Estates, including all derivative claims (the "Estate Causes of Action") and (y) any Interest in or against the Transferred Policies, but exclude any direct claim held against a non-Debtor by non-parties to the Global Settlement Agreement, in each case, that is not an Estate Cause of Action or an Interest in or against the Transferred Policies. This Court shall retain sole jurisdiction to determine what constitutes a released Estate Cause of Action or an

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

Interest in the Transferred Policies.

*See* redline of the revised 9019 Order, attached hereto as **Exhibit 1**.

The Global Settlement Agreement was negotiated and drafted specifically to be consistent with *Purdue Pharma* and should be approved. It contemplates only consensual releases, and the issue of whether Mr. Palubicki holds direct claims (verses derivative estate claims) is preserved and will be decided, if necessary, by this Court in connection with the pending adversary against him.

Moreover, the Opposition's contention that Mr. Palubicki "faces potential personal liability in the underlying litigation" and that "the NuMale Beazley Policies provide his only source of defense and indemnity" is simply untrue. *See* Opposition, p. 8, ll. 5-6. As described above, through the Global Settlement Agreement, Mr. Palubicki will be released from the +$500 million Sanchez Claim and will be dismissed from the Sanchez Lawsuit without paying a cent, despite the fact that he chose not to be a party to the Global Settlement Agreement. *See* Settlement Agreement §§ VII.C and XI.A and Ex. E.

**2.    Newtek Bank Holds a $5 Million Claim and an Expansive First Priority Lien Making a Settlement Capping Newtek's Potential Secured Claim at $1 Million Fair and Equitable and in the Best Interest of the Creditors.**

The Opposition complains about the portion of the Global Settlement Agreement that includes a release of the Pulliams' guaranty of the Newtek Loan. However, in trying to create an issue where none exists, the Opposition mischaracterizes the claim (and more importantly, the sweeping lien) held by Newtek.

It is undisputed that Newtek is NuMale Corporation's largest secured creditor, having filed a proof of claim for $5,033,301.46 (the "Newtek Claim"). *See* Proof of Claim No. 24. Newtek's Commercial Security Agreement grants Newtek a first priority lien in the following collateral:

> The word "Collateral" as used in this Agreement means the following descried property, whether no owned or hereafter acquired, whether existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:
>
> All inventory, equipment, accounts (including but not limited to all health-care-

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit wrights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment or performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other miners and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and comingled goods relating to the foregoing property, and all additional, replacements of and substitutions for all or any part of the foregoing property; all insurance relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing; and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceedings (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also include the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)    All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)    All products and proceeds of any of the property described in this Collateral section.

(C)    All accounts, general intangibles, instruments, rent, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)    All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement, or other process.

(E)    All records and data relating to any of the property described in this Collateral section, whether in the form or a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

*Id.*, p. 4 of 33.  Newtek properly recorded a UCC-1 Financing Statement perfecting its first priority lien.  *Id.* at p. 24 of 33.

Newtek's proof of claim does incorporate the value of $73,000 identified by Mr. Palubicki when he prepared NuMale Corporation's schedules and statements.  However, this is based on the

8

incorrect values stated in the initial schedules signed by Mr. Palubicki (and the value therein), which were subsequently amended. *See* ECF Nos. 31 and 220. Beyond the amended schedules, the Trustee's investigation has determined that there are additional assets that may fall within Newtek's broad definition of collateral. The Trustee's liquidation analysis for NuMale Corporation identifies: (i) scheduled assets valued at $133,000, with additional scheduled assets identified in an "unknown" amount; (ii) litigation claims, including recovery on a judgment exceeding $200,000; (iii) equity interests in affiliate entities, the value of which as a going concern will be determined in connection with the anticipated sale of Debtors' assets under the Plan; (iv) Debtors' bad faith insurance claim (which is being settled by the Global Settlement Agreement); and (v) the Quintairos malpractice claim. *See* Disclosure Statement, Liquidation Analysis, ECF No. 435-2, p. 2 of 16. Thus, Newtek can make a credible argument that its full $5 million claim is secured.

