SIMPSON THATCHER & BARTLETT LLP
David Zylberberg, Esq. (*pro hac vice*)
Bryce Friedman, Esq. (*pro hac vice*)
Summer Craig, Esq. (*pro hac vice*)
Zachary Weiner, Esq. (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-3702
David.Zylberberg@stblaw.com
Bfriedman@stblaw.com
Scraig@stblaw.com
Zachary.Weiner@stblaw.com

*Attorneys for Certain Underwriters at*
*Lloyd's London Syndicates 623/262*

LARSON & ZIRZOW, LLC
MATTHEW C. ZIRZOW, ESQ., NV# 7222
E-mail: mzirzow@lzlawnv.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Tel: 702-382-1170
Fax: 702-382-1169

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case No. 25-10341-nmc |
| | Chapter 11 |
| NUMALE CORPORATION, | Jointly Administered: |
| ☐ Affects this Debtor. | |
| ☒ Affects all Debtors. | |
| | |
| FELICIANO NUMALE NEVADA PLLC, | Case No. 25-10342-nmc |
| ☐ Affects this Debtor. | |
| | |
| NUMALE COLORADO SC, | Case No. 25-10344-nmc |
| ☐ Affects this Debtor. | |
| | |
| NUMALE FLORIDA TB PLLC, | Case No. 25-10345-nmc |
| ☐ Affects this Debtor. | |
| | |
| NUMALE NEBRASKA LLC, | Case No. 25-10346-nmc |
| ☐ Affects this Debtor. | |
| | |
| NUMALE NEW MEXICO SC, | Case No. 25-10347-nmc |
| ☐ Affects this Debtor. | |
| | Hearing Date:  September 2, 2025 |
| | Hearing Time: 9:30 a.m. |

**JOINDER AND REPLY IN SUPPORT OF**
**MOTION PURSUANT TO FED. R. BANKR. P. 9019 AND 11 U.S.C.**
**§§ 363 AND 105 TO AUTHORIZE AND APPROVE GLOBAL SETTLEMENT AND**
**ASSOCIATED RELEASES AND AUTHORIZE INSURANCE POLICIES BUYBACK**

Certain Underwriters at Lloyd's London Syndicates 623/2623 (*"Beazley"*), by and through counsel, hereby files their Joinder and Reply (this *"Joinder"*) in support of the *Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize and Approve Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* (ECF No. 430)[1] (the "**9019 Motion**"), and respectfully state as follows:

## JOINDER AND REPLY

*The Settlement Resolves the Coverage Dispute Caused by Palubicki's Misrepresentations*

1.      Beazley joins the Reply[2] filed by the Chapter 11 trustee (the "**Trustee**") in support of the 9019 Motion and in response to *Brad Palubicki's Opposition to Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize and Approve Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* (ECF No. 502) (the "**Palubicki Objection**").[3]

2.      Palubicki's objection ignores the most important element of the proposed settlement: it resolves an insurance coverage dispute created by Palubicki's own misconduct. *See Certain Underwriters at Lloyd's, London, Syndicates 2623 and 623 v. NuMale Albuquerque LLC,* No. D905-CV-2025-00157 (N.M. 9th Jud. Dist., Curry County) (the "**Coverage Lawsuit**").[4]  In short, if Beazley prevails in the Coverage Lawsuit, there will be no insurance available for the Sanchez Lawsuit and the Estates would receive <u>zero payment</u> from Beazley.

3.      In the Coverage Lawsuit, Beazley seeks a declaration that the NuMale-Beazley Policies are rescinded and void because of, *inter alia*, material misrepresentations and omissions in NuMale's application for insurance.  These misrepresentations and omissions include:

- Falsely answering "no" to the application's question asking whether the applicant or staff had "ever been the subject of a disciplinary/investigative proceedings or

---

[1] All references to "ECF No." are to the number assigned to the documents filed in lead Case No. BK-25-10341-nmc as it relates to Debtors' bankruptcy cases as they appear on the docket maintained by the clerk of court.

[2] The "**Reply**" means the *Reply to Brad Palubicki's Opposition to the Trustee's Notion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* (ECF No. 535).

[3] Capitalized terms used but not defined herein shall have the meanings given to them in the 9019 Motion or the Palubicki Objection, as applicable.

[4] A copy of Beazley's complaint filed in the Coverage Lawsuit is attached hereto as **Exhibit A**.

reprimand by a government administrative agency.  In fact, Palubicki was the target of a 2015 enforcement action by the Federal Deposit Insurance Corporation ("**FDIC**"). That action resulted in a public reprimand, monetary fine, and permanent prohibition from participating in the affairs of a federal funded financial institution. The FDIC found that Mr. Palubicki had engaged in "personal dishonesty," "willful or continuing disregard" for the safety and soundness of Mid America Bank (where he served as president from 2008 to 2011), and breaches of fiduciary duty.[5]

- Failing to disclose the incident underlying the Sanchez Lawsuit and a medical board complaint concerning that incident, both of which occurred before NuMale applied for insurance.

4.     Further, even if the NuMale-Beazley Policies are not rescinded and void as a result of Palubicki's misrepresentations, Beazley has contested the availability of coverage for the claims that are the subject of the Global Settlement Agreement because of applicable exclusions and other limitations in the NuMale-Beazley Policies.  For instance, the NuMale-Beazley Policies exclude coverage for: (1) any claim arising from a known circumstance (and a New Mexico Medical Board Complaint had been filed in relation to Sanchez's treatment at the time the policy was issued); (2) any claim based upon or arising out of any fraudulent act or unfair or deceptive trade practices; and (3) punitive damages (which comprise the bulk of Sanchez's asserted claim against the Debtors).

5.     Given the breadth and complexity of the issues raised in the Coverage Lawsuit, Beazley expects that the Coverage Lawsuit would take years to finally resolve.

**Purdue *Does Not Apply to Section 363 Sales, Including Policy Buybacks***

6.     Palubicki also asserts that the 9019 Order violates the Supreme Court's decision in *Purdue*.  He is incorrect:  *Purdue* is inapplicable in the 9019/363 sale context, including to policy buybacks.  *See*, *e.g.*, *In re Roman Catholic Diocese of Rockville Ctr.*, 665 B.R. 71, 86 (Bankr. S.D.N.Y. 2024) (approving an insurance policy buyback under Section 363(f) over objections that the sale and related injunction violated *Purdue*); *In re Hopeman Brothers, Inc.*, 667 B.R. 101, 107-8 (Bankr. E.D. Va. 2025) (approving an insurance policy buyback over *Purdue* objections, concluding that "[t]he  Court has not found, and has not been pointed to, any decision extending *Purdue's* decision to § 363 sales. . . . Nothing in [*Purdue*] suggests that the protections afforded a buyer

---

[5]  Copies of the orders issued by the FDIC are attached hereto as **Exhibit B**.

1    pursuant to § 363, including the ability of the purchaser to obtain the asset free of the claims of the

2    debtor's creditors, were intended to be abrogated. Instead, creditor claims transfer to the proceeds of

3    the sale.")

4        7.    In short, *Purdue* does not bar a debtor from selling property, including insurance

5    policies, under Section 363.  In this case specifically, the Trustee may sell the NuMale-Beazley

6    Policies free and clear of Palubicki's rights therein pursuant to Section 363(f)(4) and (5) of the

7    Bankruptcy Code, and Palubicki's interests in the NuMale-Beazley Policies, if any, are explicitly

8    protected by the 9019 Order.  *See* 9019 Order ¶ 9 ("All holders of Interests in the Transferred

9    Policies, if any, are adequately protected by having their Interests attach to the net proceeds

10   ultimately received by the Estates and attributable to the Transferred Policies against or in which

11   such Interests are asserted. . . .").  Beazley notes that the injunction in the 9019 Order is narrowly

12   drafted to only apply to claims of Palubicki and other current and former fiduciaries of the Debtors

13   *in their capacities as such*, and not in other capacities.  9019 Order ¶ 7(i).

14                                **CONCLUSION**

15       8.    Beazley defers to the Trustee's view on the myriad of benefits that the Global

16   Settlement Agreement offers to the Estates and their creditors.  But from Beazley's perspective, the

17   analysis is simple.  The Global Settlement Agreement eliminates months or years of litigation,

18   reasonably settles the Coverage Lawsuit as between Beazley and the other settlement parties, and

19   results in a $108.5 million payment to the Estates that, as a result of the prompt and efficient

20   administration of the Chapter 11 Cases by the Trustee, will almost entirely be distributed to Sanchez

21   and other creditors within weeks of the settlement Effective Date.

22       9.    For these reasons, and for the reasons stated in the Trustee's Reply and in the 9019

23   Motion itself, Beazley supports approval of the Global Settlement Agreement.

24

25                        [*Remainder of page intentionally blank.*]

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### <u>CONCLUSION</u>

WHEREFORE, Beazley respectfully requests that the Court overrule the Palubicki Objection and approve the 9019 Motion.

DATED this 26th day of August, 2025.

LARSON & ZIRZOW, LLC

By: */s/ Matthew C. Zirzow*
Matthew C. Zirzow, Esq. (NV# 7222)
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
mzirzow@lzlawnv.com

Bryce Friedman, Esq. (*admitted pro hac vice*)
David Zylberberg, Esq. (*admitted pro hac vice*)
Summer Craig, Esq. (*admitted pro hac vice*)
Zachary Weiner, Esq. (*admitted pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
bfriedman@stblaw.com
David.Zylberberg@stblaw.com
scraig@stblaw.com
Zachary.Weiner@stblaw.com

*Attorneys for Certain Underwriters at Lloyd's London Syndicates 623/2623*

1

## Exhibit A

2    Coverage Lawsuit Complaint

NINTH JUDICIAL DISTRICT COURT
Curry County
3/14/2025 3:03 PM
MICHELLE GRIZZLE
CLERK OF THE COURT

STATE OF NEW MEXICO
COUNTY OF CURRY
NINTH JUDICIAL DISTRICT COURT

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, SYNDICATES 2623 AND 623,

      Plaintiffs,

v.                                                    Case No: _____
                                                      D-905-CV-2025-00157

NUMALE ALBUQUERQUE LLC D/B/A                          Cross, Benjamin S.
NUMALE MEDICAL CENTER (A
WISCONSIN CORP.), CHRISTOPHER
ASANDRA, CARLOS FELICIANO, BRAD
PALUBICKI, AND JUSTIN PULLIAM,

      Defendants.

## CIVIL COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Certain Underwriters at Lloyd's, London, Syndicates 623 and 2623 ("Underwriters"), subscribing to Policy Nos. W14CC419601 and W1561E190601, state by way of a Complaint against Defendants NuMale Albuquerque LLC d/b/a NuMale Medical Center, Christopher Asandra, Carlos Feliciano, Brad Palubicki, and Justin Pulliam (collectively, "Defendants") as follows:

## PRELIMINARY STATEMENT

1.     Underwriters issued an insurance policy to Defendants, which operated a men's health clinic, under false pretenses. Defendants told Underwriters there were no acts, errors, facts or circumstances that could result in a malpractice or general liability claim or suit other certain specifically identified matters. In reality, Defendants knew that a New Mexico Medical Board complaint had been filed against Steven Chapman, a physician's assistant at NuMale Medical Center in Albuquerque, specifically alleging malpractice stemming from his purported treatment of Michael Sanchez for erectile dysfunction, but Defendants failed to disclose this matter to

Underwriters.  Mr. Sanchez later brought a lawsuit against Defendants in New Mexico concerning his treatment by Mr. Chapman.  Through the lawsuit, Underwriters learned about the earlier New Mexico Medical Board complaint against Mr. Chapman concerning his treatment of Mr. Sanchez. Nonetheless, Underwriters defended under a reservation of rights and met all other potential obligations to Defendants.  During the trial, the jury found that Defendants committed fraud among other violations and awarded Mr. Sanchez $412 million.  Underwriters seek, among other things, to rescind the insurance policies they issued to Defendants based on material misrepresentations made in Defendants' application for insurance.  Defendants' misrepresentations vis-à-vis Underwriters mirrored the fraud alleged by Mr. Sanchez in his lawsuit.  In seeking rescission, Underwriters endeavor to uphold the principles of honesty and integrity that are the bedrock of the insurance industry, and to prevent any unjust enrichment resulting from the misrepresentations by Defendants.

2.      Underwriters subscribed to a medical professional liability policy and an excess policy with a combined limit of $6 million issued to various corporate entities and individuals (including Defendants) affiliated with NuMale Medical Center, a men's health clinic operating multiple locations across the United States offering a wide range of treatments, including for erectile dysfunction, low testosterone, and weight loss.  The policy period for both policies is January 23, 2019 to January 23, 2020.  The policies are claims made and reported policies, meaning they provide coverage that is triggered when a claim is made against the insured and reported during the policy period, even if the incident or injury giving rise to the claim occurred prior to the inception of the policy period.

3.      On November 16, 2020, Michael Sanchez commenced a lawsuit in Bernalillo County, New Mexico, against various corporate entities and individuals affiliated with NuMale

Medical Center (including Defendants), alleging fraud, violations of the New Mexico Unfair Trade Practices Act, and negligence, among other claims, in relation to his treatment at a clinic in Albuquerque, New Mexico in the fall of 2017 (the "Sanchez Lawsuit"). Mr. Sanchez alleged that after receiving treatment for erectile dysfunction from a physician's assistant, Steven Chapman, he suffered permanent damage to his penis as a result of a prolonged untreated priapism. On November 25, 2024, a New Mexico jury found that Defendants and certain affiliates violated the New Mexico Unfair Practices Act and acted fraudulently and negligently, and awarded Mr. Sanchez $37,005,149 in compensatory damages and $375,000,000 in punitive damages.[1]

4.      In this action, Underwriters seek a judgment rescinding the insurance policies due to material misrepresentations and omissions in Defendants' application for insurance and in the insurance policies. Specifically, in the December 6, 2018 insurance application for the policies, Defendants failed to disclose that on November 20, 2017, a physician filed a complaint with the New Mexico Medical Board against Mr. Chapman on the ground that he failed to provide adequate care to Mr. Sanchez at NuMale Medical Center. In other words, Defendants are seeking insurance coverage for the incident they were required to disclose, but did not disclose, in their application for insurance.

5.      Alternatively, Underwriters seek a judgment declaring that they have no duty to indemnify Defendants for any portion of losses stemming from the Sanchez Lawsuit because the policies exclude coverage for: (1) any claim arising from a known circumstance; (2) any claim based upon or arising out of any fraudulent act or unfair or deceptive trade practices; and

---

[1]      Two additional entities (NuMale Corporation and NuMale New Mexico S.C. Corporation) were found liable in the Sanchez Lawsuit but have since filed Chapter 11 petitions for bankruptcy in the United States Bankruptcy Court for the District of Nevada. Underwriters have not named NuMale Corporation or NuMale New Mexico S.C. Corporation as Defendants due to the automatic stay.

(3) punitive damages.

6.     Underwriters further seek a judgment declaring that Defendants violated the "Assistance and Co-Operation of the Insured" clause in the policies by not timely disclosing to Underwriters that Nick Rowley, Mr. Sanchez's lead counsel in the Sanchez Lawsuit, engaged in *ex parte* communications with Dr. Christopher Asandra, the supervisor of Mr. Chapman and a named defendant in the Sanchez Lawsuit, during the pendency of that lawsuit.

7.     Finally, Underwriters seek a declaration that they did not act in bad faith with respect to the Sanchez Lawsuit.

## **PARTIES**

8.     Underwriters consist of two syndicates—Syndicates 623 and 2623—trading at Lloyd's, London who severally subscribed to Policy No. W14CC4190601, a Miscellaneous Medical Professional Liability Claims Made and Reported Insurance Policy (attached hereto as Exhibit A), and Policy No. W1561E190601, an Excess Insurance Policy (attached hereto as Exhibit B) (collectively, the "Policies").

9.     Defendant NuMale Albuquerque LLC is an insured under the Policies.  NuMale Albuquerque LLC is a limited liability company formed in Wisconsin with its principal office at 7920 Wyoming Blvd NE, Suite B-2, Albuquerque, New Mexico.  NuMale Albuquerque LLC is a defendant in the Sanchez Lawsuit.

10.     Defendant Christopher Asandra, a former physician at NuMale Medical Center, is an insured under the Policies.  Upon information and belief, Dr. Asandra resides in Irvine, California and works in Beverly Hills, California.  Dr. Asandra is a defendant in the Sanchez Lawsuit and signed the application for insurance.

11.     Defendant Carlos Feliciano, a physician at NuMale Medical Center, is an insured

under the Policies.  Upon information and belief, Dr. Feliciano resides in Tampa Bay, Florida.  Dr. Feliciano is a defendant in the Sanchez Lawsuit and signed the application for insurance.

12.    Defendant Brad Palubicki, the President of NuMale Medical Center, is an insured under the Policies.  Upon information and belief, Mr. Palubicki resides in Henderson, Nevada.  Mr. Palubicki is a defendant in the Sanchez Lawsuit.

13.    Defendant Justin Pulliam, the Vice President of NuMale Medical Center, is an insured under the Policies.  Upon information and belief, Mr. Pulliam resides in Las Vegas, Nevada.  Mr. Pulliam is a defendant in the Sanchez Lawsuit.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction pursuant to NMSA 1978, § 38-1-16 (1971) because (1) Defendants are natural persons or corporations doing business within New Mexico; (2) the Policies insure persons, property, or risk located in New Mexico; and (3) a substantial portion of the underlying events giving rise to the present controversy took place in New Mexico.

