```
                    UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA (LAS VEGAS)

                                    .
IN RE:                              .  Case No. 25-10341-nmc
                                    .  Chapter 11
NUMALE CORPORATION,                 .
                                    .  300 Las Vegas Blvd. S.
                                    .  Las Vegas, NV 89101
              Debtor.               .
                                    .  Wed., September 24, 2025
. . . . . . . . . . . . . . . . .   .  9:39 a.m.
```

 TRANSCRIPT OF DOC# 545 APPLICATION FOR COMPENSATION MOTION TO
 AUTHORIZE PAYMENT OF COMMISSION TO MICHAEL CARMEL, CHAPTER 11
 TRUSTEE FOR MICHAEL W. CARMEL, FEES: 3,278,250.00, EXPENSES: .
        WITH PROPOSED ORDER FILED BY PARTY NOT KNOWN;

    DOC# 549 APPLICATION FOR COMPENSATION FIRST INTERIM FEE
   APPLICATION OF GARMAN TURNER GORDON, LLP AS ATTORNEYS FOR
   MICHAEL CARMEL, CHAPTER 11 TRUSTEE, FOR THE ALLOWANCE OF
     COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND
    REIMBURSEMENT OF EXPENSES FOR GREGORY E. GARMAN, FEES:
 9,338,543.40, EXPENSES: 42,575.51, WITH PROPOSED ORDER FILED BY
                    GREGORY E. GARMAN;

                        (CONTINUED)
              BEFORE THE HONORABLE NATALIE M. COX
              UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:          Benji Rawling, Remote ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TRANSCRIPT OF (CONTINUED):

DOC# 631 ORDER SHORTENING TIME RE: MOTION FOR SALE/USE/LEASE OF
PROPERTY UNDER SECTION 363(B) TRUSTEE'S MOTION FOR ENTRY OF
ORDERS: (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF
DEBTORS ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE;
(III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY
AUCTION; AND (IV) GRANTING RELATED RELIEF; AND
(B)(I) AUTHORIZING THE SALE OF DEBTORS ASSETS OUTSIDE OF THE
ORDINARY COURSE OF BUSINESS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) GRANTING RELATED
RELIEF FILED BY TALITHA B. GRAY KOZLOWSKI ON BEHALF OF
MICHAEL W. CARMEL;

DOC# 435 DISCLOSURE STATEMENT TO ACCOMPANY JOINT PLAN OF
REORGANIZATION FILED BY TALITHA B. GRAY KOZLOWSKI ON BEHALF OF
MICHAEL W. CARMEL;

DOC# 434 CHAPTER 11 PLAN OF REORGANIZATION #1 JOINT PLAN OF
REORGANIZATION FILED BY TALITHA B. GRAY KOZLOWSKI ON BEHALF OF
MICHAEL W. CARMEL

APPEARANCES:

For Michael Carmel,        Garman Turner Gordon
Chapter 11 Trustee:        By:  GREGORY E. GARMAN, ESQ.
                                TALITHA B. GRAY KOZLOWSKI, ESQ.
                                MARY LANGSNER, ESQ.
                           7251 Amigo Street, Suite 210
                           Las Vegas, NV 89119
                           (725) 777-3000


Chapter 11 Trustee:        MICHAEL W. CARMEL, ESQ.
                           80 East Columbus Avenue
                           Phoenix, AZ 85012
                           (602) 264-4965


For Justin Pulliam:        Andersen Beede Weisenmiller
                           By:  RYAN A. ANDERSEN, ESQ.
                           3199 East Warm Springs Road
                           Suite 400
                           Las Vegas, NV 89120
                           (702) 522-1992


For Certain                Simpson Thacher and Bartlett LLP
Underwriters at            By:  SUMMER CRAIG, ESQ.
Lloyd's London             425 Lexington Avenue
Syndicates 623/2623:       New York, NY 10017

```
APPEARANCES (Continued):

For Certain                 Larson and Zirzow, LLC
Underwriters at             By:  MATTHEW C. ZIRZOW, ESQ.
Lloyd's London              850 East Bonneville Avenue
Syndicates 623/2623:        Las Vegas, NV 89101
                            (702) 382-1170


For Brad Palubicki and      Holland & Hart LLP
Eva Gabriela Farmer de      By:  JOSEPH G. WENT, ESQ.
la Torre:                   9555 Hillwood Drive, 2nd Floor
                            Las Vegas, NV 89134
                            (702) 669-4600


For Newtek Small            Stephens Law Office
Business Finance, LLC:      By:  DAVID A. STEPHENS, ESQ.
                            P.O. Box 33130
                            Las Vegas, NV 89133
                            (702) 656-2355


For Michael E.              Womble Bond Dickinson
Sanchez:                    By:  CHRISTINE FOX, ESQ.
                            One East Liberty Street, Suite 300
                            Reno, NV 89501-2128
                            (775) 823-2900


For the U.S. Trustee:       U.S. Department of Justice
                            Office of the United States Trustee
                            By:  JUSTIN CHARLES VALENCIA, ESQ.
                                 ALYSSA A. ROGAN, ESQ.
                            300 Las Vegas Blvd. South
                            Suite 4300
                            Las Vegas, NV 89101
                            (702) 388-6600


TELEPHONIC APPEARANCES:

For Certain                 Simpson Thacher and Bartlett LLP
Underwriters at             By:  DAVID ZYLBERBERG, ESQ.
Lloyd's London              425 Lexington Avenue
Syndicates 623/2623:        New York, NY 10017


For Michael E.              Womble Bond Dickinson
Sanchez:                    By:  OGONNA BROWN, ESQ.
                                 MICHAEL E. SANCHEZ
                            3993 Howard Hughes Parkway
                            Suite 600
                            Las Vegas, NV 89169
                            (702) 474-2622
```

```
TELEPHONIC APPEARANCES (Continued):

For Michael E.          Bencoe & Lacour Law P.C.
Sanchez:                By:  LORI M. BENCOE, ESQ.
                             CHERIE LACOUR, ESQ.
                        9201 Montgomery Blvd. NE, Suite 404
                        Albuquerque, NM 87111
                        (505) 247-8800


For Mayfair Mall LLC:   Kaempfer Crowell
                        By:  LOUIS M. BUBALA III, ESQ.
                        50 West Liberty Street, Suite 1100
                        Reno, NV 89501
                        (775) 852-3900


                        Allen Matkins Leck Gamble Mallory
                        Natsis
                        By:  IVAN M. GOLD, ESQ.
                        Three Embarcadero Center
                        12th Floor
                        San Francisco, CA 94111
                        (415) 837-1515


For Prospect Rainbow,   Johnson & Gubler, P.C.
LLC:                    By:  MATTHEW L. JOHNSON, ESQ.
                        8831 West Sahara Avenue
                        Las Vegas, NV 89117
                        (702) 471-0065


For Christopher         King Scow Koch Durham LLC
Asandra:                By:  STEVEN B. SCOW, ESQ.
                        11550 South Eastern Avenue
                        Suite 210
                        Henderson, NV 89052
                        (702) 833-1100


Also Present:           TIMOTHY STACY
```

5

I N D E X
9/24/25

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE TRUSTEE: | | | | |
| Eva Gabriela Farmer de la Torre | 33 | -- | -- | -- |

| EXHIBITS | ADMITTED |
|---|---|
| Trustee's Exhibit 1 | 36 |

```
 1          (Proceedings commence at 9:39 a.m.)
 2          THE CLERK:  Court is now in session, Chief Judge
 3   Natalie M. Cox presiding.
 4          THE COURT:  Good morning.  Please be seated.
 5          THE CLERK:  We are here in the case of NuMale
 6   Corporation, Case Number 25-10341.
 7          Your Honor, would you like us to take appearances as
 8   the first matter?
 9          THE COURT:  Yes, please.
10          THE CLERK:  Thank you.  May we have appearances in
11   the courtroom first?
12          MR. GARMAN:  Good morning, Your Honor.  It's nice to
13   see you.  Greg Garman appearing on behalf of the trustee,
14   Michael Carmel.  Accompanying me are Talitha Gray Kozlowski and
15   Dr. Langsner, and Trustee Carmel is at the end of the table.
16   And then, on the phone, we have Timothy Stacy of the PCO's
17   office.
18          THE COURT:  Okay.  Thank you.
19          MR. ANDERSEN:  Good morning, Your Honor.  Ryan
20   Andersen appearing on behalf of Justin Pulliam, unsecured
21   creditor.
22          THE COURT:  Good morning.
23          MS. CRAIG:  Good morning, Your Honor.  Summer Craig,
24   Simpson Thacher & Bartlett, on behalf of Certain Underwriters
25   at Lloyd's London 623 -- Syndicates 623 and 2623.  With me on
```

1  the phone, I have David Zylberberg, also of Simpson Thacher.

2        THE COURT:  All right, good morning.

3        MR. ZIRZOW:  Good morning, Your Honor.  Matt Zirzow

4  with Larson and Zirzow, local counsel to Beazley.

5        MS. BROWN:  Good morning, Your Honor.  Ogonna Brown

6  -- good morning, Your Honor.  Ogonna Brown on behalf of Michael

7  Sanchez, Bar Number 7589.  And I believe that Christine Fox is

8  in the courtroom.

9        MR. WENT:  Good morning, Your Honor.  Joseph Went on

10  behalf of Brad Palubicki and Gabby de la Torre.

11        THE COURT:  Good morning.

12        MR. STEPHENS:  Good morning, Your Honor.  David

13  Stevens on behalf of Newtek Bank, N.A.

14        MS. FOX:  Good morning, Your Honor.  Christine Fox on

15  behalf of Michael Sanchez.  With me today also from my office

16  is Ogonna Brown, who is appearing via phone, as well as Lori

17  Bencoe and Cherie LaCour from the team of Bencoe & LaCour, who

18  are admitted pro hac vice.  Also, I believe Mr. Sanchez is on

19  the phone.  Thank you.

20        THE COURT:  Good morning.

21        MR. VALENCIA    Justin Valencia, U.S. Department of

22  Justice, appearing for the United States Trustee.  Good

23  morning, Your Honor.

24        MS. ROGAN:  Good morning, Your Honor.  Alyssa Rogan,

25  Department of Justice, appearing on behalf of the U.S. Trustee.

```
 1                 THE COURT:  Morning.

 2                 Mr. Garman, go ahead.

 3                 MR. BUBALA:  Good morning, Your Honor.  Louis

 4   Bubala --

 5                 THE COURT:  Oh, do we have more on there -- on the

 6   phone?

 7                 MR. BUBALA:  Yes.  I apologize, Your Honor.  It's

 8   Louis Bubala, Kaempfer Crowell, on behalf of Mayfair Mall, LLC.

 9   I believe Ivan Gold (indiscernible).

10                 THE CLERK:  I apologize, but the volume is very low

11   incoming.  Can you speak up, please?

12                 MR. BUBALA:  (Indiscernible) put it on speaker.  Is

13   that better?

14                 THE COURT:  Still kind of garbled.

15                 THE CLERK:  Can you hear him?

16                 THE COURT:  It sounds like you know who this is.

17                 MR. GARMAN:  I heard Lou Bubala's voice.

18                 THE COURT:  Oh, okay.

19                 THE CLERK:  Is that who that is?

20                 MR. GOLD:  If I may, Your Honor.  It's Ivan Gold with

21   Allen Matkins.  Mr. Bubala is my co-counsel.  We represent

22   Mayfair Mall.  Good morning.

23                 THE COURT:  Yeah, I still couldn't hear him.

24                 Benji, were you able to?

25                 UNIDENTIFIED:  I believe that was Ivan Gold.
```

1  Mr. Bubala is local counsel for Mr. Gold.

2           THE COURT:  Okay.  All right.  Anyone else?

3           MR. JOHNSON:  Good morning, Your Honor.  This is Matt

4  Johnson on behalf of Prospect Rainbow, LLC.

5           THE CLERK:  Horrible connection.

6           MR. SCOW:  Good morning.  Steven Scow on behalf of

7  Christopher Asandra.

8           MR. GARMAN:  That's Steven Scow on behalf of

9  Mr. Asandra.  And you heard Mr. Johnson, I assume.

10          THE CLERK:  Matt Johnson, yes.  Excuse me, I've got

11 that one.

