GARMAN TURNER GORDON LLP
GREGORY GARMAN, ESQ.
Nevada Bar No. 6654
Email: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
Email: tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
Email: mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
*Attorneys for Michael Carmel, Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| In re: | | Lead Case No.: 25-10341-nmc |
|---|---|---|
| NUMALE CORPORATION, | | Chapter 11 |
| | | *Jointly administered with:* |
|    AFFECTS THIS DEBTOR, | ☐ | Feliciano NuMale Nevada PLLC |
|    AFFECTS FELICIANO NUMALE NEVADA PLLC, | ☐ | Case No. 25-10342-nmc |
|    NUMEDICAL SC, | ☐ | NuMedical SC<br>Case No. 25-10343-nmc |
|    NUMALE COLORADO SC, | ☐ | NuMale Colorado SC<br>Case No. 25-10344-nmc |
|    NUMALE FLORIDA TB PLLC, | ☐ | NuMale Florida TB PLLC<br>Case No. 25-10345-nmc |
|    NUMALE NEBRASKA LLC, | ☐ | NuMale Nebraska LLC<br>Case No. 25-10346-nmc |
|    NUMALE NEW MEXICO SC, | ☐ | NuMale New Mexico SC<br>Case No. 25-10347-nmc |
|    NUMALE ALL DEBTORS, | ☒ | |
|          Debtors. | | Hearing Date:   October 22, 2025<br>Hearing Time:   1:30 p.m. |

**REPLY IN SUPPORT OF TRUSTEE'S MOTION (I) AUTHORIZING THE SALE OF DEBTORS' ASSETS OUTSIDE OF THE ORDINARY COURSE OF BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND <u>(II) GRANTING RELATED RELIEF</u>**

Michael Carmel, as the Chapter 11 trustee ("Trustee") of the bankruptcy estates of NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors"), hereby respectfully submits this reply (the "Reply") in support of the *Trustee's Motion (I) Authorizing the Sale of Debtors' Assets Outside of the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* [ECF No. 631] ("Sale Motion").[1]

This Reply is based on the memorandum of points and authorities herein; the Declaration of Michael Carmel filed concurrently herewith ("Carmel Decl."); the papers and pleadings on file in the Debtors' Chapter 11 Cases, judicial notice of which is respectfully requested pursuant to FED. R. EVID. 201(b) and (c) and 1101(a) and (b); and any argument and evidence presented at the hearing on the Sale Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.
LEGAL ARGUMENT**

**A.    The Sale Must Be Approved.**

The Sale of the 363 Assets to the Prevailing Bidder must be approved. Without a sale of the Debtors' assets, the Debtors' clinics will be closed down, patient care will need to be shifted elsewhere, and all leased spaces will be vacated. Additionally, the Sale must close by October 24, 2025, which is the anticipated Effective Date of the Plan. *See* Carmel Decl. ¶¶ 6, 12, 24, 26. Only one Qualified Bid was received,[2] the Stalking Horse Bid of Justin Pulliam. *See* Carmel Decl. ¶ 20. Justin Pulliam's Stalking Horse Bid was approved as a negotiated component of the Global Settlement Agreement[3]; was approved as a term of the *Joint Plan of Reorganization* [ECF No.

---

[1] All undefined, capitalized terms used herein shall have the meanings ascribed to them in the Sale Motion.

[2] Despite the Trustee's marketing efforts, only one bid was received, which was the Qualified Bid of Justin Pulliam. *See* Carmel Decl. ¶¶ 13-21, 24.

[3] The *Settlement Release, and Policy Buyback Agreement* ("Global Settlement Agreement") approved via the approved via the *Order approving Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize and Approve Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* [ECF No. 582] ("Global Settlement Order").

1

434] (as amended and/or supplemented, the "Plan"), which Plan has been confirmed by this Court [ECF No. 727] ("Confirmation Order"); and was approved as a Stalking Horse Bid in connection with the Bid Procedures approved via this Court's *Order: (I) Approving Bid Procedures Relating to Sale of Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale; (III) Approving the Form and Manner of Notice of Sale By Auction; and (IV) Granting Related Relief* [ECF No. 698] ("Bid Procedures Order"). As such, three (3) orders of this Court have approved Mr. Pulliam serving as the Stalking Horse Bidder in connection with the Sale of the 363 Assets. *See also* Carmel Decl. ¶¶ 28, 32. No other bids or Qualified Bids were submitted by any party-in-interest. *See* Carmel Decl. ¶ 39.

