GARMAN TURNER GORDON LLP
GREGORY GARMAN, ESQ.
Nevada Bar No. 6654
Email: ggarman@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
Email: tgray@gtg.legal
MARY LANGSNER, Ph.D.
Nevada Bar No. 13707
mlangsner@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Tel: 725.777.3000
*Attorneys for Michael Carmel,
Chapter 11 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| In re: | Lead Case No.: 25-10341-nmc |
|---|---|
| NUMALE CORPORATION, | Chapter 11 |
|     AFFECTS THIS DEBTOR, ☐ | *Jointly administered with:* |
|     AFFECTS FELICIANO NUMALE NEVADA PLLC, ☐ | Feliciano NuMale Nevada PLLC Case No. 25-10342-nmc |
|     NUMEDICAL SC, ☐ | NuMedical SC Case No. 25-10343-nmc |
|     NUMALE COLORADO SC, ☐ | NuMale Colorado SC Case No. 25-10344-nmc |
|     NUMALE FLORIDA TB PLLC, ☐ | NuMale Florida TB PLLC Case No. 25-10345-nmc |
|     NUMALE NEBRASKA LLC, ☐ | NuMale Nebraska LLC Case No. 25-10346-nmc |
|     NUMALE NEW MEXICO SC, ☐ | NuMale New Mexico SC Case No. 25-10347-nmc |
|     NUMALE ALL DEBTORS, ☒ | |
|     Debtors. | Hearing Date: October 22, 2025 Hearing Time: 1:30 p.m. |

**DECLARATION OF MICHAEL W. CARMEL IN SUPPORT OF
TRUSTEE'S MOTION (I) AUTHORIZING THE SALE OF DEBTORS' ASSETS
OUTSIDE OF THE ORDINARY COURSE OF BUSINESS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) GRANTING
<u>RELATED RELIEF</u>**

I, Michael W. Carmel, hereby declare as follows:

1. I am over the age of 18 and mentally competent. I am the duly appointed Chapter 11 Trustee ("Trustee") over the bankruptcy estates of Debtors NuMale Corporation, Feliciano NuMale Nevada PLLC, NuMedical SC, NuMale Colorado SC, NuMale Florida TB PLLC, NuMale Nebraska LLC, and NuMale New Mexico SC (collectively, the "Debtors") and as such, have personal knowledge of the facts in this matter and if called upon to testify, could and would do so.

2. I make this declaration in support of the *Trustee's Motion (I) Authorizing the Sale of Debtors' Assets Outside of the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* [ECF No. 631] ("Sale Motion").[1]

3. Immediately upon my appointment, I began investigating the financial affairs and assets of the Debtors.

4. The Debtors' business is a going concern, and I as Trustee am authorized to operate the Debtors' business.

5. Upon the termination of Mr. Palubicki and his cohorts for cause in late July of 2025, it became immediately clear to me this case required a sale or liquidation of the clinics, and their reorganization in the absence of a sale was simply not possible.

6. Without a sale, the clinics will be closed down, patient care will cease, and all leased clinic spaces will be immediately vacated.

7. Maintaining the continuity of patient care during this time has been my top priority. Accordingly, in the eighty-five (85) days between Mr. Palubicki's and his cohorts' terminations from employment for cause, and the Sale Hearing, I have focused on continuity of patient care while being mindful that NuMale is not a long-term financially viable business. Patients are financial liabilities to the practice, as onboarding any new patient is NuMale akin to taking on a new liability for three, six, even twelve months.

8. I pursued a sale of the clinics under these circumstances, in lieu of closing clinics and immediately ending patient care, which in my view could potentially have opened the estate

---

[1] All undefined, capitalized terms used herein shall have the meanings ascribed to them in the Sale Motion.

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

2

up to innumerable administrative claims from patients whose treatment would have been terminated before their treatment protocols were concluded.

9. Additionally, after Mr. Palubicki's and his cohorts' terminations from NuMale, they interfered with technological platforms and vendor relationships, ultimately necessitating the transition of some NuMale vendors to new service providers. *See, e.g.*, ECF Nos. 455 (Motion for Order to Show Cause), 500 (Order to Show Cause), 663 and 708 (stipulation and order regarding Order to Show Cause).

10. Any decision regarding the transition of any technology or other vendor in light of this interference and disruption were made with continuity of patient care in mind, and were made under my auspice. I did this as I worked also toward pursuing a sale of the clinics that would transfer patient liabilities and 363 Assets including equipment to a buyer.

