# EXHIBIT 62

EXHIBIT 62

SGRO | ROGER
ATTORNEYS AT LAW

LAS VEGAS | RENO | MILAN

September 14, 2026

<u>**VIA Certified Mail & Electronic Mail**</u>
Gregory Garman, Esq.
Garman Turner Gordon
7251 Amigo Street Suite 210
Las Vegas, Nv 89119
www.gtg.legal
Phone: 725 777 3000
Fax: 725 777 3112
*Email:ggarman@gtg.legal*

**Re: In re NuMale Corporation, et al., Case No. 25-10341-nmc (Bankr. D. Nev.) — Demand for Withdrawal of Claims Asserted Against Quintairos, Prieto, Wood & Boyer, P.A.; Notice of Ethical, Fiduciary, and Statutory Deficiencies; Reservation of Rights Regarding the Barton Doctrine and Related Remedies**

Dear Mr. Garman:

Please be advised we have been retained to represents Quintairos, Prieto, Wood & Boyer, P.A. ("QPWB") relative to claims against you and/or the Trustee in connection with the above-referenced bankruptcy estate. Specifically, we have been retained to explore the integrity of a settlement accomplished within the rubric of said bankruptcy estate and the claims the Trustee has asserted, and threatens to assert, against QPWB arising out of QPWB's trial representation of NuMale [entity] ("Debtor") in the underlying New Mexico state-court medical malpractice action (the "Underlying Action"). We are not replacing Snell & Wilmer or Mr. Fugazzi. However, we ask that you include our office on all communications concerning these related matters. Further, please do not communicate directly with QPWB concerning the subject matter of this representation.

We write to place the Trustee and his counsel on formal notice of the deficiencies in the claims described below, to demand the immediate withdrawal of the demand served on QPWB, and to reserve QPWB's rights to pursue the remedies outlined herein. These remedies include relief under the Barton doctrine and a referral to the Office of the United States Trustee. We are also exploring the appearance of ethical improprieties that occurred in the underlying trial which likely contributed to the grossly disproportionate jury verdict which you seek to continue to collect on.

The exorbitant demand against QPWB is itself a central concern. I am unaware of any analysis completed that sought to crystalize QPWB's legally supportable, causally attributable exposure. It

appears the alleged punitive component of an underlying verdict has released parties whose conduct bears directly on the verdict's size. It also appears said actions were executed to impose coercive leverage rather than to obtain a recovery grounded in law, evidence, and the estate's actual interests. QPWB is evaluating which claims are available to them because of the assertion and pursuit of that demand, together with the settlement and claim-resolution structure described below. There also appears to have been a decision made to deliberately ignore numerous pieces of evidence which completely absolve QPWB from any liability. Nonetheless, as recently as yesterday, you continue to confirm that the baseless pursuit of QPWB will continue.

At a minimum, no monies should be distributed until the issues addressed herein are resolved. To the extent there have already been any distributions, we ask those be immediately returned to the bankruptcy estate until this matter is resolved. This includes monies that you and the Trustee benefitted from. This letter is not exhaustive of QPWB's substantive defenses to liability, which are addressed separately. It instead focuses on the conduct of the Trustee and his counsel in pursuing this claim.

We have also been made aware of, and reviewed, your correspondence dated September 10, 2026. That correspondence serves only to compound the concerns addressed herein.

**I. Factual Background**

As you and the Trustee are aware:

- Predecessor counsel represented the Debtor and the individual physician defendants through the pretrial phase of the Underlying Action and were replaced during discovery. QPWB was retained thereafter and served as trial counsel.

The Debtor's liability carrier was heavily involved in settlement discussions throughout the case and, by all indications, made its own independent decision not to settle within available limits in a timely matter. As referenced above, this fact alone absolves QPWB of any liability relative to the instant jury verdict. Throughout the course of their representation, the debtor was adamant about the case's lack of merit and wanted the case tried. During trial, likely due to nefarious and unethical conduct of the Plaintiff lawyers, all the debtor's representatives decided to leave the trial against the advice of counsel. Indeed, Plaintiffs' counsel used their absence in his arguments to the jury, and it was a significant factor in the size of the jury award. The jury returned a compensatory verdict of $37,005,149 and punitive damage verdict of $375,000,000. Despite the disproportionate punitive damage award, that verdict was never reduced to a final judgment. No post judgment motions were filed because before judgment was entered, the Debtor filed for Chapter 11 protection, and a trustee was appointed based on disarray within the company and findings regarding the unfitness of prior management. Each of these circumstances that predate, and are independent of, QPWB's role as trial

counsel. No post-trial motions were conducted and no other motion practice that we are aware of has ever been brought relative to apportionment of the claim you are seeking to pursue. In addition, we are not aware of how the $108 million dollar settlement was allocated between "settlement" of punitive v. compensatory damages.