The Trustee has negotiated a separate settlement with Newtek to resolve the dispute regarding the extent of Newtek's secured claim, which settlement is subject to its own 9019 motion. The Newtek settlement provides for Newtek to have an allowed $1 million secured claim, with the balance of the claim treated as unsecured claim, and a release of the Pulliams' guaranty. The Newtek settlement benefits all unsecured creditors by reducing a potential secured claim from $5 million to $1 million, thereby increasing the distribution to unsecured creditors.

Mr. Palubicki's complaint is that his guaranty is not released; however, Mr. Palubicki chose not to settle. That was his decision. Having refused to provide any value to the Estates, it would be inappropriate for the Trustee to focus on obtaining a release of Mr. Palubicki's personal guaranty of the Newtek Claim. However, as noted above, a byproduct of the Global Settlement Agreement is that Mr. Palubicki (and the other guarantors[4]) will receive a significant benefit as every dollar (both secured and unsecured) the Estates pay toward the Newtek Claim reduces dollar-

---

[4] The Newtek loan is guaranteed by NuMale Denver, LLC, NuMale Omaha, LLC, NuMale Charlotte, LLC, NuMale Tampa, LLC, NuFemme Milwaukee, LLC, Brad Palubicki, Justin Pulliam, Irma Pulliam (limited guaranty), and Carlos Feliciano. *Id.* at p. 16 of 33.

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

for-dollar their potential guarantor exposure.

Thus, if the Newtek settlement (which is subject to its own Rule 9019 Motion) is at all relevant, it is in the best interest of the creditors and the Estates and weighs in favor of approval of the Global Settlement Agreement.

**B.    The Complexity, Expense, and Delay Factor Weighs Heavily in Favor of Approval of the Settlement.**

The Opposition ignores the Trustee's significant evidence and analysis demonstrating that the complexity, expense, and delay of litigating the multitude of matters resolved by the Global Settlement Agreement weighs heavily in favor of approval of the settlement. Instead, the Opposition tries to fabricate legal issues where there are none to argue that the Global Settlement Agreement may generate new litigation. However, the threat of new, frivolous litigation does not, and cannot, alter the fact that the Global Settlement Agreement settles significant litigation that will be protracted, proceed in multiple courts, costs millions of dollars, and take years to resolve. *See, e.g.* Carmel Decl. ¶¶ 78-83 and 105-107.

The Opposition identifies three hypothetical (and frivolous) areas of litigation, two of which are addressed above – the Opposition's misapplication of *Purdue Pharma* and the Newtek settlement. The third alleged potential litigation would be between non-debtors and non-creditors, not the Trustee or the Estates and is therefore entirely irrelevant (even if it had merit). Specifically, as described above, Mr. Palubicki (neither a member nor manager of NuMale GB), without standing to do so, contends that corporate governance prohibits Dr. Aicher from causing NuMale GB to be a signatory to the Global Settlement Agreement. This is a non-debtor dispute and the Trustee neither asks this Court to adjudicate third-party control nor does the Global Settlement Agreement seek to settle such hypothetical dispute (assuming there even is one).

For the avoidance of doubt, NuMale GB's members are Dr. Aicher and Dr. Feliciano (not Mr. Palubicki). *See* Opposition ¶ 6. It was Dr. Aicher that requested that NuMale GB be a party to the Global Settlement Agreement and to receive the broad releases thereunder (verses being an entity against whom all litigation is expressly preserved). Mr. Palubicki is neither a member nor

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

10

manager of NuMale GB and therefore has no standing to contest Dr. Aicher's ability to cause NuMale GB to enter into the Global Settlement Agreement.[5]

Conversely, Dr. Aicher, a member of NuMale GB, and is the individual that signed the Global Settlement Agreement on behalf of NuMale GB, ensuring that NuMale GB receives the benefit of the significant releases thereunder. Were there to be any litigation resulting from Dr. Aicher causing NuMale GB to be a party to the Global Settlement Agreement (and therefore to benefit from the broad releases NuMale GB receives), that litigation would be between Dr. Aicher and Dr. Feliciano – not the Trustee, the Estates, or even Mr. Palubicki. At best, the Opposition's focus on NuMale GB is misguided and should be overruled.