15.    Venue properly lies in Curry County pursuant to NMSA 1978, § 38-3-1 (1988) because NuMale Albuquerque LLC is a foreign corporation admitted to do business and which has failed to maintain a statutory agent in this state upon whom service of process may be had.  NMSA 1978, § 38-3-1(F) (1988).

## FACTUAL BACKGROUND

**A.    Application For Insurance**

16.    In late 2018, Defendants sought a renewal of medical malpractice insurance coverage from Underwriters.  Underwriters required that Defendants fill out an insurance application.  The purpose of an insurance application is to give the insurer the facts necessary to determine if the potential insured is an acceptable risk and, if so, what premium to assign and under

what policy terms based on the information submitted in the application.

17.     In the insurance application, dated December 6, 2018, the applicant is "NuMale Chicago, LLC." NuMale Chicago, LLC sought insurance coverage for various affiliated entities and individuals throughout the country, including Defendants. NuMale Chicago, LLC's insurance application was signed by Dr. Asandra and Dr. Feliciano—two of the Defendants in this case—on December 6, 2018. The insurance application lists Mr. Palubicki, another Defendant in this case, as "President."

18.     The insurance application for the Policies included a series of questions aimed at uncovering known claims and potential claims for liability. These questions are critically important because Defendants sought renewals of claims made and reported policies—*i.e.*, policies triggered if a claim is made and reported during the policy period, even if the incident or injury giving rise to the claim occurred prior to the inception of the policy period.

19.     In the insurance application, Defendants were required to disclose, among other things, whether any "proposed insured" was "aware of any claim or suit, or any act, error, omission, fact, [or] circumstance" that "may result in a malpractice, general liability, or products liability claim or suit." Despite the incident giving rise to the Sanchez Lawsuit occurring in November 2017, Defendants responded "no" to this question.

20.     The application also required Defendants to disclose "any claim or suit for an error, omission or malpractice" made against the applicant, its organization, or any employees or staff. Defendants did not disclose any claims concerning Mr. Chapman's treatment of Mr. Sanchez in response to this question.

21.     The application also included the following inquiry: "Has the applicant or any staff ever been the subject of disciplinary/investigative proceedings"? In response, Defendants checked

the "no" box on the form.

22.    By signing the application of insurance, Dr. Asandra and Dr. Feliciano represented that all statements made in the insurance application were (1) "true and correct"; (2) "the basis of the contract should a policy be issued"; and (3) "have been relied upon" by Underwriters "in issuing any policy."

**B.    The Policies**

23.    In early 2019, Defendants secured two policies from Underwriters, a $1 million Miscellaneous Medical Professional Liability Claims Made and Reported Insurance (Policy No. W14CC4190601) and a $5 million Excess Insurance Policy (Policy No. W1561E190601).  The Policies' limits total $6 million, inclusive of defense costs.  The policy period for both Policies is January 23, 2019 through January 23, 2020.  The Policies are governed by Illinois law.

24.    The Policies, by their terms, state that they are made in reliance upon Defendants' statements, representations and warranties made in the insurance application which was made a part of the Policies.  Ex. A at p. 32, Ex. B at p. 13.

25.    Each Defendant is an insured under the Policies.  In an endorsement listing the scheduled insureds, Mr. Chapman is listed as a current medical professional performing services on behalf of NuMale Medical Center, but Mr. Chapman was fired on or about July 13, 2018.

26.    The Policies are designed to provide defense costs and indemnity for, among other things, claims for bodily injury arising out of any negligent act, error or omission of an insured in rendering or failure to render professional services.  The Policies contain a number of exclusions, including but not limited to the following:

- <u>Known Circumstance Exclusion</u>:  There is no coverage for "any **Claim** or circumstance which might lead to a Claim known to any Insured prior to

- 7 -

the inception of this Policy and not disclosed to the Underwriters at inception." Ex. A at p. 35, § IV(m); Ex. B at p. 13, § I.

- <u>Fraud Exclusion</u>: There is no coverage for "any **Claim** arising out of any criminal, dishonest, fraudulent or malicious act, error, or omission of any **Insured**, committed with actual criminal, dishonest, fraudulent or malicious purpose or intent." Ex. A at p. 35, § IV(b); Ex. B at p. 13, § I.

- <u>Punitive Damages Exclusion</u>:  There is no coverage for "any **Claim** for punitive or exemplary **Damages**, or **Damages** which are a multiple of compensatory **Damages**, fines, sanctions, taxes or penalties, or the return of or reimbursement for fees, costs or expenses charged by any **Insured**." Ex. A at p. 36, § IV(s); Ex. B at p. 13, § I.

- <u>Unfair Trade Practices Exclusion</u>: There is no coverage for "any **Claim** based upon or arising out of any actual or alleged violation of any federal, state, or local anti-trust, restraint of trade, unfair competition, or price fixing law, unfair or deceptive trade practices, or consumer protection any rules or regulations promulgated thereunder." Ex. A at p. 37, § IV(x); Ex. B at p. 13, § I.[2]

### C.    Underlying Facts in the Sanchez Lawsuit

27.    On November 16, 2020, Mr. Sanchez commenced a lawsuit against various corporations and individuals affiliated with NuMale Medical Center (including Defendants) in

---

[2]    The Policies also state to the extent a claim alleges both professional negligence and any of the above excluded enumerated offenses, Underwriters and the Insured will use their best efforts to reach a fair allocation between covered and uncovered damages. Ex. A at p. 37, § IV(x); Ex. B at p.13, § I.

Bernalillo County, New Mexico, alleging negligence, fraud, and violations of the New Mexico Unfair Trade Practices Act, among other claims, in relation to his treatment at the Albuquerque, New Mexico clinic in the fall of 2017.

28.     Mr. Sanchez alleged that he was referred to NuMale Medical Center for testosterone therapy but was convinced to purchase a more expensive treatment plan which included the use of medications that were to be injected directly into his penis to cause an erection. Mr. Sanchez alleged that, after he returned home, he developed priapism—an erection lasting longer than four hours—which persisted for several days.  After a few days, Mr. Sanchez returned to NuMale Medical Center, but Mr. Chapman could not reverse the erection.  Mr. Sanchez then drove himself to the emergency room, where he received treatment and emergency surgery for the priapism from a urologist, Dr. Stefan Gutow.  Mr. Sanchez alleged he did not regain complete function in his penis following the surgery and has suffered pain, disfigurement, humiliation, and loss of enjoyment of life.

29.     Mr. Sanchez alleged that Mr. Chapman was supervised by Dr. Asandra and Dr. Feliciano, and that Mr. Chapman acted as an agent of Defendant NuMale Albuquerque LLC and various other affiliated corporate entities.[3]

**D.     New Mexico Medical Board Complaint Filed Against Mr. Chapman Prior to the Policy Period Regarding the Sanchez Incident**

30.     After receiving the complaint in the Sanchez Lawsuit in December 2020, Underwriters asked Defendants for information about a New Mexico Medical Board investigation referenced in the complaint.  For the first time, and only upon Underwriters' information demand, Mr. Palubicki disclosed that a New Mexico Medical Board Complaint had been filed against Mr.

---

[3]     Mr. Chapman originally was a defendant in the Sanchez Lawsuit, but was dismissed by stipulation before the verdict.

Chapman (the "New Mexico Board Complaint") in relation to the treatment of Mr. Sanchez at

NuMale Medical Center **before** Defendants had applied for insurance in December 2018.

Specifically, on November 20, 2017, more than a year before Defendants applied for insurance,

Dr. Gutow, the emergency room physician who treated Mr. Sanchez, asserted the following in his

New Mexico Board Complaint:

> Patient was treated by Mr. Chapman on 11/17/17 for erectile
> dysfunction. He was given an intra-cavernosal injection of medicine
> to induce an erection. Patient went home and developed a priapism.
> Patient self-administered phenylephrine as instructed by Mr.
> Chapman to get erection to go down. It did not work. Priapism
> persisted and patient returned to NuMale medical center on 11/20
> where Mr. Chapman administered phenylephrine which did not
> work. Patient was instructed to go to ER. He went to Presbyterian
> ER where he is currently under my care for this problem. My
> complaints are as follow[s]:
>
> 1. Mr. Chapman is doing these procedures without any surgical
> background or any urology backup to manage complications when
> they arise. There is apparently an ER doctor who oversees him
> although I believe this doctor lives in Las Vegas, NV. His name is
> Christopher Asandra. Why am I obligated to manage this practices
> complications when they have an inadequate set up to manage
> complications.
>
> 2. Patients should not be sent home with phenlephrine to self
> administer inter-corporeally. This is malpractice in my opinion.
> This could have severe systematic consequences. When I spoke to
> Mr. Chapman today about this patient, he did not seem to be aware
> of the potential complications of this medicine.
>
> 3. This is patent abandonment as they have no ability to manage
> complications other than to send patient to ER for a real doctor to
> manage.[4]

---

[4]    On November 20, 2019, the New Mexico Medical Board served Mr. Chapman with a
Notice of Contemplated Action, notifying Mr. Chapman that the Board had sufficient
evidence to discipline Mr. Chapman for his failure to properly screen Mr. Sanchez prior to
his treatment for erectile dysfunction. The Board also alleged that Mr. Chapman's
treatment of Mr. Sanchez "may not have been effectively supervised and may have
exceeded" his "scope of practice." In November 2020, Mr. Chapman and the New Mexico

31.     By letter dated March 20, 2018, the New Mexico Medical Board informed Mr. Chapman, then an employee of NuMale Medical Center, about the New Mexico Medical Board Complaint.  Mr. Chapman discussed the New Mexico Board Complaint with several employees, including Dr. Asandra, around the time Mr. Chapman and NuMale Medical Center received notice of it.  Accordingly, Defendants knew about the New Mexico Medical Board Complaint when they applied for insurance from Underwriters in December 2018.

32.     Defendants' failure to disclose the Sanchez incident or the New Mexico Board Complaint in response to questions on the insurance application had a material impact on Underwriters' acceptance of the insurance risks.  Indeed, the assertions in the New Mexico Board Complaint against Mr. Chapman would have raised alarms for Underwriters had Defendants disclosed the matter on the application as required.  Not only did the New Mexico Board Complaint highlight a potential medical malpractice claim with respect to Mr. Chapman's treatment of Mr. Sanchez, it may have forewarned of systemic issues at NuMale Medical Center regarding inadequate training, scarce supervision, and lack of patient education.  These were central issues in the Sanchez Lawsuit.

33.     Defendants' material misrepresentations and omissions in the insurance application and prior to the Policies' inception render the Policies voidable and, moreover, preclude coverage for the Sanchez Lawsuit under the Known Circumstances Exclusion.

**E.     Underwriters' Reservation of Rights Letter**

34.      By letter dated January 13, 2021, Underwriters agreed to defend the defendants in the Sanchez Lawsuit (including all Defendants in this action), subject to a reservation of rights.

---

Medical Board entered into an agreed order which, among other things, prohibited him from treating patients for erectile dysfunction and priapism.

Underwriters informed Defendants that "several exclusions may preclude or limit coverage for the Lawsuit," including the Known Circumstance Exclusion, the Fraud Exclusion, the Unfair Trade Practices Exclusion, and the Punitive Damages Exclusion.  With respect to the Known Circumstances Exclusion, Underwriters noted that, "despite the seriousness of [Mr. Sanchez's] injuries and the allegations of" the November 2017 New Mexico Medical Board Complaint, neither was disclosed to Underwriters prior to the Policies incepting.

### F.    Trial in the Sanchez Lawsuit

35.    Between November 14 and November 25, 2024, the Sanchez Lawsuit was tried to a jury.  From jury selection through closing argument, Mr. Sanchez's counsel emphasized that the defendants engaged in fraud and violations of the New Mexico Unfair Practices Act by holding themselves out as experts in men's health when they knew or should have known that Mr. Chapman was not a urologist or otherwise an expert in men's sexual health and was not qualified to provide unsupervised medical care in NuMale Medical Center's Albuquerque clinic.

36.    For example, during jury selection, when Mr. Sanchez's counsel explained what the case was about to prospective jurors, he focused on Mr. Sanchez's allegations of fraud and unfair business practices:

> I think I'll just start out, is there anyone sitting here – we are suing a medical corporation and healthcare providers, this is a case involving medical negligence, ***we're alleging there's fraud and unfair business practices***, and this lawsuit is for many millions, tens of millions of dollars and punitive damages against healthcare providers.  Is there anyone here who, brutal honestly with your integrity speaking says, you know, a case like that you don't want me as a juror.

37.    Likewise, during opening argument, Mr. Sanchez's counsel stated that "[w]e're going to see not a care facility, but ***a fraud facility***."  According to Mr. Sanchez's counsel, while "it's natural to talk about what went wrong medically," the damages stemming from medical

negligence were just the "tip" of the iceberg.  Mr. Sanchez's counsel then went on to discuss "fraud" and "prey[ing] on the vulnerable deliberately."

38.     During closing argument, Mr. Sanchez's counsel used the words "fraud," "fraudulent," or "unfair" or "unconscionable" in relation to business practices thirty times.  For example, Mr. Sanchez's counsel stated:

- "So the way they are advertising and marketing to bring in these PAs to run these clinics it's fraud to begin with."

- "It's fraud.  It's deceptive.  Unfair.  Unconscionable."

- "And what's important about this language is you're gonna see jury instructions . . . about unfair business practices, deception, fraud.  And when you're back there, that should be a unanimous verdict on those questions[.]"

39.     Finally, in the Court's Jury Instruction No. 13 concerning the causes of action in the case, the first cause of action addressed is "fraud."  In addition, the Court had several additional jury instructions concerning fraud and the New Mexico Unfair Practices Act, including Jury Instruction Nos. 23, 24, 25, 26, 27, 28, and 53.   In Jury Instruction No. 62 concerning punitive damages, the Court instructed that if the conduct of NuMale Corporation taken as a whole was willful, reckless, wanton or fraudulent," the jury may award punitive damages against NuMale Corporation.

**G.     Verdict in the Sanchez Lawsuit**

40.     The Special Verdict Form highlighted Mr. Sanchez's fraud and Unfair Practices Act causes of action.

41.     With respect to the "fraud claim," there were two questions:  (1) "Was any conduct by any NuMale defendant fraudulent?"; and (2) "Was any fraudulent conduct by Numale a cause of Plaintiff's damages?"   The jury checked "yes" to both questions, ultimately finding all defendants liable for fraud.

42.     With respect to the Unfair Practices Act claims, there were three questions: (1) "Was any conduct by any Numale Defendant an unconscionable trade practice in violation of the Unfair Practices Act?"; (2) "Was any unconscionable conduct under the Unfair Practices Act a cause of Plaintiff's damages?"; and (3) "Was any conduct by any Numale Defendant an unfair or deceptive trade practice in violation of the Unfair Practices Act?".  The jury checked "yes" to all three questions, finding all defendants liable for violations of the New Mexico Unfair Trade Practices Act.

43.     Ultimately, the jury awarded $37,005,149.00 in compensatory damages against all defendants.  The verdict form did not distinguish between or allocate compensatory damages among the defendants or the causes of action.

44.     The jury also awarded $375,000,000.00 in punitive damages against NuMale Corporation.  In connection with the punitive damages award, the jury checked "yes" in response to the question: "Was the cumulative conduct of Numale Corporation acting through its agents and subsidiary corporations either willful, wanton or reckless?"  Further, under the jury instructions, "willful, reckless, wanton or fraudulent conduct" was required to recover punitive damages against NuMale Corporation.

45.     The trial testimony, jury instructions, and jury verdict plainly demonstrate that coverage for the Sanchez Lawsuit is excluded under the Fraud Exclusion, the Unfair Trade Practices Exclusion, and the Punitive Damages Exclusion in the Policies.

**H.      Breach of the Policies' Cooperation Provision**

46.     Notwithstanding the existence of an "Assistance And Co-Operation Of The Insured" provision (the "Cooperation Provision") in the Policies (Ex. A at p. 48, § XII), Defendants did not provide full and contemporaneous disclosure to Underwriters that Nick

Rowley, Mr. Sanchez's lead counsel in the Sanchez Lawsuit, was engaging in improper *ex parte* communications with Dr. Asandra, the NuMale physician who supervised Mr. Chapman, during the pendency of the Sanchez Lawsuit.

47.    Had Underwriters known of the *ex parte* communications between Mr. Rowley and Dr. Asandra when they occurred, Underwriters would have demanded that Defendants move to disqualify Mr. Rowley and/or move for a mistrial.

48.    Moreover, disclosure also would have been integral to Underwriters in terms of strategy in the case, including whether to have Dr. Asandra testify at trial or to settle.  Rather than appearing in person to present live testimony at trial, Dr. Asandra left New Mexico after Mr. Rowley floated the idea of dismissing Dr. Asandra from the case, which angered the Court and required Dr. Asandra to provide his trial testimony by Zoom.  During his trial testimony, Dr. Asandra admitted to breaches of the standard of care and was more critical of NuMale Medical Center and Mr. Chapman than he was in his sworn deposition testimony.

### I.    No Bad Faith on the Part of Underwriters

49.    Following the verdict in the Sanchez Lawsuit, Mr. Sanchez's counsel contacted Underwriters, raising several purported bases that Underwriters acted in bad faith in its defense of the Defendants in the Sanchez Lawsuit.  Sanchez's counsel further suggested Defendants' agreement that Underwriters acted in bad faith.  According to Sanchez's counsel, Beazley acted in bad faith in the following ways: (1) failing to provide separate independent counsel for all defendants in the Sanchez Lawsuit; (2) failing to settle the Sanchez Lawsuit within policy limits; and (3) purportedly "opposing" a proposal to dismiss Dr. Asandra and Dr. Feliciano during trial.