12          All right, anyone else?  All right, sounds like we're

13 good.

14          All right, Mr. Garman.

15          MR. GARMAN:  Yes, Your Honor.  I thought we might

16 first discuss kind of a roadmap of how you want to proceed

17 today.  Admittedly, in my wildest dreams, I didn't think we

18 would have this few issues to deal with on confirmation, and

19 candidly, we're trying.  We used a few minutes of your time

20 this morning because we're wee close to resolving the show

21 cause order, also.  There are a few implications, and so my

22 proposal for the Court, should you accept it, is that we deal

23 with the trustee's fees first, Garman Turner Gordon's fees

24 second.  The reason to handle those first is that concessions

25 need to be made in order to confirm the plan, and we need to

1    know if the fees are allowed so that the concessions can be

2    made for the distributions to creditors.

3            Then I'd propose that we handle the bid procedures

4    motion for the sale and then take a break for ten minutes or

5    so.  And the purpose of the break is that there is a

6    stipulation on the TRO that's been circulated, and I understand

7    it's been signed, but we need to confirm some signatures and

8    make sure that we have all the documents.  With that, there

9    will be the most minor of amendments to the plan that don't

10   implicate treatment of the creditors, but there are amendments

11   to the plan that we would need to incorporate.  And so we just

12   will need a few minutes to double-check.

13           And that will also then take off the evidentiary

14   hearing that we have set for the 22nd because there will be a

15   consensual injunction that will be entered.  And then -- but I

16   will ask you to still use that day for a sale, so we'll come

17   back to it.  And if that makes sense to the Court, we can

18   proceed that way.

19           THE COURT:  Works for me.

20           Anybody else want to be heard on that?

21           Okay.  Let's do it.

22           MR. GARMAN:  All right, Your Honor.  That brings us

23   first then to the compensation motion of the trustee.  Trustee

24   Carmel was appointed in April.  He's seen this case from the

25   beginning.  It's obviously been very active, and you've seen

1 | his conduct, his investigation, and the like that's occurred in

2 | and out of the courtroom that he's brought before you in

3 | reports.  It's an unopposed motion.

4 | There was significant interaction with the Office of

5 | the United States Trustee on both this and the GTG fee

6 | application of information being provided and meetings that

7 | occurred.  Trustee Carmel's compensation, we believe, is a

8 | commission under 326.  I believe that's the applicable law and

9 | certainly how it's treated in this jurisdiction.  And so I

10 | can -- I'm happy to report that the hundred-and-eight-and-a-

11 | half-million dollars is in the trustee's possession, ready for

12 | distribution under the global settlement agreement and under

13 | the plan should you choose to approve that plan today.

14 | Trustee seeks his commission on the hundred-and-

15 | eight-point-five million dollars and waives a commission on any

16 | additional amounts that were collected.  And, importantly, that

17 | includes all work going forward during the pendency of the

18 | bankruptcy case, which would include the sale.  So to the

19 | extent that additional sources of recovery, the trustee is

20 | waiving those.  So the amount that he seeks under 326(a) on a

21 | final basis is calculated exclusively on the hundred-and-eight-

22 | and-a-half-million, which amounts to $3,278,250 of which he

23 | proposes -- and this is why it's important that we deal with it

24 | first -- to defer -- to voluntarily defer $278,250 to payment

25 | under the liquidating trust.  So in essence, if all goes as we

1    hope it will go today, Trustee Carmel will be entitled to a

2    $3 million payment now and $278,250 to be deferred to the

3    liquidating trust if, and hopefully when, the trust makes

4    recoveries, although that is far from a certainty, and given

5    the litigation assets that the liquidating trust will be

6    receiving.

7               There are no other oppositions to it.

8               Trustee Carmel is here.  He submitted his declaration

9    at Docket 546.  I contend this is fair and reasonable under

10   326, and the success that he had in this case was, in my humble

11   opinion, remarkable.  I believe he's entitled to the fee, and

12   we ask for approval of the order that we've uploaded for

13   consideration.

14              THE COURT:  All right.  Does anybody else want to be

15   heard?  Does the U.S. Trustee want to be heard?

16              All right.  Ms. Rogan?

17              MS. ROGAN:  Thank you, Your Honor.  Alyssa Rogan for

18   the U.S. Trustee.  Our office reviewed Trustee Carmel's fee

19   application and supporting declaration at ECF Numbers 545 and

20   546.  We reviewed the application in the lens of Section 326,

21   and our numbers match Trustee Carmel's requested fees.  We do

22   not have any objection except our only request would be to sign

23   off on the proposed order.  Thank you.

24              THE COURT:  All right.  Thank you.

25              All right.  Anyone else?

1    All right.  I agree.  This certainly -- at the

2 beginning of this case, I didn't envision where we are today.

3 And I think that is in large part because of the trustee's

4 efforts, and I don't have any questions for you or concerns

5 about this.  And I think I understand based on that

6 explanation.  So for the reasons that have been argued, the

7 Court will grant the request.

8    MR. GARMAN:  Thank you, Your Honor.

9    So second, Your Honor, I'd like to turn to the GTG,

10 Garman Turner Gordon, fee application, which is found at Docket

11 549.  And it is supported by an evidentiary basis of my

12 declaration at Docket 550 and Mr. -- the trustee's declaration

13 at 551.  So we ask essentially for confirmation of the fee

14 structure that we agreed to subject to additional concessions.

15    For the record, I'm a little sensitive on this in

16 that the leading case on this is one I had to defend, the Fann

17 v. Garman Turner Gordon case that I was awarded a fee.  It was

18 appealed.  It was then affirmed on appeal, but it was a long

19 time.  I had to live through that.

20    So under 328 -- we were employed under 328 subject to

21 a reasonableness review by the Office of the United States

22 Trustee under 330.  It was a hybrid approach, and that hybrid

23 approach constituted a 50 percent waiver of our hourly fee and

24 a discounted contingency fee as to what is, I think, standard

25 in the market.

1          We come before the Court seeking, on an uncontested

2     basis, confirmation of that fee with additional concessions

3     being made.  And those concessions are -- you will recall at

4     the outset of the case that the Office of the United States

5     Trustee reserved the issue of -- we'll call it double dipping,

6     and they -- it was whether or not a discounted fee and a

7     discounted hourly being -- the 50 percent constituted double

8     recovery.  I respectfully don't think it does, but we are not

9     going to fight about that today because we are waiving the

10    totality of the hourly fee, and we are waiving an additional 10

11    percent of the contingency fee, which otherwise would have

12    calculated at $10,376,159.33.  We're discounting an additional

13    $1,037,615.93.  So what we ask for today is approval of our fee

14    in the amount of $9,338,543.40, and we came out of pocket for

15    costs of $42,575.51.

16         This is an interim.  We'll be back for final approval

17    not long after the effective date, but I don't have any

18    expectation that this number is changing.

19         Now, materially, same as the trustee.  What we're

20    proposing is that we take half of our fee plus 100 percent of

21    our expenses now, and we defer the remainder to a date if, and

22    or hopefully when, a liquidating trust has sufficient funds to

23    pay us.  So the amount we seek in fees is the award of the

24    $9,338,543, but hopefully if and when you approve the plan, I

25    will tell you that we will accept $4,669,271.70 as our fee and

1    $42,575.51 as cost for a total of $4,711,847.21.

2              As you saw, there were a number of extensions granted

3    the Office of the United States Trustee.  They asked for data

4    to back up our fee application.  We provided it.  We had

5    further extensive conversations with Ms. Rogan and Mr. Valencia

6    on the topic, and I'm happy to report that no opposition has

7    been filed, which I believe stands for the proposition that the

8    money parties in this case believe that we produced value for

9    which we should be compensated.

10             And with that Your Honor, I stand ready to answer any

11   questions you might have.

12             THE COURT:  No, I don't have any.  I've read all the

13   papers.  I understand.  I now understand better what the

14   position is.  I will hear from Ms. Rogan.

15             Are you going to speak for the U.S. Trustee's Office?

16             MS. ROGAN:  Thank you, Your Honor.  Alyssa Rogan

17   appearing on behalf of the U.S. Trustee.

18             Our office reviewed Garman Turner Gordon's interim

19   fee application and supporting declarations.  That's at ECF

20   Numbers 549, 550, 551, and 552.  As indicated in the GTG

21   retention application, although the contingency fee agreement

22   was approved under Section 328, the U.S. Trustee retained

23   Section 330 review.  That's at ECF Number 293.  Our office

24   reviewed the application in the lens of Section 330, and we

25   don't have any objection to the amounts requested.  Our only

```
 1   request is to sign-off on the proposed order.  Thank you.
 2            THE COURT:  Thank you.
 3            All right, anyone else?  All right.  All right.
 4   Similar --
 5            MR. CARMEL:  Your Honor -- if I may, Your Honor.
 6            THE COURT:  Suer.
 7            MR. CARMEL:  It's nice to meet you in person, Your
 8   Honor.  Michael Carmel, the trustee.
 9            I've been getting a lot of the compliments, but it
10   goes to this table as well.  This case could not have gotten to
11   where we are without the assistance and without the efforts of
12   these three people that I'm sitting next to, and it's been a
13   pleasure working with them.  Thank you.
14            THE COURT:  All right, thank you.
15            MR. GARMAN:  I didn't know he was going to do that.
16            THE COURT:  All right.  Well, I agree.  Similarly to
17   what I said earlier about the trustee, I also believe that it
18   was in large part because of the effort of your firm.  It is a
19   large amount, and it's larger than we see often.  The case is
20   very large in many respects.  And I think it's telling that
21   there aren't any objections.  I have reviewed everything, and
22   based on what was said here today, the Court's going to grant
23   the request on an interim basis, and that is including the
24   alterations, if you will, that you had stated on the record.
25            MR. GARMAN:  Thank you.
```

17

```
 1                THE COURT:  So that is on an interim basis.

 2                MR. GARMAN:  Thank you.

 3                Your Honor, that brings us then to bid procedures,

 4    and let me set the stage here for you.

 5                You've seen an orchestrated series of motions brought

 6    before you for the purpose of resolving this case, and they

 7    begin with a whole series of 1919 motions and, importantly, the

 8    global settlement.  The global settlement was a cornerstone

 9    upon which everything else was built, and the global settlement

10    touched, for all practical purposes, every other aspect that

11    will follow after the case.  The plan is here today.  You have

12    a series of 1919 motions that you heard, I think, two weeks

13    ago, and then I think you have some next week.

14                The last piece of this is the sale of the operating

15    clinics.  That's a touchy issue for us because these aren't

16    just assets.  These are patients.  And so ensuring that there's

17    a smooth transition of patient care is a critical component of

18    what you will hear, ultimately, the trustee and the PCO's

19    decision is as to what constitutes the highest and, in this

20    case, the best offer that may come in.

21                We've had extensive conversations with the Office of

22    the United States Trustee, and they have raised concerns that

23    they put forth in their reservation of rights.  The reservation

24    of rights is truly a response to the plan, but it touches this

25    sale inherently, and also the plan is -- contemplates the sale.
```

1    So this is all tied together.

2           And one of the concerns that the U.S. Trustee's

3    Office has is that, because of the timing of the motions that

4    we brought before the Court, the sale likely was to drag

5    post-effective date.  And they're concerned -- and reasonable

6    minds might disagree, we might disagree -- as to whether or not

7    a 363 sale can occur post-effective date and whether or not the

8    retention of jurisdiction found in the plan is sufficient to

9    permit that.