The Trustee is mindful of patient care and mindful that in a liquidation scenario such as the Debtors' that patients are a liability, as patients generally prepay for services up front and thereafter require treatment (services) from the clinics for an extended period of time, with some treatment protocols lasting up to twelve (12) months. The Trustee has stewarded oversight of the Debtors' clinics with patient care foremost in mind. To ensure continuity of care during the eighty-five (85)-day transitional period after Mr. Palubicki's termination, the Trustee asked Mr. Pulliam to assist in day-to-day operations, and Mr. Pulliam has been running clinics under the Trustee's auspice. *See* Carmel Decl. ¶¶ 5, 7.

Upon Mr. Palubicki's termination it became clear that a sale of the Debtors' assets would be needed. *See* Carmel Decl. ¶ 5. The Trustee pursued a sale of the clinics in lieu of closing clinics and immediately ending patient care—a scenario which, were it to occur, potentially opens the estate up to administrative claims from patients whose treatment would have been terminated before their protocols were concluded. *See* Carmel Decl. ¶ 8. To drive value in connection with the Sale, the Trustee chose an auction process with Bid Procedures and specifically did not pursue a private sale of the Debtors' assets. *See* Carmel Decl. ¶ 19. The Trustee marketed the 363 Assets, placing an advertisement with a renowned Ecommerce site that specializes in advertising the sales of businesses; immediately upon approval of the Bid Procedures personally contacted all parties-in-interest who had previously expressed an interest in purchasing any Debtor assets, as well as former and present minority interest holders in affiliates; his counsel followed up with these

potential interested purchasers who do business in the men's health and wellness space; and made available to interested purchasers a data room with relevant pertinent financial and other information concerning the Debtors' business and operations. *See* Carmel Decl. ¶¶ 13-18.

Although disappointing, it is not entirely surprising that that no other Qualified Bids were ultimately received. The Debtors' business has required some form of outside funding for nearly five (5) years; the patients are a liability having signed up for a variety of treatment protocols requiring various medical services over a period of time, after typically one prepayment; and at the time of the Trustee's appointment, rent had not been paid at multiple locations. *See* Carmel Decl. ¶¶ 23, 37. Despite the Trustee having contacted the equity holders of affiliates, and interested parties who operate in the medical men's wellness clinic space who had previously expressed an interest in purchasing Debtor assets, and despite the Trustee having marketed the Sale through a reputable and well-known Ecommerce platform specializing in sale of businesses, no non-insiders submitted a Qualified Bid. *See* Carmel Decl. ¶¶ 13-21. However under such circumstances, it is not terribly surprising that there are no non-insiders looking to purchase the assets of medical centers which have significant ongoing patient liability and a history of operating losses. *See* Carmel Decl. ¶¶ 21, 24.

The Stalking Horse Bid by Mr. Pulliam is the only bid received (and, the only Qualified Bid received) for the Sale of the 363 Assets. And, in the absence of this Court approving the Sale to Justin Pulliam, the Debtors' clinics will close on or before October 24, 2025. It is the Trustee's business judgment that a Sale of the 363 Assets to Stalking Horse Bidder Justin Pulliam is in the best interests of the Debtors, their estates, and all creditors. *See* Carmel Decl. ¶¶ 38-40.

**B.     The Palubicki Objection Should Be Overruled.**

The lone objection received to any aspect of the Sale is Mr. Palubicki's objection to Mr. Pulliam serving as the Stalking Horse Bidder. Mr. Palubicki does not object to the Bid Procedures already approved by this Court, he does not object to the auction and sale process established by the Trustee, and he does not object to the Sale of the 363 Assets. Mr. Palubicki's objection is

3

confined to Mr. Pulliam[4] and contends Mr. Pulliam should not be the Stalking Horse Bidder. However Mr. Palubicki did not bid on the 363 Assets, leaving the Trustee with only one bid received, the Qualifying Bid of the Stalking Horse, Mr. Pulliam. Mr. Pulliam as the Stalking Horse was an express term of the Court-approved Global Settlement Agreement, which Global Settlement Order is now final. It is also a term of the confirmed Plan. The Trustee negotiated the Asset Purchase Agreement with Justin Pulliam in good faith. *See* Carmel Decl. ¶ 25. Mr. Palubicki's objection, however, does not establish conduct that disqualifies Mr. Pulliam's Stalking Horse Bid, or disqualifies Mr. Pulliam from participating in the Sale and receiving an 11 U.S.C. § 363(m) "good faith purchaser" finding.