11. Thus, I enlisted Mr. Pulliam's assistance with managing the clinics during the eighty-five days between Mr. Palubicki's termination and the sale hearing date. Under my leadership, none of the clinics were "rebranded"; rather, new patients, or former patients attempting to initiate new treatment protocols, were onboarded to ensure a continuity of care was available to them. At no point in time were the clinics re-branded under VidaVital or any other name; the Debtors' clinics remained operational under NuMale.

12. Because the confirmed Plan provides that I will not be operating any clinics post-Effective Date, the clinics must be sold to a buyer, and, that Sale must close by October 24, 2025, to avoid the clinics being immediately closed and all leased spaces vacated.

13. Thus, immediately upon this Court's approval of the Bid Procedures, I reached out to every party-in-interest that I was aware had expressed an interest in purchasing all or part of the Debtors' assets, as well as certain former and present minority interest holders in affiliates (except Dr. Feliciano).

14. On Friday September 26, 2025 (two days after the bid procedures were orally approved in Court), I reached out via telephone and email to each party whom I was aware had expressed an interest in purchasing any of the 363 Assets, all of whom are persons that have connections to the male sexual health and wellness practice space.

15. I also authorized and instructed my counsel to prepare and host a data room containing lease and contract information, the Plan and related documents, Schedules and Statements, a draft APA for bidders, monthly operating reports, and other relevant case filings and debtor documents including the Patient Care Ombudsman's reports filed with this Court. The data room went active on September 30, 2025, the date the Bid Procedures Order [ECF No. 698] (*Order: (I) Approving Bid Procedures Relating to Sale of Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale; (III) Approving the Form and Manner of Notice of Sale By Auction; and (IV) Granting Related Relief*) was entered.

16. Once the Bid Procedures Order [ECF No. 698] was entered on September 30, 2025, my counsel followed up with these original interested parties, and, on October 1, 2025, my counsel followed up with each of them, inviting them to fill out the confidentiality agreement to access the data room which had been set up for the Sale. Unfortunately, none of these parties ultimately put forth a bid for any of the 363 Assets.

17. Furthermore, I researched available options for advertising the sale of medical clinic assets and ultimately decided to advertise the sale of the 363 Assets with an online magazine who specializes in sales of businesses, Practical Ecommerce, whose website is https://www.practicalecommerce.com/. With my approval and pursuant to my instruction, after the Bid Procedures Order entered, Practical Ecommerce composed and built advertisements which linked to a dedicated web page that briefly described the auction and outlined interested purchasers' steps to participate. The email and display advertisements actually linked to a web page built by Practical ECommerce that described the Auction and instructions for participating, including a form to collect the names, companies, and email addresses of interested parties to receive the confidentiality agreement from my counsel GTG.

18. The advertisements with Practical Ecommerce ran through October 17, 2025. Ultimately, although I am advised that there were just over 100 visits to the webpage describing the Auction and Sale, no parties who visited the Practical Ecommerce website actually contacted my counsel to fill out a confidentiality agreement to obtain access to the data room.

. . .

19. Additionally, I believed it was critical to try and drive value; as such, the contemplated sale process involved an Auction and not a private sale. I wanted to test the market, and to see if any other bidders who were not insiders of the Debtors, were interested. Upon the conclusion of my personal outreach, the contacts made by my counsel at my direction, and the marketing I authorized, I am confident the market for the sale of the 363 Assets has been tested.

20. Ultimately only one Qualified Bidder submitted a Qualified Bid for the 363 Assets: Stalking Horse Bidder Justin Pulliam.

21. Although disappointed, I am not surprised that the general marketplace for sales of businesses did not respond with interested purchasers for the Debtors' 363 Assets. The Debtors' clinics are specialty sexual health clinics, and, even though I had also reached out to interested parties who specifically deal in the men's sexual health and wellness space, none of those interested parties—each of whom had previously stated they were interested in potentially purchasing some of the 363 Assets—came forward with a Qualified Bid, either.

22. To me, it is also not terribly surprising that there are not many people looking to purchase the assets of medical centers which have significant ongoing patient liability, and, it seems reasonable to me the Debtors' assets are not assets that a true outsider would likely want. As mentioned previously, my own investigation reveals the Debtors' business has been operating at a significant loss since approximately 2020.