- Following his appointment, you and the Trustee made the decision not to pursue an appeal, not to seek remittitur, and not to pursue mitigation or other available defenses that could have reduced the estate's stated exposure. Clearly, post-trial motions, particularly to seek remittitur, would have likely reduced the overall award. Said reduction would not have been in the best interests if you or the trustee. It was the carrier's initial decision not to settle, and it was the debtor's representative's decision to leave the trial. One of the debtors' representatives spoke directly to plaintiff's counsel without QPWB present. Each of these decisions were made by parties other than QPWB and were made after QPWB's role in the Underlying Action had concluded. Rather than pursue remittitur, appeal, or otherwise mitigate the estate's exposure, the Trustee and his counsel instead negotiated a settlement with the liability insurer for approximately $108,000,000 and obtained releases for the insurer, the Debtor's principals, and the individual physician-managers. Each of these parties had actual exposure under New Mexico's pure comparative fault regime for their own role in the size and finality of the verdict, leaving QPWB as the sole remaining target of a hyper-inflated claim divorced from any real damage assessment, much less QPWB's share in such damages. Instead, without disclosing the potential for conflict, the debtor and the Trustee orchestrated a scenario where issues were ignored, all the while trying to maximize the opportunity to wrongfully pursue QPWB.
- Dr. Asandra was, a key, if not primary, witness for the defense in the Sanchez litigation. The day before Dr. Asandra was supposed to testify, plaintiff's counsel manufactured a conflict by offering to drop Dr. Asandra as a defendant from the case in exchange for his agreement not to testify.
- The Trustee and his counsel cannot benefit by keeping an inflated, non-final verdict alive rather than reducing it. They cannot benefit by deciding to release every other potentially responsible party in exchange for a fixed recovery, and then pursue the remaining defendant, mistakenly perceived to have the deepest available insurance coverage on a contingency-fee basis.

**II. The Perceived Claim Against QPWB is Legally and Factually Deficient**

SGRO | ROGER
ATTORNEYS AT LAW

LAS VEGAS | RENO | MILAN

New Mexico follows a pure comparative fault regime. See *Scott v. Rizzo*, 634 P.2d 1234,1242 (N.M. 1981); NMSA 1978 § 41-3A-1. The releases described above extinguished claims against multiple parties with direct, independent exposure for the size of the verdict: the carrier, whose own settlement decisions are subject to scrutiny; and the physician-managers, whose refusal to settle and failure to appear for trial the record reflects contributed materially to the verdict amount. A claim that attempts to place the entirety of a $400,000,000 verdict on trial counsel, while releasing every party whose own conduct bears directly on the size and finality of that verdict, is inconsistent with New Mexico's comparative fault framework on its face.

Causation is likewise deficient. QPWB's role concluded with the verdict. The decisions not to appeal, not to seek remittitur, and not to pursue mitigation were made afterward, by the Trustee and his counsel, and are the proximate reason the verdict was never reduced. A trustee cannot decline to exercise available, ordinary loss-mitigation tools, tools squarely within the Trustee's own control, and then attribute the resulting exposure to trial counsel who had no role in, and no ability to affect, that post-verdict decision.

The Trustee likewise cannot convert the punitive component of the underlying verdict into QPWB's alleged compensatory exposure merely by demanding it. Any legal malpractice recovery must be confined to loss that is legally recoverable and proximately caused by QPWB's alleged conduct, rather than amounts attributable to the conduct of other parties, the carrier's decisions, post-verdict choices made after QPWB's representation ended, or a punitive award imposed in the underlying action. Although New Mexico permits punitive damages in a legal-malpractice action only upon proof of independently culpable conduct, such as malicious, intentional, fraudulent, or wanton conduct, the present demand identifies no supported basis to attribute the underlying punitive award to QPWB. *Rodriguez v. Horton*, 95 N.M. 356, 622 P.2d 261 (Ct. App. 1980). As of this writing, it is still unclear exactly what QPWB did that would give rise to any malpractice claim. In other words, did they fail to comply with discovery deadlines? Did they fail to notice an expert? Was any evidence precluded because of motion practice where the trial court found their conduct to be sanctionable? It appears the only assertion made thus far is the false equivalency narrative that ONLY because there was a large verdict, there MUST HAVE BEEN malpractice. That is clearly insufficient.