There is also a passing reference to three other entities that the Opposition implies may not be controlled by the Debtors; however, this is simply incorrect based on Mr. Palubicki's own sworn testimony. *See* SOFA executed by Brad Palubicki, ECF No. 30; Opposition ¶ 5(b). Specifically, Debtor NuMale Corporation is the 99% owner of NMC Illinois, LLC and the 75% owner of NuMale Denver, LLC. *See id.* Additionally, NuMale Green Bay, LLC is owned by NuMale Corporation and Dr. Aicher, with NuMale Corporation having voting control. In accordance with the terms of each of their operating agreements, the Trustee has ensured that NuMale Corporation is the sole manager of each of these three entities.[6] Accordingly, the Trustee controls each of these entities.

---

[5] *See, e.g. Fleck & Assocs., Inc. v. Phoenix, City of, an Arizona Mun. Corp.,* 471 F.3d 1100, 1103–04 (9th Cir. 2006) ("Standing doctrine involves " 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.' " *Kowalski v. Tesmer*, 543 U.S. 125, 128–29, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). The constitutional aspect inquires "whether the plaintiff has made out a 'case or controversy' " between himself and the defendant within the meaning of Art[icle] III "by demonstrating a sufficient personal stake in the outcome." *Warth*, 422 U.S. at 498, 95 S.Ct. 2197. The prudential limitations, in contrast, restrict the grounds a plaintiff may put forward in seeking to vindicate his personal stake. *Id.* at 499, 95 S.Ct. 2197. **Most important for our purposes is that "a litigant must normally assert his own legal interests rather than those of third parties."** *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (citations omitted)) (emphasis added).

[6] As reflected in Debtors' SOFA, NuMale Corporation is the majority member and has control over the following non-debtor entities: NMC Illinois, LLC; Nevada NuMale, LLC; NuMale Albuquerque, LLC; NuFemme Milwaukee, LLC; NuMale Green Bay, LLC; NuMale Omaha, LLC; NuMale Tampa, LLC; NuMale Charlotte, LLC; and NuMale Denver, LLC. *See* ECF No. 90. The Trustee executed the Global Settlement Agreement as the Chapter 11 Trustee of NuMale Corporation, the manager of each of these entities

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

1  In short, the Opposition's arguments are meritless and should be overruled.

**C.    The Best Interest of Creditors Factor Weighs Heavily in Favor of Approval of the Settlement.**

It speaks volumes that the only opposition to the settlement was filed by Mr. Palubicki, who has been displaced from controlling the Debtors, who is the subject of the *Order to Show Cause* for his post-Trustee appointment misconduct and self-dealing, and who has been sued by the Trustee. The reason for this is simple. The Trustee has taken potentially administratively insolvent estates, resolved extensive litigation, and brought $108.5 million into the Estates to pay creditors—all of which is unequivocally in the best interest of the creditors. *See* Carmel Decl. ¶¶ 107-110.

Rather than waiting years with the hope of favorable outcomes in multiple litigations to make a distribution, the Global Settlement Agreement brings $108.5 million into the Estates now. These proceeds will be used to pay allowed secured claims in full on the Plan's effective date, with a significant distributions to allowed unsecured claims on the Plan's effective date, and additional distributions from the Liquidation Trust. *See id.*

The Opposition's only response is to object to the Plan's substantive consolidation of the Debtors for plan purposes only. However, this is a confirmation issue, not an issue for approval of the Global Settlement Agreement. This Court can and will address the Plan at the September 24, 2025 confirmation hearing. The fact that the Opposition focuses on a confirmation issue instead of the terms of the Global Settlement Agreement underscores that approval of the Global Settlement Agreement is in the best interest of the creditors and should be approved.

. . .

. . .

. . .

. . .

. . .

. . .

12

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

### III. CONCLUSION

WHEREFORE, the Trustee respectfully requests the Court overrule the Opposition, grant the Motion, and enter the revised 9019 Order.

Dated this 26th day of August, 2025.

                                    GARMAN TURNER GORDON LLP

                              By: */s/ Talitha Gray Kozlowski*
                                    GREGORY E. GARMAN, ESQ.
                                    TALITHA GRAY KOZLOWSKI, ESQ.
                                    MARY LANGSNER, Ph.D.
                                    7251 Amigo Street, Suite 210
                                    Las Vegas, Nevada 89119
                                    *Attorneys for Michael Carmel, Chapter 11 Trustee*

Garman Turner Gordon
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000