50.    None of these alleged bases give rise to any cognizable bad faith claim against Underwriters.  Beyond the fact that the Policies are voidable and, at any rate, coverage is otherwise

precluded under numerous exclusions in the Policies—barring any claim of bad faith—Underwriters at all relevant times also acted fairly and reasonably in dealings with Defendants throughout the Sanchez Lawsuit.

51.     For example, Underwriters offered to provide independent counsel to all defendants throughout the Sanchez Lawsuit.  Specifically, on January 13, 2021, Underwriters sent a letter to Defendants via Mr. Palubicki stating that Underwriters agreed to provide independent counsel to all defendants in the Sanchez Lawsuit upon request and instructing NuMale to forward the letter to all defendants.  None of the Defendants requested independent counsel.  Moreover, when it became apparent that Mr. Chapman, prior to him being dismissed from the action, might testify against NuMale, Underwriters retained independent counsel for him.

52.     In addition, Underwriters consulted with Defendants and defense counsel with respect to each settlement demand made by Mr. Sanchez, and Defendants agreed that the demands were unreasonable.  Indeed, the corporate Defendants' principal consistently insisted that Underwriters deny each demand.  At no point prior to trial were Underwriters advised by Defendants or defense counsel that an adverse verdict in the Sanchez Lawsuit was substantially likely to exceed policy limits.  Nor were Underwriters ever informed that any Defendant wished to settle within policy limits before trial.  The decision to proceed to trial was made after a full and adequate investigation and reflects an honest and reasonable conclusion that the policy limits would be adequate to compensate any liability.  Moreover, during trial, when limits liability became apparent, Underwriters offered to settle for policy limits of $6 million.  Underwriters' offer was not accepted.

53.     Finally, Underwriters did not prevent any Defendant from being dismissed from the Sanchez Lawsuit.  During trial, Mr. Sanchez offered to dismiss Defendants Dr. Asandra and

Dr. Feliciano from the case, subject to the condition that the parties "agree to shorten the trial and not to call Dr. Asandra or Dr. Feliciano to testify." Dr. Asandra was anticipated to be an important defense witness for all Defendants, and trial counsel for Defendants believed it was conflicted in responding to the proposed stipulation because of its joint representation of Dr. Asandra, Dr. Feliciano, and the remaining Defendants. At this point, defense counsel moved for a mistrial based on the dismissal offer and resulting conflict of interest. Counsel for Mr. Sanchez then withdrew the offer to dismiss Dr. Asandra and Dr. Feliciano. At no point did Underwriters oppose the offer or direct defense counsel to reject the offer.

54.     Nothing about Underwriters' actions in the Sanchez Lawsuit suggests bad faith. Underwriters could not and did not hold their own interests above Defendants' interests when Defendants were consistently consulted on and concurred with Underwriters' decisions. At every stage of the case, Underwriters relied on defense counsel's judgment, acted with the understanding that the Defendants had a meritorious defense, and conformed to their understanding of Defendants' wishes. Any purported claim of bad faith against Underwriters is based on nothing more than an outsider's perspective that hindsight is 20/20 when faced with an excess verdict, but bad faith claims are not determined in hindsight, and Underwriters cannot be held strictly liable for an unanticipated excess verdict.

## FIRST CAUSE OF ACTION
### (DECLARATORY RELIEF – RESCISSION)

55.     Underwriters re-allege and incorporate the allegations set forth in in the preceding paragraphs as if fully stated herein.

56.     Defendants or their agents made a misrepresentation and/or omission of material fact in Defendants' insurance application when they failed to disclose the incident giving rise to the Sanchez Lawsuit as an act, error, fact or circumstances that could result in a malpractice or

general liability claim or suit and/or that Dr. Gutow had filed a complaint against Mr. Chapman with the New Mexico Medical Board concerning Mr. Chapman's treatment of Mr. Sanchez at NuMale Medical Center, as required.

57.     Defendants or their agents made the foregoing misrepresentations and/or omissions of material fact with full knowledge and expectation that Underwriters would rely on said representations, which was a material and critical part of Underwriters' consideration of the risk and determination to issue the Policies under the terms provided and for the premium charged.

58.     Underwriters justifiably relied on the representations made in the insurance application in determining whether to issue the Policies under the terms provided and in determining the appropriate premium to be charged.

59.     If the true facts had been known, Underwriters would not have issued the Policies and/or would not have provided coverage under the same terms or with respect to the hazard resulting in the insurance claim at issue.

60.     Underwriters are informed and believe and thereon allege that Defendants contend to the contrary or otherwise dispute Underwriters' contentions regarding rescission.

61.     This Court has the power and authority to rescind the Policies and declare the Policies void due to the material misrepresentations by Defendants.

62.     This Court should declare that the Policies issued to the Defendants are void due to the material misrepresentations by Defendants.

WHEREFORE, Underwriters respectfully pray that the Court rescind the Policies and hold that Defendants must reimburse Underwriters for past defense costs, and that Underwriters will return to Defendants the premiums paid and any other benefit received by Underwriters in connection with the Policies.

## SECOND CAUSE OF ACTION
### (DECLARATORY RELIEF - NO DUTY TO
### INDEMNIFY DUE TO POLICY EXCLUSIONS)

63.    Underwriters re-allege and incorporate the allegations set forth in the preceding paragraphs as if fully stated herein.

64.    There is no coverage under the Policies for any losses stemming from the Sanchez Lawsuit because the Policies contain a Known Circumstances Exclusion.  The Sanchez Lawsuit is a known circumstance because Defendants knew about Mr. Sanchez's injuries and the New Mexico Medical Board Complaint prior to the inception of the Policies, but failed to disclose either to Underwriters prior to the Policies' inception.

65.    In addition, Underwriters have no duty to indemnify Defendants for their losses stemming from the Sanchez Lawsuit in whole in part because of the Fraud Exclusion, the Unfair Trade Practices Exclusion, and the Punitive Damages Exclusion in the Policies.  In the verdict form in the Sanchez Lawsuit, the jury found that the defendants engaged in fraudulent conduct, negligent conduct, and violated the New Mexico Unfair Practices Act, and also awarded Mr. Sanchez punitive damages.

66.    Underwriters are informed and believe and thereon allege that Defendants contend to the contrary or otherwise dispute Underwriters' contentions with respect to the Policies' coverage exclusions.  By virtue of the foregoing, there exists a justiciable controversy between Underwriters and Defendants regarding whether there is a duty to indemnify under the Policies.

67.    Accordingly, Underwriters seek a declaration that under the terms, conditions, and exclusions of the Policies, they have no duty to indemnify Defendants for any losses stemming from the Sanchez Lawsuit.  Alternatively, Underwriters seek a declaration as to what portion of such losses, if any, Underwriters have an obligation to indemnify.

WHEREFORE, Underwriters respectfully pray for a declaration that Underwriters have no duty to indemnify Defendants for any losses, damages, costs or expenses stemming from the Sanchez Lawsuit due to exclusions in the Policies or, alternatively, a declaration setting forth what portion of losses, damages, costs or expenses, if any, Underwriters have an obligation to indemnify.

### THIRD CAUSE OF ACTION
### (DECLARATORY RELIEF – NO DUTY TO INDEMNIFY
### DUE TO BREACH OF COOPERATION PROVISION)

68.     Underwriters re-allege and incorporate the allegations set forth in the preceding paragraphs as if fully stated herein.

69.     The Policies contain a Cooperation Provision.  The basic purpose of a cooperation provision is to protect the insurer's interests and prevent collusion between the insured and the injured party.  Under Illinois law, which governs the Policies, an insured's duty to cooperate is considered to be so important that it will trump the insured's right to maintain the confidentiality of communications with the insured's own attorney.  In fact, in Illinois, an insured must provide its insurer with information that is relevant to a claim, regardless of the attorney-client privilege.[5]

70.     Underwriters contend that Defendants breached the Cooperation Provision by failing to disclose that Mr. Rowley was engaging in *ex parte* communications with Dr. Asandra when those communications occurred.  Underwriters further contend that they were prejudiced as a result of Defendants' failure to disclose that Mr. Rowley was engaging in *ex parte* communications with Dr. Asandra.

71.     Underwriters are informed and believe and thereon allege that Defendants contend to the contrary or otherwise dispute Underwriters' contentions.  By virtue of the foregoing, there

---

[5]     *See Waste Management, Inc. v. International Surplus Lines Ins. Co.*, 144 Ill. 2d 178, 192 (1991).

exists a justiciable controversy between Underwriters and Defendants regarding whether Defendants breached the Cooperation Provision.

72.     Accordingly, Underwriters seek a declaration that Defendants breached the Cooperation Provision, and as a result thereof, Underwriters have no duty to indemnify Defendants.

WHEREFORE, Underwriters respectfully pray for a declaration that Underwriters have no duty to indemnify Defendants for any losses, damages, costs or expenses stemming from the Sanchez Lawsuit due to Defendants' breach of the Cooperation Provision or, alternatively, a declaration setting forth what portion of losses, damages, costs or expenses, if any, Underwriters have an obligation to indemnify.

## FOURTH CAUSE OF ACTION
### (DECLARATORY RELIEF – NO BAD FAITH)

73.     Underwriters re-allege and incorporate the allegations set forth in the preceding paragraphs as if fully stated herein.

74.     Underwriters seek a declaration that Underwriters have not acted in bad faith with respect to the Sanchez Lawsuit.  Underwriters acted in good faith at all points in time through the Sanchez Lawsuit, including (but not limited to) its actions with respect to the provision of independent counsel, settlement negotiations, and negotiations regarding the dismissal of Defendants during trial.

75.     Underwriters are informed and believe and thereon allege that Defendants contend to the contrary or otherwise dispute Underwriters' contentions.  By virtue of the foregoing, there exists a justiciable controversy between Underwriters and Defendants regarding whether Underwriters acted in bad faith with respect to the Sanchez Lawsuit.

WHEREFORE, Underwriters respectfully pray for a declaration that Underwriters did not act in bad faith with respect to the Sanchez Lawsuit.

Dated:  March 14, 2025

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By /s/ Eric R. Burris
    Eric R. Burris
    Debashree Nandy
    201 Third Street NW, Suite 1800
    Albuquerque, New Mexico 87102-4386
    Telephone: (505) 244-0770
    Facsimile: (505) 244-9266
    eburris@bhfs.com
    rnandy@bhfs.com

SIMPSON THACHER & BARTLETT LLP
Bryce L. Friedman*
Summer Craig*
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
bfriedman@stblaw.com
scraig@stblaw.com

Chet A. Kronenberg*
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067
Telephone: (310) 407-7500
Facsimile: (310) 407-7502
ckronenberg@stblaw.com

*Attorneys for Certain Underwriters at Lloyd's, London, Syndicates 2623 and 623*

  * *pro hac vice* application forthcoming



## MISCELLANEOUS MEDICAL PROFESSIONAL LIABILITY CLAIMS MADE AND REPORTED INSURANCE

## DECLARATIONS

This is a Claims Made and Reported Policy. Except to such extent as may otherwise be provided herein, the coverage afforded under this Insurance is limited to those **Claims** which are first made against the **Insured** and reported during the **Policy Period**. **Damages** and **Claims Expenses** shall be applied against the Deductible. Certain words and phrases which appear in bold type have the special meaning agreed by the parties in Clause V., Definitions. Words with capitalized first letters only shall have the further meaning provided in the Declarations or as the context may require. Please review the coverage provided by this Insurance carefully and discuss it with your insurance agent or broker.

These Declarations along with the completed and signed application and the **Policy** with endorsements shall constitute the contract between the **Named Insureds** and the Underwriters.

**Underwriters:**             Syndicates 2623/623 at Lloyd's

**Policy Number:**          W14CC4190601

**Authority Ref. Number:**     B6012BUSANMSL1901

Item 1.    **Named Insured:** NuMale Chicago, LLC

           **Address**:

           4711 Golf Road
           Suite 1050
           Skokie, IL 60076

Item 2.    **Policy Period:**      From:      23-January-2019

                                    To:        23-January-2020

Both dates 12:01 a.m. Local Time at the Principal Address shown in Item 1.

Item 3.    **Limit of Liability:**

           (a) Each **Claim**                              $1,000,000

           (b) Term Aggregate- all coverages combined          $3,000,000

Item 4.    **Deductible:**

           Each **Claim** Deductible                    $10,000

Item 5.    **Premium:**

         a.    The premium paid in respect of the entire **Policy Period**

              $135,000

F00531
012017 ed.
Date Issued: 11-Mar-2019 7:04:51 PM

Page 1 of 4



CIVIL COMPLAINT FOR
DECLARATORY
JUDGMENT
EXHIBIT A



Plus taxes as applicable, which shall be payable in full at inception of this Insurance as designated in Item 2. of the Declarations

**Extended Reported Period:**

b.   Premium for **Extended Reporting Period**:

c.  Length of **Extended Reporting Period**:

| | |
|---|---|
| 150% of the premium shown in 5.a. | One (1) year |
| 175% of the premium shown in 5.a. | Two (2) years |
| 200% of the premium shown in 5.a. | Three (3) years |

Item 6.   **Retroactive Date:**

Coverage shall apply only to those **Claims** reported pursuant to the terms and conditions of the Policy arising out of **Professional Services** described herein and performed subsequent to the date below:

23 January 2014 - PL
04 August 2014 - For the performance of hormone therapy, medispa and weight management treatments including but not limited to O-Shots, HCG Diet and HCG injections, BHRT, and HGH therapy.
25 April 2016 - For ultrasound assisted liposuction for body contouring procedures but solely when performed by Christopher F. Asandra, MD and solely when performed at 5052 Jones Boulevard, Suite 145, Las Vegas, NV, 89119

Item 7.   **Service of Suit:**

Service of Suit upon the Underwriters pursuant to Clause XXIII. of the Policy may be made upon:

Mendes & Mount, LLP
750 7th Ave # 24
New York, NY 10019

Item 8.   **Notice of Election:**

Recipient of Notice of **Named Insured's** Cancellation:
Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, Connecticut 06032
Tel: (860) 677-3700
Fax: (860) 679-0247

Recipient of Notice of **Named Insured's** intention to purchase **Extended Reported Period** Coverage and premium for **Extended Reported Period** Coverage:

Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, Connecticut 06032
Tel: (860) 677-3700
Fax: (860) 679-0247

F00531
012017 ed.
Date Issued: 11-Mar-2019 7:04:51 PM

Page 2 of 4



**Item 9.**   **Notice of Claim:**

Recipient of Notice of **Named Insured's Claim** or Circumstance per Condition XI. of the Policy:

Beazley Healthcare Claims
1270 Avenue of the Americas
Suite 1200
New York, NY 10020
Tel: (646) 943-5900
Fax: (646) 348-4039
Email: healthcareclaims@beazley.com

**Item 10.**   **Scheduled Insureds/ Physicians:**

None, unless scheduled via endorsement.

**Item 11.**   **Scheduled Professional Services:**

Clinic providing low testosterone treatment, erectile dysfunction treatment, Neograft Procedures, anti-aging including hormone therapy, medi-spa, weight management services, laser hair removal; Ultrasound assisted liposuction for body contouring procedures but solely when performed by Christopher F. Asandra, MD and solely when performed at 150 North Robertson Boulevard, Suite 250, Beverly Hills, CA 90211; Platelet Rich Plasma (PRP) hair, skin, and genital treatments; HCG Diet/Medical Weight Loss Treatments & HCG Injections; Bio identical Hormone Replacement Therapy; Testosterone Replacement (BioIdentical) (IM shots and subcutaneous pellet placement); Sermorelin Therapy; Botox, Latisse and Fillers; Laser Vaginal Rejuvenation with FDA Approved $CO_2$ laser; Facial aesthetics with $CO_2$ laser; PiQO4 Laser treatments; and home visits by Dr. Christopher Asandra for pellet insertions, hormone and vitamin injections, and initial and follow-up consultations so long as signed informed consent on file. In addition, Karla Balderas would also do home visits for hormone and vitamin injections as long as a signed informed consent on file.

**Item 12.**   **Choice of Law:**

Illinois

**Item 13.**   **Endorsements Effective at Inception:**

| | | |
|---|---|---|
| 1. | NMA1256 | Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A.) |
| 2. | NMA1477 | Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A.) |
| 3. | NMA2918 | War and Terrorism Exclusion Endorsement |
| 4. | E00527 052008 ed. | Mailing Address Endorsement |
| 5. | E00861 032015 ed. | Premium Payment Warranty Endorsement |
| 6. | E06086 032017 ed. | Scheduled Locations With Retroactive Dates and Termination Dates Endorsement |
| 7. | E08299 022017 ed. | HIPAA Endorsement |
| 8. | E08305 042016 ed. | Amend Sexual/Physical Misconduct Exclusion with Sublimit |

F00531
012017 ed.
Date Issued: 11-Mar-2019 7:04:51 PM

Page 3 of 4



9.  E08403 092017 ed.          Amend Item 10. Of the Declarations to Add Scheduled Insureds/
                               Physicians and Retroactive and Termination Dates

10. E08414 052016 ed.          Additional Named Insured Endorsement

11. E09757 022017 ed.          Medispa Additional Limitations and Exclusions Endorsement

12. E09759 022017 ed.          Surgical Services Exclusion

13. E09810 022017 ed.          Beazley Miscellaneous Medical Risk Management Services
                               (AssistLine and On Location Assessment and Consulting
                               Services) Endorsement

14. E12378 122018 ed.          Amend Deductible for Laser Hair Removal Services

15. E12650 012019 ed.          Neograft Procedures

16. ENC028 022017 ed.          Minimum Earned Premium Endorsement

17. SCHEDULE2019               Lloyd's Security Schedule 2019


Dated:      11-March-2019

At:         30 Batterson Park Road
            Farmington, Connecticut 06032          by _____
            (the office of the Correspondent)
                                                       Beazley USA Services, Inc. (Correspondent)

# Beazley Risk Management Services

As part of Beazley Healthcare Risk Management, you will have access to these services throughout your policy period at no additional cost to you. Look for an email in your inbox detailing the Beazley Risk Management Resource Center and AssistLine features from Beazley's preferred risk management services provider, Pendulum, LLC.