10          In order to avoid yet another fight that I think is

11   unnecessary, if the Court will indulge us -- and, one, we thank

12   you for indulging us on the on the order shortening time in

13   connection with the bid procedures today.  We believe that we

14   have a mechanism to have this sale occur on a reasonable amount

15   of time, such that Trustee Carmel will provide you sufficient

16   evidence of marketing and market tests and have this sale occur

17   prior to the effective date.

18          And so I'm going a little bit out of order here

19   because I think I need to back for -- so you have any

20   reasonable chance of understanding what I'm trying to propose

21   to you, I think I have to kind of back into the process, and

22   then I'll talk about the sale itself.

23          The global settlement agreement essentially had

24   outside dates by which all these things had to happen, and

25   we're well within those dates.  It was contemplated under our

1    plan that the effective date of the plan would occur 15 days --

2    a standard 15 days after entry of the confirmation order.

3    That's a pretty tight timeline in which to get a sale done.

4         All of the parties whose consent would be necessary

5    consented to an extension of the outside date through October

6    24th, So a month from now.  And so what we would propose, and I

7    have a timeline of -- how did I lose something here?

8         So we have a timeline that takes us up to the 24th to

9    conduct a sale that essentially is the timeline that I'm asking

10   you to approve by way of these bid procedures, then I'll circle

11   back to the actual procedures themselves.  But since we can

12   push up to a effective date of October 24th and you already

13   have us scheduled for the whole day of the 22nd, we would

14   propose to conduct the auction on the first thing in the

15   morning of October 22nd.  We don't expect the sale to take an

16   extensive amount of time.

17        We would then turn to the evidentiary hearing on the

18   show cause which is what you have set for October 22nd.  I

19   believe, with confidence, that when we take a break, we will

20   tell you that we have resolved that by way of stipulated

21   injunctions that will free up the day.  I would then propose

22   that the trustee, in consultation with the PCO -- and I want to

23   put this on the record -- because patient care is critical in

24   determining what is highest and best, we're asking in this

25   mechanism that you approve perhaps a bit of an expansion of the

1    PCO's role so that the trustee can get expert guidance in

2    determining what, if any, patient care concerns might be

3    impacted by this auction and that with the trustee's -- with

4    the input of the trustee, I'm sorry, the input of the patient

5    care ombudsman, the trustee can then decide what constitutes

6    highest and best, and we would have the sale hearing the same

7    afternoon of October 22nd.  That way, you could enter an order

8    hopefully shortly thereafter, and we've told our buyers that

9    closing, if they want a 363 order, would need to occur by the

10   24th, the outside date for the effective date.  And if it

11   doesn't occur by the 24th, all they would get is a bill of

12   sale.  I believe those buyers would want a 363 order.

13        So that's a long way of saying this was our proposal

14   to try and alleviate the concerns of the Office of the United

15   States Trustee and alleviate a fight over retained jurisdiction

16   that I don't think we need to have.  We've conferred

17   extensively with the trustee.  He will provide you an

18   evidentiary record of marketing.  I believe you will be

19   satisfied that the market test has occurred by October 22nd.

20   And so I'm just going to say them now, and then we'll come back

21   to them after I've done the rest of the presentation, but our

22   proposal is the auction and the sale take place -- the sale

23   hearing take place on the 22nd, that the bid deadline be 4 p.m.

24   on October 17th, that any sale objections be due by October

25   10th, and that we would then ask you to enter a sale order

21

1  hopefully shortly thereafter so that we close before the 24th

2  outside date.

3         So having said that, let me come back to the bid

4  procedures then.  We really need to find a buyer for this

5  clinic or we have to go through a winddown process with patient

6  care.  The only bidder that we currently have is an insider.

7  It's Mr. Pulliam.  Mr. Pulliam is -- has negotiated arm's

8  length with the trustee.  That'll be an issue for the sale, for

9  you to ultimately approve, but I'm confident that you will have

10  a sufficient record upon which to base that.  But we've put

11  before you a straightforward 363 sale that implements the

12  strategy we've used in this case.  It is subject to market

13  exposure.  It is subject to overbid.  It is a bid of $300,000

14  as the opening bid.  And again, I'll just say that bid makes

15  sense to the trustee in his business judgment to accept, for

16  among other reasons, it deals with patient care on a go-forward

17  basis.  They -- we've asked for the notice to be approved in

18  conformity with the motion that we filed.  The bid protections

19  that go to Mr. Pulliam are minor.  It is a $25,000 bid

20  increment that comes -- would come on top of his $300,000.  He

21  gets to bid, credit bid his secured claim for the $300,000.

22  And then he is entitled to, if he is overbid, an expense

23  reimbursement up to $30,000, a fairly nominal amount that I'm

24  quite confident Ryan has already exceeded in preparation for

25  getting us this far with an APA.

22

1           The APA is attached.  We'll run a standard sale

2    procedure with diligence.  It's an as-is sale.  And this will

3    come up in the context of the plan, but we will continue to

4    operate clinics until we find a buyer or we contemplate a

5    winddown of those operations in some fashion.

6           And so for all of those reasons and all of the

7    reasons set forth in Docket 631 and the attachments that

8    contain the bid procedures, the notice, the things that you

9    would see, as well as the evidentiary record established at

10   Docket 632, the declaration of Mr. Carmel, we would ask you to

11   set a sale and approve our bid procedures on the timeline that

12   I outlined.

13          THE COURT:  All right.  Then just asking for --

14   you're intending the auction to take place the --

15          MR. GARMAN:  We believe it to be best in this case.

16   Yes, Your Honor.

17          THE COURT:  All right.  All right.  Who wants to be

18   heard on this?

19          MS. ROGAN:  Alyssa Rogan for the U.S. Trustee.  Your

20   Honor, our office reviewed the bidding procedures at ECF Number

21   631, and regarding Counsel's comment today for expanding the

22   PCO's duties, the U.S. Trustee does have a slight concern that

23   we're not expanding his duties to step into becoming -- or

24   taking control and making decisions as a Chapter 11 trustee.

25   Instead, we want to caution that the PCO is only making

1  decisions to further the health and monitoring of the patients

2  and their care.

3        The debtor's amended schedules and statement of

4  financial affairs indicate that the debtors do retain both

5  private health information, which I'll refer to as PHI, and

6  personally identifiable information, PII, as well as a privacy

7  policy.  That's at ECF Numbers 220 at Page 8 and 221 at Page 8.

8  If the Court's inclined to grant today's motion, our request

9  would be that the proposed order includes language indicating

10  that the trustee and any prevailing bidder will follow the

11  debtor's privacy policy to ensure that PHI and PII is being

12  complied with both for federal and state laws to ensure the

13  health and consumer information is properly protected.  Our

14  office would also like to request a copy of the debtor's

15  privacy policy.  And at this stage, we do not have a position

16  as to whether a consumer privacy ombudsman under Section 332 is

17  necessary, but the U.S. Trustee reserves all his rights to --

18  in the future if it becomes necessary.  Thank you.

19        THE COURT:  All right.  Thank you.

20        All right.  Does anyone else want to be heard?  I

21  know there were oppositions to the sale itself, right, by

22  Mayfair Mall.

23        MR. GARMAN:  Yes, I think that's more in the context

24  of the plan though.

25        THE COURT:  Okay.

24

```
 1              MR. GARMAN:  Yeah, I think that's --

 2              THE COURT:  That was my understanding.

 3              MR. GARMAN:  -- adequately resolved in the context of

 4  the plan, so I'll get to that.

 5              THE COURT:  Okay.  All right.

 6              MR. GOLD:  (Indiscernible) context of the plan, and

 7  (indiscernible).  And if I may, Your Honor, just briefly

 8  (indiscernible).

 9              THE COURT:  Counsel, I can't hear you.

10              MR. GARMAN:  I think that was me.  I think that was a

11  very delayed echo of me.

12              THE CLERK:  No, I'm sorry.  That's Mr. Gold.  We're

13  just having a --

14              MR. GOLD:  Your Honor, I can hear you clearly, and I

15  have my (indiscernible) 100 percent.

16              THE COURT:  You're garbled.  I mean, I can hear

17  you're speaking, but I can't understand what you're saying.

18  I'm not even sure what he asked.

19              MR. GOLD:  I will try another device and will return

20  to this and talk (indiscernible).

21              THE COURT:  I'm not even sure what he asked.

22              THE CLERK:  Mr. Gold, is there any chance you could

23  dial in on perhaps a phone?

24              MR. GOLD:  That's what I'm using now.

25  (Indiscernible) another device.
```

1                THE CLERK:  Hopefully, that -- I asked him to dial in

2    on a phone, so hopefully that'll be make --

3                THE COURT:  Yeah.

4                THE CLERK:  -- the audio better.

5         (Pause)

6                THE COURT:  Call in yet?

7                THE CLERK:  I can't tell if he's dialed back in.

8                Mr. Gold, have you dialed back in yet?

9                Sorry.

10               THE COURT:  Mr. Garman, let me ask you a question

11   while we're waiting for Mr. Gold.

12               UNIDENTIFIED:  Your Honor, if I may.  Your Honor, I

13   was able to text Mr. Bubala.  He just relayed that Mr. Gold

14   would be deferring his comments to plan argument, and he will

15   be dialing back in at that point.

16               THE COURT:  Okay, great.  Thank you.

17               MR. GARMAN:  So just to alleviate any concerns on

18   this motion, there are no circumstances on which we will be

19   assuming Mr. Gold's client's lease as part of the sale.  And so

20   I think that really goes with the plan, but I just want to

21   assure the Court and the parties that there are no

22   circumstances in which we're going to assume it.  So we just

23   have to talk about an admin claim rejection damage in the

24   context of the plan so we can deal with that when we get to the

25   plan.

1          THE COURT:  One of the things that Ms. Rogan brought

2   up was the delineation of rules between trustee and PCO.  Is

3   there some sort of, you know, description of duties and so on?

4          MR. GARMAN:  Yeah.  Let me clarify that.  I want to

5   make sure everyone is comfortable.  I want to confirm that at

6   the end of the day, it will be the trustee exercising his

7   business judgment to determine what constitutes highest and

8   best.  He's not an expert in patient care.  This is a case

9   that's had troubled patient care.  And so having someone to

10  rely upon for input, maybe, you know, just advice is all I'm

11  proposing.  I'm really not looking to expand it.

12          I just wanted to -- it's not typically -- the U.S.

13  Trustee, this morning -- and I take no issue with the fact that

14  I asked for this on shortened time -- raised the issue of, is

15  this within the scope of the patient care ombudsman?  And I

16  think that what constitutes appropriate patient care

17  essentially goes into what constitutes higher and better.  And

18  so just letting everyone know he would be seeking input from

19  the patient care ombudsman in connection with his business

20  determination.  But I want to clarify, to the extent I garbled

21  it, it will be the trustee exercising his business judgment

22  based upon the advice of probably all of his professionals.

23          THE COURT:  And I assume that's been happening all

24  along.

25          MR. GARMAN:  Absolutely.  Absolutely.

27

```
 1              MR. CARMEL:  Yes, Your Honor.

 2              THE COURT:  All right.  All right, then.  Well, I've

 3    reviewed everything.  I've heard the arguments.  There doesn't

 4    seem to be an objection here.  And based on all of that, the

 5    Court will go ahead and grant the motion for bid procedures.

 6              MR. GARMAN:  Okay.  Then I'll input the dates that I

 7    gave to you in the order, and we'll get that uploaded to you.

 8              THE COURT:  I'm just assuming.  So the 22nd was

 9    already a date that was set aside, correct?  So we should be

10    good.

11              MR. GARMAN:  My understanding.

12              THE COURT:  Will you just double-check that,

13    Ms. Rawling, that we're still --

14              THE CLERK:  It is, Your Honor.

15              THE COURT:  All right.

16              THE CLERK:  We do have it reserved.

17              THE COURT:  Yeah, then everything should be fine with

18    the dates.

19              MR. GARMAN:  Okay.  Thank you.  Okay.  That leads us

20    to the disclosure statement and the plan.  I think it makes

21    sense to deal with them both.

22              Mr. Zirzow's office was kind enough to have printed a

23    series of documents that have been being circulated that I

24    think we understood five minutes before Court may have been

25    agreed to.  I'd ask for a brief continuum so that we can
```

1    confirm those documents because they do have, again, a minor

2    implication on plan confirmation.