"[C]ourts generally have followed traditional equitable principles in holding that a good faith purchaser is one who buys 'in good faith' and 'for value.'" *In re Ewell*, 958 F.2d 276, 281 (9th Cir. 1991) (citing *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3rd Cir. 1986)). "Typically, lack of good faith is shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Ewell*, 958 F.2d at 281 (citation omitted). Here, there is good faith. And, the record shows there is no fraud, collusion, nor an attempt to take grossly unfair advantage of other bidders.

First, Mr. Palubicki's allegations concern operational matters at the company he stewarded for more than ten years, from which he was recently terminated. *See* ECF Nos. 455 (Motion for Order to Show Cause), 500 (Order to Show Cause), 663 and 708 (stipulation and order regarding Order to Show Cause). Nothing in Mr. Palubicki's allegations contend there has been fraud or collusion in the auction or sale *process*, nor is there any evidence of collusion or fraud on the record before this Court. As forth herein and in the Carmel Decl., the Trustee had asked Mr. Pulliam to step forward after Mr. Palubicki was terminated and assist the Trustee by facilitating clinic operations and the Debtors' business in the eighty-five days between Mr. Palubicki's termination and the Sale hearing. *See* Carmel Decl. ¶¶ 7-11, 27, 34.

---

[4] The Trustee, having overseen case administration of these estates for more than six (6) months now, is well aware of the animus between Messrs. Palubicki and Pulliam, both insiders of the Debtors with a longstanding history of conflict between them. *See also* Carmel Decl. ¶ 31.

4

Good faith addresses the heart of the sale process, not operational disputes outside of the sale. "Absence of good faith is 'typically shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Adeli v. Barclay (In re Berkeley Delaware Court, LLC)*, 834 F.3d 1036, 1041 (9th Cir. 2016) (upholding a good faith finding which was supported by the trustee's declaration) (citation omitted). Courts evaluating good faith look to the process of the sale. *See 240 N. Brand Partners v. Colony GFP Partners (In re 240 N. Brand Partners)*, 200 B.R. 653, 659 (9th Cir. B.A.P. 1996). "'Good faith' encompasses fair value, and further speaks to the integrity of the transaction. Typical 'bad faith' or misconduct, would include collusion between the seller and buyer, or any attempt to take unfair advantage of other potential purchasers." *In re 240 N. Brand*, 200 B.R. at 659 (citation omitted). *See also Onouli Kona Land Co. v. Estate of Richards (In re Onouli Kona Land Co.)*, 846 F.2d 1170, 1173-74 (9th Cir. 1988) (finding no lack of good faith even where appellant argued the purchaser had taken "grossly unfair advantage at the auction", as the purchaser followed Court-approved sale procedures, the Court's procedures order was not appealed, and the purchaser "did nothing wrong with respect to any of the auction's terms[.]") (citations omitted).

Here, there are no allegations from Mr. Palubicki that there has been fraud, collusion, or an attempt to take grossly unfair advantage of any other bidders, and, there is zero evidence of same. Additionally, the Asset Purchase Agreement with the Stalking Horse Bidder was negotiated at arm's length and in good faith, and all interested parties (including Mr. Palubicki) were afforded the opportunity to formulate a Qualified Bid for the 363 Assets. *See* Carmel Decl. ¶¶ 13-19, 24, 25. Mr. Palubicki choosing not to bid does not equate to a lack of good faith in the auction and sale process. The inquiry about good faith is about the buyer's conduct in the sale proceedings—in the vein of fraud, collusion, or unfair advantage in the auction. The operational matters identified in Mr. Palubicki's objection are not collusive bidding, do not show an agreement to control price, and do not taint the integrity of the Sale. As such, the objection must be overruled.

The balance of Mr. Palubicki's allegations concern matters extrinsic to the Sale and predominantly focus on operations. As set forth herein and in the Carmel Decl., Mr. Pulliam's stewardship of the Debtors' clinics during the less-than-ninety (90) days between Mr. Palubicki's

5

termination and the Sale hearing was with the Trustee's authorization and effected no advantage on Mr. Pulliam, who was forced to find rapid solutions to intentional interference in Debtor business and clinic operations, which solutions were implemented with the Trustee's authority. Mr. Pulliam's assistance managing the Debtors' clinics under the Trustee's auspice is wholly separate from the auction and sale process approved by this Court. Mr. Palubicki's operational allegations about Mr. Pulliam's leadership of the clinics are not material to the determination that the Prevailing Bidder at the 363 Sale takes in "good faith" within the meaning of 11 U.S.C. § 363(m), as they do not concern the integrity of the Sale process. Furthermore, the Sale Motion discloses Mr. Pulliam as the Stalking Horse Bidder, describes negotiations with Mr. Pulliam as at arm's length, identifies that the Trustee will seek a good faith finding for the Prevailing Bidder at closing, and structured an auction process with incremental bidding that was approved in the Bid Procedures Order.