23. As set forth in my declaration in support of the *Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize and Approve Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* [ECF No. 430] ("Settlement Motion"), my investigations have revealed: (i) from April 2020 through February 2021 the Debtors, collectively, received over $1.098 million in paycheck protection loans that were ultimately forgiven; (ii) as the Debtors' financial strife escalated in 2023 (*i.e.*, as then-senior debt became due), in approximately December 2023 NuMale Corporation and others took out a $5 million Small Business Association-backed loan from Newtek Bank, National Association ("Newtek"), and, of the $5 million in proceeds received under this loan facility, approximately $2,410,964.73 went to "working capital" for NuMale Corporation, which then transferred approximately $407,280 to various NuMale

entities and used approximately $1,312,653.90 to fund losses; (iii) in the last four months of 2024 alone the Debtors appear to have taken out over $1.1 million in Merchant Cash Advance loans; and (iv) the Debtors also financed operations through factoring-type arrangements as well. Additionally, based on my investigations, it appears the Debtors have required some form of outside funding to stay afloat for approximately five years—making it difficult and complex, if not impossible, to prosecute a confirmable plan in these Chapter 11 Cases that is funded from operations alone. Because the Global Settlement Agreement brought immediate and significant money into the Estates in the form of the Purchase and Settlement Amount, the court-approved Global Settlement Agreement avoided the complexity, expense, delay, and inconvenience of litigating and prosecuting a plan of reorganization premised on other means of recovery (which appear scant, based on the information I have uncovered in the course of my investigations to date).

24. In light of these considerations, though I am disappointed I am not ultimately surprised that no true third parties bid on the 363 Assets and that the only bid (and, the only Qualifying Bid) for the 363 Assets was the Stalking Horse Bid submitted by Mr. Pulliam. Mr. Palubicki was afforded the opportunity to bid on the 363 Assets, and did not.

25. Mr. Pulliam's Stalking Horse Bid is the highest and best offer for the Sale of the 363 Assets, and, the Sale to Mr. Pulliam should be immediately approved, so that Mr. Pulliam can effectuate closing by the Court's deadline of October 24, 2025. Mr. Pulliam's Asset Purchase Agreement was negotiated in good faith and at arm's length.

26. If the Sale does not close by October 24, 2025, the clinics must be closed on October 24, 2025, the spaces vacated, and all patient treatment disrupted.

27. Additionally, through the transitional period of these most recent nearly eight-five (85) days, Mr. Pulliam has been helpful, he has been responsive to both myself and my professionals, and, he has provided information to me (and my advisors) when requested. I therefore have confidence that, upon the closing of the Sale of the 363 Assets, Mr. Pulliam is and will be an appropriate steward of the 363 Assets and will effectively manage the transition of patient care through the closing.

28. As this Court may recall, Mr. Pulliam's Stalking Horse Bid was a cornerstone of the Global Settlement Agreement[2]—which has been approved by this Court in the *Order approving Motion Pursuant to Fed. R. Bankr. P. 9019 and 11 U.S.C. §§ 363 and 105 to Authorize and Approve Global Settlement and Associated Releases and Authorize Insurance Policies Buyback* [ECF No. 582] ("Global Settlement Order"), which has now gone final and is not appealable). Mr. Pulliam's Stalking Horse Bid was also component of the *Joint Plan of Reorganization* [ECF No. 434] (as thereafter amended and supplemented, the "Plan") which has been confirmed [ECF No. 727] ("Confirmation Order").

29. As set forth in my declaration [ECF No. 632] in support of the Bid Procedures Motion,[3] the Sale and sale process is expressly contemplated in the Plan. I believe that the sale process for the Sale of the 363 Assets has been the appropriate and optimal mechanism in order to effectuate the terms of the Global Settlement Agreement, which has produced $108.5 million of value for the creditors, thereby maximizing the value for the benefit of all creditors and the estates.

30. Furthermore, I believe the sale process and Bid Procedures provided the best mechanism to maximize value for the Debtors, their creditors, and their estates.

31. Mr. Palubicki did not submit a bid (or a Qualifying Bid) in connection with the Sale. Mr. Palubicki did file an objection to the designation of Justin Pulliam as a Qualified Bidder. I am not surprised Mr. Palubicki is upset by Mr. Pulliam's Stalking Horse Bid, as I have learned through the course of administering these Chapter 11 Cases that Messrs. Pulliam and Palubicki have a long, and negative, history with one another.