We are aware of authority, including cases addressing sanctions against trustees and their counsel for maintaining inflated or contested claims for improper leverage rather than pursuing available reduction, and disapproving of the use of estate litigation to generate contingency-fee recoveries rather than to maximize net value to creditors. *See*, *e.g.*, *In re Jones*, 356 B.R. 39, 45 (Bankr. D. Idaho 2005) (refusing to validate counsel's contingency fee arrangement and identifying as problematic counsel's actions while questioning "whether [c]ounsel was driven by his own interests rather than his clients' interests"); *In re Scoggins*, 142 B.R. 940, 945-46 (Bankr. D. Or. 1992) (upholding order

disgorging the trustee's attorney's fees where the attorney pursued meritless claims and a cost benefit analysis would have indicated that the only parties likely to receive any funds from the litigation was the trustee and trustee's attorney); *In re Barnes*, No. 12-65084-tmr7, 2013 Bankr. LEXIS 2876, *12-*19 (Bankr. D. Or. July 16, 2013) (denying the trustee's application to employe counsel who agreed to be paid on a contingency fee basis to pursue bad faith and legal malpractice claims and noting counsel had a personal interest in recovering fees). That authority is directly relevant to the posture of this claim.

The demand to QPWB is entirely grounded in baseless legal theories and poses serious conflicts for you and your client. You and the Trustee will definitely be witnesses is this litigation. The continued threats to law firm partners across the country rises to the level of unreasonable and vexatious litigation which warrants fee shifting, which we will pursue under 28 U.S.C. § 1927. *Franco v. Dow Chem. Co. (In re Girardi), 611 F.3d 1027, 1065 (2010)* citing *B.K.B. v. Maui Police Dep't*, 276 F3d 1091, 1107 (9th Cir. 2002)("[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct").

**III. The Trustee's Fiduciary and Statutory Duties**

A Chapter 11 trustee is a fiduciary to the estate and its creditors and is charged with maximizing the value of the estate, not with manufacturing the largest nominal claim against the most solvent available target. See 11 U.S.C. § 704(a)(1) (duties incorporated for chapter 11 trustees via § 1106(a)(1)); *Mosser v. Darrow*, 341 U.S. 267, 274, 71 S. Ct. 680, 683 (1951) (explaining "a trusteeship is serious business and is not to be undertaken lightly or so discharged," and recognizing that the most effective sanction against a trustee "is personal liability for the consequences of forbidden acts"). Where a trustee releases every party with direct, independent exposure for a verdict's size, the carrier that refused to timely settle and the debtors representatives actually leaving the trial, in exchange for a fixed sum, declines to pursue remittitur or appeal that would reduce the estate's stated exposure, and then pursues a contingency-fee claim against trial counsel with no comparable causal or culpability nexus, that pattern is directly relevant to whether the Trustee is exercising independent business judgment in the estate's interest, or is instead structuring recoveries to maximize contingency-fee return to himself and his counsel. It should be noted that the carrier's "settlement" has been calculated by you on a dollar-for-dollar basis relative to the alleged "balance" left to pursue against QPWB. The undersigned has never met a carrier who ever settled dollar for dollar.

SGRO | ROGER
ATTORNEYS AT LAW

LAS VEGAS | RENO | MILAN

We intend to investigate, through appropriate discovery and motion practice, the Trustee's and counsel's engagement and compensation agreements, all analyses (if any) of remittitur or appeal, all communications regarding the decision to release the carrier and the physician-managers, and all records reflecting other matters in which the Trustee and this counsel have employed a similar structure.

A bankruptcy trustee serves as the legal representative and fiduciary of the estate. *In re AFI Holdings, Inc.*, 530 F.3d 832, 844 (9th Cir. 2008). The Trustee therefore owed an obligation to conserve estate assets and maximize distributions to creditors. *In re Rigden*, 795 F.2d 727, 730 (9th Cir. 1986). The Trustee must hold no interest adverse to the estate, and an appearance of impropriety or potential conflict of interest may itself constitute grounds for removal. *In re AFI Holdings*, 530 F.3d at 845, 850. Trustees must not advance their self-interest in a manner that calls into question the disinterestedness of their administration. 7 Collier on Bankruptcy ¶ 1106.02 (16th ed. 2026).

QPWB's present understanding is that the "settlement" channeled $96.5 million of the $108.5 million paid by Beazley directly to Sanchez, while GTG received over $9.3 million and the Trustee personally received approximately $3.3 million, leaving unsecured creditors with only pennies on the dollar. QPWB further understands that the Trustee released the insurer from any obligation to pay the full judgment amount and assigned estate claims against other parties to the insurer, further diminishing the estate's recovery. Had the Trustee challenged the verdict and simultaneously pursued Beazley on the insurance claim, the likelihood is that all unsecured creditors would have been paid in full.