## On-Location Services

During a full one-day risk assessment, a Pendulum risk control consultant evaluates clinical and/or operational processes and the environment for risk of liability exposures. They evaluate risk/quality/safety practices/programs, policies and procedures, incident reporting, physical environment, human resources protocols, patient services (if applicable), records, and high-risk areas. Time allotments and areas of specific focus during the assessment can be customized to meet specific insured needs. After the assessment, a written report of findings, including recommendations to enhance risk management practices, is sent to the Insured.

## Pendulum AssistLine

Pendulum AssistLine offers easy access to answers for questions on adverse events, policies and procedures, regulatory issues, and much more. Dialing the AssistLine phone number connects your organization to feedback from an expert clinician and referral sources on risk and defensibility issues.

**To access AssistLine, simply call toll free (844) 451-0874. AssistLine is available from 9:00 a.m. – 4:00 p.m. MT every business day.** Think of a question on off hours? Call and leave a voicemail! Calls received after regular office hours will be returned the next business day.

## Beazley Risk Management Resource Center

The Beazley Risk Management Resource Center is an online portal that allows users to access numerous documents to assist the miscellaneous medical insured in the management of risk in their specific setting.

Many of the tools on the Resource Center are user-friendly Word documents that can be downloaded, customized, and used within a facility immediately.

The Beazley Risk Management Resource Center is updated regularly to ensure users are viewing current information on issues and trends in the miscellaneous medical arena.

The Resource Center also allows users to follow the status of key healthcare legislation. Users can see when a bill was introduced, the bill's sponsor(s), status details, and any current action on the bill. Users can also view news and blog coverage of the bill.

The calendar feature of the Resource Center lists important dates, including conventions and governmental deadlines.

**Features include:**
• Access to industry-related documents and tools
• Regular updates
• Information on key healthcare legislation
• Industry news
• Industry calendar
• Email alerts concerning pertinent uploads/news items.





Register today!
1. Go to: https://resourcesforrisk.com/beazley
2. Click on the "Register" button
3. Complete the registration form
   (you will need your approval code: **beazleyhealthcare** and policy number)

A message will display notifying you that your registration has been approved.

The descriptions contained in this broker factsheet are for preliminary informational purposes only. Coverages are underwritten by Beazley syndicates at Lloyd's and will vary depending on individual country law requirements and may be unavailable in some countries. Coverages are available in the US only on a surplus lines basis through licensed surplus lines brokers. The exact coverage afforded by the product(s) described in this factsheet are subject to and governed by the terms and conditions of each policy issued. The publication and delivery of the information contained herein is not intended as a solicitation for the purchase of insurance on any US risk.





CBSL567_US_10/18

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**

<u>**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)**</u>

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

<u>This Policy</u>* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction:

      (a)    with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

      (a)    the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

      (b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or

NMA1256                                                         

possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1.  war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.  any act of terrorism.

    For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## MAILING ADDRESS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance®**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Item 1. is amended to include the following mailing address of the entity in Item 1. of the Declarations:

2600 North Mayfair Road, Suite 505

Wauwatosa, WI 53226

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E00527                                                                                                      Page 1 of 1
052008 ed.

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## PREMIUM PAYMENT WARRANTY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

All premium due to the Underwriters under this Policy is paid within 30 days from the inception date of the Policy.  Non-receipt of such premium by midnight (local standard time) on the premium due date, shall render this Policy void from the inception date.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**SCHEDULED LOCATIONS WITH RETROACTIVE DATES AND TERMINATION DATES ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage provided by **INSURING AGREEMENTS I.**A. Professional Liability shall apply to the facilities scheduled below, where the **Insured** provides **Professional Services** but only occurring between the Retroactive Date and the Termination Date set forth below:

| Scheduled Location(s) | Retroactive Date | Termination Date |
|---|---|---|
| 1. Austin Personal Surgeons, PA and NuMale Texas, PA d/b/a NuMale - 630 West 34th Street, Suite 301, Austin, TX 78705 | 23 January 2014 | 01 January 2017 |
| 2. NuMale Chicago, LLC - 4711 Golf Road, Suite 1050, Skokie, IL 60076 | 23 January 2014 | N/A |
| 3.a. Asandra NuMale Nevada, PLLC d/b/a NuMale Medical Center and Nevada NuMale - 5052 Jones Boulevard, Suite 145, Las Vegas, NV 89118 | 28 April 2014 | N/A |
| 3.b. Asandra NuMale Nevada, PLLC d/b/a Doctors of Hair - 5052 Jones Boulevard, Suite 145, Las Vegas, NV 89118 | 19 January 2016 | N/A |
| 4. NuMale Nebraska, LLC - 444 Regency Parkway Drive, Suite 204, Omaha, NE 68114 | 23 June 2014 | N/A |
| 5. NuMale New Mexico, SC - 7920 Wyoming Boulevard, Northeast, Suite B-2, Albuquerque, NM 87109 | 04 August 2014 | N/A |
| 6. NuMale Colorado, SC - 8200 East Belleview Avenue, Suite 230C, Greenwood Village, CO 80111 | 13 November 2014 | N/A |
| 7. NuMale Arizona P.C. - 5240 East Knight Drive, Suite 100, Tucson, AZ 85712 | 19 January 2015 | 01 April 2016 |

| | | |
|---|---|---|
| 8. NuMale North Carolina, SC - 380 Billingsley Road, Suite 201, Charlotte, NC 28211 | 02 February 2015 | N/A |
| 9. NuMale Florida TB, PLLC - 500 North Westshore Boulevard, Suite 635, Tampa, FL 33609 | 16 February 2015 | N/A |
| 10. NuMale Villages, LLC - 8640 East County Road 466, Suite B, The Villages, Florida 32162 | 05 June 2015 | 01 September 2016 |
| 11. Asandra MD, PC NuMale Beverly Hills, LLC NuMale Corporation - 150 North Robertson Boulevard, Suite 250, Beverly Hills, CA 90211 | 07 August 2017 | N/A |

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**HIPAA ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that solely for the purposes of this endorsement:

1.    Clause **I. INSURING AGREEMENTS** is amended by the addition of the following:

**HIPAA Coverage**

The Underwriters shall indemnify the **Insured** for **Damages** and **Claims Expenses** in excess of the Deductible set forth in Item 4. of the Declarations that the **Insured** is legally obligated to pay, as a result of any **Claim** for a **HIPAA Violation** that is first made against the **Insured** and is reported to the Underwriters in writing during the **Policy Period** or within sixty (60) days after the end of the **Policy Period**; provided, however, that: (1) the **Insured** had no knowledge of such **HIPAA Violation** prior to the Inception Date of this Policy set forth in Item 2. of the Declarations; (2) such **HIPAA Violation** took place subsequent to the Retroactive Date set forth in Item 6. of the Declarations; and (3) no **Insured** has notified any **Government Entity** or **Commercial Payor** of the **HIPAA Violation** giving rise to the **Claim**.

2.    Clause **IV.  EXCLUSIONS** is amended by the addition of the following at the end thereof:

The coverage under this Policy does not apply to **Damages** or **Claims Expenses** incurred with respect to any **Claim**:

(1)    based upon or arising out of: (1) any dishonest, fraudulent, criminal, intentional or malicious act by any **Insured**; (2) any wilful violation of any law, statute, ordinance, rule or regulation by an **Insured**; or (3) any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled; provided, however, that this Exclusion (1) shall not apply to any **Claim** brought under any federal or state statute, regulation or rule predicated upon reckless conduct.  For the purposes of determining the applicability of this Exclusion (1), no **HIPAA Violation**  by any **Insured** shall be imputed to any other **Insured**;

(2)    based upon or arising out of any actual or alleged act, error or omission in the rendering of or failure to render medical services by an **Insured**, except with respect to any allegations of releasing or failure to protect protected health information of any patient;

(3)    for **Bodily Injury**, sickness, disease or death of any person, or for emotional distress, mental anguish or similar injury or damage;

(4)    arising out of false arrest, humiliation, detention or imprisonment, wrongful entry or eviction or other invasion of private occupancy, or malicious prosecution, libel, slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's rights of privacy;

(5)    based upon or arising out of employment discrimination, termination or other wrongful employment acts in violation of any municipal, State or Federal Civil Rights law, regulation or ordinance;

(6)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged: (1) damage to or destruction of any tangible property, including loss of use thereof whether or not resulting from damage or destruction; (2) ownership, operation, use, maintenance, loading or unloading of any

motor vehicle, trailer, watercraft, aircraft or helipad;

(7)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Bodily Injury**, sickness, disease or death to any employee of any **Insured** arising out of and in the course of employment by the **Insured**; or any obligation for which the **Insured** in its capacity as an employer and/or its insurer may be held liable under any workers' compensation, disability benefits law, or any similar law;

(8)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or similar provisions of any federal, state or local law or any amendments thereto, or rules and regulations promulgated thereunder;

(9)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged liability of any **Insured** under any contract or agreement; provided, however, that this Exclusion (9) shall not apply to the extent that liability would have attached to the **Insured** and would have been insured by this Policy even in the absence of such contract or agreement;

(10)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:  (1) insolvency, bankruptcy, conservatorship, rehabilitation, receivership, liquidation, or financial inability to pay of (a) any **Insured** acting as an insurer or reinsurer, or (b) any other insurer, reinsurer, self-insurer, third party payor, managed care organization, health care plan, or other person or entity; (2) failure to obtain, effect or maintain any form, policy, plan or program of insurance, stop loss or provider excess coverage, reinsurance, self-insurance, suretyship, or bond; (3) commingling or mishandling of funds; or (4) failure to collect or pay premiums, commissions, brokerage charges, fees or taxes;

(11)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **HIPAA Violation**, or series of facts, circumstances, transactions, events, or **HIPAA Violation**; (1) which underlies or is alleged in any litigation or administrative or regulatory proceeding brought prior to and/or pending as of the Effective Date stated in the Declarations; or (2) which was the subject of any notice given prior to the Effective Date under any Policy of insurance or plan or program of self-insurance; or (3) which was the subject of any **Claim** made prior to the Effective Date;

(12)    against any subsidiary designated in the Declarations or its past, present or future employees, directors, officers, trustees, review board or committee members, or volunteers acting in their capacity as such, which are based upon, arise out of, directly or indirectly result from, are if consequence of, or in any way involve any fact, circumstance, situation, transaction, event or **HIPAA Violation** or series of facts, circumstances, situations, events or **HIPAA Violation** happening before the date such entity became a subsidiary;

(13)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged service of any **Insured** as an employee, director, officer, trustee, member, manager, governor, medical director, member of any duly constituted review board or committee, or volunteer of any entity other than the **Named Insured**, even if directed or requested by the **Named Insured** to serve in such capacity for such other entity;

(14)    based upon, arising out of a violation or alleged violation of the Securities Act of 1933 as amended, or the Securities Exchange Act of 1934 as amended, or any other State Blue Sky or securities law or similar state or federal statute, and any regulation or order issued pursuant to the foregoing statutes;

(15)    for any actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961 et. seq., and any amendments thereto, or any rules or regulations

promulgated thereunder;

(16) based upon assertions, allegations, causes of action or any demands whatsoever by or on behalf of an **Insured** or **Insureds** hereunder; provided, however, that these provisions shall not apply to any **Claim** brought by a *qui tam* plaintiff or brought under the False Claims Act (31 U.S.C. 3729 et. seq.) or any similar state or local statue, ordinance or regulation.

3. The following definitions in Clause **V. DEFINITIONS** are deleted and replaced with the following:

**"Claim"** means any written demand brought by or on behalf of any **Government Entity** or brought by a **Commercial Payor** against an **Insured**:

1) seeking **Damages** for a **HIPAA Violation**;

2) commencing an audit or investigation of a **HIPAA Violation**; or

3) seeking injunctive relief on account of a **HIPAA Violation**.

However, **Claim** does not include:

4) any customary or routine billing inquiry, including any cost report, request for documentation to support a submission for payment or reimbursement, or other audit/reconciliation conducted by or on behalf of a **Government Entity** or a **Commercial Payor**;

5) notice of a Circumstance;

6) any criminal proceeding against an **Insured**; or

7) any written demand or civil proceeding brought by or on behalf of a private citizen against an **Insured**; provided, however that this subsection 7) shall not apply to a *qui tam* action.

**"Claims Expenses"** means:

1) reasonable and necessary fees charged by an attorney or auditor designated by the **Insured** with the written consent of the Underwriters; or

2) other reasonable and necessary fees, costs or expenses incurred in the investigation, adjustment, defense and appeal of a **Claim**, if incurred by the **Insured** with the written consent of the Underwriters.

However, **Claims Expenses** do not include:

3) remuneration, salaries, wages, overhead fees, or benefits of any **Insured**;

4) any fees, costs, or expenses incurred with respect of any criminal proceedings or actions against any **Insured**; or

5) any fees, costs, or expenses associated with the adoption and implementation of any corporate integrity agreement, compliance program or similar provision regarding the operations of the **Insured's** business, negotiated as part of a settlement with or by order of a **Government Entity** or **Commercial Payor**.

**"Damages"** means any monetary amount, otherwise covered by this Policy and subject to the Limit of Liability, which an **Insured** is legally obligated to pay as a result of a **Claim**, including sums paid as awards, judgments, settlements, and civil fines and penalties imposed by a **Government Entity**.

However, **Damages** shall not include:

1) the return, disgorgement or restitution of fees, profits, charges or benefit payments to any **Commercial Payor** or governmental health benefit payor or program;

2) the costs associated with the adoption, implementation of any corporate integrity

agreement, compliance program or similar provision regarding the operations of the **Insured's** business negotiated as part of a settlement with or by order of a **Government Entity** or **Commercial Payor**;

3)    matters deemed uninsurable by law;

4)    punitive and exemplary damages, taxes, criminal fines or penalties. However, this provision does not apply to any multiplied portion of a civil fine or penalty; or

5)    any costs associated, whether directly or indirectly, with the **Insured's** loss of provider number(s) or the **Insured's** exclusion from participation in any governmental health program, including, but not limited to, Medicare and/or Medicaid.

4.    Clause **V. DEFINITIONS** is amended to include the following at the end thereof:

**"Commercial Payor"** means any entity which arranges for payment or reimbursement of expenses on account of medical services, including the following types of entities:

1)    any entity, including an investor-owned insurance company, which indemnifies subscribers against expenses for medical services;

2)    any self-funded plan or any type of health plan where the risk for the cost of medical services is assumed, in whole or in part, by an employer rather than by an insurance company or managed care organization; or

3)    any managed care organization, such as health maintenance organization ("HMO"), preferred provider organization ("PPO"), point of service plan ("POS"), integrated delivery network ("IDN"), or any type of entity which has all or some of the following characteristics:

(a)    negotiated discount arrangements with selected providers;

(b)    explicit criteria for selection of providers;

(c)    financial or program incentives or penalties to enrolees who do not use selected providers; and

(d)    provider risk-sharing arrangements.

**"Government Entity"** means:

1)    any department, agency, task force or other organization created by any federal, state or local law, executive order, ordinance or rule;

2)    any department, agency, task force or other organization operated, funded or staffed, in whole or in part, by the federal or any state, county or local government; or

3)    any organization operating as a Medicare Integrity Program Contractor in accordance with 63 F.R. 1590 (March 20, 1998) and pursuant to Section 1893 of the Social Security Act (42 U.S.C. 1395ddd).

**"HIPAA Violation"** means any negligent or reckless act, error or omission by the **Insured** in violation of the Health Insurance Portability and Accountability Act (The Health Insurance Portability and Accountability Act of 1996, the Social Security Act, 42 U.S.C. Section 1320a, et. seq) ("HIPAA") and any amendments thereto, or any rules, regulations promulgated thereunder. All similar erroneous billing submissions and all related negligent or reckless acts, errors or omissions in violation of HIPAA any amendments thereto, or any rules or regulations promulgated thereunder, shall be deemed a single **HIPAA Violation**.

5.      Clause **VI.  LIMIT OF LIABILITY** is amended by the addition of the following:

AA.     The Limit of Liability for each **Insured** for all **Damages** and **Claims Expenses** arising from any one **Claim** shall be $50,000 per **Claim** subject to a maximum aggregate Limit of Liability under this Policy of $100,000.  Underwriters shall be obligated to pay only **Damages** and **Claims Expenses** which are in excess of the applicable Deductible set forth in Item 4. of the Declarations.  The **Insured** shall pay the Deductible uninsured and at its own risk.  The Limits of Liability available under this HIPAA Endorsement shall be a sublimit of the Policy's overall Limit of Liability and not in addition thereto.