3            THE COURT:  All right.  So how much time do you need?

4            MR. GARMAN:  I'm always bad at this.  Okay, 15

5    minutes.

6            THE COURT:  So you mean 30?

7            MR. GARMAN:  Yeah, I don't think so.  I think we're

8    just confirming that the documents have been signed, and

9    there's five different documents.  We need to make sure that

10   they're all signed.  So I would have said less than 15.  So I

11   think she's right.

12           THE COURT:  That's fine.  I mean, if you need more,

13   just let us know.

14           MR. GARMAN:  Okay.

15           UNIDENTIFIED:  Thank you, Your Honor.

16           THE CLERK:  All rise.

17      (Recess taken at 10:13 a.m.)

18      (Proceedings resumed at 10:40 a.m.)

19           THE CLERK:  Court is back in session.

20           THE COURT:  All right.  You may be seated.

21           THE CLERK:  Thank you.  We're back on --

22           THE COURT:  Mr. Garman, would you make your

23   appearance again?

24           MR. GARMAN:  Again, it's Greg Garman appearing on

25   behalf of Mr. Carmel.  Do you want everybody?  Do you want

1    everybody?

2           THE COURT:  No, no, that's good.  I just -- so we

3    don't have to go through the whole room again.  Just when

4    you're speaking, when you come up.

5           MR. GARMAN:  All right.  Your Honor, we are solving

6    problems, and I want to walk you through what we want to do.

7    I'm going to fumble around here, but I think we'll get there.

8           THE COURT:  Okay.

9           MR. GARMAN:  So let me pass you up an exhibit.  Can I

10   approach with an exhibit?

11          THE COURT:  Yes.

12          MR. GARMAN:  Okay.

13          THE CLERK:  Thank you.

14          THE COURT:  There are a couple of interconnected

15   issues that relate to confirmation today, and they relate to

16   the show cause hearing that you have currently scheduled for

17   the 22nd.  The list of issues we're trying to resolve is as

18   follows, some of which we're not asking for your approval of,

19   just so that you understand the picture of where we are.

20          You have before you what I'm going to put in front --

21   I'm going to ask you to let me call a witness for a couple of

22   questions in a minute.  But what you have before you on the top

23   is a stipulation resolving the order to show cause and granting

24   a permanent injunction.  This resolves the order to show cause,

25   and it is an admission by the targets of our show cause hearing

1  that they acknowledge that they engaged in the conduct that was

2  alleged by the trustee.  However, we wish to resolve our

3  dispute with them without a judicial determination as to

4  liability and avoiding the cost and trouble associated with

5  litigation.  This is in the best interest of the estate

6  because, as you will see, it also contains a permanent

7  injunction going forward prohibiting certain acts from

8  occurring in the future that satisfies the trustee.  And this

9  will put to rest the issues of the order to show cause.  So

10  that is one document.

11          The issues are that -- how do I say this?  We need

12  some confirmation of the signatures on this for a variety of

13  reasons that have occurred in this case.  And so I'm going to

14  ask you to permit me to call Ms. Farmer de la Torre to discuss

15  her involvement in gathering the signatures and her

16  understanding that each of them signed it and she has no reason

17  to believe that these signatures are someone else for reasons

18  that are not before the Court, but for reasons that give the

19  trustee a moment of pause under this.  So that's document one.

20          THE COURT:  And who is she?

21          MR. GARMAN:  She is a subject of the order to show

22  cause.  And she has a relationship with Mr. Palubicki that I,

23  candidly, don't know that I can accurately elaborate on what

24  exactly that relationship is.  But I believe they have a

25  romantic relationship, although I don't want to go out -- go

```
 1   over my skis.

 2           UNIDENTIFIED:  Your Honor, if I may.

 3       (Counsel confer)

 4           MR. GARMAN:  Okay.  This is awkward.  Can I have the

 5   last two documents back?  They're not going to be part of the

 6   exhibit.

 7           THE COURT:  The settlement agreements themselves?

 8           MR. GARMAN:  Yes.  The settlement agreements are

 9   between non-debtors, and the estate is not a party to those

10   agreements.  And I don't need to go through them.

11           Okay.  So we're down to three.

12           THE COURT:  I'm a fast reader.  I've already --

13           MR. GARMAN:  For context, you will recall that under

14   the global settlement order, the estate transferred certain

15   claims it holds against non-debtors to Beazley.  In the context

16   of that, I don't think it's a secret that there are discussions

17   that are ongoing between Beazley as a holder of those claims

18   and those individual defendants that do not involve the trustee

19   as that order is final and those claims have been transferred.

20           Okay.  So the second document is connected to the

21   first and that this is a stipulation allowing certain claims

22   held by Dr. Feliciano.  The reason that I'm doing this today in

23   a bit of an awkward fashion is that we have to make a minor

24   plan amendment that Ms. Gray Kozlowski will walk through when

25   we get to the plan because those claims are currently
```

 1  subordinated under the plan.  And if we don't do it today, that

 2  ship has sailed, and it makes getting this agreement in place

 3  difficult.  I'm going to ask the same questions just on how

 4  those signatures came to be.

 5          And then finally, the third document is a stipulation

 6  regarding the claims of Mr. Palubicki that were heavily

 7  negotiated with the trustee and Mr. Palubicki's attorney,

 8  Mr. Went, whose professionalism I greatly appreciate in helping

 9  us to get to resolution.  Kind of the same thing that

10  implicates allowed claim is implicated in the plan because the

11  plan seeks to subordinate them.  And if we don't do it today,

12  that ship has sailed and the consideration for this agreement

13  is no longer available.  And all of this came to be five

14  minutes before we showed up today.

15          So that's what I propose to do.

16          THE COURT:  Did you say I have three -- I only have

17  two things.  You told me three.

18          MR. GARMAN:  So there's three.  Okay.  So --

19          THE COURT:  I've got the stipulation regarding

20  Feliciano claims.  I've got the stipulation resolving the order

21  to show cause.

22          MR. GARMAN:  And then there is another one, which is

23  a stipulation regarding Brad Palubicki's claims.

24          THE COURT:  Oh, I'm sorry, it was attached.  It was

25  stuck on the bottom.  Apologize.

Farmer de la Torre – Direct                    33

1          MR. GARMAN:  Okay, great.  So those are the three.

2   And if you would permit me, in a quite unorthodox fashion, I

3   think Mr. Went and I would like to take the podium together and

4   get through a couple of questions authenticating the documents

5   from Ms. Farmer de la Torre.

6          THE COURT:  Okay.  All right.

7      EVA GABRIELA FARMER DE LA TORRE, TRUSTEE'S WITNESS, SWORN

8          THE WITNESS:  Good morning, Your Honor.

9          THE CLERK:  (Indiscernible) stating your name first

10  and then spelling it for (audio interference).

11         THE WITNESS:  Eva Gabriela Farmer de la Torre.  It's

12  E-V-A G-A-B-R-I-E-L-A F-A-R-M-E-R D-E L-A T-O-R-R-E.

13         THE CLERK:  Thank you.

14         MR. GARMAN:  Your Honor, may I hand up the one

15  exhibit we have?  Thank you.

16         THE COURT:  Yes, you may.

17         MR. GARMAN:  So, Your Honor, I'll represent to you

18  that the exhibit that I gave to the witness is identical in

19  nature to the one that I provided to the Court, and they are in

20  the same order.

21                   DIRECT EXAMINATION

22  BY MR. GARMAN:

23  Q   Ms. Farmer de la Torre, you say it so much better than I

24  do.  I apologize.  We met today for the first time.  My name is

25  Greg Garman.  You understand that I represent the trustee,

Farmer de la Torre – Direct                    34

1    right?

2    Q    I do.

3    Q    Okay.  I placed in front of you an exhibit, and we will

4    call this -- is Exhibit 1 fine?

5    A    Yeah, that's fine.

6         MR. GARMAN:  We'll call all three of these documents

7    Exhibit 1.  Do you see three documents being titled as

8    stipulation resolving order to show cause and granting

9    permanent injunction?  Do you see that as the top one?

10   A    Yes, I do.

11   Q    And do you see a stipulation regarding Carlos Feliciano

12   claims?

13   A    Yes.

14   Q    And do you see a stipulation regarding Brad Palubicki

15   claims?

16   A    Yes.

17   Q    Have you seen those documents before today?

18   A    Yes, I have.

19   Q    Okay.  And just briefly, can you tell the Court in what

20   context you've seen these documents?

21   A    I've seen them in the filings for the permanent

22   injunction, was one that I personally sent out for signature to

23   the staff that signed it -- or the -- the former employees that

24   signed it.  I talked to each one of them last night, so that

25   one, I'm familiar with, and I have seen the other two

 1  stipulations in court filings.

 2  Q    Were you involved in the gathering of signatures for the

 3  for the stipulations resolving the claims of Mr. Feliciano and

 4  Mr. Palubicki?

 5  A    For those two, I was not.

 6  Q    You were not?

 7  A    No, I was not.

 8  Q    Did you did you bring them here today, these documents

 9  signed or --

10  A    I believe they were sent to you.

11  Q    Okay.

12  A    We emailed them.

13          MR. WENT:  Did you talk to Dr.  Feliciano in

14  connection with that stipulation?

15          THE WITNESS:  I did talk to Dr.  Feliciano last night

16  for both of these documents.

17  BY MR. GARMAN:

18  Q    Okay.  And did you talk to Mr. Palubicki about these

19  documents?

20  A    I was actually there, yes.

21  Q    Okay.

22  A    So I did talk to him.

23          MR. GARMAN:  With that foundation, Your Honor, I'd

24  move to admit the exhibit into the record.

25          THE COURT:  All right, I will go ahead and admit

Farmer de la Torre – Direct                    36

 1  those into the record.

 2        (Trustee's Exhibit 1 admitted into evidence)

 3  BY MR. GARMAN:

 4  Q    Okay.  Ms. Farmer de la Torre, I'd like to ask you very

 5  few questions about the first document, the stipulation

 6  resolving the order to show cause and granting permanent

 7  injunction.  You have that right?

 8  A    Yes.

 9  Q    Okay.  There are a series -- well, one, you've read this

10  document.  You understand it, correct?

11  A    I do.

12  Q    Okay.  You -- there are a series of signatures,

13  electronic, I believe, that begin on Page 6 and go through Page

14  7. Do you see those?

15  A    Yes.

16  Q    Okay.  Were you involved in the gathering of these

17  signatures?

18  A    Yes.  I sent the Docusigner -- actually, it was an Adobe

19  Sign document myself.

20  Q    Okay.  And just in your own words, can you tell the Court

21  how you were involved in that process?

22  A    So I sent them via my personal Adobe Sign account last

23  night.  I also talked to each one of these signatures, or

24  signatures --

25  Q    Okay.

Farmer de la Torre – Direct                    37

1  A    -- as there was a series to make sure that they were all

2  signed last night before we had this proceeding today.  So I

3  did talk to each one of them.  It's sent out via email.

4  They're all notified in the order that the next person needs to

5  sign.  I contacted them and said, please sign, please sign,

6  please sign.  So we could gather all the signatures for today.

7  Q    Great.  Great.  And then you forwarded those to Mr. Went?

8  A    Correct.

9        MR. WENT:  Great.

10        THE COURT:  Just a second, Mr. Garman.  I want to ask

11  a question.  So it's a Docusign.  So in other words, that's one

12  of those things that you sign with your finger, for example, on

13  the screen, or it's not as --

14        THE WITNESS:  It sends to your personal email, and

15  then there's also a document that verifies.

16        THE COURT:  But it's not the same necessarily of

17  being able to recognize a person's signature for that, right?