Because Mr. Palubicki's objection does not contend (much less present evidence to substantiate allegations of) fraud, collusion, or a sale process that takes grossly unfair advantage of other bidders, the objection should be overruled in its entirety, and this Court should grant the Sale Motion and approve the Sale of the 363 Assets to the Stalking Horse Bidder, affording Mr. Pulliam a good faith finding as the Prevailing Bidder and Buyer.

1. **Mr. Pulliam's Daily Management of the Debtor Clinics After Mr. Palubicki Was Terminated Was Done at the Request of the Trustee and Under the Trustee's Auspice.**

After Mr. Palubicki was terminated from NuMale, they interfered with technological platforms and vendor relationships, ultimately necessitating the transition of some NuMale vendors to new service providers despite the anticipated Sale. *See, e.g.*, ECF Nos. 455 (Motion for Order to Show Cause), 500 (Order to Show Cause), 663 and 708 (stipulation and order regarding Order to Show Cause). The Trustee had asked Mr. Pulliam to provide management over the clinic operations under the Trustee's oversight upon Mr. Palubicki's removal. During the eighty-five days between Mr. Palubicki's and his cohorts' terminations, and the Sale hearing, Mr. Pulliam has assisted the Trustee with management of the clinic operations (under the Trustee's oversight). Any decision regarding the transition of any technology or other vendor in light of the

6

interference and disruption were made with continuity of patient care in mind, and were made under the Trustee's auspice while the Trustee also pursued a sale of the clinics that would transfer patient liabilities and 363 Assets to a buyer. At no point in time were the clinics re-branded under VidaVital or any other name; the Debtors' clinics remained operational under NuMale. *See* Carmel Decl. ¶¶ 9-11.

### 2. Other Allegations In the Palubicki Objection Are Unfounded.

There has been no re-branding of the clinics. Mr. Palubicki, having been terminated from the Debtors on July 29, 2025, lacks knowledge about certain of the issue raised in his objection. For example there was no unauthorized "interference" by Mr. Pulliam regarding the CLIA Certificate change for the Debtors, as the Trustee was aware of the Debtors' Certificate change and had approved it as a cost savings measure. *See, e.g.*, Carmel Decl. ¶¶ 34, 35. Second, as to the Wisconsin Department of Workforce Development, as soon as the Trustee became aware, he took ameliorative action and communicated with the appropriate state agency. *See* Carmel Decl. ¶ 36. Last, the transition to the Zenoti platform was necessitated by the interference in multiple of the Debtors' vendors, including the medical records platform AdvancedMD. That interference is well established in the record of this Court, and, the Trustee's decision to navigate use of an alternate platform amidst such circumstances was in the best interests of the Debtors and their estates. Furthermore, patient records are still with NuMale and are still available to any purchaser. *See* Carmel Decl. ¶ 34.

Mr. Pulliam's operational leadership of the Debtors has not threatened patient records management (to the contrary, has ensured patient records are accessible after Mr. Palubicki and his cohorts disrupted multiple technological platforms utilized by the Debtors once they were terminated from employment), and his actions in stewarding the Debtors' clinics under the Trustee's auspice have maintained the value of the 363 Assets to be sold.

### II.
### CONCLUSION

It is the Trustee's business judgment that the Sale to the lone Qualified Bidder is in the best interests of the Debtors, their estates, and all creditors, and, the Trustee asks the Sale be approved

by this Court with Mr. Pulliam afforded a good faith finding, as requested in the Sale Motion. As such, the Trustee requests the Court grant the Sale Motion and enter the Sale Order, approving of the Sale of the 363 Assets to Stalking Horse Bidder Justin Pulliam.

Dated this 20th day of October 2025.

GARMAN TURNER GORDON LLP

By: */s/ Mary Langsner*
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
MARY LANGSNER, Ph.D.
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
*Attorneys for Michael Carmel, Chapter 11 Trustee*