32. Nevertheless, Mr. Pulliam's Stalking Horse Bid was a negotiated term of the Court-approved Global Settlement Agreement and also the confirmed Plan. Mr. Pulliam's Stalking

---

[2] The *Settlement Release, and Policy Buyback Agreement* approved in the Global Settlement Order (the "Global Settlement Agreement").

[3] *Trustee's Motion for Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale; (III) Approving the Form and Manner of Notice of Sale by Auction; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Debtors' Assets Outside of the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief and (B)(I) Authorizing the Sale of Debtors' Assets Outside the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Granting Related Relief* [ECF No. 631] ("Bid Procedures Motion").

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000

Horse Bid has now been approved by three orders of this Court—the Global Settlement Order, the Confirmation Order, and the Bid Procedures Order. I believe Mr. Palubicki's request that this Court remove Mr. Pulliam's Court-approved designation as the Stalking Horse Bidder, is simply wrong, not to mention inconsistent with multiple prior rulings of this Court on this point.

33. Nevertheless, in an abundance of caution and to ensure clarity of the record in connection with this Court's approval of the Sale, I address Mr. Palubicki's remaining contentions herein.

34. As already stated herein, there has been no re-branding of the Debtors' clinics. In light of Mr. Palubicki's and his cohorts' removal from employment with the Debtors for cause, I asked Mr. Pulliam to assist in day-to-day operations. Mr. Pulliam has been running the Debtors' clinics under my auspice. Specifically, the transition to the Zenoti platform was necessitated by Mr. Palubicki's and his cohorts' interference in multiple of the Debtors' vendors, including the medical records platform AdvancedMD. That interference is well established in the record of this Court, and, my decision to navigate use of an alternate platform amidst such circumstances was without doubt in the best interests of the Debtors and their estates. Patient records are still with NuMale and still available to any purchaser.

35. I was aware of the Debtors' CLIA certificate change identified in August 2025.

36. As to the Wisconsin Department of Workforce Development questionnaire apparently submitted by Mr. Pulliam, as soon as this was brought to my attention I took ameliorative action and communicated with the appropriate state agency. A true and correct copy of my correspondence with this agency is attached hereto as **Exhibit "1"**. To date I have heard nothing further from this agency on this matter. I also instructed my counsel to address this with Mr. Pulliam's counsel, and, I am advised this was done.

37. As also established in the record before this Court, at the time I was appointed the Debtors had not paid rent at multiple locations. That has changed under my oversight. And, in a liquidation scenario such as that which the estates will face should this Court not approve the Sale to Mr. Pulliam, patients are a liability and not an asset, and if the Sale is not approved the estates face the risk of innumerous potential administrative claims being brought by active patients. I am

taking the steps necessary to ensure a continuity of patient care, and that patients continue to receive the medical treatment they signed up to receive; of critical importance to me is patient care, as patients have generally pre-paid for services that are then a liability for the Debtors' clinics to render over time (at times upwards of twelve (12) months). It should not be lost that patients and patient care are an estate liability, and, in a Sale of the 363 Assets that includes equipment, accounts receivable, and all other components of the business, it is not surprising that the only Qualified Bidder (and, the only party to submit any bid, let alone a Qualified Bid) is Mr. Pulliam, an insider who is intimately familiar with the Debtors' operations and structure, the management of the clinics, and the current on-site management of clinic operations under my auspice. These clinics have limited assets, and, in view of the circumstances of these Chapter 11 Cases it is simply unsurprising me that despite multiple marketing efforts including direct outreach to all parties who had formerly expressed an interested in purchasing some of the 363 Assets, that ultimately the only Qualified Bid I received is that of an insider.

38. In my business judgment, a Sale of the 363 Assets to Stalking Horse Bidder Justin Pulliam is in the best interests of the Debtors, their estates, and all creditors.

39. No other bids were received for the 363 Assets. No other Qualified Bids were received for the 363 Assets.

40. In the absence of this Court approving the Sale to Justin Pulliam, the Debtors' clinics will close on or before October 24, 2025.

I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

DATED this 20th day of October, 2025.

/s/ Michael W. Carmel
MICHAEL W. CARMEL
*Chapter 11 Trustee*

Garman Turner Gordon
7251 Amigo Street, Ste. 210
Las Vegas, Nevada 89119
(725) 777-3000