Under 11 U.S.C. §§ 1106(a)(1) and 704(a)(5), a Chapter 11 trustee must perform the incorporated duty to examine proofs of claim and object to the allowance of any improper claim if a purpose would be served. A trustee has not only the right but the duty to object to any claim not entitled to allowance against estate assets and to eliminate or modify claims to ensure equitable distribution to the proper creditors of the estate. 4 Collier on Bankruptcy ¶ 502.02 (16th ed. 2026). The duty to administer estate claims includes the duty to appear and prosecute, or defend against, causes of action on behalf of the estate that may benefit or adversely affect estate property. *In re Smart World Technologies, LLC*, 423 F.3d 166, 175 (2d Cir. 2005). That principle includes the obligation to object to improper claims. *In re International Yacht & Tennis, Inc.*, 922 F.2d 659, 661 (11th Cir. 1991).

The Trustee's own Rule 9019 motion reportedly acknowledged the estate's obligation to mitigate damages and seek to reduce the Jury Verdict as much as possible. Yet the only identified evidence of any appeal analysis is a single line in the Trustee's declaration that he became aware of the difficulty generally involved in overturning the Jury Verdict, with no substantive explanation. Beazley had agreed to pay for all post-judgment motions and appeals, eliminating the cost barrier that might otherwise have been offered to justify inaction. By stipulating to an inordinate claim rather than challenging it, the Trustee ensured that the claim remained artificially inflated to the detriment of every other unsecured creditor.

**IV. Fee Arrangement and Rule 2014 Disclosure Concerns**

Trustee's counsel compensation is subject to Bankruptcy Court approval and the reasonableness standards of 11 U.S.C. §§ 328 and 330, and counsel's retention is subject to the disclosure requirements of Fed. R. Bankr. P. 2014(a), which requires disclosure of all connections with the debtor, creditors, and other parties in interest, and of the terms of any proposed compensation arrangement, including contingency terms. At the hearing on counsel's contingent-fee retention, the Court expressed hesitation about authorizing compensation on a contingency basis. The Court granted the retention motion only after the Trustee reserved the right to contest counsel's entitlement to a contingent fee. The Trustee's presentation was not forthright for two independent reasons. First, notwithstanding that express reservation, the Trustee has never contested counsel's entitlement to the contingency fee. Second, the Trustee and counsel knew when the retention request was presented that the case was about to settle, eliminating the actual risk of nonpayment that ordinarily provides the economic justification for a contingent-fee arrangement. In these circumstances, the Court should be provided a complete explanation of the basis for the contingency arrangement, the timing and status of settlement negotiations when retention was sought, the Trustee's reservation of rights, and the Trustee's decision never to invoke that reservation. To the extent the contingency-fee terms governing pursuit of the QPWB claim, the allocation of the $108,000,000 insurer settlement, or any prior similar arrangement in other estates were not fully and accurately disclosed to and approved by this Court, that is an independent basis for relief, including disgorgement under § 328(c) and possible removal under § 324. QPWB's present understanding, subject to verification through the Rule 2004 examination and discovery described in Section VIII, is that the Trustee's and his counsel's connections, including any prior contingency-fee relationship between the Trustee and his counsel, and any comparable contingency-fee arrangements either has had with other counsel or other trustees, respectively, may not have been fully disclosed as Rule 2014(a) requires. This would independently support disgorgement, not only of compensation paid to the Trustee and his counsel in this case, but, to the extent the same non-disclosure or the same pattern described in Section I recurs, of compensation paid to the Trustee and his counsel in any other matter in which they have acted together on a contingency-fee basis.

Before the Court approved GTG's employment on May 22, 2025, GTG attorneys had already engaged in extensive settlement discussions with Beazley and Sanchez, beginning as early as April 14, 2025, with a Zoom call with Beazley's counsel. QPWB further understands that GTG had negotiated a term sheet and begun drafting the settlement agreement and a Chapter 11 plan before the Court's employment ruling.

None of that activity was disclosed to the Court in the GTG Employment Application or the supporting declarations. The application sought approval of a contingency-fee arrangement on the ground that the largest estate asset was litigation claims, which were by their nature speculative. But,

by the time the Court ruled, those claims allegedly were no longer speculative because a settlement term sheet was already in hand.

Attorneys who file employment applications have a continuing responsibility to disclose facts material to the application, even after it is filed. *In re Metropolitan Environmental, Inc.*, 293 B.R. 871, 887 (Bankr. N.D. Ohio 2003). The failure to update the Court was materially relevant to the contingency-fee decision and would have likely saved the estate millions of dollars in administrative expenses. Counsel for a trustee is also a fiduciary to the estate. *In re Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989) (trustees and attorneys for trustees are held to high fiduciary standards of conduct). Trustee's counsel owes a higher fiduciary duty to the estate than to the Trustee. *In re Delta Petroleum (P.R.), Ltd.*, 193 B.R. 99, 111 (D.P.R. 1996).