BB.     **Claims Expenses** are part of and not in addition to, the Underwriters' Limits of Liability, and the payment of **Claims Expenses** by the Underwriters shall reduce such Limits of Liability.

CC.     After the Underwriters' Limit of Liability for an **Insured** has been exhausted payment of **Damages** and/or **Claims Expenses**, all of the Underwriters' obligations under this Policy shall be completely fulfilled, and the Underwriters shall have no further obligation to pay **Damages** or **Claims Expenses**.

DD.     If both **Damages** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim** against any **Insured** includes both covered and uncovered matters or because a **Claim** is made against both **Insureds** and others, the **Insured** and the Underwriters shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Damages** and **Claims Expenses** and uncovered portions of settlements or judgments and **Claims Expenses**.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

### AMEND SEXUAL/PHYSICAL MISCONDUCT EXCLUSION WITH SUBLIMIT

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that

1.  Item 3. of the Declarations is amended to include the following under the Professional Liability Coverage:

    $300,000          Sexual/Physical Misconduct Limit for Each **Claim**

    $600,000          Sexual/Physical Misconduct Annual Aggregate Limit

2.  The Underwriters' maximum aggregate limit of liability for all **Damages** and **Claims Expenses** resulting from all such **Claims** shall be as listed under paragraph 1. above which amount shall be part of and not in addition to the Aggregate Limit of Liability set forth in Item 3(b) of the Declarations. One deductible amount, as shown in Item 4 of the Declarations shall apply to any one **Claim**.

3.  **Clause IV. EXCLUSIONS** (r) is deleted in its entirety and replaced with the following:

(r)   to any **Claim** arising out of or resulting from:

    (1)   any conduct, physical act, gesture, or spoken or written words of a sexual or physically violent nature by any **Insured**, including but not limited to, sexual intimacy (whether or not consensual), sexual molestation, sexual act, sexual contact, sexual advances, requests for sexual favors, sexual or physical assault or battery, sexual or physical abuse, sexual harassment or exploitation, or other verbal or physical conduct of a sexual nature; or

    (2)   the **Insured's** actual or alleged negligent employment, investigation, supervision, hiring, training or retention of any **Employee, Insured** or person for whom the **Insured** is legally responsible and whose conduct falls within paragraph (1), above.

However, this exclusion does not apply to:

    (3)   Any Specific Individual **Insured** who allegedly committed such misconduct, unless it is judicially determined that the Specific Individual **Insured** committed the misconduct. If it is judicially determined that the Specific Individual **Insured** committed the misconduct, we will not pay **Damages**.

    (4)   Any other **Insured**, unless that **Insured**:

        (i)   knew or should have known about the  misconduct allegedly committed by the Specific Individual **Insured**, but failed to prevent or stop it; or

        (ii)   knew or should have known that the Specific Individual **Insured** who allegedly committed the misconduct had a prior history of sexual or physical misconduct.

Underwriters will defend **Claims** alleging such acts until final civil or criminal adjudication, as the case may be.

As used in this exclusion, Specific Individual **Insured** includes employees and authorized volunteer workers while performing duties related to the conduct of the **Insured's** business.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**AMEND ITEM 10. OF THE DECLARATIONS TO ADD SCHEDULED INSUREDS/ PHYSICIANS AND RETROACTIVE AND TERMINATION DATES**</u>

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that **Item 10 Scheduled Insureds/ Physicians** is amended to include the following:

| Scheduled Insureds/ Physicians | Retroactive Date | Termination Date |
|---|---|---|
| Dr. Robert A. Ersek, MD | 23 January 2014 | N/A |
| Dr. Todd William Arbiture, DO | 23 January 2014 | N/A |
| Dr. Christopher F. Asandra, MD | 28 April 2014 | N/A |
| Dr. Carlos E. Felciano, MD | 28 April 2014 | N/A |
| Dr. Guy A. Petersen, MD | 19 January 2015 | 01 April 2016 |
| Michelle Lynn North, NP | 28 June 2017 | N/A |
| William Von Rueden PA (as floater for the New Mexico, Florida, North Carolina and Illinois locations) | 20 June 2017 | N/A |
| Edward William Gronko, PA | 09 February 2016 | N/A |
| Clayton McKiddy, APRN | 10 February 2014 | N/A |
| John R. Olin, PA | 23 June 2017 | N/A |
| Steven Chapman, PA | 02 February 2015 | N/A |
| Cristhian Lujan, PA | 31 July 2015 | N/A |
| James Johnson, NP | 01 May 2017 | N/A |
| Greg Sikorski, PA | 28 August 2017 | N/A |
| Branden Valent, PA | 29 January 2018 | N/A |

Coverage will only be provided with respect to the physicians scheduled above for their **Professional Services** rendered on behalf of the **Named Insured** occurring after the Retroactive Date set forth above, or after the date of hire that is on file with the **Named Insured** and before the Termination Date set forth above.

Solely with respect to the coverage provided in this Endorsement, Item 6. of the Declarations is deleted in its entirety.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**ADDITIONAL NAMED INSURED ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1.    **Item 1** of the Declarations is amended to include the following:

     **Item 1  Named Insured:**

          1. NuMale Corporation
          2. Polysciences Management, LLC (termed 01 January 2017)
          3. NuMale Austin, LLC (termed 01 January 2017)
          4. Austin Personal Surgeons, PA (termed 01 January 2017)
          5. CTAST, LLC (termed 01 January 2017)
          6. NuMale Omaha, LLC
          7. Revive for Life Men's Wellness Centers, LLC
          8. NuMale Denver, LLC
          9. Numale Tucson, LLC
          10. NuMale Charlotte, LLC
          11. NuMale North Carolina, PLLC (New Entity)
          12. NuMale North Carolina, SC (Old Entity)
          13. NuMale Villages, LLC
          14. NuMale Tampa, LLC
          15. NuMale Albuquerque, LLC
          16. Nevada NuMale, LLC
          17. NuMale Beverly Hills, LLC
          18. NuMale Medical Center d/b/a Clinic Asandra MD P.C.
          19. NuFemme Rejuvenation Clinic d/b/a Clinic Asandra MD P.C.
          20. Doctors of Hair d/b/a Clinic Asandra MD P.C.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

### MEDISPA ADDITIONAL LIMITATIONS AND EXCLUSIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause
**IV. EXCLUSIONS** is amended by the addition of the following:

(au)    Medispa Exclusions- to any **Claim** arising out of:

Bariatric surgery, blepharoplasty, mammoplasty, rhinoplasty, any implant surgeries.
Medispa treatments including Botox/Dysport, Fillers, Latisse, Hair Stimulation, Facial
Treatment performed by licensed physician, nurse, nurse practitioner or physician
assistant as permitted by local licensing requirements.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**SURGICAL SERVICES EXCLUSION**</u>

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage under this Policy does not apply to **Damages** or **Claims Expenses** incurred with respect to any **Claim** arising out of any actual or alleged act, error or omission in the rendering or failing to render any surgical services, other than the incision of boils and superficial abscesses or suturing skin.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E09759                                                                                           Page 1 of 1
022017 ed.

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## BEAZLEY MISCELLANEOUS MEDICAL RISK MANAGEMENT SERVICES (ASSISTLINE AND ON-LOCATION ASSESSMENT AND CONSULTING SERVICES) ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the Underwriters will provide the **Named Insured** the following risk management services during the **Policy Period.** Beazley has partnered with Pendulum, LLC to provide risk management services for the **Named Insured**.

**AssistLine**

The **Named Insured** will have access to a Pendulum consultant who will be available by phone to answer questions on adverse events, policies and procedures and regulatory issues.

**On-location Assessment and Consulting Services**

Pendulum, LLC will provide the **Named Insured** with a one-day on-location visit by a Pendulum Risk Control Consultant who will review specific facility documents, including policies and procedures and regulatory survey data.

**Risk Management Resource Center**

The **Named Insured** will also be provided with online access to the Beazley Miscellaneous Medical Risk Management Resource Center which provides resources such as sample policies, articles and information on healthcare regulations.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E09810
022017 ed.

Page 1 of 1

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

### AMEND DEDUCTIBLE FOR LASER HAIR REMOVAL SERVICES

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that solely with respect to Professional Liability Coverage and with respect to any **Claim** based upon or arising out of laser hair removal services only, Item 4. of the Declarations is deleted in its entirety and replaced with the following:

Item 4. **Deductible:**

The Deductible amount shall be separately applicable to each **Claim** first made against the **Insured** during the **Policy Period** and shall apply to **Damages** and **Claims Expenses** as follows:

$25,000                    Each Claim Deductible

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E12378                                                                                              Page 1 of 1
122018 ed.

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**NEOGRAFT PROCEDURES**</u>

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that it is a condition of the coverage afforded under this Policy that all Neograft procedures are required to be performed under the direct supervision of a licensed physician, nurse practitioner or physician assistant as permitted by local licensing requirements.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

<u>**MINIMUM EARNED PREMIUM ENDORSEMENT**</u>

This endorsement modifies insurance provided under the following:

**Miscellaneous Medical Professional Liability Claims Made and Reported Insurance**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

If the **Named Insured** cancels this Insurance prior to reporting any **Claim** or circumstance under this Policy, 30% of the premium shall be deemed earned upon inception of the Policy, and the remaining earned premium shall be computed in accordance with the customary short rate table and procedure.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative



**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W14CC4190601**
**Syndicate 2623/623 at Lloyd's. Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## LLOYD'S SECURITY SCHEDULE

Syndicate 2623      82%
Syndicate 623       18%


ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.



## MISCELLANEOUS MEDICAL PROFESSIONAL LIABILITY CLAIMS MADE AND REPORTED INSURANCE

**NOTICE**: -This is a Claims Made and Reported Policy. Except to such extent as may otherwise be provided herein, the coverage afforded under this insurance policy is limited to those **Claims** which are first made against the **Insured** and reported to the Underwriters during the **Policy Period**. **Damages** and **Claims Expenses** shall be applied against the Deductible. Certain words and phrases which appear in bold type have special meaning; please refer to Section V., Definitions. Please review the coverage afforded under this insurance policy carefully and discuss the coverage hereunder with your insurance agent or broker.

In consideration of the payment of premium and reliance upon the statements, representations and warranties made in the application which is made a part of this insurance policy (hereinafter referred to as the "Policy" or "insurance") and subject to the Limit of Liability, exclusions, conditions and other terms of this insurance, the Underwriters agree with the **Named Insured** (set forth in Item 1. of the Declarations, made a part hereof) as follows:

I.    **INSURING AGREEMENTS**

    A.    Professional Liability

        The Underwriters will pay on behalf of the **Insured Damages** and **Claims Expenses** which the **Insured** shall become legally obligated to pay because of any **Claim** or **Claims** for **Bodily Injury** first made against any **Insured** during the **Policy Period** and reported to the Underwriters during the **Policy Period**, or any applicable **Extended Reporting Period**, arising out of any negligent act, error or omission of the **Insured** in rendering or failing to render **Professional Services** for others, on behalf of the **Named Insured** designated in Item 1. of the Declarations, except as excluded or limited by the terms, conditions and exclusions of this Policy.

    B.    Defense and Settlement

        1.    The Underwriters shall have the right and duty to defend the **Insured**, subject to the Limit of Liability, for any **Claim** first made against the **Insured** seeking payment under the terms of this insurance, even if any of the allegations of the **Claim** are groundless, false or fraudulent. The Underwriters shall choose defense counsel in conjunction with the **Insured**, but in the event of a dispute, the decision of the Underwriters is final.

        2.    It is agreed that the Limit of Liability available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the Deductible set forth in Item 4. of the Declarations.

        3.    The Underwriters shall have the right to make any investigation they deem necessary, including, without limitation, any investigation with respect to coverage and statements made in the application.

4. If the **Insured** refuses to consent to any settlement or compromise recommended by the Underwriters and acceptable to the Claimant and elects to contest the **Claim**, the Underwriters' liability for any **Damages** and **Claims Expenses** shall not exceed the amount for which the **Claim** could have been settled, less the remaining Deductible, plus the **Claims Expenses** incurred up to the time of such refusal, or the applicable Limit of Liability, whichever is less, and the Underwriters shall have the right to withdraw from the defense of the **Claim** by tendering control of said defense to the **Insured**.

5. Subject to the Limit of Liability of this Policy, the Underwriters shall pay all premiums on bonds to release attachments, all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish such bonds, all costs taxed against the **Insured** in any suit, all interest accruing after entry of judgment until Underwriters have paid, tendered or deposited in courts such part of such judgment as does not exceed the Underwriters' Limit of Liability.

6. Subject to the Limit of Liability of this Policy, the Underwriters shall reimburse the **Insured** for all reasonable expenses, other than loss of earnings, incurred at the Underwriters' request.

7. The Underwriters shall not be obligated to pay any **Damages** or **Claims Expenses**, or to undertake or continue defense of any **Claim** after the applicable Limit of Liability has been exhausted by payment of **Damages** or **Claims Expenses** or after deposit of the remaining applicable Limit of Liability in a court of competent jurisdiction, and that upon such payment, the Underwriters shall have the right to withdraw from the further defense of the **Claim** by tendering control of said defense to the **Insured**.

## II. PERSONS INSURED

Each of the following is an **Insured** under this insurance to the extent set forth below:

(a) if the **Named Insured** designated in Item 1. of the Declarations is an individual, the person so designated but only with respect to the conduct of the business of which he or she is the sole proprietor, and the spouse of the **Named Insured** with respect to the conduct of such a business, and any **Employee** or volunteer worker while acting within the scope of his or her duties as such;

(b) if the **Named Insured** designated in Item 1. of the Declarations is a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his or her liability as such and any **Employee** or volunteer worker while acting within the scope of his or her duties as such;

(c) if the **Named Insured** designated in Item 1. of the Declarations is other than an individual, partnership or joint venture, the organization so designated and any executive officer, director, stockholder, **Employee**, employed medical director, administrator, volunteer worker, student, intern, or employed physician, surgeon,

osteopath, dentist, orthodontist, chiropractor, podiatrist, psychiatrist, psychologist, nurse practitioner, physician assistant, CRNA, or midwife, thereof while acting within the scope of his or her duties as such; provided, however, that coverage is contingent on any such employed physician, surgeon, osteopath, dentist, orthodontist, chiropractor, podiatrist, psychiatrist, psychologist, nurse practitioner, physician assistant, CRNA, or midwife, being scheduled in Item 10. of the Declarations;

(d)     any person who previously qualified as an **Insured** under (a), (b), or (c) above prior to the termination of the required relationship with the **Named Insured**, but solely with respect to **Professional Services** performed on behalf of the **Named Insured** designated in Item 1. of the Declarations, occurring prior to the termination of the required relationship with the **Named Insured**;

(e)     the estate, heirs, executor, administrators, assigns and legal representatives of any **Insured** in the event of the **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy; and

(f)     any independent contractor, vendor and/or agent of the **Named Insured** scheduled in Item 10. of the Declarations as an **Insured**.

This Policy shall not apply:

(g)     to liability of an **Insured**, if an individual physician, surgeon, osteopath, dentist, orthodontist, chiropractor, podiatrist, psychiatrist, psychologist, nurse practitioner, physician assistant, CRNA, or midwife, for his or her personal acts, errors or omissions outside the scope of work conducted for, or on behalf of, the **Named Insured**; and

(h)     to any liability arising out of the conduct of any partnership or joint venture of which the **Insured** is a partner or member and which is not designated in this Policy as a **Named Insured**.

## III.    TERRITORY

This insurance applies to negligent acts, errors, or omissions which take place anywhere in the world, provided the **Claim** is first made against the **Insured** within the United States of America, its possessions and territories, or Puerto Rico.