18        THE WITNESS:  Correct.  You send to --

19        THE COURT:  But you send it to the emails --

20        THE WITNESS:  -- their personal emails.

21        THE COURT:  -- that you are familiar with.

22        THE WITNESS:  Yes.

23        THE COURT:  Okay.

24        THE WITNESS:  And I believe there have been multiple

25  emails that have gone to these personal emails.  So they should

1  be in other documents.

2  BY MR. GARMAN:

3  Q    Okay.  So let's begin.  I'll do this once, and then we'll

4  just incorporate it for the future documents.  You know

5  Mr. Palubicki, right?

6  A    Yes, I do.

7  Q    And you personally spoke with Mr. Palubicki and understand

8  that he authorized his electronic signature to be applied to

9  this document, correct?

10  A    I did.

11  Q    And, Mr. Feliciano, do you personally know Mr. Feliciano?

12  A    Yes, I do.

13  Q    And did you speak with him in connection with this

14  document?

15  A    Yes, I did.

16  Q    And do you have an understanding that Mr. Feliciano

17  personally caused his signature to be affixed to this --

18  electronically to this document?

19  A    (No audible response).

20  Q    Okay.  And obviously, Ms. Farmer de la Torre, your

21  signature is also electronic.  You're familiar with -- you

22  caused this signature to be applied to this document, correct?

23  A    Yes, I did.

24  Q    Okay.  How about Holly Triplett?  Do you know Ms. Holly

25  Triplett?

Farmer de la Torre – Direct                    39

```
1    A    Yes, I do.

2    Q    And did you --

3    A    And I spoke to her.

4    Q    -- did you personally speak with Ms. Triplett?

5    A    Yes, I did.

6    Q    Okay.  And you have a personal understanding that Ms.

7    Triplett caused her electronic signature to be applied to this

8    first stipulation regarding the injunction?

9    A    Yes, I did.

10   Q    Okay.  And then finally, another name I'm going to

11   butcher.

12   A    Ken Brielmaier.

13   Q    Yes.

14   A    Yes.

15   Q    You personally know Mr. Brielmaier?

16   A    Yes, I did.

17   Q    And did you speak with him in connection with this

18   stipulation?

19   A    Yes, I did.

20   Q    And do you have an understanding that he personally

21   affixed his signature to this stipulation and returned it to

22   you?

23   A    Yes, I did.

24   Q    Okay.  Do you have any reason -- do you have any personal

25   knowledge or any reason to believe that someone other than the
```

Farmer de la Torre – Direct                    40

1   named signature block caused any of these electronic signatures

2   to be applied?

3   A    Anyone other than the signatures?  No.

4   Q    Right.  Okay.

5   A    Each of the individuals signed their own.

6   Q    Okay.

7   A    And I verified.

8   Q    Okay.  I'd like to move on to the second document, and I

9   will advance this faster.  This will be the stipulation

10  regarding Carlos Feliciano's claim.  Do you see that one,

11  ma'am?  Well, one, do you see the stipulation?

12  A    Yes.

13  Q    Okay.

14  A    Sorry.

15  Q    Then I would direct your attention to Page --

16  A    6?

17  Q    -- 6.  Foundation question here.  Was it you who caused

18  this document to be transmitted to Dr. Feliciano for execution?

19  A    I did not send this one.

20  Q    Okay.  Who did?

21  A    I can't say.  I'm not sure.  More than likely, Brad helped

22  me.

23          MR. GARMAN:  You did?  All right.  Can you make that

24  representation?

25          MR. WENT:  Represent the Court that I transmitted the

1  document to Dr. Feliciano.

2  BY MR. GARMAN:

3  Q    Okay.  Did you speak with Dr. Feliciano concerning his

4  execution of this stipulation?

5  A    I did.

6  Q    And do you have an understanding that he caused this

7  signature to be applied to this stipulation concerning his

8  claim?

9  A    Recognize the signature.

10  Q    Do you have any reason to believe that this is not

11  Dr. Feliciano's signature?

12  A    I do not, no.

13  Q    Okay.  Okay, moving on to the last document.  Ma'am, I'd

14  direct your attention to the stipulation regarding Brad

15  Palubicki's claims.  Do you have that?

16  A    Yes.

17  Q    One, I'm not trying to pry too deeply, but what is your

18  relationship with Mr. Palubicki?

19  A    We have a child together.

20  Q    Okay.

21  A    We are co-workers.

22  Q    Okay.

23  A    We are no longer in a romantic relationship.

24  Q    Okay.  I apologize then for misstating that previously.

25  So in that capacity, you're familiar with Mr. Palubicki and his

Farmer de la Torre – Direct                          42

1   signature, I assume?

2   A    I am.

3          MR. GARMAN:  Did you cause this one to be sent to

4   (indiscernible)?  Okay.

5          MR. WENT:  I think I did.  I'll represent to the

6   Court that I transmitted this document to Mr. Palubicki.

7          THE COURT:  Can you state your name just so that --

8   for the record.

9          MR. WENT:  Joseph Went on behalf of Brad Palubicki

10  and Ms. De La Torre.

11         THE COURT:  Thank you.

12  BY MR. GARMAN:

13  Q    Ms. De La Torre, did you speak with Mr. Palubicki about

14  the application of his signature to this stipulation?

15  A    Yes, I was there when he signed it.

16  Q    And do you understand that this is Mr. Palubicki's

17  signature and it was intentionally and knowingly applied to the

18  stipulation?

19  A    Yes, I did.

20  Q    Do you have any reason to believe that someone other than

21  Mr. Palubicki executed this document?

22  A    No, I don't.

23         MR. GARMAN:  That's good with me.

24         MR. WENT:  Nothing further from me, then.

25         MR. GARMAN:  Your Honor, thanks for the indulgence of

43

```
 1  letting us get through this part.

 2          Okay, no further questions.

 3          THE COURT:  Thank you.

 4      (Witness excused)

 5          MR. GARMAN:  So --

 6          THE COURT:  Mr. Garman, can I assume that the people

 7  we were talking about, Mr. Feliciano, Mr. Palubicki, are not on

 8  the phone or not available?

 9          MR. GARMAN:  Regrettably, they are not.  Yeah, I had

10  hoped that we wouldn't have to go through that because they

11  would be here, but that didn't happen.

12          So, Your Honor, in context, what this means is we

13  will be submitting orders along with these stipulations for

14  your consideration to approve it, to resolve the show-cause

15  hearing that's set for the 22nd and to permit allowed claims

16  because those allowed claims need to be a component of the

17  plan.  I'm going to ask -- so I'd like to turn to the

18  disclosure statement and the plan now.  And before I begin with

19  the presentation, just so this isn't a haphazard -- more

20  haphazard than I've already made it, I'd like Ms. Gray

21  Kozlowski to discuss with you how these stipulations implicate

22  minor modifications to the plan that we're asking you to

23  confirm today.

24          THE COURT:  All right.  Thank you.

25          MS. GRAY KOZLOWSKI:  Your Honor, under the plan, we
```

44

1   had contemplated that the -- all of the claims of Mr. Palubicki

2   and all of the claims of Mr. Feliciano would be subject to

3   equitable subordination proceedings.  Certainly, that was not

4   resolved, but that is what was contemplated in the plan.

5   Through these stipulations, the wage-related claims of

6   Mr. Feliciano and Mr. Palubicki are going to be allowed claims

7   in their appropriate priority.  If they were an administrative

8   claim, they'd have administrative priority if they fell within

9   the standard time period.  All other claims that are either not

10  wage-related or -- Mr. Palubicki contends he had advanced some

11  money to pay wages while he was managing the debtors.  Subject

12  to proving that up to the trustee's satisfaction, that would

13  also be an allowed claim and fall sort of under the

14  wage-related category.

15          Every other proof of claim that was submitted by

16  either Mr. Palubicki or Mr. Feliciano is going to be withdrawn

17  with prejudice.  That is millions of dollars of claims that are

18  being withdrawn, and obviously then alleviates the need for the

19  equitable subordination proceedings.  Those were the only

20  contested equitable subordination that was contemplated under

21  the plan, so it does resolve that.  The -- so I think in the

22  proposed findings of fact and conclusion of law, we'd want to

23  just clarify that consistent with the stipulations and to

24  resolve that.

25          The other change is that, Your Honor, in the plan, in

1    Section 5.12, there had been an agreement with respect to the

2    trust's prosecution of the Quintairos claims.  And there was

3    language that had been negotiated with Mr. Pulliam and with

4    Mr. Asandra, Dr. Asandra, as to how those -- the debtor and

5    debtor-controlled claims, as well as their claims, would be

6    jointly prosecuted by the liquidating trust.  The only

7    modification now is that Mr. Palubicki and Mr. Feliciano's

8    claims will also be jointly prosecuted by -- under the trust.

9    So there's a slight modification to that provision that will

10   need to be made and confirmed in the findings of fact and

11   conclusions of law.  In fact, in the redline that we did

12   submit, that provision had been in there, but this -- these

13   resolutions dragged on for quite some time.  And so the version

14   that was submitted excludes that provision, but again, it is

15   there in the redline.  Those are the only modifications that

16   would arise out of this resolution to the plan.

17          THE COURT:  Okay.  Anybody else want to be heard on

18   that?  Mr. Went, any issues?

19          MR. WENT:  Nothing from me.

20          THE COURT:  All right.  Go ahead, Mr. Garman.

21          MR. GARMAN:  All right.  I'm going to try and bring

22   us in for a landing here then on this.  So Your Honor, with

23   that, we -- I'm going to ask you to walk through the disclosure

24   statement and the plan.  And if you confirm our plan today, we

25   have a couple of 9019s that you'll hear next week.

 1          We will have the auction that we already established

 2   for the 22nd, and there will be some residual claims objections

 3   from the trust.  We will put all the pieces to the stool

 4   together.

 5          So you have before you our disclosure statement and

 6   our plan.  You approved the disclosure statement on a

 7   conditional basis.  And so I'm here today on behalf of the

 8   trustee asking that you do two things.  I'm asking that you

 9   approve on a final basis our disclosure statement, and I'm

10   asking that you confirm a, I don't want to say unobjected to,

11   but nominal issues that remain in connection with our plan.

12          So let me start from the top.  The disclosure

13   statement has not been objected to by any party.  I contend

14   that particularly when measured from the eyes of a trustee,

15   which is how I believe that the disclosure statement needs to

16   be measured is from the eyes of a trustee, it contains adequate

17   information.

18          It was solicited.  We received many ballots.  We

19   received much participation by all parties in interest, and no

20   party has expressed formally or informally any concern that the

21   disclosure statement did not contain adequate information,

22   wasn't sufficiently noticed, and the solicitation is

23   established by the declaration of Trustee Carmel, I believe,

24   establishes that the disclosure statement should be approved.

25          When it comes to the plan, we created 13 classes.  Of

1   those 13 classes, 1 through 8 are unimpaired and already taxes,

2   secured claims, administrative claims.  They all get paid in

3   full, except to the extent that there was consent, as in that

4   consent being on the part of the trustee, Garman Turner Gordon,

5   and then a settlement with Newtek that you previously approved

6   in connection with their secured claim.  Classes 9 through 12

7   are impaired and they voted.

8           We had Class 9 being Sanchez, our largest unsecured

9   creditor, who, again, by way of the global settlement, we

10  reduced by more than $150 million.  He consented and voted yes

11  in favor of the plan.

12          Class 10 is the general unsecured creditors, 11 of

13  the 12 voted yes, which was 92 percent in number and 99.5

14  percent in amount.  We had one negative ballot.

15          And then Classes 11 and 12 both accepted with 100

16  percent.  Equity did not vote because this is a wildly

17  insolvent case when it comes to equity, and they will -- there

18  is no scenario under which they will receive anything, and so

19  they were deemed to have rejected.

20          It is important to understand in the context of this

21  plan that while we have one extraordinarily large creditor in

22  the form of Sanchez, Sanchez consented to treatment that is

23  lesser than the treatment that is provided to other unsecured

24  creditors.  Sanchez received less than 25 percent on his

25  allowed claim, notwithstanding the fact that that's $96.5

1  million, and that is less than 25 percent.