Those fiduciary obligations were not met if GTG concealed the full status of negotiations that directly affected the Court's evaluation of the fee structure. QPWB reserves the right to seek discovery into the timing, participants, substance, and disclosure of all settlement negotiations and to seek appropriate relief if the evidence confirms that the Court was not provided information material to its employment and compensation decisions.

QPWB raises these concerns mindful that undisclosed connections among the professionals administering a bankruptcy estate are not a theoretical harm. *In re Professional Fee Matters Concerning the Jackson Walker Law Firm,* No. 23-00645 (Bankr. S.D. Tex.), saw the Office of the United States Trustee pursue disgorgement of tens of millions of dollars in fees across dozens of bankruptcy cases arising from a connection among bankruptcy professionals that went undisclosed as the rules required, a matter that resolved through a $15,000,000 settlement announced in August 2026. QPWB does not suggest that the facts here are the same as those in that matter. The relevant point is the principle the U.S. Trustee and the courts applied: undisclosed connections among the professionals administering an estate compromise the integrity of the bankruptcy process, and where such nondisclosure recurs across matters, the appropriate response is a coordinated investigation and disgorgement reaching each affected estate, not case-by-case tolerance of the underlying conduct.

**V. The Barton Doctrine and QPWB's Reservation of Rights**

Pursuant to the holding in *Barton v. Barbour*, 104 U.S. 126 (1881), and its progeny, a party ordinarily must obtain leave of the appointing bankruptcy court before suing a trustee for acts taken within the scope of the trustee's official duties. QPWB does not concede that the conduct described above falls within that protection. Courts recognize that Barton does not shield a trustee for acts outside the scope of authority, for ultra vires conduct, or for conduct undertaken to benefit the trustee personally rather than the estate, and the pattern described in Sections I and III bears directly on that question. See,

e.g., *Kashani v. Fulton (In re Kashani)*, 190 B.R. 875, 884 (B.A.P. 9th Cir. 1995) (recognizing *Barton* only applies to suits against trustees for actions done within the scope of their official duties); *Muratore v. Darr*, 375 F.3d 140 (1st Cir. 2004).

**VI. Potential Professional Responsibility Violations**

We would like you to explain how you navigated your participation in this matter without violating the following list of ethical rules:

- Nev. RPC 1.5 and its counterparts — the reasonableness of contingency-fee arrangements entered by a fiduciary on behalf of an estate, and whether those arrangements were structured to benefit counsel and the Trustee rather than creditors;
- Nev. RPC 1.7/1.8 — conflicts of interest between the Trustee's/counsel's own contingency-fee interest and the estate's interest in maximizing net recovery through mitigation, remittitur, or appeal, and in pursuing the parties (the carrier, the physician-managers) with the most direct exposure;
- Nev. RPC 3.1 and 3.3 — assertion of claims and damages figures (here, a demand exponentially exceeding the actual verdict against trial counsel while releasing parties with direct, independent exposure for the verdict and where the defendants are also significantly responsible for the alleged damages) without a good-faith basis in law or fact, and candor in representations made to this Court regarding the basis for and reasonableness of the claim and the releases;

**VII. Potential Civil Conspiracy**

Such a claim generally requires: (1) an agreement between two or more persons; (2) to accomplish an unlawful objective, or a lawful objective by unlawful means (including breach of fiduciary duty for personal gain); (3) one or more overt acts in furtherance of the agreement; and (4) resulting damage. Preservation of the materials bearing on this claim is addressed in Section IX below.

**VIII. Document Preservation and Litigation Hold Notice**

QPWB intends to pursue, concurrently and without regard to any single track's independent outcome: (i) a motion for leave of this Court to proceed against the Trustee individually under the exceptions to the Barton doctrine described in Section V; (ii) a referral to and motion practice before the Office of the United States Trustee, including under Fed. R. Bankr. P. 2004 and 11 U.S.C. § 324; and (iii) referral to any other regulatory or law enforcement agency. Because QPWB intends to present these

matters together, on a coordinated basis, this section serves as formal notice that all documents, communications, and electronically stored information relevant to any of the foregoing must be preserved in their entirety, effective immediately.

The federal bankruptcy courts in Nevada follow the Nevada Rules of Professional Conduct, which "are largely identical to, the ABA Model Rules of Professional Conduct." *Dignity Health v. Seare (In re Seare*), 493 B.R. 158, 182-83 (Bankr. D. Nev. 2013). *See also McKenna v. Chesnoff*, No. 2:14-cv-01773-JAD-CWH, 2017 U.S. Dist. LEXIS 25499, *7 (D. Nev. Feb. 23, 2017) ("In the United States District Court for the District of Nevada, attorneys must abide by the Model Rules of Professional Conduct as adopted by the Supreme Court of Nevada.) (citing LR IA 11-7(a)).