## IV.    EXCLUSIONS

The coverage under this Policy does not apply to **Damages** or **Claims Expenses** incurred with respect:

(a)     to any **Claim** arising out of **Personal Injury**, **Property Damage** or **Advertising Liability**, except with respect to **Bodily Injury** arising out of any negligent act, error or omission of any **Insured** in the rendering or failing to render **Professional Services**;

(b)     to any **Claim** arising out of any criminal, dishonest, fraudulent or malicious act, error or omission of any **Insured**, committed with actual criminal, dishonest, fraudulent or malicious purpose or intent. However, notwithstanding the foregoing, the insurance afforded by this Policy shall apply to **Claims Expenses** incurred in defending any such **Claim** in a civil proceeding, but shall not apply to any **Damages** which the **Insured** might become legally obligated to pay;

(c)     to any **Claim** arising out of or relating to any liability under any contract or agreement, whether written or oral, unless such liability would have attached to the **Insured** in the absence of such contract or agreement;

(d)     to any **Claim** based upon an express or implied warranty or guarantee, or breach of contract in respect of any agreement to perform work for a fee;

(e)     to any **Claim** arising out of any **Insured's** activities as a trustee, partner, officer, director or **Employee** of any trust, charitable organization, corporation, company or business other than that of the **Named Insured**;

(f)     to any **Claim** arising out of failure to pay any bond, interest on any bond, any debt, financial guarantee or debenture;

(g)     to any **Claim** arising out of any financial or investment advice given, referrals, warranties, guarantees or predictions of future performance made by any **Insured** as regards specific and identifiable investment items including but not limited to personal property, real property, stocks, bonds or securities;

(h)     to any **Claim** arising out of the actual or alleged publication or utterance of libel or slander or other defamatory or disparaging material, or a publication or utterance in violation of an individual's right to privacy;

(i)     to any **Claim** arising out of actual or alleged plagiarism, misappropriation of likeness, breach of confidence, or misappropriation or infringement of any intellectual property right, including patent, trademark, trade secret, trade dress and copyright;

(j)     to any **Claim** made by or against or in connection with any business enterprise (including the ownership, maintenance or care of any property in connection therewith), not named in the Declarations, which is owned by any **Insured** or in which any **Insured** is a trustee, partner, officer, director or **Employee**;

(k)     to any **Claim** arising out of the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto;

(l)     to any **Claim** or circumstance which might lead to a **Claim** in respect of which any **Insured** has given notice to any insurer of any other policy or self-Insurance in force prior to the effective date of this Policy;

(m)     to any **Claim** or circumstance which might lead to a **Claim** known to any **Insured** prior to the inception of this Policy and not disclosed to the Underwriters at inception;

(n)  to any **Claim** or circumstance that might lead to a **Claim** arising out of any negligent act, error or omission which first took place, or is alleged to have taken place, prior to the Retroactive Date as set forth in Item 6 of the Declarations;

(o)  to any **Claim** arising out of discrimination including but not limited to discriminatory employment practices, allegations of actual or alleged violations of civil rights or acts of discrimination based entirely or in part on the race, gender, pregnancy, national origin, religion, age or sexual orientation;

(p)  to any **Claim** directly or indirectly arising out of:

   (1)  the actual, alleged or threatened discharge, dispersal, release or escape or failure to detect the presence of **Pollutants**, provided that this Exclusion shall not apply to: (i) **Bodily Injury** sustained by any patient, visitor or invitee; and (ii) **Bodily Injury** or **Property Damage** arising out of heat, smoke or fumes from a **Hostile Fire**;

   (2)  the manufacture, distribution, sale, resale, rebranding, installation, repair, removal, encapsulation, abatement, replacement or handling of, exposure to or testing for **Pollutants** contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever; or

   (3)  any governmental or regulatory directive or request that the **Insured** or anyone acting under its direction or control to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize said **Pollutants**;

(q)  to any **Claim** arising out of the insolvency or bankruptcy of any **Insured** or of any other entity including but not limited to the failure, inability, or unwillingness to pay **Claims**, losses or benefits due to the insolvency, liquidation or bankruptcy of any such individual entity;

(r)  to any **Claim** arising out of or resulting from:

   (1)  any conduct, physical act, gesture, or spoken or written words of a sexual or physically violent nature by any **Insured**, including but not limited to, sexual intimacy (whether or not consensual), sexual molestation, sexual or physical assault or battery, sexual or physical abuse, sexual harassment or exploitation; or

   (2)  the **Insured's** actual or alleged negligent employment, investigation, supervision, hiring, training or retention of any **Employee, Insured** or person for whom the **Insured** is legally responsible and whose conduct falls within paragraph (1), above;

(s)  to any **Claim** for punitive or exemplary **Damages**, or **Damages** which are a multiple of compensatory **Damages**, fines, sanctions, taxes or penalties, or the return of or reimbursement for fees, costs or expenses charged by any **Insured**;

(t)    to any **Claim** arising out of **Personal Injury** to any **Employee** or volunteer worker of the **Insured** arising out of and in the course of his employment by the **Insured**, or under any obligation for which the **Insured** or any carrier as his insurer may be liable, under any Workers' Compensation, Unemployment Compensation, Disability Benefits Law or under any similar law;

(u)    to any **Claim** based upon or arising out of a violation or alleged violation of the Securities Act of 1933 as amended, or the Securities Exchange Act of 1934 as amended, or any State Blue Sky or securities law or similar state of Federal statute and any regulation or order issued pursuant to any of the foregoing statutes;

(v)    to any **Claim** or actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq., and any amendments thereto, or any rules or regulations promulgated thereunder;

(w)    to any **Claim** arising from costs of complying with physical modifications to any premises or any changes to the **Insured's** usual business operations mandated by the Americans with Disabilities Act of 1990, including any amendments, or similar federal, state or local law;

(x)    to any **Claim** based upon or arising out of any actual or alleged violation of any federal, state, or local anti-trust, restraint of trade, unfair competition, or price fixing law, unfair or deceptive trade practices, or consumer protection any rules or regulations promulgated thereunder; to the extent a **Claim** alleges both professional negligence and any of the above excluded enumerated offenses, Underwriters and the **Insured** will use their best efforts to reach a fair allocation between covered and uncovered **Damages**;

(y)    to any **Claim** caused directly or indirectly, in whole or in part, by:

　　　(1)    any fungus(es) or spore(s);

　　　(2)    any substance, vapor or gas produced by or arising out of any fungus(es) or spore(s);

　　　(3)    any materials, product, building component, building or structure that contains, harbors, nurtures or acts as a medium for any fungus(es) or spore(s);

　　　(4)    the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungus(es), molds, spore(s) or mycotoxins of any kind;

　　　(5)    any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungus(es), molds, spore(s) or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungus(es), molds, spore(s) or mycotoxins; or

(6)     any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungus(es), molds, spore(s) or mycotoxins of any kind;

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that injury or **Damages**.

For the purposes of this Exclusion, the following Definitions are added:

"Fungus(es)" includes, but is not limited to, any form of mold, mushroom or mildew.

"Spore(s)" mean any reproductive body produced by or arising out of any fungus(es).

This Exclusion shall not apply to **Claims** arising from medical research activities that would otherwise be covered hereunder or to any **Damages** and **Claims Expenses** which the **Insured** shall become legally obligated to pay in rendering or failing to render **Professional Services** as stated in Item 11. of the Declarations;

(z)     to any **Claim** based upon or arising out of any action or proceeding brought by or on behalf of any federal, state or local governmental, regulatory or administrative agency, regardless of the name in which such action or proceeding is brought, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996, the Social Security Act, 42 U.S.C. §1320a, et. seq., or similar state or federal statute, regulation or executive order promulgated thereunder;

(aa)    to any **Claim** arising out of any **Insured's** data processing, including:

(1)     conversion of data from source material into media for processing on the **Insured's** electronic data processing system;

(2)     processing of data by the **Insured** on the **Insured's** electronic data processing system;

(3)     design or formulation of an electronic data processing program or system;

(4)     any liability arising from:

(i)     the failure of any program, instruction or data for use in any computer or other electronic processing device, equipment or system to function in the manner expected or intended;

(ii)     the transmission or receipt of any virus, program or code that causes loss or damages to any computer system and /or prevents or impairs its proper function or performance; or

(iii)    unauthorized access to any computer system;

(iv)    the functioning, non-functioning, improperly functioning, availability or unavailability of:

(a)    the internet or similar facility; or

(b)    any intranet or private network or similar facility; or

(c)    any website, bulletin board, chat room, search engine, portal or similar third party application service.

(v)    the alteration, corruption, destruction, distortion, erasure, theft or other loss of or damage to data, software, information repository, microchip, integrated system or similar device in any computer equipment or non-computer equipment or any kind of programming or instruction set;

(vi)    any    loss of use or functionality,    whether    partial    or entire, of data, coding, program, software, any computer or computer system or other device dependent upon any microchip or embedded logic and any ensuing inability or failure of any insured to conduct business;

(vii)    any alteration, breach, corruption, destruction, or failure of any computer, network systems or firewalls;

(viii)    theft, loss, or unauthorized disclosure or access to personally identifiable information including non-public personal information, medical or healthcare information (including protected health information) in the care, custody or control of the **Insured** or a third party for whose such unauthorized disclosure or access the **Insured** is legally liable, or violation of a privacy law protecting such information, including any consequential liability (including any failure to comply with any legislation requiring monitoring or notification to any person affected by any of the above, or in respect of any related regulatory proceeding or investigation); or

(ix)    theft, loss, or unauthorized disclosure or access to information emanating from a third party that the **Insured** is required by agreement to maintain confidential;

(ab)    to any **Claim** for **Personal Injury, Property Damage** or **Advertising Liability** based upon or arising out of the **Named Insured's Products**;

(ac)    to any **Claim** based upon the manufacture, handling, sale or distribution of Phenylpropanolamine, Phenylpropanolamine Hydrochloride, PPA or any product or drug containing any of these substances;

(ad)    to any **Claim** based on the willful non-compliance of any **Insured** with any Food and Drug Administration (FDA) rules, regulations, and statutes found at Food and Drugs, 21 C.F.R. Chapter 1 § 1.1 to § 1299, as amended and revised, or treating a patient with any drugs, medical devices, biologics or radiation-emitting products that have been disapproved or not yet approved by the FDA;

(ae)    to any **Claim** based upon or arising out of any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

(af)    to any **Claim** against any subsidiary designated in the Declarations or its past, present, or future **Employees**, directors, officers, trustees, review board or committee members, or volunteers acting in his or her capacity as such, which are based upon, arise out of, directly or indirectly result from, are in consequence of, or in any way involve any fact, circumstance, situation, transaction, event, or negligent acts, errors or omissions or series of facts, circumstances, situations, transactions, events or negligent acts, errors or omissions happening before the date such entity became a subsidiary;

(ag)    to any **Claim** arising directly out of, or resulting from or in consequence of, or in any way involving:

(1)    asbestos or any materials containing asbestos in whatever form or quantity;

(2)    the actual, potential, alleged or threatened presence, release or dispersal of any asbestos;

(3)    any action taken by any party in response to the actual, potential or threatened presence, release or dispersal of any asbestos particles of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such materials containing asbestos;

(4)    any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened presence, release or dispersal of any asbestos containing particles of any kind;

(5)    any product, substance or waste which contains lead;

(6)    inhaling, ingesting or physical exposure to silica directly or through any goods, products, structures, real estate or land containing silica;

(7)    the use or presence of silica in any process or operation of any type, including but not limited to construction, manufacturing, sandblasting, cleaning, drilling, farming or mining;

(8)    the use or presence of silica in any goods, products, structures, real estate or land, or any component part of any good, product, structures, real estate or land containing silica;

(9)    the manufacture, sale, transportation, handling, storage, or disposal of silica or any goods, products, structures, real estate or land containing silica;

(10)    disease actually or allegedly caused by, contributed to or aggravated by silica, including but not limited to silicosis, chronic silicosis, accelerated silicosis, acute silicosis, conglomerate silicosis, any auto-immune disorder, tuberculosis, silicoproteinosis; cancer, scleroderma, emphysema, pneumoconiosis, pulmonary fibrosis, progressive massive fibrosis, any lung disease or any other ailment actually or allegedly caused by, contributed to or aggravated by silica;

(11)    any costs of medical or other testing, monitoring or diagnosis arising from or related to any actual, alleged, threatened or feared disease or injury, including any emotional or mental distress, arising in whole or in part, directly or indirectly, out of silica; or

(12)    any cost of investigations, feasibility studies, cleaning, removal or remediation of the actual or alleged presence of silica in or on any goods, products, structures, real estate or land.

For the purposes of this Exclusion, "silica" means any silica in the form of and any of its derivatives, including but not limited to silica dust, silicon dioxide (SiO2), crystalline silica, quartz, or non-crystalline (amorphous silica);

(ah)    to any **Claim** associated with implementation of any compliance program or any policies, procedures or practices relating to participation as a provider of medical services to a managed care organization or under a healthcare benefit program, whether initiated voluntarily or pursuant to direction by, order of, or in settlement with a government body, hospital, healthcare facility or managed care organization;

(ai)    to any **Claim** based upon, arising out of, resulting from, any actual or alleged: (1) failure to obtain, effect, or maintain any form, policy, plan or program of insurance, stop loss or provider excess coverage, reinsurance, self-insurance, suretyship, or bond; (2) commingling, mishandling of or liability to pay, collect or safeguard funds; or (3) failure to collect or pay premiums, commissions, brokerage charges, fees or taxes;

(aj)    to any **Claim** for **Personal Injury**, **Property Damage or Advertising Liability** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing;

(ak)    to any **Claim** arising out of or relating to any loss, damage, or cost or expense of whatsoever nature directly or indirectly caused by, resulting from happening through, arising out of or in connection with any act of terrorism, regardless of any other cause contributing concurrently or in any other sequence to the loss, damage, cost or expense.

For the purpose of this Exclusion, terrorism means an act or threat of violence or an act harmful to human life, tangible or intangible property or infrastructure with the intention or effect to influence any government or to put the public or any section of the public in fear. In any action, suit or other proceedings where the Underwriters allege that by reason of this Exclusion, a loss, damage, cost or expense in not covered by this Policy, the burden of proving that such loss, damage, cost or expense is covered shall be upon the **Insured**.

In the event any portion of this Exclusion is found to be invalid or unenforceable, the remainder shall remain in full force and effect;

(al)    to any **Claim** brought against any **Insured** by any other **Insured** hereunder;

(am)    to any **Claim** arising out of or resulting from the distribution of unsolicited email, text messages, direct mail or facsimiles, or telemarketing;

(an)    to any **Claim** arising out of or resulting from any action or omission that violates or is alleged to violate:

    (1)    the Telephone Consumer Protection Act (TCPA);

    (2)    the CAN-SPAM Act of 2003;

    (3)    the Fair Credit Reporting Act; or

    (4)    any statute, ordinance or regulation, other than TCPA, CAN-SPAM Act of 2003 or the Fair Credit Reporting Act, that prohibits or limits the sending, transmitting, communicating or distribution of material or information;

(ao)    to any **Claim** arising out of or resulting from the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person, or the environment, or that affects the value, marketability, condition or size of any property, provided this Exclusion shall not apply to any patient receiving **Professional Services**.

(ap)    to any **Claim** caused by or at the direction of the **Insured** with the knowledge that the act would violate the rights of another and would inflict **Bodily Injury**;

(aq)    to Any **Claim** arising out of an electronic chatroom or bulletin board the **Insured** hosts, owns or over which the **Insured** exercises control;

## V.   DEFINITIONS

Wherever used in this Policy, the bolded terms have the meaning provided:

(a)    **"Advertising Liability"** means injury arising out of one or more of the following, committed in the course of the **Insured's** advertising activities:

    (1)    libel, slander or defamation;

    (2)    infringement of copyright, title slogan, trade dress, or advertising idea;

    (3)    piracy or idea misappropriation under an implied contract; or

    (4)    invasion of right of privacy.

(b)     **"Bodily Injury"** means physical injury (including death at any time resulting therefrom), mental injury, mental illness, mental anguish, humiliation, emotional upset, shock, sickness, disease or disability.

**"Bodily Injury"** shall also include injury arising out of one or more of the following committed in the course of the rendering or failure to render **Professional Services**:

(1)     libel;

(2)     slander;

(3)     defamation of character; or

(4)     invasion of right of privacy;

(c)     **"Claim"** means a written notice received by any **Insured** of an intention to hold the **Insured** responsible for compensation for **Damages**, including the service of suit or institution of arbitration proceedings against the **Insured**.

(d)     **"Claims Expenses"** means:

(1)     reasonable and customary fees charged by an attorney(s) designated and agreed by the Underwriters in consultation with the **Insured**, but subject always to the Underwriters' final decision; and

(2)     all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, if incurred by the Underwriters, or by the **Insured** with the written consent of the Underwriters.

**Claims Expenses** does not include any salary, overhead or other charges by the **Insured** for any time spent in co-operating in the defense and investigation of any **Claim** or circumstance which might lead to a **Claim** notified under this insurance.

(e)     **"Damages"** means a civil monetary judgment, award or settlement and does not include:

(1)     the restitution of compensation and expenses paid to the **Insured** for services and goods; and

(2)     judgments or awards deemed uninsurable by law.

(f)     **"Employee"** means a person on the **Insured**'s regular payroll, with federal and, if applicable, state taxes withheld, whose work is directed or controlled by the **Insured**, including part-time and seasonal **Employees** and leased workers. **Employee** does not include a temporary worker.

(g)     **"Extended Reporting Period"**, if applicable, means the period of time after the end of the **Policy Period** for reporting **Claims**, arising out of negligent acts, errors or omissions which take place prior to the end of the **Policy Period** but subsequent to the Retroactive Date identified in Item 6. of the Declarations.

(h)     **"Hostile Fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be.

(i)     **"Named Insured"** means the entity or person identified in Item 1. of the Declarations.

(j)     **"Named Insured's Products"** means goods or products manufactured, sold, handled or distributed by the **Named Insured** or by others trading under its name, including any container thereof (other than a vehicle) but shall not include a vending machine or any property, other than such container rented to or located for use of others but not sold.

(k)     **"Personal Injury"** means:

   (1)     **Bodily Injury**;

   (2)     false arrest, false imprisonment, wrongful eviction, detention or malicious prosecution;

   (3)     libel, slander, defamation of character or invasion of right of privacy, unless arising out any advertising activities; or

   (4)     wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

(l)     **"Policy Period"** means the period of time between the inception date and the effective date of termination, expiration or cancellation of this insurance shown in Item 2. of the Declarations and specifically excludes any **Extended Reporting Period**;

(m)     **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to asbestos and/or lead (or products containing asbestos and/or lead whether or not the asbestos and/or lead is or was at any time airborne as a fibre or particle, contained in a product, carried on clothing, inhaled, transmitted in any fashion or found in any form whatsoever), smoke, vapour, soot fumes, acids, alkalis, toxic chemicals and waste (waste includes materials to be recycled, reconditioned or reclaimed).

(n)     **"Professional Services"** means those professional services specifically identified in Item 11. of the Declarations.