2        And there is no scenario in which unsecured creditors

3  don't receive a percentage greater than that that could be up

4  to 40 percent, but I'm not here to represent what that payment

5  will be.  I'm here to represent that the payment to general

6  unsecured creditors as a percentage of the allowed class will

7  be greater than the amount that was paid to Sanchez.

8        Different courts like to handle 1129 different.

9  Judge Landis and Judge Markell always liked me to go through

10  1129 element by element.  Judge Nakagawa doesn't seem to have

11  exactly the same rule.  I am prepared to do that here today,

12  Your Honor.  Having said that, we filed the confirmation brief,

13  we filed a supplement.  I believe that we've satisfied all the

14  conditions of 1129.  And when it comes to our one non-

15  consenting class, which would be equity, I certainly think that

16  it is fair and equitable treatment.  They're not being

17  discriminated against and the absent priority rule demonstrates

18  that cram down over that class is appropriate.

19        We have the Mayfair Mall objection.  I don't want to

20  say it's been resolved, but I think it's been mooted.  In an

21  ideal world, I assure the Court and the parties that we would

22  have told Mayfair earlier whether their lease was being assumed

23  or rejected.  But candidly, one, there was a lot going on in

24  this case on a bunch of different fronts.  And it's strange,

25  but this is a case in which the actual operations took

1  secondary to some of the other issues, and obviously the sale

2  of the asset is a fraction of the value of this case.  And so

3  our attention was focused elsewhere.

4          But until you know who your buyers are, you don't

5  know whether or not you're going to be assumed or rejected.

6  And so I regret that Mayfair Mall was forced to file paper.

7  But I don't know that -- what else we could have done under the

8  circumstances.  But it is clear and it is unconditional and

9  irrevocable that we are rejecting their claim.

10         And I believe that there is a mechanism that is

11  appropriate and fair in the plan to deal with both an

12  administrative claim to the extent that they have one and a

13  rejection claim to the extent they have one.  I'm not

14  consenting that they do, but we will resolve that in the way

15  those claims are resolved post-rejection should you choose to

16  confirm this plan.

17         The plan is entirely consistent with the global

18  settlement.  It implements its mechanics and the timelines and

19  then the obligations that were imposed upon the trustee.  And

20  that leads us to the reservation of rights by the opposite of

21  the United States Trustee, which essentially is going to come

22  down to three.

23         I want to talk and certainly I'll respond to the

24  extent that I get this wrong, but I want to talk about the

25  three issues, which are first the discharge injunction

1  language.  It is true that we are liquidating.  And it is true

2  that it is our intent and desire to liquidate prior to the

3  effective date based upon the sale process that we laid out.

4         Unfortunately, I've been involved in far too many

5  cases in which sales failed.  And to the extent that this sale

6  fails or is unable to close by the effective date, where we

7  find ourselves is that the trustee will be operating these

8  clinics on a go-forward basis because a wind down of patient

9  care will be inevitable.

10        To that extent, we ask that this Court issue an

11  injunction and discharge for that operational facility because

12  otherwise all of this will have been for nothing and all of

13  these claims will arise and we'll be back in the same spot

14  impairing patient care.  We have agreed and supplemented --

15  well,, and I think we've - -have we agreed on the language?

16  Yeah, okay.

17        So we've proposed language.  I'll let the U.S.

18  Trustees speak for themselves.  We've proposed language that I

19  think they're agreeable to in the red line confirmation order

20  that we uploaded that says to the extent the sale closes before

21  the effective date, we receive no discharge and we receive no

22  injunction, because we will have liquidated.  And the purpose

23  of that statute will not have been necessary.

24        But to the extent that we do not close by that

25  deadline, we will be a reorganized debtor and we will be

```
 1   operating.  And I would ask this Court to understand and

 2   acknowledge that we need the injunction and we need the

 3   discharge to apply.

 4             THE COURT:  Can you -- I'm having a hard time finding

 5   the red line.  What Docket Number is that?

 6             MR. GARMAN:  That's 650, right?  Yeah, it's 650.

 7   Yeah, and by the way, red line's a bit confusing of a notion in

 8   that we didn't actually file the first one.  But the reason we

 9   put the red line in and we talked about this with -- to the

10   Office of the United States Trustee is that we circulated it to

11   the parties and there was significant discussion and movement

12   of what that order would be, primarily based upon changes that

13   the U.S. Trustee requested.

14             And so 650 contains both a clean copy, and then

15   beginning at Page 37 is the red line -- 38 is the red line.

16             THE COURT:  And so is it -- I'm looking at Page 45

17   and that's part of the -- in the middle of the --

18             MR. GARMAN:  Yeah.

19             THE COURT:  -- red line.  Those are the modifications

20   you were talking about with respect to the U.S. Trustee's --

21             MR. GARMAN:  Yes.

22             THE COURT:  -- concerns?

23             MR. GARMIN:  Yes.  And just -- I'm sure they will

24   cover it, but changes requested by the U.S. Trustee are

25   extensive in the context of the order.  So I'm highlighting a
```

1  couple of things, but there are many additional changes that

2  they informally requested that we spent time working with them

3  on and resolved.

4          THE COURT:  So are you standing there today to say

5  that you've resolved all of them, or am I -- are they still --

6          MR. GARMAN:  I think we have, but they filed a

7  reservation of rights and I'm sure that they have some things

8  to say.  But I believe that this is uncontested, with the

9  exception of raising concerns, some of which I'm addressing

10 right now, and I can address after we go through that.

11         THE COURT:  Okay.

12         MR. GARMAN:  Let me make sure I've covered

13 everything.  The exculpation provision, always a hot topic.  I

14 believe that the changes that we've proposed to the exculpation

15 provision relate to fiduciaries and parties who negotiated the

16 plan, as well as the conforming components that were essential

17 to the plan, meaning primarily the 9019 global resolution.

18         We filed for the Court, to probably make it easier

19 for you, the supplement in support of confirmation at Docket

20 651 yesterday to discuss those things.  I believe that we've

21 got to a place where the exculpation is narrow and complies

22 with the Blixseth case, and so an express request has been made

23 to ensure that you review that and find that it complies.

24         It's narrow in nature, it's narrow in scope, and it

25 applies to the parties who negotiated exclusively post-petition

1  the plan and exculpates the parties who were fiduciaries or

2  otherwise participated in that process, and we believe it is

3  sufficiently narrow and appropriate, particularly in light of

4  the circumstances of this case.

5         I've covered the sale.  I've covered the disclosure

6  statement.  The exact contents of the findings of fact and

7  conclusions of law were obviously implicated by way of the

8  global settlement agreement.  This plan has -- this

9  confirmation order has been signed off on by all parties who

10  would have rights under the global settlement.

11         And with that, Your Honor, it's probably appropriate

12  for me to turn over the podium to the U.S. Trustee to allow you

13  to hear their input and where they stand on things.

14         THE COURT:  All right.

15         MR. VALENCIA:  Justin Valencia, U.S. Department of

16  Justice, appearing for the United States trustee.  Good morning

17  again, Your Honor.

18         With regards to the final approval of the disclosure

19  statement, we have no objections to granting that.  With

20  regards to confirmation, I have a prepared statement.

21         The Court is well aware of our office's involvement

22  in these cases since the petition date from filing over 100

23  pleadings to the appointment of a PCO and a Chapter 11 trustee,

24  the application for appointments, et cetera.  In particular,

25  and for a while now, our office inquired to multiple concerns,

 1   including the sufficiency of information included in the

 2   proposed plan, disclosure statement, and the Global 9019

 3   Agreement, among other things.

 4            Some of them involved additional clarity regarding

 5   Purdue issues, the filing of a liquidation trust agreement,

 6   striking the Chapter 11 trustee unilateral removal of the PCO,

 7   adding provisions that the debtor will file MORs, as well as

 8   the payment of U.S. Trustee fees, and a provision that the

 9   reorganized debtors and the liquidating trustee or successor

10   will contemporaneously file separate PCRs after the effective

11   date, as well as provisions that the reorganized debtors and

12   the liquidating trustee or a successor shall be jointly and

13   severally liable to pay all confirmation quarterly fees after

14   the effective date.

15            We've also requested provisions that the filing of

16   reports and the payment of U.S. Trustee fees shall comply with

17   Bankruptcy Code rules and the Local Rules.  We also requested

18   clarity regarding if and when debtors will obtain a discharge,

19   regarding injunctions related to that discharge, and clarity

20   regarding the exculpation clauses that are contained in the

21   plan and the liquidating -- liquidation on trust agreement.  We

22   also requested clarity regarding the 363 cell, which I believe

23   counsel has provided here today.

24            We also asked for clarity regarding the CPO concerns

25   and the bidding procedures, and we filed a reservation of

1  rights as to our concerns, in particular, on the discharge

2  indemnification exculpation and the 363 cells.  We also

3  specifically requested supplemental and briefing and evidence

4  filing to support the trustee's issues regarding the discharge,

5  whether the exculpation clause is consistent with Ninth Circuit

6  precedent and the 363 cells.

7         Like the trustee, our office has also been busy with

8  the overall goal of complying with Bankruptcy Code, the Federal

9  Rules of Bankruptcy Procedure, the local rules, and 25 U.S.C.

10  Section 586.

11         Our issues and concerns are resolved based on the

12  comments of counsel today, along with the red line proposed

13  confirmation order, the supplemental brief, and additional

14  evidence that were filed yesterday, all of which appear to

15  satisfy our office's inquiries and issues under Sections 1129,

16  1143, and 1141.

17         With that, and to be clear, our office has no

18  objection to plan confirmation.  And if the Court confirms the

19  plan, our office would like to sign off on the order.

20         THE COURT:  All right.  Thank you.

21         MR. VALENCIA:  Thank you.

22         THE COURT:  And I do appreciate the U.S. Trustee's

23  Office's work on this.  I know you are also working hard, like

24  Mr. Carmel, Mr. Garman, and all counsel that's been here.  So I

25  appreciate that.  Thank you.

```
 1              MR. VALENCIA:  Thank you, Your Honor.

 2              MR. GARMAN:  I don't know if Mr. Bubala or his

 3   retaining --

 4              THE COURT:  Right.

 5              MR. GARMAN:  -- counsel have anything to say.

 6              THE COURT:  Is Mr. Gold --

 7              MR. GOLD:  Yes, if I may, Your Honor.  This is Ivan

 8   Gold from Allen Matkins.  I understand, from your clerk we now

 9   have a better connection.  Can you hear me?

10              THE COURT:  I can.  This is much better.

11              MR. GOLD:  Thank you, Judge.  As I stated earlier, I

12   represent Mayfair Mall, LLC.  This is two leases in Wisconsin.

13   Mr. Garman mentioned briefly that we were rejected at the last

14   minute.  I don't know, as I sit here today, when that decision

15   was made.  As he noted, that was not communicated to us prior

16   to our objection.

17              At the time we filed our objection to the plan, we

18   were anticipating we would be assumed and assigned, because the

19   plan said all leases designated in plan, unless expressly

20   excluded, would be assumed and assigned.  So it's only this

21   week that we lost our landlord hat, although the estate is

22   still in occupancy of the premises, and became a general

23   unsecured creditor.  The fact that our lease has now been

24   designated for objection does not change several of the

25   objections we briefed.  So I do not share the opinion of the
```

1    Trustee's counsel that our comments and objections are now

2    moot.

3          So let me run through them really quickly because we

4    briefed them.  I don't believe the resolution proposed, which

5    is reflected in Paragraph 52 of the proposed confirmation order

6    regarding the discharge, is proper, and it does not comply with

7    the language, the plain language of Section 1141(c)3(b) because

8    the effective date has nothing to do with the statute.

9          The statute speaks of liquidating in the context of

10   consummation.  Consummation and the effective date are two

11   distinct bankruptcy concepts.  The effective date is when the

12   confirmation order becomes final and debtor or a reorganized

13   debtor begins implementation of the claim.