This notice constitutes a litigation hold and demand for preservation directed to the Trustee, Trustee's counsel, and their respective firms, agents, and any third-party vendors or service providers holding responsive materials on their behalf. The duty to preserve extends, without limitation, to:

- All engagement letters, retention applications, compensation and fee agreements (including any contingency-fee terms), and all Rule 2014 disclosures made to this Court in connection with the Trustee's or his counsel's retention in this case;
- All analyses, drafts, notes, and communications concerning remittitur, appeal, or other post-verdict relief in the Underlying Action, and the decision not to pursue any such relief;
- All communications and negotiation records concerning the settlement with, and release of, the liability carrier, the Debtor's principals, and the physician-managers, including drafts of the releases and any analysis of their comparative-fault exposure;
- All records concerning the calculation, allocation, and proposed distribution of the $108,000,000 insurer settlement, including any portion allocated or anticipated to be allocated to the Trustee's or his counsel's compensation;
- All documents and communications concerning any other bankruptcy estate, matter, or case in which the Trustee and his counsel have acted together, to the extent bearing on the pattern described in Section I;
- All documents and communications reflecting any prior contingency-fee relationship between this Trustee and this counsel; any contingency-fee engagement this counsel has had with any other trustee; and any other contingency-fee litigation this Trustee has pursued with different counsel, the categories of discovery identified in Section VIII;

- All communications between the Trustee, his counsel, and any other party, including the liability carrier, the Debtor's principals, the physician-managers, and predecessor counsel, occurring prior to the filing of the Chapter 11 petition. QPWB does not concede that the Barton doctrine has any application to this category of material: Barton protects only acts taken within the scope of a trustee's official duties following appointment, and pre-petition communications and conduct necessarily fall outside that protection, whatever their relevance to the pattern, connections, and disclosure issues described in this letter;
- All calendars, billing records, time entries, and internal firm communications concerning the decision to pursue QPWB, including any communications with the U.S. Trustee's office, other creditors, or the Court regarding that decision.

This preservation demand applies regardless of any document retention or auto-deletion policy otherwise in effect, and QPWB reserves all rights and remedies, including spoliation-based relief, sanctions, and adverse-inference remedies, should any responsive material be lost, altered, or destroyed after the date of this letter.

**IX. Settlement Process, Lack of Notice, and Improper Allocation of Exposure**

QPWB did not receive adequate notice or a meaningful opportunity to be heard before material settlement, plan, claim-resolution, release, assignment, carve-out, or related decisions were negotiated, presented, approved, or implemented. QPWB was not afforded a meaningful opportunity to protect its interests before those decisions became final, including the opportunity to review and respond to pertinent motions, applications, notices, disclosure statements, proposed orders, settlement materials, hearing notices, and deadlines affecting its ability to object or participate. QPWB is unaware of any specific allocation made as to bifurcated responsibility of the verdict. QPWB is unaware as to what the $108,000,000 received was allocated for between compensatory and punitive damages. QPWB therefore demands identification of every person who determined that notice to QPWB was unnecessary, declined to provide notice, or evaluated QPWB's right to participate or be heard, together with the factual and legal basis for those determinations.

QPWB is investigating whether the settlement was negotiated, approved, or structured in a manner that unfairly or improperly shifted risk and asserted exposure to QPWB, while depriving QPWB of notice and a meaningful opportunity to protect its interests. That investigation includes the settlement process; the releases, carve-outs, assignments, and allocation decisions that were negotiated or implemented; the waiver, abandonment, or non-pursuit of post-trial and appellate rights; the treatment of claims or potential claims against the carrier and other participants; and the conduct, communications, and authority of the persons involved in those decisions. As you may have gleaned

by now, QPWB is investigating litigation related to the manifestation of the previously refined settlement agreement.

QPWB further requires identification of each person who participated in, recommended, authorized, approved, directed, negotiated, materially influenced, or implemented the settlement and related claim-resolution decisions. That identification should include the Trustee; Trustee's counsel; bankruptcy counsel; the Debtor's representatives; insurer or carrier representatives; post-verdict and appellate counsel; consultants; agents; any individual physician-manager or principal; and every other person who provided advice, exercised authority, or participated in deliberations concerning settlement, releases, assignments, carve-outs, post-trial relief, appellate rights, or claims maintained against QPWB. For each person, please identify the person's role, the authority relied on, the advice provided or received, and the communications and materials considered in making or influencing the decision.