(o)     **"Property Damage"** means:

(1)    physical injury to or destruction of tangible property, including consequential loss of use thereof; or

(2)    loss of use of tangible property which has not been physically injured or destroyed.

## VI.    LIMIT OF LIABILITY

A.    The Limit of Liability stated in Item 3(a) of the Declarations as "Each **Claim**" is the Underwriters' Limit of Liability for all **Damages** and **Claims Expenses** arising out of the same, related or continuing negligent acts, errors or omissions, without regard to the number of **Insureds**, **Claims** or claimants. All **Claims** arising out of the same, related or continuing negligent acts, errors or omissions shall be deemed to be a single **Claim**.

B.    The Limit of Liability stated in Item 3(b) of the Declarations as "Term Aggregate" is the Underwriters' Limit of Liability for all **Damages** and **Claims Expenses** arising out of all **Claims** which are covered under the terms and conditions of this Policy.

C.    The Limit of Liability for any **Extended Reporting Period** shall be part of, and not in addition to, the Underwriters' Limit of Liability for the **Policy Period**.

## VII.    DEDUCTIBLE

The Deductible amount stated in Item 4. of the Declarations shall be satisfied by payments by the **Insured** of **Damages** and/or **Claims Expenses** resulting from each **Claim** first made and reported to the Underwriters during the **Policy Period** and/or any applicable **Extended Reporting Period** as a condition precedent to the payment by the Underwriters of any amounts due hereunder. The Underwriters shall be liable only for the amounts in excess of such Deductible subject to the Underwriters' Limit of Liability in Item 3. of the Declarations. The Deductible is in addition to the Underwriters' Limit of Liability and not part thereof. The **Insured** shall make direct payments within the Deductible to appropriate parties designated by the Underwriters. The Deductible is to be uninsured, unless otherwise agreed to by the Underwriters. Under no circumstances shall Underwriters be called upon to pay the Deductible, but the Underwriters may do so at their sole discretion. Such payment shall in no way affect the Underwriters' ability to collect the Deductible from the **Insured**. The existence of "other insurance" shall not affect or abrogate the obligation of the **Insured** to pay the Deductible as required.

## VIII.    INNOCENT INSURED

Whenever coverage under this insurance would be excluded, suspended or lost:

A.    because of Exclusion IV.(b) relating to intentional, criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Insured**, and with respect to which any other **Insured** did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof; or

B.      because of non-compliance with any condition relating to the giving of notice to the Underwriters with respect to which any other **Insured** shall be in default solely because of the failure to give such notice or concealment of such failure by one or more **Insureds** responsible for the loss or damage otherwise covered hereunder;

the Underwriters agree that such insurance as would otherwise be afforded under this Policy shall be paid with respect to those **Insureds** who did not personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of (a) one or more of the acts, errors or omissions described in any such exclusion; or (b) such failure to give notice, provided that the condition be one with which such **Insured** can comply, and after receiving knowledge thereof, the **Insured** entitled to the benefit of Section VIII. shall comply with such condition promptly after obtaining knowledge of the failure of any other **Insured** to comply therewith.

With respect to this provision, the Underwriters' obligation to pay in such event shall be in excess of the full extent of any assets of any **Insured** to whom the exclusion applies and shall be subject to the terms, conditions and limitations of this Policy.

## IX.    EXTENDED REPORTING PERIOD

A.      In the event of cancellation or non-renewal of this insurance, the **Named Insured** designated in Item 1. of the Declarations shall have the right to an **Extended Reporting Period** identified in Item 5. of the Declarations for **Claims** first made against any **Insured** and reported to the Underwriters during the **Extended Reporting Period**, subject to the conditions set forth in the definition of **Extended Reporting Period** herein.  In order for the **Named Insured** to invoke the **Extended Reporting Period** option, the payment of the additional premium set forth in Item 5(b) of the declarations for the **Extended Reporting Period** must be paid to the Underwriters within 30 days of the non-renewal or cancellation.

B.      The Limit of Liability for the **Extended Reporting Period** shall be part of, and not in addition to, the Underwriters' Limit of Liability for the **Policy Period**.

C.      The quotation by the Underwriters of a different premium or Deductible or Limit of Liability or changes in Policy language for the purpose of renewal shall not constitute a refusal to renew by the Underwriters.

D.      The right to the **Extended Reporting Period** shall not be available to the **Named Insured** where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable Limit of Liability or within the applicable Deductible.

E.      All notices and premium payments with respect to the **Extended Reporting Period** shall be directed to the Underwriters through the entity named in Item 8. of the Declarations.

F.      At the commencement of the **Extended Reporting Period**, the entire premium shall be deemed earned, and in the event the **Named Insured** terminates the

Extended Reporting Period for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the Extended Reporting Period.

## X.    OTHER INSURANCE

This insurance shall apply in excess of any other valid and collectible insurance or self-insurance available to any Insured, unless such other insurance is written only as specific excess insurance over the Limit of Liability of this Policy.

## XI.    NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM

A.    If any Claim is made against the Insured, the Insured shall forward as soon as practicable to the Underwriters through persons named in Item 9. of the Declarations written notice of such Claim and forward every demand, notice, summons or other process received by the Insured or its representative. In no event shall the Underwriters be given notice of a Claim later than the end of the Policy Period, the end of the purchased Extended Reporting Period, or thirty (30) days after the expiration date of the Policy Period in the case of Claims first made against the Insured during the last thirty (30) days of the Policy Period. The Insured's duty to provide notice in accordance with this provision is a condition precedent to coverage.

B.    If during the Policy Period the Insured first becomes aware of a negligent act, error or omission that could lead to a Claim, it must give written notice to the Underwriters through persons named in Item 9. of the Declarations during the Policy Period of:

(1)    the specific, negligent act, error, or omission;

(2)    the injury or damage which may result or has resulted from the negligent act, error, or omission; and

(3)    the circumstances by which the Insured first became aware of the negligent act, error or omission.

Any subsequent Claim made against the Insured which is the subject of the written notice shall be deemed to have been made at the time written notice was first given to the Underwriters.

C.    A Claim or circumstance that might lead to a Claim shall be considered to be reported to the Underwriters when notice is received by the Underwriters through persons named in Item 9. of the Declarations.

D.    All Claims arising out of the same, continuing or related negligent act, error or omission shall be considered a single Claim and deemed to have been made at the time the first of the related Claims is reported to the Underwriters. Such related Claims shall be subject to one Limit of Liability identified in Item 3(a) of the Declarations.

E.  In the event of non-renewal of this insurance by the Underwriters, the **Insured** shall have thirty (30) days from the expiration date of the **Policy Period** to notify the Underwriters of **Claims** made against the **Insured** during the **Policy Period** which arise out of any negligent act, error or omission occurring prior to the termination date of the **Policy Period** and otherwise covered by this insurance.

F.  If any **Insured** shall make any **Claim** under this Policy knowing such **Claim** to be false or fraudulent, as regards amount or otherwise, this Policy shall become null and void and all coverage hereunder shall be forfeited.

## XII.  ASSISTANCE AND CO-OPERATION OF THE INSURED

The **Insured** shall co-operate with the Underwriters in all investigations, including regarding the application and coverage under this Policy, and upon the Underwriters' request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization other than an **Employee** of any **Insured** who may be liable to the **Insured** because of negligent acts, errors or omissions with respect to which insurance is afforded under this Policy.  The **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.  The **Insured** shall not, except at its own cost, admit liability, make any payment, assume any obligation, incur any expense, enter into any settlement, stipulate to any judgment or award or otherwise dispose of any **Claim** without the consent of the Underwriters.

## XIII.  ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters unless, as a condition precedent thereto, there has been full compliance with all terms of this insurance, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment or award against the **Insured** after actual trial or arbitration or by written agreement of the **Insured**, the claimant and the Underwriters.  No person or organization shall have any right under this insurance to join the Underwriters as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability, nor shall the Underwriters be impleaded by the **Insured** or its legal representative.

## XIV.  BANKRUPTCY

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Underwriters of their obligations hereunder.

## XV.  SUBROGATION

In the event of any payment under this insurance, the Underwriters shall be subrogated to all the **Insured's** rights of recovery against any person or organization, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing before or after the payment of **Damages** by the Underwriters to prejudice such rights.

## XVI.  CHANGES

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this insurance or estop the Underwriters from asserting any right under the terms of this insurance; nor shall the terms of this insurance be waived or changed, except by endorsement issued to form a part of this insurance, signed by the Underwriters.

## XVII.  MERGERS AND ACQUISITIONS

A.      If during the **Policy Period,** the **Named Insured** mergers or acquires an entity and

(1)      the revenues of the merged or acquired entity do not exceed 10% of the **Named Insured's** annual revenues as set forth in its most recent application for insurance;

(2)      the business operations of the merged or acquired entity are of a similar nature to those of the **Named Insured** as set forth in its most recent application for insurance; and

(3)      the merged or acquired entity is located in the same state as the **Named Insured** or any subsidiary,

then this Policy will automatically cover the merged or acquired entity, subject to the policy terms, conditions and limitations, from the date such merger or acquisition becomes final but only for negligent acts, errors or omissions that take place subsequent to the merger or acquisition. In the event the total amount of revenues of all merged and acquired entities during the **Policy Period** exceed 10% of the **Named Insured's** annual revenues as set forth in its most recent application for insurance, the above provision shall no longer apply and any further mergers or acquisitions will be subject to Paragraph B., below.

B.      In the event during the **Policy Period** the **Named Insured** mergers or acquires an entity that does not fall within the criteria detailed in Paragraph A. above, or where Paragraph A. above no longer applies by virtue of the provision contained in the last sentence of Paragraph A. above, then the **Named Insured** shall be required to give written notice to the Underwriters prior to the completion of a merger or acquisition of the **Named Insured**, and the Underwriters expressly reserve the right to request additional premium and/or to apply amended terms and conditions if this insurance is to remain in force subsequent to any merger or acquisition.

## XVIII.  ASSIGNMENT

The interest hereunder of any **Insured** is not assignable.  If the **Insured** shall die or be adjudged incompetent, this insurance shall cover the **Insured's** legal representative as the **Insured,** as would be permitted by this Policy.

## XIX.  CANCELLATION

This Policy may be cancelled by the **Named Insured** or by the Underwriters by sending registered or certified mail notice to the other party stating when, not less than 60 days thereafter, cancellation shall be effective. However in the event of non-payment of premium by the **Named Insured**, this Policy may be cancelled by the Underwriters by sending registered or certified mail notice to the **Named Insured** stating when, not less than ten days thereafter, cancellation shall be effective.

The mailing of notice as aforesaid by the Underwriters shall be sufficient proof of notice, and the insurance under this Policy shall end on the effective date and hour of cancellation stated in the notice.  Delivery of such written notice either by the **Named Insured** or by the Underwriters shall be equivalent to mailing.

In the event this Policy is cancelled, as aforesaid, the expiration date of this Policy shall be the effective date of such cancellation.

If this Policy shall be cancelled by the **Named Insured**, the Underwriters shall retain the short rate proportion of the premium for the period this Policy has been in force, calculated in accordance with the Short Rate Cancellation Table on file with the Underwriters.  If this Policy shall be cancelled by the Underwriters, the Underwriters shall retain the pro rata proportion of the premium for the period this Policy has been in force. Notice of cancellation by the Underwriters shall be effective even though the Underwriters make no payment or tender of return premium with such notice.

## XX.    SINGULAR FORM OF A WORD

Whenever the singular form of a word issued, herein, the same shall include the plural when required by context.

## XXI.    ENTIRE CONTRACT

By acceptance of this Policy, the **Insured** agrees that the statements in the Declarations and application are his or her agreements and representations, that this insurance is issued in reliance upon the truth of such representations and that this Policy embodies all agreements existing between the **Insured** and the Underwriters relating to this insurance.

## XXII.    NUCLEAR INCIDENT EXCLUSION

The insurance provided by this Policy does not apply:

A.    To injury sickness, disease, death or destruction

(1)    with respect to which an **Insured** under this Policy of insurance is also an **Insured** under a nuclear energy liability insurance issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada or would be an **Insured** under any such insurance but for its termination upon exhaustion of its limits of liability; or

    (2)    resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the **Insured** is, or had this insurance not been issued would be, entitled to indemnity from the United States of America, or any agency thereof under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B.    Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

C.    To injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

    (1)    the nuclear material (i) is at any nuclear facility owned by, or operated by or on behalf of, an **Insured** or (ii) has been discharged or dispersed there from;

    (2)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

    (3)    the injury, sickness, disease, death or destruction arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to injury to or destruction of property at such nuclear facility.

D.    As used in this Section: "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof, "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (i) containing by-product material and (ii) resulting from the operation by any person or organization of any nuclear facility under paragraph (1) or (2) thereof; "nuclear facility" means:

    (1)    any nuclear reactor;

    (2)    any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging waste;

(3)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if any time the total amount of such material in the custody of the **Insured** at the premises were such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 of any combination thereof, or more than 250 grams of uranium 235; or

(4)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste;

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms or radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this Section is subject to the terms, exclusions, conditions and limitations of the insurance to which it is attached.

## XXIII. SERVICE OF SUIT

A.     It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due under this insurance, the Underwriters hereon, at the request of the **Named Insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. This Condition does not constitute and should not be understood to constitute an agreement by the Underwriters that an action is properly maintained in a specific forum, nor may it be construed as a waiver of the Underwriters' rights to commence an action in a court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state of the United States, all of which rights the Underwriters expressly reserve.  It is further agreed that service of process in such suit may be made upon the designated entity in Item 7. of the Declarations, and that in any suit instituted against any one of them upon this contract, the Underwriters will abide by the final decision of such court in the event of an appeal.

B.     The Entity designated in Item 7. of the Declarations is authorized and directed to accept service of process on behalf of the Underwriters in any such suit and/or upon the request of the **Named Insured** to give written undertaking to the **Named Insured** that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.  Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as his or her true and lawful attorney upon whom may be served any lawful process in any action, suit or proceedings instituted by or on behalf of the **Named Insured** or

any beneficiary hereunder arising out of this contract of insurance, and hereby designates the Entity, designated in Item 7 of the Declarations, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## XXIV. CHOICE OF LAW

Any dispute involving this Policy shall be resolved by applying the law of the state designated in Item 12. of the Declarations.

## XXV. SEVERAL LIABILITY

The subscribing Underwriters' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of his or her individual subscriptions. The subscribing Underwriters are not responsible for the subscription of any co subscribing Underwriter who for any reason does not satisfy all or part of its obligations.

## XXVI. LICENSURE

A.  It is a condition of the coverage afforded under the Policy that the facilities of the **Named Insured** and any **Insured** requiring a license to practice shall be licensed in accordance with all relevant federal, state and local requirements. The **Named Insured** warrants that as of the inception date of this Policy it has secured all relevant licenses.

B.  If, during the **Policy Period**, any **Insured's** licensure status is altered by withdrawal, revocation, denial, suspension or failure to renew, the **Named Insured** shall give written notice of such change to the Underwriters' within thirty days of the change becoming effective. Following receipt of such notice, the Underwriters may elect, at their sole option, to revise any Insuring Agreements. Definitions, Exclusions, Endorsements or other Conditions of this Policy with respect to the **Insured**, with effect from such date of such withdrawal, revocation, denial, suspension or failure to renew. Such action does not waive the Underwriters' option to invoke the provisions of Section XIX. of this Policy. Furthermore, the Underwriters will have no obligation to respond to any **Claim** arising out of **Professional Services** which took place subsequent to the date the of withdrawal, revocation, denial, suspension or failure to renew.

*beazley*

## DECLARATIONS

## EXCESS INSURANCE POLICY

**SUBJECT TO THE PROVISIONS OF THE UNDERLYING INSURANCE, THIS POLICY MAY ONLY APPLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS OR LOSS DISCOVERED DURING THE POLICY PERIOD PROVIDED THAT SUCH CLAIM OR LOSS IS REPORTED IN WRITING TO THE UNDERWRITERS PURSUANT TO THE POLICY PROVISIONS. AMOUNTS INCURRED AS DEFENSE COSTS SHALL REDUCE AND MAY EXHAUST THE APPLICABLE LIMITS OF LIABILITY AND ARE SUBJECT TO THE RETENTIONS. THE UNDERWRITERS SHALL NOT BE LIABLE FOR ANY DEFENSE COSTS OR FOR ANY JUDGMENT OR SETTLEMENT AFTER THE LIMIT OF LIABILITY HAS BEEN EXHAUSTED. PLEASE READ THIS POLICY CAREFULLY.**

These Declarations along with the completed and signed **Application** and the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

| | |
|---|---|
| **Underwriters:** | Syndicates 2623/623 at Lloyd's |
| **Policy Number:** | W1561E190601 |
| **Authority Ref. Number:** | B6012BUSANMSL1901 |

Item 1. **Named Insured:**

NuMale Chicago, LLC

Principal Address:

4711 Golf Road, Suite 1050
Skokie, IL 60076

Item 2. **Policy Period:**

From:    23 January 2019
To:       23 January 2020

(Both dates at 12:01 a.m. Local Time at the Principal Address stated in Item 1.)

Item 3. **Limits of Liability:**

$5,000,000    Each Claim
$5,000,000    Aggregate for the **Policy Period**, including costs and expenses incurred in the defense or settlement of all claims.