14         Consummation is when the plan is substantially

15   completed.  They're completely different concepts.  And good

16   wordsmithing, and I'm not trying to take away from the spirit

17   of cooperation and the hard work that went into it, but what

18   they came up with simply is inconsistent with the statute and

19   the Ninth Circuit law that we cited.

20         We have an issue with the treatment of claims, which

21   is in 11.1.4 of the plan.  And there is no authority for the

22   proposition that claims can be automatically disallowed whether

23   they're late.  The fact that we have an upcoming deadline, I

24   won't walk the Court through a scenario by which this -- the

25   trustee could object to a portion of our claim, but -- and

1   suffice it to say, this is about the third time in the last

2   three days I've heard how the trustee intends to object to our

3   claim.  So Your Honor will hear a lot more about that later.

4         But the one thing the trustee's reply did not address

5   was 11.1.4 of the plan would bar any amendments.  They

6   basically are asking for an advisory ruling from Your Honor as

7   to whether or not there's cause for an amendment.  And there's

8   no authority for that, nor have they offered any, and they

9   ignored it in their reply.  So that should be stricken from the

10  plan as not complying with applicable law.

11        A final issue relates to the bidding procedures that

12  you approved.  The plan, as proposed, obviously excluding my

13  client's lease now, calls for assumption of the leases as of

14  the confirmation order.  And Mr. Garman just acknowledged that

15  the sales may fail.

16        We raised this issue in our opposition that this

17  makes the liquidation analysis, and indeed the entire

18  disclosure statement, fundamentally flawed because it doesn't

19  disclose to unsecured creditors the risk created by the

20  administrative claims under 503(b)(7) that are triggered by the

21  assumption of leases.  Landlords under 503(b)(7) get a two-year

22  administrative priority claim under an assumed lease.  So

23  should the sale fail as to any or all locations, the

24  liquidation analysis is wrong, and the disclosure statement did

25  not disclose to unsecured creditors voting in favor of the plan

 1  that even the small distribution to them would then be wiped

 2  out.

 3          I think there's a further issue that was disclosed at

 4  the hearing today, because to the extent Mr. Garman earlier

 5  referred to the fact that if they can't close the sale by the

 6  target effective date, they'll, quote, "do a bill of sale."

 7  Well, you can't assume and assign a lease with a bill of sale.

 8          And we have no position from the debtor as once the

 9  effective date has occurred, are they governed by the

10  Bankruptcy Code, are they governed by applicable state law in

11  the terms of leases?  But one thing is clear is that after the

12  effective date, the estate doesn't get a 365(k) release.

13          So that contingent liability at the administrative

14  level has been completely ignored in this, quote, "creative

15  process" that is being undertaken.  And the risk of that -- the

16  risk of failure falls squarely on the backs of administrative

17  creditors who haven't been told anything about it.

18          So those are our three primary objections.

19  Unfortunately, again, notwithstanding debtors' comments about

20  smooth transition and operating clinics, debtors are still in

21  possession of one of our suites.  That lease will be deemed

22  rejected upon entry of your confirmation order.  I fear we'll

23  be back in front of Your Honor regarding continuing possession

24  shortly after that.  But I'm happy to answer any questions

25  about those three points, Your Honor.  But our objection

60

 1  stands.  We do not believe that the discharge and claim

 2  provisions of this plan comply with applicable law.  Thank you.

 3           THE COURT:  All right.  Thank you.  I'm going to hear

 4  from -- is Mr. Johnson on the call?

 5           MR. JOHNSON:  Yes, Your Honor.

 6           THE COURT:  Would you like to be heard?

 7           MR. JOHNSON:  Your Honor, we are -- we have reached

 8  an agreement, and we are in support of the plan.

 9           THE COURT:  Okay.  All right.  Is there anyone else

10  that wants to be heard?

11           MS. FOX:  Your Honor, Christine Fox appearing on

12  behalf of Michael Sanchez, who is the largest creditor in this

13  matter.  Also with me today is Ogonna Brown, appearing via

14  telephone, as well as Lori Bencoe and Cherie LaCour.

15  Mr. Sanchez, as you know, entered into a settlement agreement,

16  ECF Number 430, Exhibit 1, which this Court approved in the

17  order approving settlement entered September 4th, 2025, ECF

18  582.

19           Mr. Sanchez enthusiastically supports plan

20  confirmation, Your Honor.  Mr. Sanchez filed the joinder to

21  plan reorganization and joined the trustee's brief in support

22  of plan confirmation, ECF Number 628.  We commend the trustee's

23  lightning speed efforts to get this plan before the Court in

24  such a short amount of time.  And with that, Your Honor, thank

25  you.

61

```
 1              THE COURT:  All right.  Thank you.  All right.
 2   Anyone else?
 3              Mr. Garman?
 4              MS. BENCOE:  Your Honor, Lori --
 5              THE COURT:  Oh, I apologize.  Go ahead.
 6              MS. BENCOE:  Sorry.
 7              THE COURT:  Go ahead.
 8              MS. BENCOE:  Your Honor, Lori Bencoe, pro hac vice on
 9   behalf of Michael Sanchez.  Just briefly, on behalf of
10   Mr. Sanchez and his entire legal team, consisting of Ogonna
11   Brown and her firm, Christine Fox, who just spoke, Bencoe &
12   LaCour Law in New Mexico, and Nick Rowley and Trial Lawyers For
13   Justice, Mr. Sanchez thanks the trustee, Mr. Carmel, and his
14   legal team, Beasley Insurance and its counsel, and everyone
15   else who worked very hard on putting the settlement plan
16   together that was approved by the order entered September 4, as
17   well as the plan.
18              Mr. Sanchez approves the plan as he approved the
19   global settlement agreement, and he hopes that NuMale
20   Corporation's reorganization can result in a healthy medical
21   practice that responsibly delivers standard of care treatment
22   to its future patients.  Thank you, Your Honor.
23              THE COURT:  All right.  Thank you.  All right,
24   Mr. Garman is somewhere.  Is there anyone else that wants to be
25   heard?  All right.
```

1             Mr. Garman, would you -- will you address the --

2             MR. GARMAN:  Yeah.

3             THE COURT:  -- arguments, Mr. Gold made, please?

4             MR. GARMAN:  Yeah.  Respectfully, I don't think

5   they're well-founded for the following reasons.  I'll take them

6   in reverse order.

7             I mean, Mr. Gold said, we're going to reject.  We are

8   going to reject.  And he said he feared that we would remain in

9   possession and we would be back here fighting.  That's not a

10  plan objection, Your Honor.  If -- we have no intention of

11  violating the code, we have no intention of keeping a tendency

12  passed when the Code authorizes us to do so, and he has plenty

13  of remedies in case that unlikely set of circumstances is going

14  to happen.

15            His next argument was that administrative creditors

16  don't have any understanding as to what will happen if a sale

17  isn't consummated.  That's not the case.  Administrative

18  creditors will be paid in full.  There is no ambiguity to that.

19  There is no evidence in the record that suggests there are

20  illiquid or insufficient assets to pay administrative

21  creditors, regardless of what those claims come in as.

22            I think it was on a similar, but in the same vein of

23  an argument, it was to say that the liquidation analysis was

24  insufficient because it didn't identify what would happen in

25  the event that our sale failed.  I want to be clear.  The

1   liquidation analysis shows no money coming in from the sale.

2   It contemplates that an administrative claim will be

3   contributed back.  And so does that have an implication on our

4   balance sheet of cash?  Yes.

5          But this is not a sale that we expected or

6   demonstrated to creditors was going to be a component of their

7   recovery, and to the extent that it is a component of their

8   recovery, it is not material.  It is not what is contained in

9   the Bankruptcy Code that says you can't confirm a plan unless

10  you can identify with specificity the outcome of every

11  potential future scenario.

12         Yes.  If this is a case in which the facts were

13  flipped and 99 percent of our asset recovery was going to come

14  from a sale, that might be a better argument.  But 99 percent

15  of our asset recovery comes from a settlement that's already

16  been approved for money that is already in the trustee's

17  account.

18         We have sufficient money to pay administrative

19  creditors, and the outcome of the liquidation analysis doesn't

20  impact unsecured creditors.  And to the extent that it does

21  impact unsecured creditors, it would be showing a greater

22  recovery because the bidding went up, and even, let me just

23  assume for a moment here that his argument is correct and that

24  the number would decline, it's not material.  We've provided a

25  spread of what unsecured creditors would receive in this case,

64

 1  and is implicated by a whole bunch of things that haven't

 2  happened.  There are claims objections yet to be prosecuted.

 3  That's every case.  You don't have to have every claim

 4  objection done by the time of confirmation, and what happens in

 5  liquidating trusts occurs post-confirmation by definition in

 6  all cases.

 7        Okay.  The discharge.  I respectfully disagree.

 8  That's not the law.  We hope to liquidate, and to the extent

 9  that we liquidate, we have proposed new language, and I think

10  it's Paragraph 52, that says we don't receive a discharge or an

11  injunction to the extent that -- we solved this problem is

12  essentially what I'm coming to.  We will, to the extent we

13  liquidate, we will liquidate pre-effective date, and we will

14  not receive a discharge or an injunction.

15        But to the extent the sale fails, and it might fail,

16  then we are a reorganized debtor, and there is for the

17  foreseeable future an indeterminate amount of time in which we

18  will be operating clinics.  I don't know what the future will

19  hold, but to the extent that our goal of liquidating fails,

20  then we will be a reorganized debtor, and we are absolutely

21  entitled to the protections of those components.

22        But we expect to liquidate.  We expect to not receive

23  the injunction.  We expect to not receive the discharge.

24        But, Your Honor, that's asking, as a condition to

25  confirmation, that the trustee or any debtor be able to predict

1    all future outcomes of every contingent uncertainty by the

2    effective date.  That's not the law.  That's -- I've never had

3    that case.

4             And I respectfully believe that under the facts and

5    circumstances of this case, it's entirely distinguishable.  I

6    believe that we have more than adequately satisfied that.  I

7    believe that, again, I believe the trustee carried the water on

8    that, and the resolution that we worked out with the trustee

9    should satisfy a creditor who I don't see how they are

10   implicated by that decision in any way.

11            I regret that we were -- I do regret that we were

12   unable to tell counsel what we were going to do with their

13   lease on an earlier time frame when they were forced to file

14   paper.  That is -- it's regrettable, and I'm sorry about that.

15   But that -- the circumstances that we live in, we rejected the

16   remainder of their claims, I think are easily overrulable.  And

17   that should not stand.

18            Academic concerns about uncertainties of the future

19   are not an appropriate basis to stop this otherwise.

20   Incredibly successful and incredibly consensual plan.

21            So with those, Your Honor, we've submitted the

22   findings and conclusions.  We would ask that you approve on a

23   final basis the disclosure statement and confirm our plan.

24            THE COURT:  I'm ready to --

25            MR. GOLD:  May I respond to a couple of points, Your

66

1  Honor?

2       THE COURT:  Well, I will let you do that, but -- and

3  then I will -- Mr. Garman, you'll have one last chance at this.

4  But just briefly, please.

5       MR. GOLD:  Yes, Your Honor.  What Mr. Garman didn't

6  say is, what is the administrative liability being assumed with

7  respect to the leases?  That is what is not being disclosed.

8       Administrative claim disclosure is at the heart of

9  the adequacy of a disclosure statement and the risk the debtor

10  is taking, which would wipe out unsecured creditors down to

11  zero and is completely undisclosed.

12       With respect to the discharge, the Code says what the

13  Code says.  And you know what else?  5.18 of the plan says what

14  it says.

15       And the -- if the sale falls through, that still

16  contemplates the wind-down of the business just on a

17  transitional basis to maintain patient care.  So the Court

18  should take another look at that.

19       And he did not address late claims, so I assume

20  there's no response to that.  Thank you, Your Honor.