QPWB also requires the complete factual and legal basis for releasing, protecting, compromising, resolving, or otherwise limiting claims involving the liability insurer or carrier. This includes the carrier's potential liability or exposure; all settlement demands, offers, coverage analyses, reservations of rights, and bad-faith analyses; the consideration given for any release or protection; the valuation and allocation of settlement proceeds; the comparative-fault and causation analysis applied to the carrier and other released parties; and the reasons those parties were released, protected, or resolved while claims against QPWB were retained, assigned, carved out, or otherwise left exposed. QPWB requests all analyses, communications, negotiation records, drafts, and approval materials bearing on those matters.

Under Bankruptcy Rule 9019, a court may approve only a settlement that is fair and equitable to creditors and in the best interest of the estate. The Trustee bears the burden of demonstrating that standard. *In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 420 (9th Cir. BAP 2003). The business-judgment rule does not extend to decisions that lack a business purpose, are tainted by a conflict of interest, are so egregious as to amount to a no-win decision or result from an obvious and prolonged failure to exercise oversight or supervision. *Joy v. North*, 692 F.2d 880, 886 (2d Cir. 1982). The District of Nevada applied those principles in the bankruptcy context in *Buchanan v. Henderson*, 131 B.R. 859, 868 (D. Nev. 1990).

Judge Cox relied on these same authorities in her written decision involving GTG, warning that the lack of disclosure of conflicts and adverse interests also may incur consequences, including, but not limited to, the complete loss of the business-judgment presumption. *In re MP Reorganization*, Case No. 22-14422-nmc, at 39 (Bankr. D. Nev. May 20, 2024). Taken together, these authorities establish that the Trustee cannot invoke business-judgment deference where the decision-making was tainted by undisclosed conflicts and apparent self-dealing. QPWB is evaluating whether the Trustee's conduct makes him ineligible for business-judgment-rule protections.

SGRO | ROGER
ATTORNEYS AT LAW

LAS VEGAS | RENO | MILAN

While courts have discretion to afford meaningful deference to a trustee's business judgment in evaluating a proposed Rule 9019 settlement, (see e.g. *Mickey Thompson*, 292 B.R. at 420, that judgement does not eliminate the Trustee's statutory obligations to examine and object to improper claims when doing so serves a purpose, to preserve and maximize estate value, or to administer the estate free from disqualifying conflicts. Plan-granted authority does not authorize conflicted decision-making, excuse material nondisclosure, eliminate fiduciary duties, or insulate a settlement from scrutiny where the operative facts support a good-faith question whether estate value was sacrificed to benefit the Trustee, GTG, or a favored creditor at the expense of unsecured creditors.

**X. Demand**

In addition to the preservation obligations set forth in Section IX, QPWB demands that the Trustee and his counsel, within fourteen (14) days of this letter:

- Withdraw any and all pending demands against QPWB;
- Produce the engagement letter, compensation agreement, and any contingency terms governing the Trustee's counsel's representation of the estate in this matter, together with any Rule 2014 disclosures made to the Court regarding same;
- Produce all analyses, communications, and records concerning the decision not to pursue remittitur or appeal of the underlying verdict, and the decision to release the carrier and the physician-managers;
- Provide a full accounting of the $108,000,000 insurer settlement, including proposed allocation of damages resolved, and distribution to creditors and proposed compensation to the Trustee and his counsel from that recovery;
- Produce all materials sufficient to identify and substantiate the allocation of the Beazley settlement proceeds, including the amounts paid to Sanchez, GTG, the Trustee, every other professional, and each creditor; the estate claims assigned to Beazley; the consideration for and scope of the insurer release; and the projected or actual dividend to each unsecured creditor;
- Produce all communications, calendars, meeting invitations, term sheets, draft settlement agreements, draft plans, and attorney work product memorializing settlement discussions among GTG, Beazley, Sanchez, the Trustee, or their representatives before May 22, 2025, together with all materials reflecting the disclosure or nondisclosure of those matters in connection with GTG's employment application and the requested contingency-fee arrangement;

- Produce all analyses, declarations, correspondence, and agreements concerning the availability of Beazley funding for post-judgment motions and appeals, the decision to forgo remittitur or appeal, and any decision to stipulate to or preserve the asserted punitive-damages claim amount;
- Identify any other bankruptcy estates in which the Trustee and/or his counsel have employed a comparable litigation and settlement structure, including any other matter in which this Trustee and this counsel have had a prior contingency-fee relationship with one another, any other trustee for whom this counsel has served on a contingency-fee basis, and any other contingency-fee litigation this Trustee has pursued with different counsel;
- Confirm the Trustee and his counsel's intention to voluntarily disgorge compensation received in this matter;
- Produce all pre-petition communications within the Trustee's or his counsel's possession, custody, or control between any of the Trustee, his counsel, the liability carrier, the Debtor's principals, the physician-managers, and predecessor counsel.