Item 4. **Premium:**    **$** 62,000

CIVIL COMPLAINT FOR
DECLARATORY
JUDGMENT

EXHIBIT B

Item 5. **Notification under this Policy:**

a. Notification pursuant to Clause VI shall be given to:

Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, CT 06032
Tel: (860) 677-3700
Fax: (860) 679-0247

b. All other notices under this Policy shall be given to:

Beazley USA Services, Inc.
30 Batterson Park Road
Farmington, CT 06032
Tel: (860) 677-3700
Fax: (860) 679-0247

Item 6: **Service of process in any suit shall be made upon:**

Mendes & Mount, LLP
750 7th Ave #24
New York, NY 10019

Item 7: **Choice of Law:**        Illinois

Item 8: **Endorsements Effective at Inception:**

1.    BSLXS05040511 Retroactive Date Exclusion
2.    E00527052008 Mailing Address Endorsement
3.    E02505022011 Amend Notice of Claim
4.    E03159092011 Single Limit of Liability Endorsement
5.    E05487022014 Not Follow Form of Endorsement to Underlying Insurance
6.    Schedule2019 Lloyd's Security Schedule 2019

Dated: 12 March 2019

At:    30 Batterson Park Road
Farmington, Connecticut 06032
(the office of the Correspondent)

By:_____
Beazley USA Services, Inc. (Correspondent)

## SCHEDULE OF UNDERLYING INSURANCE

## EXCESS INSURANCE POLICY

Type of Insurance: PL

Primary Policies:

Professional Liability

| Insurer: | Syndicates 2623/623 at Lloyd's |
|---|---|
| Policy No.: | W14CC4190601 |
| Limit of Liability: | $ 1,000,000/$3,000,000 |
| Deductible: | $ 10,000 |

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W1561E190601**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>RETROACTIVE DATE EXCLUSION</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that this policy shall not apply to loss or damages in connection with or resulting from any claim or circumstance that might lead to a claim arising out of any act, error or omission which took place, or is alleged to have taken place, prior to 28 April 2014.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W1561E190601**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## MAILING ADDRESS ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Item 1. is amended to include the following mailing address of the entity in Item 1. of the Declarations:

2600 North Mayfair Road, Suite 505, Wauwatosa, WI 53226

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W1561E190601**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

<u>**AMEND NOTICE OF CLAIM**</u>

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that Clause **VI. NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM** is deleted in its entirety and replaced with the following:

> All claims first made during the **Policy Period** and circumstances that might lead to a claim reported under the **Primary Policy** must be reported to the Underwriters in writing via the entity named in Item 5. of the Declarations before the end of the **Policy Period** or any additional claims reporting period granted by the **Primary Policy** provided such additional claims reporting period is no greater than thirty (30) days. However, the **Insured** must provide immediate written notice to the Underwriters via the entity named in Item 5 of the Declarations of any claim made against the **Insured** where the **Insured** or the **Insured's** defense counsel evaluates the potential liability of all claims plus costs and expenses incurred in the defense or settlement of such claims at an amount equal to or greater than fifty percent (50%) of the **Underlying Policy Limits**. Notice to any underlying carrier is not notice to the Underwriters.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W1561E190601**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

## SINGLE LIMIT OF LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that with respect to the Commercial Excess Liability Coverage, there will be one combined single limit of liability as set forth in Item 3. of the Declarations.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E03159                                                                                                    Page 1 of 1
092011 ed.

**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W1561E190601**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the**
**"Underwriters"**

**NOT FOLLOW FORM OF ENDORSEMENT TO UNDERLYING INSURANCE**

This endorsement modifies insurance provided under the following:

**EXCESS INSURANCE POLICY**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that this Policy shall not:

1.      provide coverage pursuant to; or

2.      follow form of any **Underlying Insurance**,

to the extent such insurance provides coverage under the following endorsement(s) of the **Primary Policy**:

Endorsement(s):

E08403092017  AMEND ITEM 10. OF THE DECLARATIONS TO ADD SCHEDULED INSUREDS/ PHYSICIANS AND RETROACTIVE AND TERMINATION DATES

But solely for ultrasound assisted liposuction for body contouring procedures.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

E05487                                                                                     Page 1 of 1
022014 ed.



**Effective date of this Endorsement: 23-Jan-2019**
**This Endorsement is attached to and forms a part of Policy Number: W1561E190601**
**Syndicates 2623/623 at Lloyd's Referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## LLOYD'S SECURITY SCHEDULE

Syndicate 2623      82%
Syndicate 623       18%


ALL OTHER TERMS, conditions and limitations of said Certificate shall remain unchanged.



# Lloyd's Certificate

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Insurance** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of the said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part and not one for another, their Executors and Administrators.

**The Insured** is requested to read their Policy, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding the Policy should be addressed to the following Correspondent:

Beazley USA

**SLC-3 (USA)** NMA2868 (24/08/2000) (amended)



One Lime Street London EC3M 7HA



**EXCESS INSURANCE POLICY**

In consideration of the payment of the premium, in reliance on all statements made in the application, and subject to all of the provisions of this Policy, the Underwriters and the **Named Insured**, on behalf of all **Insureds**, agree as follows:

**I.    INSURING CLAUSES**

To pay on behalf of the **Insured** excess of the **Underlying Policies** any claim or loss which triggers coverage under the **Underlying Policies**, and is not otherwise excluded by the terms, conditions or endorsements of this policy,  and which is reported to Underwriters in accordance with Clause VI. of this Policy.

**II.    DEFINITIONS**

The following terms whenever used in this Policy in boldface type shall have the meanings indicated.

A.    "**Insured**" shall mean all persons and entities insured under the **Primary Policy**.

B.    "**Named Insured**" shall mean the person or entity set forth in Item 1. of the Declarations.

C.    "**Policy Period**" shall mean the period set forth in Item 2. of the Declarations.

D.    "**Primary Policy**" shall mean each policy identified as such in the Schedule of Underlying Insurance.

E.    "**Sublimit**" means any **Underlying Limits** which:

1.    apply only to a particular grant of coverage under such **Underlying Policy**; and

2.    reduce and are part of the otherwise applicable limits of liability of such **Underlying Insurance** set forth in the Declarations.

F.    "**Underlying Policies**" shall mean all policies identified in the Schedule of Underlying Insurance.

G.    "**Underlying Limit**" means the limit of liability of an individual **Underlying Policy**.

H.    "**Underlying Policy Limits**" shall mean the combined limits of liability of the **Underlying Policies** for each type of insurance, including costs and expenses incurred in the defense or settlement of any claim.

III.    **LIMIT OF LIABILITY**

A.    The amount shown in Item 3. of the Declarations shall be the maximum aggregate Limit of Liability of the Underwriters under this Policy.

B.    Payment by the Underwriters of any amount, including but not limited to defense costs, shall reduce the limits of liability available under this Policy.

IV.    **MAINTENANCE OF UNDERLYING POLICIES**

It is a condition of this Policy that the **Underlying Policies** shall be maintained in full effect during the **Policy Period** except for any reduction of the **Underlying Policy Limits** solely by payment of any claims or losses or costs and expenses incurred in the defense or settlement of such claims. If this condition is breached then this Policy shall automatically and immediately terminate with effect from the date when the **Underlying Policies** cease to be maintained or are deemed to have ceased to be maintained.

In the event the insurer under one or more of the **Underlying Policies** fails to pay any claim or loss or costs and expenses incurred in the defense or settlement of such claim as a result of the insolvency, bankruptcy or liquidation of said insurer, then the **Insured** shall be deemed self-insured for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

V.    **REDUCTION / EXHAUSTION OF THE UNDERLYING POLICIES**

If by reason of the payment of any claims or losses or costs and expenses incurred in the defense or settlement of such claims or losses by the insurers of the **Underlying Policies**, the amounts of the **Underlying Policy Limits** are:

A.    Partially reduced, then this Policy shall continue to apply in excess of the reduced amounts of the **Underlying Policy Limits**; or

B.    Totally exhausted, then this Policy shall continue in force as primary insurance with respect to any subsequent claim; provided, however that this Policy shall only pay in excess of the retention or deductible applicable to the **Primary Policy** and in conformance with the terms, conditions and limitations of the **Primary Policy** except as stated herein, which shall be applied to any subsequent claim in the same manner as specified in the **Primary Policy**.

C.    If any **Underlying Limits** are subject to a **Sublimit** then coverage hereunder shall not apply to any claim which is subject to such **Sublimit**, provided however, that the **Underlying Limit** shall be recognized hereunder as depleted to the extent of any payment of such claim subject to such **Sublimit**.

VI.    **NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM**

For all claims and circumstances that might lead to a claim the **Insured** must provide written notice in the same manner as required by the **Primary Policy**, and must be reported to the Underwriters

in writing via the entity named in Item 5. of the Declarations.  Notice to any underlying carrier is not notice to the Underwriters.

**VII.    CONDITIONS**

A.    In the event of a claim or loss for which the Underwriters hereon may be liable to contribute, no costs or expenses shall be incurred on their behalf without their written consent being first obtained (such consent not to be unreasonably withheld).  No settlement of a claim or loss shall be effected by the **Insured** for such a sum as will involve this Policy without the written consent of the Underwriters hereon.

B.    All recoveries or payments recovered or received subsequent to a loss settlement under this Policy shall be applied first to subrogation expenses, second to claims or loss or costs and expenses incurred in the defense or settlement of such claims by the Underwriters hereon, third to claims or loss or costs and expenses incurred in the defense or settlement of such claims by the insurers of the **Underlying Policies**, and fourth to the applicable retention or deductible under the **Primary Policy**.  Provided always that nothing in this Policy shall be construed to mean that loss settlements under this Policy are not payable until the **Insured'**s ultimate net loss has been finally ascertained.

C.    If the **Insured** shall proffer any claim or loss knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claims hereunder shall be forfeited.

D.    By acceptance of this Policy, the **Insured** agrees the Underwriters may at their own discretion and expense retain counsel to associate in the defense or settlement of any claim and to cooperate with such counsel.

E.    If during the **Policy Period** the provisions of the **Primary Policy** are changed in any manner, as a condition precedent to coverage under this Policy, the **Insured** shall give written notice to the Underwriters of the full particulars of such change as soon as practicable but in no event later than thirty (30) days following the effective date of such change.  No amendment to any **Primary Policy** or **Underlying Policies** during the **Policy Period** shall be effective in broadening or extending the coverage afforded by this Policy or extending or increasing the limits of liability afforded by this Policy unless the Underwriters so agree in writing.  The Insurer may, in its sole discretion, condition its agreement to follow any changes to the **Primary Policy** or the **Underlying Policies** on the **Insured** paying any additional premium required by the Underwriters for such change.

As soon as practicable, but in no event later than thirty (30) days thereafter, the **Insured** must give the Underwriters written notice of any additional or return premiums charged or allowed in connection with any **Underlying Policies.**

**VIII.    SINGULAR FORM OF A WORD**

Whenever the singular form of a word is used herein, the same shall include the plural when required by context.

**IX.    TITLES OF PARAGRAPHS**

The titles of paragraphs, sections, provisions or endorsements of or to this Policy are intended solely for convenience and reference.  Such titles are not deemed in any way to limit, expand or define the provisions to which they relate and are not part of this Policy.

**X.    SERVICE OF SUIT**

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due under this Insurance, the Underwriters hereon, at the request of the **Insured**, will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.  It is further agreed that service of process in such suit may be made upon the persons named in Item 6. of the Declarations, and that in any suit instituted against any one of them upon this contract, the Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The persons named in Item 6. of the Declarations is authorized and directed to accept service of process on behalf of the Underwriters in any such suit and/or upon the request of the **Insured** to give a written undertaking to the **Insured** that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this Policy, and hereby designate the persons named in Item 6. of the Declarations, as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**XI.    CHOICE OF LAW**

Any dispute concerning the interpretation of this Policy shall be governed by the laws of the state designated in Item 7. of the Declarations.

1

**Exhibit B**

2

FDIC Orders

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| BRAD A. PALUBICKI, ) | ORDER TO PAY |
| ) | |
| Individually, and as an ) | |
| institution-affiliated party of ) | |
| ) | FDIC-14-295k |
| MID AMERICA BANK ) | |
| JANESVILLE, WISCONSIN ) | |
| ) | |
| (INSURED STATE NONMEMBER BANK) ) | |

Brad A. Palubicki ("Respondent") and a representative of the Legal Division of the Federal Deposit Insurance Corporation ("FDIC") executed a Stipulation and Consent to the Issuance of an Order to Pay ("CONSENT AGREEMENT"), dated January 20, 2015, whereby Respondent, solely for the purpose of this proceeding and without admitting or denying any allegations of engaging in unsafe or unsound practices or breaches of fiduciary duty for which civil money penalties may be assessed, consented and agreed to pay a civil money penalty in the amount specified below to the Treasury of the United States.

After taking into account the CONSENT AGREEMENT, the appropriateness of the penalty with respect to the financial resources and good faith of Respondent, the gravity of the violations by Respondent, the history of previous violations by Respondent, and such other matters as justice may require, the FDIC accepts the CONSENT AGREEMENT and issues the following:

<u>ORDER TO PAY</u>

IT IS HEREBY ORDERED, that by reason of the unsafe or unsound practices and breaches of fiduciary duty alleged in paragraph 3 of the CONSENT AGREEMENT, a penalty of $50,000 be, and hereby is, assessed against Respondent.  Respondent shall pay the civil money penalty to the Treasury of the United States.

IT IS FURTHER ORDERED, that Respondent is prohibited from seeking or accepting indemnification from any insured depository institution for the civil money penalty assessed and paid in this matter.

This ORDER TO PAY shall be effective upon issuance.

Pursuant to delegated authority.

Dated at Washington, D.C., this 22<u>ND</u> day of <u>April</u>, 2015.


    <u>  /s/                              </u>
    Christopher J. Newbury
    Associate Director
    Division of Risk Management
        Supervision

2

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| BRAD A. PALUBICKI, | ) | ORDER OF PROHIBITION |
| | ) | FROM FURTHER |
| Individually, and as an | ) | PARTICIPATION |
| institution-affiliated party of | ) | |
| | ) | |
| MID AMERICA BANK | ) | FDIC-14-0265e |
| JANESVILLE, WISCONSIN | ) | |
| | ) | |
| (INSURED STATE NONMEMBER BANK) | ) | |

Brad A. Palubicki ("Respondent") has been advised of the right to receive a NOTICE OF

INTENTION TO REMOVE AND PROHIBIT FROM FURTHER PARTICIPATION

("NOTICE") issued by the Federal Deposit Insurance Corporation ("FDIC") detailing the unsafe

or unsound banking practices and breaches of fiduciary duty for which an ORDER OF

PROHIBITION FROM FURTHER PARTICIPATION ("ORDER") may issue, and has been

further advised of the right to a hearing on the charges under section 8(e) of the Federal Deposit

Insurance Act ("Act"), 12 U.S.C. § 1818(e), and the FDIC Rules of Practice and Procedure, 12

C.F.R. Part 308.  Having waived those rights, Respondent entered into a STIPULATION AND

CONSENT TO THE ISSUANCE OF AN ORDER OF PROHIBITION FROM FURTHER

PARTICIPATION ("CONSENT AGREEMENT") with a representative of the Legal Division of

the FDIC, whereby solely for the purpose of this proceeding and without admitting or denying

any unsafe or unsound banking practices and breaches of fiduciary duty, Respondent consented

to the issuance of an ORDER by the FDIC.

The FDIC considered the matter and determined it had reason to believe that:

(a)      Respondent has engaged or participated in unsafe or unsound banking practices and breaches of fiduciary duty as an institution-affiliated party of Mid America Bank, Janesville, Wisconsin ("Bank");

(b)      By reason of such practices and breaches of fiduciary duty, the Bank has suffered financial loss or other damages and Respondent has received financial gain or other benefit; and

(c)      Such practices and breaches of fiduciary duty involved personal dishonesty on the part of Respondent or demonstrated Respondent's willful or continuing disregard for the safety or soundness of the Bank.

The FDIC further determined that such practices and breaches of fiduciary duty demonstrate Respondent's unfitness to serve as a director, officer, person participating in the conduct of the affairs or as an institution-affiliated party of the Bank, any other insured depository institution, or any other agency or organization enumerated in section 8(e)(7)(A) of the Act, 12 U.S.C. § 1818(e)(7)(A).

The FDIC, therefore, accepts the CONSENT AGREEMENT and issues the following:

ORDER OF PROHIBITION FROM FURTHER PARTICIPATION

1.      Respondent is hereby, without the prior written approval of the FDIC and the appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(D) of the Act, 12 U.S.C. § 1818(e)(7)(D), prohibited from:

(a)      participating in any manner in the conduct of the affairs of any financial institution or organization enumerated in section 8(e)(7)(A) of the Act, 12 U.S.C. §

2

(b)      soliciting, procuring, transferring, attempting to transfer, voting, or

attempting to vote any proxy, consent or authorization with respect to any voting rights in any

financial institution enumerated in section 8(e)(7)(A) of the Act, 12 U.S.C. § 1818(e)(7)(A);

(c)      violating any voting agreement previously approved by the appropriate

Federal banking agency; or

(d)      voting for a director, or serving or acting as an institution-affiliated party.

2.      This ORDER shall be effective upon issuance.  The provisions of this ORDER

will remain effective and enforceable except to the extent that, and until such time as, any

provision of this ORDER shall have been modified, terminated, suspended or set aside by the

FDIC.

Pursuant to delegated authority.

Dated this  22nd  day of April, 2015.


_/s/_____

 Christopher J. Newbury
Associate Director
Division of Risk Management
          Supervision

3