21       THE COURT:  All right.  Thank you.

22       Mr. Garman, quick response?

23       MR. GARMAN:  To the late claims -- I don't want to go

24  at another round, but I don't actually understand this

25  objection, because 11.1.4 simply reads, no proof of claim filed

67

1  after the applicable bar date or as applicable to the

2  administrative claims bar date shall be allowed and all such

3  proofs of claim are hereby disallowed in full after the bar

4  date or the administrative bar date and applicable -- as

5  applicable, no creditor shall be permitted to amend any claim

6  or proof of claim, increase the claim amount, and any such

7  amendment shall be disallowed to the extent of the late filed

8  increase in the claimed amount.

9         This plan contemplates rejection damages components

10 being filed, and it contemplates an administrative bar date

11 that hasn't passed yet.  That's the law and that's your --

12 that's a bar date order.  That's how bankruptcy works is there

13 is a final bar date by which claims are filed.

14         I will proffer on behalf of the trustee that

15 everything that we have contemplated and said has taken into

16 account what rejection damages might be.  There aren't millions

17 of dollars of rejection damages.  Those claims have yet to be

18 filed.  Could they have an implication on unsecured creditors?

19 Of course, they could.  Was the disclosure statement silent on

20 the fact that there would be rejected contracts?  Of course, it

21 wasn't.

22         And the argument essentially comes down to an

23 argument saying prior to the filing of the disclosure

24 statement, we needed to tell creditors with specificity -- the

25 logical extension is this:  We needed to tell creditors with

1    specificity what the assumption and rejection list would be.

2    And again, that's not any bankruptcy case I've ever been

3    involved in.

4            It is adequate information to make a decision, an

5    informed decision.  We identified that there would be assumed

6    contracts.  We identified there would be rejection contracts.

7    The only concern that has been raised is to the liquidation

8    analysis is to -- was to suggest that we didn't identify what

9    would happen in the event that the sale fell through.  The

10   liquidation analysis doesn't contain an implication that there

11   would be money distributed on account of that sale.

12           After the effective date, if these facilities

13   continue to operate, there is no mechanism in which the estate

14   pays for losses to the extent that the argument that's being

15   raised is one in which it says, to the extent that we continue

16   to operate because the sales fail, there will be a consumption

17   of the assets of the liquidating trust.

18           I assure the Court and represent to the Court that's

19   simply not the case.  These will be reorganized debtors that

20   rise and fall on their own account and creditor claims on

21   account of a failed sale as a reorganized post-effective date

22   operation, which we don't think is going to happen, are not

23   going to consume assets of this estate or consume distributions

24   that are made to creditors.

25           I believe those are creative arguments by a creditor

69

1   whose claim has been rejected, who was an unsecured creditor.

2   They hold an administrative claim.  I didn't say we're going to

3   object.  I simply don't know enough about an administrative

4   claim that hasn't been filed or a rejection claim that hasn't

5   been filed to tell the Court.  I personally have no knowledge

6   of what those claims will be and whether we will object to them

7   or not.

8          So to the extent that my words said we are objecting

9   to their claim, that was not my intent.  We will deal with it

10  as we deal with all claims that come in.  They have adequate

11  remedies to seek an administrative claim that will be paid in

12  full because this case has only been going on less than a year

13  and is an immaterial amount of money compared to the amounts

14  that we hold in our possession, over $100 million, and they

15  will participate in an unsecured pool, how they participate in

16  an unsecured pool, and the amount of the assets and the amount

17  of the claims, candidly, are not material to distribution when

18  we're talking about half a billion dollars of claims that are

19  in the unsecured pool.

20         And so, Your Honor, I'd ask that you overrule the

21  objection.

22         THE COURT:  Mr. Garman, if this is -- this may be --

23  I don't want this to take too much time.  Can you tell me,

24  again, the sections of the plan that you specifically were

25  addressing so I can --

70

```
 1              MR. GARMAN:  Yeah, for --

 2              THE COURT:  -- make sure that I go --

 3              MR. GARMAN:  Yes.

 4              THE COURT:  -- in the right places.

 5              MR. GARMAN:  Can you give me a minute?

 6              THE COURT:  Okay.

 7              MR. GARMAN:  Yeah.

 8              THE COURT:  Okay.

 9              MR. GARMAN:  All right, Your Honor.  On page -- so

10  I'll make references to the docket.  On Docket 435-1, which is

11  where the plan's attached to the disclosure statement, there is

12  a definition found on Page 14 that is rejection damages claim

13  is 1.1. -- I'm sorry, rejection damages claim bar date,

14  1.1.117, and it is defined as, and I read it in full, the end

15  of the first business day occurring on or after the 15th day

16  after the effective date.  So the rejection damage is due

17  within 15 days of the effective date.

18              Working backwards, there's an administrative claims

19  bar date that's found in 1.1.9 on Page 2, and the

20  administrative claims bar date is the first business day

21  occurring on or after the 15th day after the effective date.

22  That's when the -- that is due.

23              And then -- I lost my train of thought.  Oh, yeah,

24  yeah.  And then the definition I read into the record of late

25  filed claims is found at 11.1.4 on Page 40.
```

71

```
 1              THE COURT:  11.1.4?

 2              MR. GARMAN:  Yeah.

 3              THE COURT:  And what page?

 4              MR. GARMAN:  Page 40.

 5              UNIDENTIFIED:  And Your Honor, that provision is

 6   critical because you can't make distributions until you know

 7   what the claim pool is, and that's the entire purpose of that

 8   provision.

 9              THE COURT:  Thank you.  All right.  What I'd like to

10   do, it's, what, 11:40?  Let's come back in a half an hour.

11   Does that work for everybody?  And then I'll come out and give

12   you my decision.

13              THE CLERK:  Thank you, Your Honor.  All rise.

14         (Recess taken at 11:39 a.m.)

15         (Proceedings resume at 12:48 p.m.)

16              THE CLERK:  Court is back in session.

17              THE COURT:  Oh, please be seated.  I apologize, I

18   made the joke about the half an hour, I know, but that's why I

19   knew because yeah, I do the same.

20              I actually was hoping that I spent more time in there

21   because I thought I could resolve the issue of the discharge.

22   I hadn't looked at the cases or anything like that before

23   today.  So what I'd like to do, unless there's some reason why

24   we can't, is to have a telephonic hearing tomorrow.  I'll be

25   able to give my decision, then I'll have time to look at that
```

72

1  issue.  I assume it's still an issue.  There wasn't any

2  resolution over the break.

3            So that is my sticking point at this point.  I just

4  want to look that over.  And I have, I think, a 10:30 tomorrow,

5  maybe at eleven o'clock setting, Ms. Rawling.  Is that a  --

6            THE CLERK:  Yes, Your Honor.

7            MR. GARMAN:  Your Honor, can we have one minute?

8            THE COURT:  Sure.

9            Ms. Rawling, do you think -- I can't remember what I

10 have at 9:30.  Is it all the scheduling conferences?

11           THE CLERK:  Yes.  Well, no, there's a motion to amend

12 the complaint at the very last matter.

13           THE COURT:  Oh, okay.  And I have the 10:30, probably

14 11:30.

15           THE CLERK:  11:30?  Sounds good.

16           THE COURT:  If you would like, I can give you some

17 more time.

18           MR. GARMAN:  We're -- I think we're ready.  We're

19 good.  Okay.

20           Your Honor, I don't want to be presumptuous and read

21 your mind.  However, to the extent that it is the discharge

22 issue, we have firm sale date now.  The trustee is willing to

23 forego a discharge and injunction for the reorganized debtor

24 and live with a sale that concludes prior to the effective

25 date.

1    That would alleviate the issue and we will either

2  sell the assets by the effective date or candidly we will cease

3  operations and close down and we'll have liquidated.  And to

4  the extent that that resolves the issue, our only need is to

5  keep firm sale dates of the 22nd so that we can have an

6  effective date on the 24th and we will not need a discharge or

7  an injunction for a reorganized debtor past that date.

8    THE COURT:  All right.  Does anybody want to be heard

9  on that?

10    MR. GOLD:  Yes, Your Honor.  Ivan Gold for Mayfair

11  Mall.  That would resolve our issue.  I would just ask, there

12  would obviously need to be some language in your findings of

13  fact and the confirmation order that conforms to Mr. Garman's

14  representation.  And I'd just like to see that before it's

15  submitted to the Court.  But that -- the comments from

16  trustee's counsel to what would be satisfactory and will

17  resolve our objection.

18    THE COURT:  All right.  Thank you.  All right.  That

19  that does resolve the only issue that I was concerned about.  I

20  guess I should have come out here earlier when I said I was

21  going to come out.

22    MR. GARMAN:  Well, with that again, I hate being

23  presumptuous, but I think you're going to confirm the plan.

24  And so what I would say is in light of what's happened today,

25  there are a few modifications to the findings of fact and

74

1  conclusions of that I think are what, 651, last we put on the

2  record that we're going to need to amend.  And so I think we

3  just need to go down the list and see who wants to sign off on

4  them, and then we would submit that to Your Honor for approval.

5        THE COURT:  All right.  Yeah, is -- who does want to

6  sign off by their -- Mr. Gold, obviously.  Who else?

7        MR. ZIRZOW:  Your Honor, Matt Zirzow on behalf of

8  Beasley.  We'd like to sign, please.

9        MR. ANDERSEN:  Ryan Andersen for Justin Pulliam.  I

10 would like to sign off.  Thank you.

11       THE COURT:  Thank you.

12       MR. VALENCIA:  Justin Valencia for --

13       MR. JOHNSON:  Your Honor, Matt Johnson for Prospect

14 Rainbow and we'd be happy to sign as well.

15       THE COURT:  All right.  Thank you.

16       MR. VALENCIA:  Justin Valencia for the U.S. Trustee.

17 We'll sign as well.

18       THE COURT:  Thank you.

19       MR. WENT:  Joseph Went for Brad Palubicki and Gaby De

20 La Torre.  We'd like to sign.

21       THE COURT:  Thank you.

22       MS. FOX:  Christine Fox on behalf of Michael Sanchez.

23 We will also sign.

24       THE COURT:  Thank you.

25       MR. HERRON:  Matt Herron and David Stephens for

 1  Newtek.  We would waive signature.

 2              THE COURT:  Okay.  All right.  Thank you.

 3              MR. GARMAN:  Well, the good news is we have until the

 4  24th for the effective date, so.

 5              THE COURT:  Right.  All right.  Well, I haven't

 6  actually confirmed the plan yet.  But I will, for all the

 7  reasons that have been stated today, I will go ahead and

 8  confirm the plan.  I will adopt the order, although saying

 9  that, I assume that that order will conform to all of the

10  changes that were stated here.  And with all of the people that

11  will be reviewing this, I'm sure that somebody will point it

12  out if it doesn't reflect what was stated here.  And again,

13  just make sure it conforms with all the representations.

14              And the -- in adopting that order, I think that

15  states appropriately the standards by which the Court can

16  confirm a plan.  And I think that there's sufficient evidence

17  in the record to support that.

18              So that will then mean that we don't need a hearing

19  tomorrow, and I will watch for the order.

20              MR. GARMAN:  Thank you, Your Honor.

21              THE COURT:  Anything else?  All right.

22              Well, congratulations.  Again, I've said it before

23  and today, this certainly didn't start off looking like we

24  would have a successful case, and I really do appreciate

25  everyone's efforts in getting us to this point.  All right.

1           MR. GARMAN:  Thank you, Your Honor.

2           THE COURT:  All right.  Thank you.

3           THE CLERK:  All rise.

4      (Proceedings concluded at 12:55 p.m.)

5                       *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T I O N

2

3         I, Heidi Jolliff, court-approved transcriber, hereby

4   certify that the foregoing is a correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9   _____

10  HEIDI JOLLIFF, AAERT NO. 2850    DATE: September 30, 2025

11  ACCESS TRANSCRIPTS, LLC

12

13

14            **C E R T I F I C A T I O N**

15

16         I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428    DATE: September 30, 2025

25  ACCESS TRANSCRIPTS, LLC