**X-A. Notice Regarding Settlement Proceeds and Supplemental Production**

The preservation obligations in Section IX also apply to materials held by or for the Debtor, counsel, agents, consultants, vendors, insurers, litigation funders, former counsel, monitoring counsel, appellate counsel, and all other persons or entities that participated in or communicated about these matters. They include emails, letters, text messages, instant messages, messaging-platform communications, voicemail, attachments, metadata, personal accounts or devices used for relevant communications, cloud-storage locations, document-management systems, and backup media. Immediately suspend auto-delete settings and all ordinary-course deletion, overwriting, alteration, recycling, or disposition of responsive information. Preserve ESI in native format where applicable, together with associated metadata. This preservation demand does not seek disclosure of privileged or protected information; any withheld responsive material must nonetheless be preserved in native form and identified in an appropriate privilege log when required. Within five (5) business days, please confirm in writing that a litigation hold has been implemented and that reasonable steps have been taken to preserve the foregoing materials.

QPWB requests that no settlement proceeds or other funds traceable to the settlement be disbursed, transferred, distributed, encumbered, or otherwise dissipated pending completion of QPWB's investigation and reasonable advance notice to QPWB of any proposed disposition. If any distribution is asserted to be necessary or authorized, provide written notice sufficiently in advance to permit QPWB to evaluate the proposed disposition and, if appropriate, seek relief from the Bankruptcy Court or another court of competent jurisdiction.

Within five (5) business days of this letter, please confirm in writing: (a) whether settlement proceeds remain in the Trustee's possession or control and their present location; (b) whether any disbursement is proposed or scheduled; (c) the amount, recipient, and anticipated date of each proposed distribution; and (d) the process by which QPWB may obtain documents and information necessary to evaluate how the settlement was reached, including why QPWB was left exposed and whether it received notice and an opportunity to be heard.

In addition to the categories stated in Section X, please produce all communications and materials reflecting QPWB's notice, participation, service, or opportunity to be heard, including service lists, disclosure statements, plans, motions, applications, notices, hearing materials, orders, proofs of service, and communications concerning whether notice was required or provided.

The requested preservation and production also expressly include communications, contacts, negotiations, or understandings involving Sanchez's counsel and Dr. Asandra, Dr. Feliciano, other NuMale-affiliated defendants, their representatives, or intermediaries relating to settlement, testimony, litigation strategy, the verdict, post-trial proceedings, appeal, or potential claims against QPWB. This request encompasses materials bearing on whether any such communications created, reflected, or were affected by a conflict; whether they were timely disclosed; and whether they influenced decisions that left QPWB exposed.

The ESI preservation demand specifically includes audio and video recordings, spreadsheets, presentations, databases, mobile-device data, collaboration-platform data, audit logs, e-discovery-vendor materials, cloud-service-provider materials, backup media, and data created after the date of this letter that concerns the matters identified here.

QPWB further reserves the right to seek appropriate relief concerning professional retention, disinterestedness, adverse interests, disclosures, compensation, fee sharing, and the return or disgorgement of fees under applicable law, including 11 U.S.C. §§ 327, 328, 329, and 330; and to evaluate and assert, if supported by the evidence and permitted by law, claims including aiding and abetting, breach of fiduciary duty, fraud-based claims, civil conspiracy, and other available remedies.

## XI. Reservation of Rights

Nothing in this letter waives, and QPWB expressly reserves, all rights, remedies, claims, and defenses available to it at law, in equity, in this Court, in any other court of competent jurisdiction (subject to any required Barton leave), before the Office of the United States Trustee, before any bar disciplinary authority, and before any law enforcement or regulatory body. QPWB's willingness to engage in dialogue regarding withdrawal of the claim should not be construed as a concession on any point addressed above or in QPWB's substantive defenses to the underlying claim, which are reserved and addressed separately.

SGRO | ROGER
ATTORNEYS AT LAW

LAS VEGAS | RENO | MILAN

You have an affirmative and continuing "duty to correct or withdraw litigation positions after it becomes obvious that they are meritless". *Franco v. Dow Chem. Co. (In re Girardi)*, 611 F.3d 1027, 1064 (2010)(citing *Edwards v. Gen. Motors Corp.*, 153 F.3d 242, 245 (5th Cir. 1998) (affirming § 1927 sanctions for the "willful continuation of a suit known to be meritless")).

We are available to discuss the foregoing. Absent a substantive response within the time specified, QPWB will proceed with the steps outlined in this letter, including seeking leave of the Bankruptcy Court to pursue the Trustee individually.

Respectfully,
**SGRO & ROGER**

*/s/ Anthony Sgro*
ANTHONY P. SGRO, ESQ.